Luke Busby
NV Bar# 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff Kirstin Blaise Lobato*

Elizabeth Wang*
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

David B. Owens*
LOEVY & LOEVY
100 S. King St., #100-748
Seattle, WA 98104
O: 312.243.5900
david@loevy.com

Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
megan@loevy.com
*Admitted *pro hac vice*
*Counsel for Plaintiff Kirstin Blaise Lobato*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KIRSTIN BLAISE LOBATO, | ) |
| | ) Case No. 2:19-cv-01273-RFB-EJY |
| Plaintiff, | ) |
| v. | ) Judge Richard F. Boulware, II |
| | ) |
| LAS VEGAS METROPOLITAN POLICE | ) Magistrate Judge Elayna J. Youchah |
| DEPARTMENT, NEVADA, THOMAS | ) |
| THOWSEN, and JAMES LAROCHELLE, | ) **PLAINTIFF'S RESPONSE TO** |
| | ) **DEFENDANTS' MOTION FOR PARTIAL** |
| Defendants. | ) **DISMISSAL** |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## INTRODUCTION

Plaintiff Kirstin Blaise Lobato was wrongfully imprisoned after Defendants framed her for a crime they knew she did not commit. Among other things, Defendants coerced her into making a false confession, fabricated evidence against her, and withheld exculpatory evidence. Plaintiff's conviction was ultimately vacated, but only after she spent sixteen years in prison. Plaintiff brings this suit to seek relief for the serisous injury she has suffered. Defendants have moved to dismiss portions of her complaint, arguing that several of her claims are untimely or insufficiently pleaded. Because Plaintiff brought this suit challenging her wrongful conviction within two years of her criminal proceedings being terminated in her favor and because she has alleged ample facts to support her claims, Defendants motion should be denied.

## STATEMENT OF FACTS[1]

At the age of 18, Plaintiff Kirstin Blaise Lobato was wrongfully convicted for the murder of Duran Bailey. ECF No. 1 ¶8. This is a crime of which she is entirely innocent. *Id.* ¶42.  When Duran Bailey was murdered in Las Vegas, Plaintiff was a three-hour drive away in her hometown of Panaca. *Id.* ¶¶30-32.

On the evening of July 8, 2001, Duran Bailey was beaten and stabbed to death during a violent attack near a trash dumpster by a Nevada State Bank on the west side of Las Vegas. *Id.* ¶¶40, 45. After he died, his attacker cut off his penis, cut his rectum, and covered his body with plastic wrap and trash. *Id.* ¶46. Defendant Officers were assigned to investigate the murder and visited the crime scene in the early morning hours of July 9, shortly after Bailey was murdered. *Id.* ¶¶65-66. As a result, they were aware of the nature, location, and details of the crime. *Id.*

A great deal of physical evidence from the crime scene was collected and tested, but not a shred of this evidence connected Plaintiff to Bailey's murder. *Id.* ¶¶48, 50. In fact, evidence affirmatively excluded Plaintiff as a suspect—the bloody shoe prints revealed that the killer had

---

[1] When considering a motion to dismiss, courts should take all facts as true and construe them in the light most favorable to the plaintiff. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018).

much larger feet than Plaintiff, tire tracks most likely left by the killer did not match Plaintiff's car, and fingerprints and DNA evidence left on Bailey's body and other places at the crime scene were not a match for Plaintiff. *Id.* ¶¶51-62.

Nevertheless, Defendants honed in on Plaintiff as their main and only suspect after learning third-hand from a Lincoln County probation officer that Plaintiff had told family and friends that she had defended herself when a man had tried to rape her in Las Vegas, and that in doing so had tried to cut the man in an effort to free herself and run away. *Id.* ¶¶68-70, 73, 89. Defendants immediately traveled to the home of Plaintiff's family in Panaca, already convinced that Plaintiff was the person responsible for Bailey's murder. *Id.* ¶71.

When they arrived, Plaintiff's parents were out and she was alone with her younger sister. *Id.* ¶75. To take advantage of Plaintiff's age and youthful inexperience, Defendants rushed to complete their interrogation before Plaintiff's parents could return home and stop them from mistreating their daughter. *Id.* ¶76. The Defendants told Plaintiff that they were homicide detectives, but did not tell her anything about the location or date of the homicide they were investigating. *Id.* ¶77. Instead, they immediately told Plaintiff that they knew she had recently been attacked and had defended herself, and that they knew she had been sexually abused multiple times as a child. *Id.* ¶78.  Plaintiff immediately became distressed and started crying at the mention of her traumatic history of abuse. *Id.* ¶79. Rather than stop their questioning, Defendants used Plaintiff's distress to their advantage, psychologically manipulating and coercing her into providing statements they could use to frame her for Bailey's murder.

As the interrogation progressed, it quickly became clear that Plaintiff was telling the Defendants *not* about Bailey's murder, but about a completely separate and independent event where she was physically assaulted by a man who tried to rape her. *Id.* ¶82. There were numerous and obvious significant differences between the incident described by Plaintiff and the murder of Duran Bailey. Among other things, Plaintiff told the Defendants:

- She was attacked "over a month ago"; Bailey had been murdered less than two weeks prior. *Id.* ¶83.

- She was attacked at the Budget Suites on the east side of Las Vegas near a Sam's Town casino; Bailey was murdered on the west side of the city in the dumpster enclosure of the parking lot of the Nevada State Bank, and there was no Sam's Town casino in the area. *Id.* ¶¶40, 83, 87-88.
- Her attacker was very large; Bailey was 5'10" and just 130 pounds. *Id.* ¶¶43, 83.
- She was attacked in a parking lot near a fountain; there is no fountain near the scene of Bailey's murder. *Id.* ¶¶85-86.
- Plaintiff defended herself by trying to cut her attacker, although she was not sure if she was successful, and her attacker was alive and crying when she fled; Bailey was badly beaten (with a cracked skull, missing teeth, numerous stab or slash wounds, and bruises), and after his death his penis was cut off, his rectum was cut, and he was covered with trash and plastic wrap. *Id.* ¶¶45-46, 89.

Because it was clear that Plaintiff was not describing Bailey's murder and in fact knew no information about that murder, the Defendants decided to obtain a statement they could use to frame her by any means possible. *Id.* ¶¶91-93. They asked her leading questions, suggested facts of Bailey's murder to her, and recorded only parts of the interrogation, all in an effort to create the impression that she was confessing to a murder she did not actually commit. *Id.* ¶¶92, 94-95. And when Defendants prepared their police reports, they wrote that Plaintiff confessed to and described the details of Bailey's murder, even though they knew she did nothing of the kind. *Id.*

Defendants did not stop there. They next interviewed witnesses in an attempt to bolster the involuntary (and false) "confession" that they had obtained from Plaintiff. Many of the witnesses informed Defendants that Plaintiff had told them about her attack well before Bailey's murder; they also told Defendants that they saw Plaintiff in Panaca on the day that Bailey was murdered, as well as the days preceding and following his death. *Id.* ¶¶105, 109. Faced with this clear evidence of Plaintiff's innocence, Defendants decided to fabricate the witness statements. To do so, Defendants fed the witnesses information they wanted them to say, pressured them to change their statements, and recorded only strategic portions of their statements so as to exclude information that clearly exonerated Plaintiff. *Id.* ¶¶105-08. And when additional witnesses came forward with critical alibi evidence, Defendants intentionally ignored this information. *Id.* ¶108.

Defendants arrested Plaintiff based on her involuntary "confession." *Id.* ¶99. Criminal proceedings were then initiated against Plaintiff based solely on her purported confession and the

fabricated statements and reports discussed above. *Id.* ¶102. This same false evidence was used to convict Plaintiff at two different criminal trials, where prosecutors argued that her statement to Defendants was a confession to Bailey's murder. *Id.* ¶¶113-120.

Plaintiff's conviction was eventually vacated on post-conviction review, when expert evidence was presented narrowing the time of Bailey's death to a period when she had an uncontested alibi. *Id.* ¶121. She was finally released after spending sixteen years of her young-adult life in prison. *Id.* ¶124. As a result of their misconduct, Defendants took from Plaintiff irreplaceable life experiences and the opportunity to build a life of her choosing, a right enjoyed by all free people. *Id.* ¶125. Although she can never be made whole, she brings this action to seek relief for the serious injury she has suffered.

## ARGUMENT

### I.    Legal Standard

To state a claim upon which relief can be granted, a plaintiff's complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, the complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### II.    The Court Should Strike Exhibits C and D

As Defendants concede, ECF No. 24. at 6-7, courts are limited to considering the allegations in the complaint when deciding a motion to dismiss. *Magpiong v. Superdry Retail LLC*, 304 F. Supp.3d 983, 986 (D. Nev. 2018). In limited circumstances, courts may consider documents of which judicial notice is appropriate. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Those circumstances do not exist with regard to Exhibits C and D—court documents from Plaintiff's post-conviction proceedings—attached to Defendants' motion to dismiss. There is a dispute about the content of these documents, which Defendants concede means this Court should look to the complaint. ECF No. 24 at 7 n.2.[2] Accordingly, the exhibits should be stricken.

## III.    Plaintiff's Claims Are Timely

Plaintiff brings this action to recover for her wrongful conviction and sixteen years of imprisonment; her claims attack, directly, the validity of her prior conviction. Plaintiff could not have brought a § 1983 suit challenging the validity of her conviction while it remained extant. Instead, these claims accrued when all charges against Plaintiff were dismissed shortly after her conviction was vacated on December 19, 2017.

### A.    Plaintiff's Claims Accrued When Charges against Her Were Dismissed

"The accrual date of a § 1983 cause of action is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Generally, accrual occurs when a plaintiff has a complete cause of action. *Id.* In *Heck v. Humphrey*, the Supreme Court established a deferred-accrual rule for § 1983 claims that imply the invalidity of an outstanding criminal conviction:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. 477, 486-87 (1994). In other words, because a § 1983 damages claim that would necessarily impugn an outstanding conviction is incompatible with that conviction, it does not accrue until the conviction "has been invalidated." *Id.* at 490.

---

[2] Defendants rely on these exhibits to argue that Plaintiff's prosecution was not completed in a manner indicative of innocence. Plaintiff disagrees. Indeed, these exhibits are incomplete and misleadingly because Defendants have omitted large portions of the proceedings. These exhibits are therefore not properly considered on a motion to dismiss. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

This year, the Supreme Court reaffirmed and extended *Heck*, concluding that the favorable-termination requirement also applies to claims that imply the invalidity of ongoing criminal proceedings. *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019); *id.* at 2160 ("*Heck* explains why favorable termination is both relevant and required for a claim . . . that would impugn a conviction," and that same "rationale extends to an ongoing prosecution as well."). Under *McDonough*, where a claim challenging a state criminal proceeding or extant conviction is at issue, "[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck* will the statute of limitations begin to run." *Id.* at 2158 (citing *Heck*, 512 U.S. at 486-87).

Both *Heck* and *McDonough* make clear that, to determine whether the deferred accrual rule applies to a § 1983 claim, courts must look to the nature of the allegations underlying the claim; this is a fact-specific inquiry. *See Heck*, 512 U.S. at 487 (to determine whether deferred accrual applies, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence"); *accord. McDonough*, 139 S. Ct. at 2159-60 (requiring courts to look at the "nature" of the plaintiff's claim and suggesting that within one type of claim (i.e., a "fabricated evidence claim"), there may be examples where the deferred-accrual rule applies and examples where it does not); *Muhammad v. Close*, 540 U.S. 749, 752-54 (2004) (per curiam) (concluding that it is a mistake to apply *Heck* "categorically" to certain types of claims, and analyzing the plaintiff's claims to determine whether they challenged his conviction or underlying sentence).

### 1.    Plaintiff's Involuntary Confession

In Count I, Plaintiff alleges Defendants violated her Fifth and Fourteenth Amendment rights when they coerced a false confession and fabricated her confession. This coerced "confession" was then used in the criminal proceedings against Plaintiff, ultimately leading to her wrongful conviction and sixteen years of imprisonment. There can be no question that success on this claim is incompatible with Plaintiff's conviction. Therefore, this Claim did not, and could not have, accrued until after that conviction was vacated and charges against Plaintiff

were dropped. In short, the deferred-accrual rule applies to Plaintiff's involuntary-confession claim, which was not cognizable prior to favorable termination of her criminal proceedings. *See Trimble v. City of Santa Rosa*, 49 F.3d 583, 585 (9th Cir. 1995); *Johnson v. Winstead*, 900 F.3d 428, 439 (7th Cir. 2018) (same); *Hamilton v. Lyons*, 74 F.3d 99, 103 (5th Cir. 1996) (same); *Scheib v. Grand Rapids Sheriff's Dep't*, 25 F. App'x 276, 277 (6th Cir. 2001) (same).

As the Court noted in *McDonough*, "[t]his conclusion follows . . . from the rule of the most natural common-law analogy," *id.* at 2155, which instructs that accrual rules for § 1983 claims should be determined by considering "common-law principles governing analogous torts." 139 S. Ct. at 2156 (citing *Wallace*, 549 U.S. at 388). Just as in *McDonough*, the most analogous common law tort here is malicious prosecution. *Id.* "The essentials" of the two claims are "similar." *Id.* Like common law malicious prosecution, Plaintiff's "claim requires [her] to show that the criminal proceedings against her—and consequent deprivations of [her] liberty—were caused by [Defendant's] malfeasance in [coercing her confession]. At bottom, both claims challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'" *See id.* (quoting *Heck*, 512 U.S. at 484); *Heck*, at 484 (noting that where a claim seeks damages for confinement imposed pursuant to legal process, it is most analogous to the common-law cause of action for malicious prosecution, rather than other common-law torts like false imprisonment). Tellingly, Defendants do not propose any alternative common-law analogy.

Defendants instead cite the elements of Plaintiff's claims to contend that Plaintiff's Fifth Amendment claim accrued when her confession was actually used at Plaintiff's second trial, and her substantive due process claim accrued "immediately upon questioning." ECF No. 24 at 11.[3] Defendants' theory would require Plaintiff to have brought her § 1983 suit in the midst of her criminal or post-conviction proceedings—a result that *Heck* and *McDonough* were meant to

---

[3] Defendants do not challenge the timeliness or sufficiency of Plaintiff's Fourteenth Amendment procedural due process claim based on their fabrication of her purported confession. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076-80 (9th Cir. 2001) (discussing a fabrication claim based on interrogations conducted by the defendant officers and statements obtained from those interrogations).

completely forbid and that conflicts directly with the rationale behind deferred accrual, which has its basis in comity and avoiding conflicting parallel litigation between state and federal courts. *See McDonough*, 139 S.Ct. at 2155-57 (reaffirming *Heck*'s discussion of the practical considerations supporting the deferred accrual rule).  That should end the matter altogether.

It bears mention, however, that the authorities cited by Defendants are inapposite. First, Defendants point to *Hall v. City of Los Angeles*, which uncontroversially held the Fifth Amendment is not implicated until a coerced confession is "used" in criminal proceedings—a proposition the Ninth Circuit had already reached years before. 697 F.3d 1059, 1069 (9th Cir. 2012); *see Stoot v. City of Everett,* 582 F.3d 910, 927 (9th Cir. 2009). *Hall* did not address accrual or any statute-of-limitations issues. In fact, the case actually undermines Defendants' positions because the Ninth Circuit remanded the case to the district court to allow the plaintiff to go forward with a Fifth Amendment involuntary confession claim, even though he did not bring his lawsuit until over nineteen years after he was convicted based, in part, on his involuntary confession. 697 F.3d. at 1066. Likewise, Defendants' quotation of *Rosales-Martinez v. Palmer* contradicts their position—the Court concluded that *Heck* applied to the plaintiff's claims because "were [he] to recover a judgment in his civil case, it would mean that his conviction was invalid." 753 F.3d 890, 896 (9th Cir. 2014). The same is true here.

The remaining cases cited by Defendants in support of their earlier accrual points are similarly unhelpful to them. *Crowe v. County of San Diego*, 608 F.3d 406, 427-30 (9th Cir. 2010), says nothing about the accrual of confession claims, and neither does *Doody v. Schriro*, 548 F.3d 847, 858 (9th Cir. 2008).  By relying on these cases, Defendants appear to conflate two distinct events: when an injury occurs and when a claim for that injury accrues. But "[t]he Court has never suggested that the date on which a constitutional injury first occurs is the only date from which a limitations period may run." *McDonough*, 139 S. Ct. at 2160. To the contrary,

*McDonough* made clear that claims impugning ongoing criminal proceedings or extant convictions are not cognizable until the criminal proceedings have terminated. *Id.*[4]

### 2.    Plaintiff's Prosecution without Probable Cause

In Count III, Plaintiff alleges that Defendants caused her pretrial detention without probable cause, in violation of her Fourth Amendment rights. The Supreme Court in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), recently clarified the scope of such a claim. As the Court explained, the Fourth Amendment right to be free from detention absent probable cause is implicated both *before and after* the onset of criminal proceedings. *Id.* In other words, a Fourth Amendment violation has occurred "when the police hold someone without any reason before the formal onset of a criminal proceeding," but also "when a form of legal process resulted in a pretrial detention unsupported by probable cause." *Id.* at 918-919. The Court therefore concluded that the plaintiff, Manuel, had alleged a Fourth Amendment claim for his pretrial detention following a judge's determination of probable cause that was based on fabricated evidence provided by the defendant officers. *Id.* at 915, 919-920. The Court declined to consider the question of when Manuel's Fourth Amendment claim accrued, however, leaving the question to be considered in the first instance by the lower court on remand. *Id.* at 922.

Although the Supreme Court did not answer the accrual question in *Manuel*, it did less than a year later in *McDonough*: A claim that necessarily challenges ongoing criminal proceedings does not accrue until the criminal proceedings are resolved conclusively in the defendant's favor. 139 S. Ct. at 2158-59. As discussed above, *McDonough*'s rule requires courts to look to the nature of the allegations made, not just to the label assigned to the claim. *Id.*

Because Plaintiff's Fourth Amendment claim challenges her pretrial detention pursuant to legal process that was tainted by Defendants' fabricated evidence, her claim necessarily impugns

---

[4] *Bradford v. Scherschlight*, 803 F.3d 382, 386 (9th Cir. 2015), which Defendants rely on, states that "*Heck* applies only when there is an extant conviction and is not implicated merely by the pendency of charges." But this principle—and the portions of *Bradford* that rely on it—has been overruled by *McDonough*, which held that *Heck* extends to claims challenging ongoing criminal proceedings. 139 S. Ct. at 2158-60.

the validity of her criminal proceedings and did not accrue until favorable termination—

dismissal of all charges against her. As above, the most analogous common-law tort concerning

wrongful detention after the legal process has commenced is malicious prosecution. *See*

*McDonough*, 139 S. Ct. at 2159; *Wallace*, 549 U.S. at 390.[5]

Defendants nonetheless argue based on the Supreme Court's decision in *Wallace v. Kato*

that all Fourth Amendment claims "accrue on the date of the injury, that is, the day by which the

plaintiff was 'detained pursuant to the legal process' or subjected to an unreasonable search or

seizure." ECF No. 24 at 12 (quoting *Wallace*, 549 U.S. at 397). This is both an incorrect reading

of *Wallace* and a direct contravention of *McDonough*.

In *Wallace*, the Court addressed the point of accrual for a false arrest claim challenging

an unlawful arrest in the absence of any legal process. 549 U.S. at 388-89. This claim was most

analogous to the common law tort of false imprisonment because it concerned "detention *without*

*legal process*." *Id.* at 389 (emphasis in original). And because the claim challenged a false arrest

without any knowledge of whether criminal proceedings would follow, the claim could not

possibly impugn the validity of any such hypothetical proceedings. *Id.* at 393. The Court

therefore concluded that *Heck*'s deferred accrual rule did not apply to Fourth Amendment claims

for false arrest in the absence of legal process. *Id.* at 393-94.

By contrast, a claim challenging detention *following* the issuance of legal process will

necessarily call into question those proceedings and, therefore, must be analogized to malicious

prosecution for purposes of setting the accrual date. *McDonough* confirms the limited scope of

*Wallace*: "A false-arrest claim, *Wallace* explained, has a life independent of an ongoing trial or

putative conviction—it attacks the arrest only to the extent it was without legal process, even if

legal process later commences. . . . By contrast, a claim [that] centers on evidence used to secure

an indictment . . . directly challenges—and thus necessarily threatens to impugn—the

prosecution itself." 139 S. Ct. at 2159. While the former will accrue with the initiation of legal

---

[5] As with Plaintiff's confession-related claims, Defendants fail to propose an alternative common-law analogy.

process, the latter will not accrue until criminal proceedings have terminated in the criminal defendant's favor. *Id.* at 2159-60.

Moreover, Defendants' accrual date would implicate all the practical concerns discussed in *McDonough* as supporting the imposition of a favorable termination requirement on all claims challenging criminal proceedings. *Id.* at 2155, 2157. If Plaintiff were required to raise her involuntary confession claims when they were used against her at trial, this would raise concerns of "parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* In contrast, a rule that this claim did not accrue until termination of criminal proceedings in her favor "avoids allowing collateral attacks on criminal judgments through civil litigation." *Id.* It further promotes fundamental principles of finality and comity, and reduces friction between federal and state courts. *Id.*

### 3.     Plaintiff's Federal Claims Are Timely

Because Plaintiff's involuntary-interrogation and detention-without-probable-cause claims would necessarily have impugned both her criminal proceedings and her conviction, under *Heck* and *McDonough* they did not accrue until her conviction was vacated and all charges against her were dismissed in December 2017. ECF No. 1 ¶¶121-23. *See Bradford*, 803 F.3d at 388-89 (concluding that where *Heck*'s deferred accrual rule applies, a claim does "not accrue until the charges [a]re fully and finally resolved" such that they "could no longer be brought again him" or "revived"). Plaintiff filed this complaint on July 23, 2019, and therefore her claims were brought well within the two year statute of limitations for § 1983 claims filed in Nevada. *See McIntyre v. Bayer*, 339 F.3d 1097, 1099 (9th Cir. 2003).

### B.     Plaintiff's State Law Claims Are Also Timely

Because Plaintiff's state law abuse-of-process and IIED claims, like her federal claims, would necessarily have implied the invalidity of her conviction while it was still outstanding, those claims did not accrue until her conviction was vacated and all charges were dismissed.

Defendants correctly concede that Nevada looks to *Heck* for determining accrual of claims like Plaintiff's. ECF No. 24 at 10 & n.4. *See Morgano v. Smith*, 879 P.3d 735, 737-38

(Nev. 1994) (relying on *Heck* and holding that a legal malpractice claim against a criminal defense attorney is not cognizable until the criminal defendant/civil plaintiff has obtained appellate or post-conviction relief); *Banks v. Clark City*, 2010 WL 1416877, at *5 (D. Nev. Apr. 2, 2010) (applying *Heck* to state law claims, including an IIED claim, predicated on an alleged wrongful conviction because "pursuing such claims would necessarily imply the invalidity of Plaintiff's [extant] conviction"); *Bacon v. Laswell*, 238 P.3d 794 & n.3, 2008 WL 6124708, at *1 & n.3 (Nev. 2008) (unpublished) (quoting *Heck* and holding that "because the allegations in [the] complaint necessarily imply the invalidity of [the plaintiff's] conviction, he must first demonstrate that he has obtained appellate or post-conviction relief from his conviction or sentence, or otherwise established innocence of the charges").

Plaintiff's abuse-of-process and IIED claims necessarily implied the invalidity of her criminal proceedings and conviction. ECF No. 1 ¶¶179-80, 184-85 (seeking relief based on Defendants actions taken with the intent to frame her for murder, which caused her severe distress). These claims did not accrue until the criminal proceedings terminated in her favor.

## IV.    Plaintiff's Claims Are Adequately Pleaded

Defendants repeatedly argue that Plaintiff's claims should be dismissed because they fail to explain "how the alleged wrong-doing occurred." ECF No. 24 at 15-17. This argument misunderstands the pleading requirement. Plaintiff is not required to plead in her complaint any legal theories underlying her claims. *See Skinner v. Switzer*, 562 U.S. 521, 531 (2011) ("[A] complaint need not pin plaintiff's claim for relief to a precise legal theory"); *Pac. Coast Fed'n of Fisherman's Assoc. v. Glaser*, No. 17-17130, 2019 WL 4230097, at *6 (9th Sept. 6, 2019) ("A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case." (quoting *Am. Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781, 786 (9th Cir. 1982))); *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir.

2008) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories." (emphasis in original)).[6]

Defendants further contend that Plaintiff has not given them "fair notice" of her claims. Such an argument—which itself is so cursory as to not warrant a response—is belied by the extensive factual detail in the complaint.[7]

## A.    Involuntary Confession

For example, Defendants claim that the complaint does not actually explain how Defendants overbore Plaintiff's will. ECF No. 24 at 8. Not so.

Whether a confession is involuntary is determined by examining "the totality of all the surrounding circumstances." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). This includes "both the characteristics of the accused and the details of the interrogation." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  The "voluntariness inquiry 'is not limited to instances in which the claim is that the police conduct was "inherently coercive,"' but 'applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will.'" *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1993)).

Here, Plaintiff has alleged numerous factors which, together, show that Defendants used psychologically coercive techniques to secure a false confession from a teenager. Plaintiff—an

---

[6]Defendants concede that Plaintiff has pleaded an actionable procedural due process claim under the Fourteenth Amendment. ECF No. 24 at 22. To the extent that Defendants argue that any "sub-claims" should be dismissed, *id.* at 17-18, they appear to be asking the Court to order that Plaintiff may not prevail using certain theories. This is improper—Plaintiff is not required to plead her legal theories in her complaint.

[7] Defendants take issue with Plaintiff pleading various facts "on information and belief." *See* ECF No. 24 at 8. But the Ninth Circuit has concluded that this practice—especially in relation to facts that are within the possession and control of defendants—is proper. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1087 (9th Cir. 2014) (concluding that pleading claims on information and belief is a practical necessity); *accord.* Fed. R. Civ. P. 11(b) (noting that pleadings should be based on a "person's knowledge, information, and belief").

eighteen-year-old—was home alone with her younger sister when the adult male Defendants showed up to interrogate her about a murder she did not commit. ECF No. 1 ¶¶8, 13, 75. Recognizing the particular vulnerability that her age presented, the Defendants rushed to complete the interrogation before her parents arrived home. *Id.* ¶76; *see Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) ("Factors to be considered include . . . the defendant's maturity, education, physical condition, mental health, and age."). When they arrived, they were vague about the incident they were investigating, simply noting that they were homicide detectives. *Id.* ¶77. The Defendants then told Plaintiff that they knew she had been sexually abused multiple times as a child and that they knew she had recently been attacked again, using her traumatic history to psychologically manipulate her into giving a false confession. *Id.* ¶78; *see United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) ("A confession is involuntary if coerced . . . by psychological pressure."). This technique was clearly effective. Plaintiff became visibly distressed and started crying at the mention of her childhood abuse. *Id.* ¶79; *see United States v. Williams*, 435 F.3d 1148, 1153 n.5 (9th Cir. 2006) (to determine whether a confession is voluntary, courts should "assess the psychological impact on the accused" (quoting *Schneckloth*, 412 U.S. at 226)). Defendants ignored her distress and proceeded to question her. *Id.* ¶81.

Throughout the interrogation, it was clear to Defendants that Plaintiff was telling them about an attack and attempted rape that she suffered in May 2001—not the July 2001 murder of Duran Bailey. *Id.* ¶¶80-93. She simply had no knowledge of Bailey's murder because she had absolutely no connection to it. *Id.* As a result, the Defendants repeatedly asked her vague and leading questions designed to create the impression that Plaintiff was confessing to Bailey's murder. *Id.* ¶94. They also repeatedly suggested facts of the murder to her in an effort to get her to agree or otherwise repeat those facts back to them. *Id.* In these circumstances, Plaintiff's purported "confession" was clearly involuntary. *See Fikes v. Alabama*, 352 U.S. 191, 196 (1957) (leading and suggestive questioning supporting a finding that a confession was involuntary); *Spano v. New York*, 360 U.S. 315, 322 (1959) (same).

14

Defendants passing suggestion that these allegations do not provide them adequate notice is thus belied by the complaint and completely fails.

### B.    Failure to Intervene

Defendants also take issue with Plaintiff's failure-to-intervene claim as being too vague. Again, their cursory arguments are contradicted by the extensive complaint. It is well-established that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994)). Here, Plaintiff alleges that Defendants Thowsen and LaRochelle were assigned to investigate the murder of Duran Bailey, and each stood by while the other acted to frame Plaintiff for that murder, thereby violating her constitutional rights. ECF No. 1 ¶¶65, 161. For example, both of the Defendants were present and could have intervened in the coercive interrogation described above, or at each of the points when this coerced and false "confession" was used to institute baseless criminal proceedings against Plaintiff and to secure her wrongful conviction at trial. *Id.* ¶¶72-102, 117. Similarly, each of the Defendants could have intervened in the fabrication of witness statements and police reports, as well as the use of those reports and statements in Plaintiff's criminal proceedings. *Id.* ¶¶95, 103-110. These allegations are plainly sufficient to put the Defendants on notice, particularly given Plaintiff is not required to plead the theories underlying her claims, but only to provide a short and plain statement of those claims that is plausible on its face. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 570.

### C.    Civil Conspiracy and Intentional Infliction of Emotional Distress

Defendants make a cursory, two-sentence argument that Plaintiff's IIED and civil conspiracy claims are insufficiently pleaded because they "simply cite the elements from Nevada state case law" and "lack the necessary explanation as to *how* the Defendants' conduct purportedly satisfies the elements in question." ECF No. 24 at 16-17. First, this argument is so underdeveloped that any challenge to these claims has been waived. *See McClean v. State Farm Mut. Auto.  Ins. Co.*, 2013 WL 12218463, at *1 (D. Nev. Dec. 6, 2013) (rejecting the party's

15

argument because it was "undeveloped and unsubstantiated"); *Werbicky v. Green Tree Servicing, LLC*, 2014 WL 5470466, at *3 (D. Nev. Oct. 27, 2014) ("Bare assertions of a right to relief are not valid or sufficient."). Second, Defendants' vague argument misstates the law. *See Skinner*, 562 U.S. at 531 (plaintiff is not required to plead legal theories). And finally, as discussed above, Defendants argument ignores the extensive factual allegations in the record.

Plaintiff has pleaded plausible IIED and civil conspiracy claims against the Defendants. Plaintiff alleges that, among other things, Defendants Thowsen and LaRochelle engaged in extreme and outrageous conduct by coercing her confession and fabricating evidence against her, all while knowing she was innocent, and thereby caused her to be wrongfully convicted and spend sixteen years in prison for a crime she had absolutely no involvement in. ECF No. 1 ¶¶74-110, 184-88. *See Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1142 (D. Nev. 2014) ("[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community" and "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." (internal citations omitted)). She further alleges that Defendants Thowsen and LaRochelle agreed and worked together to frame Plaintiff for Duran Bailey's murder by taking the actions already discussed to coerce her into providing false statements, fabricating evidence against her, and withholding exculpatory evidence. ECF No. 1 ¶¶65-110, 189-94; *Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198-99 (Nev. 2014) (concluding that an actionable civil conspiracy claim arises when "two or more persons undertake some concerted action with the intent 'to accomplish an unlawful objective for the purpose of harming another,' and damage results," but that direct evidence of an agreement is not required (citation omitted)). These claims must proceed.

### D.    Malicious Prosecution

An individual is liable for malicious prosecution if he "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff" without probable cause and with malice. *LaMantia v. Redisi*, 38 P.3d 877, 879-80 (Nev. 2002).

"[M]alice may be inferred from proof of want of probable cause." *Bonamy v. Zenoff*, 362 P.2d 445, 446 (Nev. 1961). Under Nevada law, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated against a person without probable cause. *See Catrone v. 105 Casino Corp.*, 414 P.2d 106, 108 (Nev. 1966) (noting that a police officer is a proper defendant in a malicious prosecution case and "approv[ing] the rule that one who procures a third person to institute a malicious prosecution is liable in damages to the party injured to the same extent as if he had instituted the proceeding itself"); *Frank v. City of Henderson*, 2015 WL 5562582, at *4 (D. Nev. Sept. 21, 2015) (holding that plaintiffs sufficiently pleaded a malicious prosecution claim under Nevada law against a police officer who provided false statements to procure their prosecution without probable cause); *Aziz v. Eldorado Resorts, LLC*, 72 F. Supp. 3d 1143, 1152 (D. Nev. 2014) (similar).

Defendants argue that Plaintiff's allegations cannot support a finding that she was prosecuted absent probable cause. ECF No. 24 at 16, 19. In support, they cite to a federal law presumption that a prosecutor deciding to bring charges has exercised independent judgment regarding the existence of probable cause. *Id.* (citing *Newman v. City of Orange*, 457 F.3d 991, 993 (9th Cir. 2006)). Such a presumption does not apply here—and Defendants do not point to one in Nevada law. But, even assuming *arguendo* such a presumption was applicable, it has been adequately rebutted, given that Plaintiff alleges that Defendants fabricated evidence that was presented to the prosecutor. *See Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 1116 (9th Cir. 2018) ("Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence."); *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (same); ECF No. 1 ¶¶75-94, 95, 98-102.[8]

Defendants further argue that Plaintiff has not stated a claim because the complaint does not allege sufficient facts to show a favorable termination of her criminal case. ECF No. 24 at 19.

---

[8] Defendants also argue that there must have been probable cause to prosecute Plaintiff because she was bound over for trial by a Justice of the Peace and twice convicted by a jury. ECF No. 24 at 19. This again ignores the fact the evidence against her was fabricated by Defendants, undermining probable cause entirely. *See* ECF No. 1 ¶¶113, 119.

Not so. According to the complaint, Plaintiff's conviction was vacated on post-conviction review after she introduced scientific evidence narrowing the time of death of Duran Bailey to a period when she had an uncontested alibi. ECF No. 1 ¶121. Thereafter, the charges were dismissed. *Id.* ¶122. This is sufficient to demonstrate favorable termination. *See Abbott v. United Venture Capital, Inc.*, 718 F. Supp. 828, 834 (D. Nev. 1989) ("Abbott has satisfactorily alleged the favorable termination element merely by alleging that the underlying litigation was voluntarily dismissed."); *Boren v. Harrah's Entm't, Inc.*, 2010 WL 4181239, at *7 (D. Nev. Oct. 19, 2010) ("[A] plaintiff can survive a motion for summary judgment on a malicious prosecution claim by merely showing that the underlying litigation was voluntarily dismissed.").

Defendants have attached very limited excerpts of Plaintiff's post-conviction record to their motion to dismiss. ECF No. 24 at 33-38. As explained above, and as Defendants concede, because Plaintiff disputes the factual matters therein and the inferences from these incomplete records, they are beyond this Court's purview at the motion to dismiss phase. And, as explained above, Plaintiff's allegations are more than sufficient at this juncture.

### E.    Abuse of Process

Under Nevada law, an abuse of process claim requires "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *LaMantia*, 38 P.3d at 879. Plaintiff has sufficiently stated an abuse of process claim here where she alleges that Plaintiff's ulterior purpose was to frame her for the murder of Duran Bailey—despite knowing that she could not have committed the murder—and thereby wrongfully resolve the case. ECF No. 1 ¶¶179-83. And Defendants willfully engaged in the improper use of the legal process by, among other things, coercing a false confession from Plaintiff, fabricating police reports and witness statements against her, and providing this false evidence to prosecutors (as well as withholding exculpatory evidence) to be used against her at trial. *Id.* ¶¶75-102, 179-83; *see Woods v. City of Reno*, 2018 WL 493015, at *17-18 (D. Nev. Jan. 18, 2018) (denying a motion to dismiss an

abuse of process claim where plaintiff alleged that defendant—a law enforcement officer—fabricated evidence that was used against the plaintiff in her criminal proceedings).

Defendants argue that Plaintiff's abuse of process claim is insufficient because the Defendants were "not responsible for prosecuting the criminal case or otherwise using the judicial process." ECF No. 24 at 19. This appears to be an argument that Defendants cannot be liable for abuse of process because they are not prosecutors. This argument is without merit. *See Posadas v. City of Reno*, 851 P.2d 438, (Nev. 1993) (denying summary judgment on an abuse of process claim against, among others, the law enforcement officers responsible for the criminal investigation of the plaintiff); *LaMantia*, 38 P.3d at 888 (recognizing that a person may be liable for abuse of process if he "actively pressured or directed" another to improperly use the legal process); *Woods*, 2018 WL 493015, at *17-18 (similar). Nor do the two cases cited by Defendants support their contention. *See Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981) (addressing the federal presumption of prosecutorial independence in Fourth Amendment claims which, for the reasons discussed above, does not apply in this case); *Land Baron Inv. V. Bonnie Springs Family LP*, 356 P.3d 511, 519-20 (Nev. 2015) (concluding that abuse of process claims do not encompass abuse of *administrative proceedings* because the "utilized process must be judicial, as the tort protects integrity of the court").

## F.    Indemnification

Defendants argue that Plaintiff's claim for indemnification should be dismissed because it "does not specify the basis upon which indemnification applies." ECF No. 24 at 17. In other words, Defendants argue that Plaintiff's indemnification claim should be dismissed because she does not provide an explanation of her legal theory underlying this claim of liability. But, again, Plaintiff is not required to provide any such explanation. *See Skinner*, 562 U.S. at 531.

Moreover, Count X states that, when committing the actions alleged in the complaint, Defendants Thowsen and LaRochelle were acting within the scope of their employment, and that Nevada law directs the LVMPD to pay any tort judgment for compensatory damages for which their employees are liable within the scope of their employment activities. ECF No. 1 ¶¶196-97.

19

In their response, Defendants acknowledge that Nevada law provides for such indemnification, even citing to a statute that provides for it. ECF No. 24 at 8 n.3 (citing to Nev. Rev. Stat. § 41.0349). As a result, Defendants' contention that Plaintiff's claim for indemnification (Count X) should be dismissed is without merit.

### V.    *Monell* Claim

Defendants claim Plaintiff has not asserted a *Monell* claim against them. The complaint tells a different story and their motion should be denied. The Las Vegas Metropolitan Police Department (LVMPD) may be liable for under § 1983 when its policies, practices, or customs were the moving force behind a constitutional violation. *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 646 (9th Cir. 2012). A "'policy' is 'a deliberate choice to follow a course of action . . . made from among various alternatives by the officials responsible for establishing final policy with respect to the subject matter in question.'" *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). In the absence of a formal policy or action by an official policymaker, municipal liability can be established based on a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).

Policies and customs can involve not only affirmative action, but refusals to act. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012); *Long*, 442 F.3d at 1185-86. A policy "of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143. In fact, the Ninth Circuit "consistently has found that a [municipality's] lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the [municipality] has other general policies in place." *Long*, 442 F.3d at 1189. A policy of inaction may also be based on a municipal entity's failure to supervise the practices of its officers, or to adequately train those officers. *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th

Cir. 2011); *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Here, Plaintiff has stated a claim for relief against the LVMPD under § 1983 based on three different *Monell* theories. First, Plaintiff has alleged a plausible claim that the LVMPD had a policy or custom that officers (1) feed non-public facts of a crime they are investigating to witnesses and suspects during interrogations, (2) selectively record—both using audio equipment and in writing—portions of a witness's or suspect's statement in order to create a statement favorable to the officers' theory of the case, and (3) use psychological pressure to obtain false statements during interrogations of witnesses or suspects. ECF No. 1 ¶¶75-110, 134, 136-37, 139. Second, Plaintiff has sufficiently pleaded a claim that the LVMPD did not have adequate safeguards, including adequate supervision, in place to ensure that its officers made accurate, rather than fabricated, reports and statements, and that its officers disclosed, rather than concealed, exculpatory evidence to prosecutors and criminal defendants. *Id.* ¶¶75-110, 135-39. And finally, Plaintiff has adequately alleged that the LVMPD failed to train its officers regarding the proper treatment of evidence and the constitutionality of using psychologically coercive tactics to secure statements during a criminal investigation. *Id.* ¶¶75-100, 135-39. And Plaintiff has alleged that these policies and omissions either counseled or condoned the Defendant Officers' framing of Plaintiff for the murder of Bailey, as discussed above, thereby proximately causing her injuries. *Id.* ¶¶140-42.

Defendants argue that Plaintiff's *Monell* claim should be dismissed because "isolated or sporadic events are not legally sufficient to establish improper custom or policy." ECF No. 24 at 23. This argument is without merit. Even in the absence of a formal policy, evidence of repeated incidents of unlawful conduct is not necessary to establish municipal liability. *See Castro v. City of Los Angeles*, 833 F.3d 1060, 1074 & n.7 (9th Cir. 2016) (rejecting as an inaccurate statement of the law the defendants' argument that a "plaintiff can establish neither a custom or practice, nor deliberate indifference, without providing prior incidents of harm"; among other things, a court may look to a municipality's prior statements and other regulations to find that it had

knowledge of a risk of harm); *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (concluding that the plaintiff "is correct that he need not show a series of similar acts to establish municipal liability, but has other routes available to him, including, among other things "showing that an official with final policymaking authority either delegated the authority to, or ratified the decision, of a subordinate"); *Gibson v. County of Washoe*, 290 F.3d 1175, 1195 (9th Cir. 2002), *overruled* on other grounds by *Castro*, 933 F.3d 1060 (concluding that a plaintiff may demonstrate a *Monell* claim for an omission in a municipality's policies or procedures where the need to act is obvious, even in the absence of examples of other misconduct);

Plaintiff has alleged sufficient facts to support her policy or practice claim here. She alleges that Defendants Thowsen and LaRochelle used psychologically coercive tactics not just during her interrogation, but repeatedly when interviewing witnesses as part of their efforts to frame Plaintiff. ECF No. 1 ¶¶75-110. Plaintiff further asserts that the Defendant Officers repeatedly fabricated witness statements through, among other things, selectively recording those statements. *Id.* ¶¶103-10. Such brazen and frequent behavior—especially in the absence of any discipline or corrective action by LVMPD—plausibly suggests that the Defendant Officers' conduct was part of an established policy or an expansive, widespread practice in the LVMPD. At the very least, such conduct supports that the LVMPD failed to supervise its officers and establish sufficient procedures and training regarding the interviewing of witnesses and suspects, as well as the recording of their statements.  *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147-48 (9th Cir. 2005) (denying summary judgment because repeated examples of unconstitutional conduct by defendant officers during a single protest, in the absence of any reprimand for that conduct, was sufficient to show an unconstitutional practice); *Larson v. Napier*, 700 F. App'x 609, 611 (9th Cir. 2017) (finding "the fact that the deputies followed the same procedures at the house next door shortly after," combined with statements by other officers and the sheriff that the deputies' unlawful conduct complied with department policy and standard procedures, sufficient to demonstrate a widespread practice); *Jackson*, 749 F.3d at 763-64 (holding the plaintiff stated a claim for relief under *Monell* where defendant officer "admitted that he routinely deprived

suspects of *Miranda* warnings as a 'ploy' to elicit confessions" and plaintiff alleged there was a failure to supervise, but there was no allegation of misconduct committed by other officers); *Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979 (N.D. Cal. 2017) (concluding that a policy or custom may be inferred if, following misconduct, no action was taken to reprimand or discharge those responsible).

And whether the LVMPD directed, condoned or simply failed to take action to prevent the actions of the Defendant Officers, the risks of its chosen course of conduct were obvious: Investigators must interview witnesses and prepare statements. They are also motivated to close cases. Investigations that produce evidence that is fabricated or the result of coercion will lead to wrongful convictions, just as Plaintiff suffered here. *See Castro*, 833 F.3d at 1076-77 (statements concerning a risk are sufficient to show that a city had actual or constructive notice that a particular omission was substantially certain to result in the violation of the constitutional rights of their citizens, satisfying the dictates of *Monell*); *Long*, 442 F.3d at 1190 ("When policymakers know that their medical staff members will encounter those with urgent medical health needs yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result." (quoting *Gibson*, 290 F.3d at 1196)); *Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1148 (E.D. Cal. 2009) (a "highly predictable" constitutional violation due to a "failure to equip law enforcement officers with specific tools to handle recurring situations," is a circumstance in which liability for failure to train may be imposed); *Tobias v. City of Los Angeles*, 2018 WL 6003559, at *10 (C.D. Cal. Sept. 17, 2018) (finding triable issue of fact regarding municipal liability where the LAPD failed to have policies or procedures instructing officers to treat juveniles with special care during interrogations).

To require Plaintiff to plead her *Monell* claim with greater specificity, as Defendants advocate, would be both contrary to the law of the circuit, and impractical to the point of imposing an unjust burden on plaintiffs. *See Estate of Alejandro Sanchez v. County of Stanislaus*, 2019 WL 1745868, at *5 (E.D. Cal. April 18, 2019) ("It is a rare plaintiff who will have access to the precise contours of a policy or custom prior [to] having engaged in discovery, and

requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork."). Accordingly, courts within the Ninth Circuit have found that a plaintiff need only identify the policy or custom at issue, explain how it is deficient, and reflect how it demonstrates deliberate indifference. *See, e.g.*, *Jarreau-Griffin v, City of Vallejo*, 2013 WL 6423379, at *5 (E.D. Cal. Dec. 9, 2013). Importantly, the plaintiff need not point to the policy or custom with a high level of specificity—the "details of the policy or custom . . . is a subject more properly left to development through discovery." *Estate of Alejandro*, 2019 WL 1745868, at *5 (identifying categories of alleged facts that may support a *Monell* claim); *accord. Estate of Osuna v. County of Stanislaus*, 392 F. Supp.3d 1162, 1174 (noting that plaintiff need not "articulate the intricacies of an alleged policy" at the pleading stage; generally it is sufficient if a complaint "pair general averments of a policy or custom with particular examples").

Because Plaintiff has satisfied this standard at the pleading stage, her *Monell* claim should not be dismissed. *See, e.g.*, *Guevara v. County of Los Angeles*, 2015 WL 224727, at *2-4 (concluding that a plaintiff sufficiently stated a *Monell* claim where she alleged that the County had a longstanding policy of removing children from their parents without exigent circumstances or a warrant, and that the County did not provide adequate training regarding parents' constitutional rights); *cf. Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (dismissing a *Monell* allegation as too conclusory where the plaintiff noted simply that "(1) 'Defendant CITY's policies and/or customs caused the specific violations of Plaintiff's constitutional rights at issue in this case[ ]' and (2) 'Defendant CITY's polices and/or customs were the moving force and/or affirmative link behind the violation of the Plaintiff's constitutional rights and injury, damage and/or harm caused thereby.'").[9]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[9] Plaintiff has sufficiently stated a *Monell* claim. Should the Court desire additional factual development, though not necessary at this juncture, Plaintiff should be given leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Respectfully submitted,

KIRSTIN BLAISE LOBATO


By: /s/ Megan Pierce
One of Plaintiff's Attorneys

Elizabeth Wang*                          Luke Busby
LOEVY & LOEVY                            NV Bar # 10319
2060 Broadway, Ste. 460                  316 California Ave., #82
Boulder, CO 80302                        Reno, NV 89509
O: 720.328.5642                          O: 775.453.0112
elizabethw@loevy.com                     luke@lukeandrewbusbyltd.com


Jon Loevy*                               David B. Owens*
Megan Pierce*                            LOEVY & LOEVY
LOEVY & LOEVY                            100 S. King St., # 100 -748
311 N. Aberdeen St., 3rd Fl.             Seattle, WA 98104
Chicago, IL 60607                        O: 312-243-5900
O: 312.243.5900                          david@loevy.com
megan@loevy.com
*Admitted *pro hac vice*

*Counsel for Plaintiff Kirstin Blaise Lobato*

## CERTIFICATE OF SERVICE

I, Megan Pierce, an attorney, hereby certify that on October 18, 2019, I filed the foregoing Plaintiff's Response to Defendants' Motion for Partial Dismissal via CM/ECF, which was electronically delivered to all counsel of record.

/s/ Megan Pierce
One of Plaintiff's Attorneys