**Marquis Aurbach Coffing**
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
*Attorneys for Defendants LVMPD, James LaRochelle and Thomas Thowsen*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| KIRSTIN BLAISE LOBATO, | CASE NO. 2:19-cv-01273-RFB-EJY |
| Plaintiff, | |
| vs. | |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, THOMAS THOWSEN, and JAMES LaROCHELLE, | |
| Defendants. | |

## LVMPD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Thomas Thowsen ("Det. Thowsen") and James LaRochelle ("Det. LaRochelle") (cumulatively "LVMPD Defendants"), by and through their attorneys of record, Marquis Aurbach Coffing, hereby file their Motion for Summary Judgment. This Motion is made and based upon the pleadings and papers on file herein, the attached Memorandum of Points & Authorities, and any oral argument allowed by counsel at the time of hearing.

*MARQUIS AURBACH COFFING*
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1

## <u>TABLE OF CONTENTS</u>

2   MEMORANDUM OF POINTS & AUTHORITIES ................................................................1

3   I.    INTRODUCTION .................................................................................................................1

4   II.   STATEMENT OF FACTS ....................................................................................................1

5         A.    THE MURDER OF DURAN BAILEY. ..................................................................1

6         B.    DETECTIVES       THOWSEN      AND       LAROCHELLE'S
                INVESTIGATION. ....................................................................................................3
7
                1.    Witness Interviews...........................................................................................3
8
                2.    Det. Thowsen's Additional Investigation. ...................................................12
9
          C.    PRELIMINARY HEARING. ..................................................................................13
10
          D.    LOBATO'S 2002 CRIMINAL TRIAL. .................................................................13
11
                1.    The State's Case-In-Chief..............................................................................13
12
                2.    Lobato's Case-In-Chief. ................................................................................22
13
                3.    State's Rebuttal Witnesses.............................................................................28
14
                4.    The Verdict. ...................................................................................................28
15
                5.    The Appeal of the 2002 Criminal Trial. .......................................................29
16
          E.    2006 CRIMINAL TRIAL........................................................................................29
17
                1.    State's Case-In-Chief.....................................................................................29
18
                2.    Lobato's Case-In-Chief. ................................................................................40
19
                3.    The Verdict. ...................................................................................................47
20
                4.    The Appeal.....................................................................................................47
21
          F.    THE EVIDENTIARY HEARING. .........................................................................48
22
          G.    AFTERMATH. ........................................................................................................49
23
                1.    The Dismissal of the Criminal Charges.........................................................49
24
                2.    Clark County Conviction Review Unit..........................................................49
25
26  III.  LEGAL STANDARDS........................................................................................................50

          A.    SUMMARY JUDGMENT STANDARDS. .............................................................50
27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

i

B.   42 U.S.C. §1983 STANDARDS........................................................................50

IV.  LEGAL ARGUMENT.............................................................................................51

A.   COUNT I: 42 U.S.C. §1983 INVOLUNTARY CONFESSION...................52

1.   Fifth and Fourteenth Amendment Coercive Interrogation Law. ........52

2.   Both Lobato and Her Experts Agree that the Detectives Did Not Coerce a False Statement....................................................................54

3.   Qualified Immunity. ..........................................................................56

B.   COUNT II: PLAINTIFF'S 42 U.S.C. §1983 DUE PROCESS/DENIAL OF FAIR TRIAL CLAIM .........................................................................57

1.   Relevant Fourteenth Amendment Law...............................................58

2.   Analysis of Lobato's Fabrication of Evidence Claim..........................59

3.   The Detectives Are Entitled to Qualified Immunity on the Fabrication of Evidence Claim. .........................................................64

C.   COUNT III: 42 U.S.C. §1983 CONTINUED DETENTION WITHOUT PROBABLE CAUSE CLAIM. ...................................................................65

1.   Relevant Fourth Amendment law.......................................................66

2.   Analysis of Lobato's Fourth Amendment Lack of Probable Cause Claim...........................................................................................66

D.   COUNT IV: 42 U.S.C. §1983 FAILURE TO INTERVENE.........................68

1.   Relevant Failure to Intervene Law. ...................................................68

2.   Analysis of Lobato's Failure to Intervene Claim. ..............................69

E.   COUNTS V AND IX: 42 U.S.C. §1983 CONSPIRACY CLAIM AND STATE LAW CONSPIRACY CLAIM..........................................................69

1.   Relevant Conspiracy Law...................................................................69

2.   Analysis of Lobato's Civil Conspiracy Claim.....................................70

F.   COUNT VI: STATE LAW MALICIOUS PROSECUTION. .......................72

1.   Relevant Malicious Prosecution Law. .................................................72

2.   Analysis of Lobato's Malicious Prosecution Claim. ..........................73

G.   COUNT VII: STATE LAW ABUSE OF PROCESS....................................73

1.   Relevant Abuse of Process Law. ........................................................73

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

ii

2.  Analysis of Lobato's Abuse of Process Claim. ...................................74

H.  COUNT VIII: STATE LAW IIED. ..................................................................75

1.  Relevant IIED Law. ..............................................................................75

2.  Analysis of Lobato's IIED Complaint. ................................................75

I.  COUNT X: INDEMNIFICATION ....................................................................75

V.  CONCLUSION ..........................................................................................................76

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

iii

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## TABLE OF AUTHORITIES

**Cases**

*Albright v. Oliver,*
   510 U.S. 266 (1994)..................................................................... 50, 51

*Awabdy v. City of Adalanto,*
   368 F.3d 1062 (9th Cir. 2004) ...................................................... 72

*Baker v. McCollan,*
   443 U.S. 137 (1979)..................................................................... 66

*Beck v. v. City of Upland,*
   527 F.3d 853 (9th Cir. 2008) ...................................................... 59, 63

*Borunda v. Richmond,*
   885 F.2d 1384 (9th Cir. 1989) .................................................... 51

*Bradford v. Davis,*
   923 F.3d 599 (9th Cir. 2019) ...................................................... 53

*Briscoe v. Madrid,*
   1:17-CV-0716-DAD-SKO, 2018 WL 4586251 (E.D. Cal. Sep. 21, 2018) ...................... 69

*Bull v. McCuskey,*
   615 P.2d 960 (Nev. 1980).............................................................. 74

*Caldwell v. City and Cty. of San Francisco,*
   889 F.3d 1105 (9th Cir. 2018) ............................................ 58, 59, 63, 65

*Cefalu v. Village of Elk Grove,*
   211 F.3d 416 (7th Cir. 2000) ...................................................... 70

*Celotex v. Catrett,*
   477 U.S. 317 (1986)..................................................................... 50

*Chavez v. Martinez,*
   538 U.S. 760 (2003)................................................................. 53, 57

*Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.,*
   971 P.2d 1251 (Nev. 1988)........................................................... 70

*Cooper v. Dupnik,*
   963 F.2d 1220 (9th Cir. 1992) ...................................................... 57

*Costanich v. Dep't. of Soc. & Health Servs.,*
   627 F.3d 1101 (9th Cir. 2010) ...................................................... 65

*Crowe v. Cty. of San Diego,*
   593 F.3d 841 (9th Cir. 2010) ...................................................... 53

MAC:14687-221 3890205_1

*Cunningham v. City of Wentachee,*
  345 F.3d 802 (9th Cir. 2003) ................................................................ 53

*Cunningham v. Gates,*
  229 F.3d 1271 (9th Cir. 2003) .............................................................. 68

*Cunningham v. Perez,*
  345 F.3d 802 (9th Cir. 2003) .......................................................... 56, 57

*Daniels v. Williams,*
  474 U.S. 327 (1986) ........................................................................... 64

*Dental v. City Salem,*
  No. 3:13-CV-01659-MO, 2015 WL 1524476 (D. Or. Apr. 2, 2015) .............. 69

*Devereaux v. Abbey,*
  263 F.3d 1070 (9th Cir. 2001) ................................................ 50, 58, 59

*Dutt v. Kremp,*
  844 P.2d 786 (Nev. 1992) ..................................................................... 74

*Fazaga v. FBI,*
  965 F.3d 1015 (9th Cir. 2020) .............................................................. 71

*Freeman v. Santa Ana,*
  68 F.3d 1180 (9th Cir. 1995) ............................................................... 66

*Galbraith v. Cnty. of Santa Clara,*
  307 F.3d 1119 (9th Cir. 2002) .............................................................. 72

*Gausvik v. Perez,*
  345 F.3d 813 (9th Cir. 2003) .......................................................... 58, 65

*Gillette v. Malheur Cty.,*
  2:14-CV-01542 -SU, 2016 WL 3180228 (D. Or. 2016) .......................... 69

*Gladden v. Holland,*
  366 F.2d 580 (9th Cir. 1966) ............................................................... 57

*Hall v. City of Los Angeles,*
  697 F.3d 1059 (9th Cir. 2012) .............................................................. 59

*Hand v. Gary,*
  838 F.2d 1420 (5th Cir. 1988) .............................................................. 73

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ........................................................................... 51

*Harris v. Roderick,*
  126 F.3d 1189 (9th Cir. 1997) .............................................................. 72

*Hasbrouck v. Yavapai Cty.,*
  2021 WL 321894 (D. Az. Feb. 1, 2021) ................................................. 71

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

v

*Haynes v. Washington*,
  373 U.S. 503 (1963).................................................................................. 53

*Heck v. Humphrey*,
  512 U.S. 477 (1994).................................................................................. 74

*Hofmann v. City and Cty. of San Francisco*,
  870 F.Supp.2d 799 (N.D. Cal. 2012).................................................. 71

*Howell v. Tanner*,
  650 F.2d 610 (5th Cir. 1981).................................................................. 66

*Hunter v. Bryant*,
  502 U.S. 224 (1991).................................................................................. 51

*Juan H. v. Allen*,
  408 F.3d 1262 (9th Cir. 2005) ........................................................ 53, 57

*Lacy v. County of Maricopa*,
  631 F.Supp.3d 1183 (D.Az. 2008)........................................................ 68

*Lal v. California*,
  746 F.3d 1112 (9th Cir. 2014) .............................................................. 51

*LaMantia v. Redisi*,
  118 Nev. 27, 38 P.3d 877 (2002) .................................................... 72, 74

*Lassiter v. City of Bremerton*,
  556 F.3d 1049 (9th Cir. 2009) .............................................................. 72

*Lolli v. Cty. of Orange*,
  351 F.3d 410 (9th Cir. 2003) ................................................................ 68

*Marschall v. City of Carson*,
  86 Nev. 107, 464 P.2d 494 (1970) ...................................................... 66

*Milke v. City of Phoenix*,
  No. CV-15-00462-PHX-ROS, 2016 WL 5339693 (D.Az. Jan. 8, 2016) .......................... 69

*Mirch v. Clifton*,
  2015 WL 6681231 (Nev. 2015) ............................................................ 74

*Murray v. Schriro*,
  745 F.3d 984 (9th Cir. 2014) ................................................................ 57

*Nev. Credit Rating Bureau, Inc. v. Williams*,
  88 Nev. 601, 503 P.2d 9 (1972)............................................................ 74

*Newman v. Cty. of Orange*,
  457 F.3d 991 (9th Cir. 2006) ................................................................ 63

*Ornelas v. United States*,
  517 U.S. 690 (1996).................................................................................. 66

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

vi

MAC:14687-221 3890205_1

*Posadas v. City of Reno,*
  851 P.2d 438 (Nev. 1993) ............................................................................ 74

*Rabkin v. Dean,*
  856 F.Supp. 543 (N.D. Cal. 1994) ............................................................... 71

*Rashid v. Albright,*
  818 F. Supp. 1354 (D. Nev. 1993) ............................................................... 73

*Rowland v. Lepire,* 313 P.2d 1332 (Nev. 1983) .............................................. 73

*Ruble v. Escola,*
  898 F.Supp.2d 956 (N.D. Ohio 2012) .......................................................... 71

*Scafidi v. Las Vegas Metro Police Dep't.,*
  966 F.3d 960 (9th Cir. 2020) ....................................................................... 67

*Shiels v. City of New York,*
  141 A.D.3d 421, 35 N.Y.S. 3d 330 (1st Dept. 2016) ................................... 74

*Sims v. City of Columbus,*
  2013 WL 3394001 (S.D. Ohio July 8, 2013) ............................................... 76

*Sloman v. Tadlock,*
  21 F.3d 1462 (9th Cir. 1994) ....................................................................... 63

*Smiddy v. Varney,*
  665 F.2d 261 (9th Cir. 1981) ............................................................ 1, 59, 63, 72

*Smith v. Almada,*
  640 F.3d 931 (9th Cir. 2011) ....................................................................... 72

*Smith v. Gomez,*
  550 F.3d 613 (7th Cir. 2008) ....................................................................... 70

*Star v. Rabello,*
  97 Nev. 124, 625 P.2d 90 (1981) ................................................................. 75

*Stoot v. City of Everett,*
  582 F.3d 910 (9th Cir. 2009) ................................................................. 53, 57

*Stuart v. City of Scottsdale,*
  2021 WL 977166 (D.Az. March 16, 2021) .................................................. 71

*Taylor v. Maddox,*
  366 F.3d 992 (9th Cir. 2004) ....................................................................... 56

*Terry v. Ohio,*
  392 U.S. 1 (1968).......................................................................................... 66

*Ting v. United States,*
  927 F.2d 1504 (9th Cir. 1991) ..................................................................... 70

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

vii

MAC:14687-221 3890205_1

*Tobias v. Arteaga,*
  996 F.3d 571 (9th Cir. 2021) ........................................................... 53

*Torres v. City of Madera,*
  648 F.3d 1119 (9th Cir. 2011) ......................................................... 51

*U.S. v. Koon,*
  34 F.3d 1416 (9th Cir. 1994) ........................................................... 68

U.S. v. Koon,
  518 U.S. 81 (1996) ............................................................................ 68

*United States v. Haswood,*
  350 F.3d 1024 (9th Cir. 2003) ......................................................... 53

*Von Williams v. City of Albany,*
  936 F.2d 1256 (11th Cir. 1991) ....................................................... 64

**Constitutional Provisions**

Fifth Amendment .................................................. 52, 53, 54, 56, 57

Fourteenth Amendment ................................ 51, 52, 53, 54, 56, 57, 58, 59

Fourth Amendment ...................................................... 66, 68, 69

**Rules**

Fed.R.Civ.P. 56 ......................................................................... 50

Fed.R.Civ.P. 56(a) ..................................................................... 50

Fed.R.Civ.P. 56(c)(1)(A) and (B) ............................................... 50

**Statutes**

42 U.S.C. §1983 ...................... 1, 50, 51, 52, 57, 64, 65, 68, 69, 71, 72, 73

42 U.S.C. §1985 ......................................................................... 71

42 U.S.C. §1985(3) ................................................................... 71

NRS 41.0349 ............................................................................. 76

**Treatises**

Prosser & Keaton, LAW OF TORTS (1984) .................................. 73, 74

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

viii

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.    INTRODUCTION**

This is a 42 U.S.C. §1983 wrongful conviction lawsuit.  Two separate juries found plaintiff, Kirsten Blaise Lobato ("Lobato"), guilty of murder with the use of deadly weapon and sexual penetration of a dead human body.  Years later, the Supreme Court of Nevada overturned Lobato's conviction finding that her criminal defense attorneys failed her by neglecting to retain expert entomologists who could challenge the State's experts regarding the time of death.  Despite the State's continuing belief in Lobato's guilt, it recognized that "by the time a third trial could proceed, [Lobato] would be immediately eligible for parole if convicted again."  Therefore, it dropped all criminal charges.  Lobato has never been declared innocent of the underlying crime.

Lobato is now suing Det. Thowsen and Det. LaRochelle who arrested her in 2001.  Lobato alleges that the Detectives framed her for the murder by coercing her confession, intimidating witnesses, fabricating evidence, and withholding evidence.  Lobato raised these same issues in both of her criminal trials and was soundly rejected by both the trial court and the Supreme Court of Nevada.  There is absolutely no evidence that the Detectives violated the Constitution or Nevada state law.  As the Ninth Circuit recognized over forty-years ago in these types of cases, "[a] police officer's lot already is unfortunate because it is he who often is the only actor in the chain of decisions leading to prosecution who is subject to section 1983 liability.  We need not make it more unfortunate by holding the officer liable for damage that is the result of the intervening fault of others in the chain."  *See Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981).  The Detectives (and LVMPD) now request summary judgment on all claims brought against them.

**II.    STATEMENT OF FACTS**

**A.    THE MURDER OF DURAN BAILEY.**

On the night of July 8, 2001, Richard Shott ("Shott") was dumpster diving in the area of 4240 West Flamingo Road, near a Nevada State Bank and across the street from the

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

Palms Hotel and Casino, when he saw the stomach of what he believed was a dead body behind the dumpster. (2006 Criminal Jury Trial Transcript, at IV:54-55, 56, **Exhibit A[1]**.) Shott immediately left and went to the Terrible Herbst gas station a block away. (*Id.* at IV:57.) Not knowing what to do, Shott eventually called 911 two hours later, at 10:36 p.m. (*Id.* at IV:58, 63, 64.)

Officer James Testa ("Testa"), a field training officer with LVMPD, was dispatched to the scene of a sick or injured person at approximately 10:45 p.m. (*Id.* at IV:108, 109.) He met with Shott, who showed him where the body was. (*Id.* at IV:110-11.) Testa moved the dumpster to access the body, and immediately saw several spots of blood, some shoe prints, and a foot sticking out. (*Id.* at IV:116-117.) Testa noticed blood so he backed away and called for medical assistance. The fire department confirmed that the person was dead. (*Id.* at IV:118-19.) Testa testified that although he indicated to the medical team where to step, there was low light, and it was possible that someone could have stepped in areas they shouldn't have. (*Id.* at IV:151.) Testa further testified that there was some saran or plastic wrap around part of the body. (*Id.* at IV:140, 152.) The victim was later identified as Duran Bailey ("Bailey"), a homeless man who lived in that area. (*Id.* at IV: 67, 75.) Bailey was 5'10" and weighed 133 pounds at time of death. (*Id.* at IV: 42.)

On July 9, 2001, an autopsy was performed on Bailey by Chief Medical Examiner Lary Simms, M.D. ("Dr. Simms"). The autopsy revealed that Bailey suffered: (1) multiple traumas to his face including stab wounds and abrasions/contusions; (2) trauma to his teeth (missing teeth); (3) left side skull fracture; (4) laceration to left side of his neck; (5) four stab wounds to his abdomen; (6) left hand lacerations (defensive wounds); (7) severed penis; (8) laceration to the anus; (9) laceration to the scrotum; and (10) back abrasions. Dr. Simms concluded the cause of death to be blunt trauma to the head and stab wound to the neck. He

---

[1] Relevant portions of Lobato's 2006 criminal trial transcript are attached as Exhibit A. The citation refers to the volume and the page. So, a reference to page 1 of Volume I of the 2006 criminal trial will be cited as "Ex. A at I:1."

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    also opined that the injuries to Bailey's penis and anus were postmortem.  Dr. Simms

2    labeled the death a "homicide."  (Autopsy Report of Dr. Simms, **Exhibit B.**)

3    **B.    DETECTIVES THOWSEN AND LAROCHELLE'S INVESTIGATION.**

4        Detectives Thowsen and LaRochelle were assigned to the Bailey homicide

5    investigation on July 8, 2001.  The Detectives traveled to the site of the investigation,

6    supervised the documenting of the scene, and interviewed witnesses.

7        **1.    Witness interviews.**

8            **a.    Richard Shott.**

9        The Detectives interviewed Shott and obtained a voluntary statement.  Det. Thowsen

10   examined Shott for evidence of blood and photographed him.  No evidence was found

11   implicating Shott in the crime.  (LVMPD Officer's Report at 13, **Exhibit C.**)

12           **b.    Diann Parker.**

13       After the Detectives cleared the scene and returned to the LVMPD homicide office,

14   Det. Thowsen received a phone call from a crime scene analyst informing him that a Diann

15   Parker ("Parker") had arrived at the crime scene and reported that she had previously been

16   assaulted by Bailey.  (Ex. C at 13.)

17       Detectives Thowsen and LaRochelle travelled to Parker's apartment that she shared

18   with her boyfriend, Steven King ("King"), that was located one block north of the homicide

19   scene.  Parker and King informed the Detectives that Bailey had sexually assaulted her the

20   prior week and that a sexual assault detective had interviewed her.  The Detectives obtained

21   consent to examine Parker and King's clothing and footwear.  No evidence was found

22   connecting either Parker or King to the homicide.  (*Id.* at 13-14.)

23       On July 17, 2001, the Detectives received Parker's report regarding the rape that

24   occurred on July 5.  Listed in the report were the apartment numbers of several "Mexican

25   men" who Parker claimed warned Bailey to stay away from her.  On July 18, 2001, the two

26   detectives returned to the apartment and obtained the names of the "Mexican men" from the

27   apartment manager.  Det. Thowsen ran background checks on the men and interviewed the

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1  apartment manager.  He found nothing connecting the individuals to the murder and

2  dismissed them as suspects. (Ex. A at XIII:136-137, 160.)

3      On July 23, 2001 (after Lobato's arrest), the Detectives returned to Parker's

4  apartment to obtain a taped statement.  (Parker's Stmnt. **Exhibit D; and** Audio Recordings

5  of Statements CD, **Exhibit E**.)  By this date, LVMPD had identified Bailey as the victim,

6  and the Detectives showed Parker a photograph of Bailey, and she identified him as her

7  rapist. (Ex. D.)

8           **c.**    **Laura Johnson.**

9      On July 20, 2001, almost two weeks post-murder, Det. Thowsen received a

10  telephone call from Laura Johnson ("Johnson"), a Juvenile Probation Officer in Lincoln

11  County, Nevada. (Ex. C at 15.)  Johnson told Det. Thowsen that a friend of hers, Dixie

12  Tienken ("Tienken"), a school teacher in Lincoln County, had reported to her that one of her

13  former students, Lobato, had cut off the penis of a man who tried to rape her.  [Importantly,

14  LVMPD had kept the fact that Bailey's penis had been severed from his body confidential

15  from the public.]  Johnson reported that Lobato was concerned that someone may have seen

16  her car and was hiding it at her parent's house in Panaca, Nevada located in Lincoln County.

17  (*Id.*)

18      Det. Thowsen ran Lobato's name in SCOPE and learned that she was 18 years old

19  and a prior sexual assault victim in 1989.  (*Id.*)  He obtained a copy of her sexual assault

20  report and made arrangements with Det. LaRochelle to travel to Panaca, Nevada – a 170-

21  mile drive.  The Detectives met with Johnson later that day and obtained a statement.

22  (Johnson Stmnt., **Exhibit F**.)  Johnson warned the Detectives not to contact Tienken prior to

23  meeting with Lobato because she would likely warn Lobato about the officers.  (Ex. C at

24  16.)  The Detectives contacted the Lincoln County Sheriff's Office and requested assistance

25  in locating the Lobato residence. (*Id.*)

26

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

#### d.    Blaise Lobato.

On July 20, 2001, the Detectives traveled to Lobato's residence in Panaca. Det. Thowsen noticed Lobato's red Pontiac Fiero with the distinctive license plate "4NIK8ER" parked in the street. Lobato was home with her sister. Det. Thowsen introduced himself and identified himself and Det. LaRochelle as LVMPD homicide investigators. (Ex. C at 16.)

Det. Thowsen began by telling Lobato that he understood she had been attacked in Las Vegas and defended herself. (*Id.*) He also told her that her vehicle's license plate "is very distinct." (*Id.*) Lobato responded that someone could have been borrowing her car at the time of the incident. When Det. Thowsen informed Lobato that he knew she had been hurt in the past, Lobato dropped her head, began to cry, and said "I didn't think anyone would miss him." (*Id.*) Lobato agreed to speak to the Detectives and signed a Miranda card. (Lobato Miranda Card, **Exhibit G**; Lobato Depo. at 133-134, **Exhibit H**.)

Lobato agrees that she understood her Miranda rights and voluntarily spoke with the Detectives. (Ex. H at 133-134.) Before the Detectives began recording to the conversation, Lobato told them what had happened. (*Id.* at 135-136.) Once the Detectives began recording, Lobato told them the same story, but with more details. (*Id.*)

Lobato told the Detectives she had been on a three-day drug binge and had just parked her car in a parking lot she believed was at a Budget Suites near Flamingo and Boulder Highway. (Lobato Stmnt. at 20, **Exhibit I**.) She admitted she could be mistaken about the location because "I don't remember a lot." (*Id.* at 5.) As she exited her car, an older black male who smelled "like old alcohol and dirty diapers" threw her down and attempted to rape her. She described her assailant as "really big . . . like a giant compared to me." Lobato said she was wearing a short skirt with pockets, and she retrieved a butterfly knife from the rear pocket and grabbed the assailant's penis and testicles with her left hand, and she remembers "trying to cut it off but I don't know if I actually did" with her right hand. She claimed she then "snapped" and could not recall anything else. She did recall

MAC:14687-221 3890205_1

1  that the assailant "was on the ground" and "crying." (*Id.* at 4-5.) She then left because "I
2  didn't think anybody would miss somebody like that." (*Id.* at 8.)

3      When pressed about the location of the incident, Lobato admitted there was a
4  dumpster "not far from where it happened but I don't remember putting him it or anything.
5  I don't think there's anyway that I could have." (*Id.* at 16.) Also, when asked if she hit the
6  assailant with anything besides the knife, Lobato responded "No, but it's poss - I have a
7  baseball bat that I keep behind my seat or had a baseball bat." (*Id.* at 21.) Lobato also
8  denied telling anyone about the incident. (*Id.* at 17.)

9      Lobato eventually threw away her clothes and got rid of the knife. (*Id.* at 9.) She
10  claimed that she hid her car at an ex-boyfriend's house, Jeremy Davis ("Davis"), and left
11  him a note that "I had done something bad and I had to be gone for a while." (*Id.* at 8-9.)
12  Lobato also reported going to a Catholic church in the early morning hours where she used a
13  phone. (*Id.* at 10.) She told the Detectives she returned a week later to pick up her car and
14  found it damaged and that someone had urinated and defecated in it. She then returned to
15  Panaca on July 13th and visited a doctor and was proscribed Prozac due for her depression
16  from the incident. (*Id.* at 15.) At the very end of her statement, Lobato claimed to recall
17  another person assaulted by Bailey named "Mumblina," and she mentioned her attack
18  occurred "over a month ago." (*Id.* at 27.)

19      After obtaining Lobato's statement, Det. Thowsen placed Lobato under arrest for
20  Murder with a Deadly Weapon. (Ex. C at 17.) Lobato signed a consent to search card
21  allowing the Detectives to search her via DNA buccal swab, her bedroom, and her vehicle.
22  The Detectives took photographs of Lobato, collected a pair of black shoes, and
23  photographed her vehicle. Det. Thowsen also showed Lobato a photo of Bailey. The photo
24  caused Lobato to tear up, but she said she could not recognize him because she had put him
25  out of her mind. (*Id.*)

26      As they were finishing up, Lobato's step-mother, Rebecca Lobato ("Rebecca"),
27  returned home. She denied any knowledge of the homicide. (Ex. C at 17.) However,

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1  Lobato told Rebecca, "Mom, I did it, now I have to do what I have to do."  A short time

2  later, Lobato's father, Larry Lobato ("Larry"), also arrived home.  The Detectives explained

3  Lobato was under arrest for homicide.  Larry kissed his daughter good bye, and she said

4  "I'm sorry, Daddy, told you I did something awful."  When asked by Det. Thowsen, Larry

5  denied any knowledge of the homicide.  (*Id.* at 17-18.)

6      Lobato was transported to the Clark County Detention Center ("CCDC").  At CCDC,

7  Lobato was photographed for overall appearance and for injures to her abdomen and right

8  leg which she suffered rock climbing.  She was photographed in cell Z-4.  Lobato made the

9  unprovoked statement that the cell enclosure reminded her of the location where she had

10 been attacked and that the area where the attack occurred did not have a covering and she

11 could see the metal covering of a carport area.  Det. Thowsen agreed that the cell closely

12 resembled the garbage enclosure where the incident occurred.  (*Id.* at 18.)

13                    e.    **Dixie Tienken.**

14     On July 26, 2001, Det. Thowsen telephoned Dixie Tienken in Panaca and set up an

15 appointment.  (Ex. C at 21.)  The Detectives met with Tienken at her residence and Tienken

16 provided a voluntary statement.  (Tienken Stmnt., **Exhibit J**.)  Tienken relayed that she was

17 a former teacher of Lobato and that Lobato arrived at her home in the early morning hours

18 of July 10th or 11th.  *Id.* at 2-3.  Tienken immediately noticed that Lobato was driving her

19 dad's truck and not her red Pontiac.  (*Id.* at 4 & 12.)  Lobato told her that she did not want

20 anyone to see her car because they might recognize it from the incident.  Tienken told the

21 Detectives that Lobato was known to carry and use knives.  (*Id.* at 8.)

22     Lobato told Tienken "I did something bad and I need a hug."  (*Id.* at 4.)  She then

23 told Tienken that an "old and smelly" man tried to hit on her.  (*Id.* at 6.)  Lobato specifically

24 told Tienken that she cut the man's penis off and "threw it" and that "it was a mess" and got

25 "ick on her."  (*Id.* at 5, 9.)  Importantly, Lobato told Tienken that the assault occurred on one

26 of the "hotel streets" and that it was either West Flamingo or West Tropicana and that it

27 occurred "between buildings or in an alley."  (*Id.*)  (Bailey was murdered on West

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Flamingo.) Lobato stated that no one saw her but was afraid someone saw her distinctive her car. It was Tienken's impression the man was "stumbling and getting up" when Lobato left. (*Id.* at 10.) Tienken was clear that Lobato "did not think she ever killed anybody." (*Id.* at 20.) According to Tienken, Lobato left the scene, cleaned up at a friend's house, and then drove home to Panaca the same night. (*Id.* at 11.) It was Tienken's impression that the incident Lobato was talking about "had just happened a day or two before" she visited her. (*Id.* at 12.)

Tienken also knew about Lobato's former boyfriend, Davis, allegedly damaging her car. However, Tienken told the Detectives that it was a separate incident that occurred previously. (*Id.* at 21-22.)

After talking to Lobato, Tienken began checking newspapers on the internet to see if she could find out whether the incident had been reported. (*Id.* at 19-21.) She also acknowledged that, on July 11th, she had relayed Lobato's story to probation officer Johnson. (*Id.* at 22-23.)

### f. Stephen Pyszkowski.

On July 23, 2001, the Detectives met with Lobato's former roommate, Stephen Pyszkowski ("Pyszkowski"). (Pyszkowski Stmnt., **Exhibit K**.) In June and July 2001, Lobato moved in with Pyszkowski and had a sexual relationship with both Pyszkowski and his girlfriend. (*Id.* at 8-9.) Pyszkowski also employed Lobato's ex-boyfriend, Davis. (*Id.* at 3.) He told the Detectives that he helped Lobato recover her car from Davis's residence in early June 2001. (*Id.* at 4.) He confirmed that Lobato regularly kept a knife in her possession. (*Id.* at 13.) He last saw Lobato the week of July 4, 2001, when she moved out. (*Id.* at 15.) Lobato did tell him around the end of May 2001 that she was worried about a black male "trying to pimp her out or something like that at the Budget Suites." (*Id.* at 12.) She never told him about an attack or severing a man's penis.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

     MAC:14687-221 3890205_1

1

**g.    Catherine Anne Reininger.**

2    On August 2, 2001, Catherine Reininger ("Reininger") was interviewed at the Clark

3 County Detention Center by the Detectives. (Reininger Stmnt., **Exhibit L.**)  Reininger was

4 Pyszkowski's girlfriend.  She admitted that both Pyszkowski and she herself had a sexual

5 relationship with Lobato and that the three all lived together. (Id. at 5.)  It was Reininger's

6 impression that Lobato had a lot of anger toward older men.  She last saw Lobato the last of

7 June/early July and believed that she returned to Panaca for the 4th of July.  According to

8 Reininger, Lobato told her in May that she "beat someone up and chopped his dick off."

9 (Id. at 17.)  Reininger said the guy had tried to attack Lobato's sister.  She admitted she

10 never told Pyszkowski about this story.  (The day prior to the interview she admitted to

11 meeting with Pyszkowski who had already been interviewed by the Detectives.)

12

**h.    Doug Twining.**

13    On August 2, 2001, the Detectives met with Doug Twining ("Twining"). (Twining

14 Stmnt., **Exhibit M.**)  Twining was Lobato's boyfriend at the time, and he admitted that he

15 had spoken to Lobato's father, Larry, earlier in the day.

16    According to Twining, he met Lobato the end of May 2001.  (*Id.* at 2.)  The two

17 developed a relationship, and she stayed with him June 30th until July 2nd.  (*Id.* at 3,7.)

18 Twining claimed that Lobato was continuously in Panaca from July 2nd through July 8th.

19 (*Id.* at 7-8.)  On July 9th, he drove to Panaca and picked Lobato up at 12:45 a.m. and left to

20 return her to Las Vegas at 1:10 a.m.  (*Id.* at 8-9.)  Twining claimed that around the end of

21 May or first part of June, Lobato said she "cut a guy's penis." (*Id.* at 12.)  He did not

22 believe she was serious.  Twining admitted to being in love with Lobato and that he

23 threatened suicide when she told him she wanted to go back to Panaca on July 2nd.

24    After Twining picked Lobato up on July 9th, she stayed with him until July 13th,

25 when Lobato's father came to pick her up.  (*Id.* at 10.)  From July 9th through July 13th,

26 Twining admitted he and Lobato "tried to lay, law low because, you know, she didn't want

27 to deal with [Pyszkowski and Reininger's] bullshit." (*Id.*)  He admitted they did not leave

**MARQUIS AURBACH COFFING**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   his place except to get food.  Twining also admitted they watched news stories on the Bailey

2   homicide.  (*Id.* at 11.)

3                    **i.    Jeremy Davis.**

4          On July 25, 2001, the Detectives interviewed Lobato's ex-boyfriend Davis.  (Davis

5   Stmnt., **Exhibit N**.)  Lobato and Davis dated for five years, but the last time he saw her was

6   May 15, 2001.  (*Id.* at 2-3.)  On May 25, 2001, Lobato's car appeared in his driveway with a

7   note that she needed to leave town.  Davis left town, and, when he returned on May 28th, the

8   vehicle was gone.  (*Id.* at 5.)  He told the Detectives that Lobato was "into knives."  (*Id.* at

9   9.)  Davis denied ever seeing Lobato's car after the date of the Bailey homicide.  The

10  Detectives also interviewed Davis's then-girlfriend, Kimberly Miller, who confirmed his

11  story.  (Ex. C)

12                   **j.    Korinda Martin.**

13         On August 1, 2001, the Detectives interviewed CCDC inmate Korinda Martin

14  ("Martin") at the request of the district attorney.  (Martin Stmnt., **Exhibit O**.)  Martin

15  claimed that Lobato confessed to her and said she met Bailey while looking for

16  methamphetamine.  The victim wanted a "piece of ass" so Lobato hit him in the head, later

17  cut off his penis and tried to shove it down his throat.  (*Id.* at 4-8.)  Lobato also said she

18  stabbed him in the anus and lost count at 8 stabs.  Martin claimed that Brenda Self also

19  overheard the confession.  (*Id.* at 3.)

20                   **k.    Lobato's alibi witnesses.**

21         Lobato provided the Detectives with a list of witnesses who she claimed she told

22  about the incident.  The Detectives, with the assistance of the Lincoln County Sheriff's

23  Office, located and interviewed the witnesses.  The Detectives were able to locate and

24  interview each witness identified except "Shane Craft."  (Ex. C at 22.)

25                   **(1)    <u>Michele Austria.</u>**

26         Michele Austria ("Austria") was a friend of Lobato.  (Austria Stmnt., **Exhibit P**.)

27  She recalled that at some point during the week of July 2nd - 8th, Lobato told her she was

1   attacked in Las Vegas and pulled a knife from her bag and slashed the person's penis. (*Id.* at

2   3.) Lobato did not tell her where the incident occurred, nor did she describe the man. (*Id.* at

3   7.) Austria knew that Lobato used a butterfly knife but did not know if the man was dead or

4   alive but that Lobato "pretty much figured that she had killed him." (*Id.* at 8.) It was

5   Austria' assumption that the incident occurred "within the first couple of weeks or sometime

6   before" Lobato returned to Panaca in July, but Lobato never told her when it occurred. (*Id.*

7   at 9.) Lobato told her that, as result of the incident, she required medical treatment and

8   began taking medication for depression. (*Id.* at 3, 7-8.) Austria found Lobato to be "very

9   upset," "very different," and "wasn't happy at all." (*Id.*)

### (2)   Paul "Rusty" Brown.

11      Paul Rusty Brown ("Brown") was Austria's boyfriend. (Brown Stmnt., **Exhibit Q** at

12   2.) According to Brown, he was present for Lobato and Austria's conversation. Brown

13   recalled the conversation occurring just one week before Lobato's arrest on July 20, 2001.

14   (*Id.*) He overheard Lobato tell Austria that a man was molesting her, and she grabbed a

15   knife and cut his penis off. (*Id.* at 3.)

### (3)   Heather McBride.

17      Heather McBride ("McBride") had known Lobato since high school. (McBride

18   Stmnt., **Exhibit R** at 2.) Sometime after the July 4th weekend, Heather was at home with

19   her boyfriend, Chris Collier, when Lobato came for a visit. (*Id.* at 3.) Lobato arrived in "her

20   dad's truck." (*Id.* at 9.) During the visit, Lobato told her that she used a butterfly knife to

21   stab a man in the abdomen who "did her wrong." (*Id.* at 4.) Lobato left without knowing

22   whether her attacker was dead or alive. (*Id.*) Lobato did not tell her when or where the

23   incident occurred. (*Id.* at 4-5.) McBride described Lobato's demeanor as "down" and "very

24   not normal." (*Id.* at 9.) Lobato also told McBride that in Las Vegas people hired her to go

25   out and beat up people who had done them wrong on a drug deal. (*Id.* at 5.)

26

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1

           **(4)**      **Christopher Collier.**

2        Christopher Collier ("Collier") is McBride's boyfriend who was present during

3  Lobato's visit. (Collier Stmnt., **Exhibit S**.) Collier recalled the visit occurring between July

4  9th and 11th. (*Id.* at 2.) He claimed to be certain of the date because it occurred between a

5  softball tournament and his brother's birthday. (*Id.* at 3.) Lobato arrived in her dad's truck.

6  She told a story of how she stabbed a large, black male and left him not knowing the

7  outcome. (*Id.* at 4.) Lobato stated the incident happened in Las Vegas and that she was

8  "tweakin" on methamphetamine. (*Id.* at 5.) One month prior to the visit, Lobato had told

9  him she had been paid to "beat the shit out of people in Las Vegas," and he knew she carried

10  a butterfly knife. (*Id.* at 6.)

11           **(5)**      **Christopher Carrington.**

12        Christopher Carrington ("Carrington") used to date Lobato and had recently moved

13  back to Lincoln County. (Carrington Stmnt., **Exhibit T**.) On July 27, 2001, Carrington told

14  the Detectives that, a week earlier, he ran into Lobato in front of drug store. Lobato told him

15  she returned to Panaca because her "bodyguard" pulled a gun on her. She did not say

16  anything about an attack. Carrington had seen Lobato with a knife in the past. (*Id.*)

17       **2.**      **Det. Thowsen's additional investigation.**

18        At the time of the homicide, NRS 629.031 required that healthcare providers report

19  any injuries involving the use of a knife or firearm. Det. Thowsen, with the assistance of his

20  staff, researched all police records (from all local police agencies) and contacted local

21  hospitals and healthcare providers to determine whether anyone had reported any stab

22  injuries to the groin area. (Ex. A at XIII:59-63, 112-116.) The Detectives did not locate any

23  such injuries for the months of May, June, or July 2001 and reported their findings to the

24  District Attorney's office. (*Id.*) [Det. Thowsen conducted this additional investigation after

25  Lobato was arrested and at the request of the district attorney - hence it is not mentioned in

26  the Officer's Report. (*Id.*)]

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

        MAC:14687-221 3890205_1

1    After Lobato's arrest, Det. Thowsen traveled to the Budget Suites where Lobato

2    claimed she was attacked in May 2001.  At the Budget Suites, Det. Thowsen spoke to the

3    manager and learned that it had 24-hour security, that there were no reports of a stabbing

4    having occurred there, and there was no evidence of a crime scene. (*Id.* at 159-164.)

5    **C.    PRELIMINARY HEARING.**

6    On August 7, 2001, a preliminary hearing was held.  (Preliminary Hearing

7    Transcript, **Exhibit U**.)  At the hearing, Dixie Tienken, medical examiner Dr. Simms, and

8    Det. Thowsen testified. (*Id.)*  At the conclusion of the testimony, the presiding judge held

9    that "there is sufficient cause to believe that Kirsten Blaise Lobato is responsible for those

10   crimes and you're hereby ordered to be held over to answer to the charges in the Eighth

11   Judicial District Court . . ." (*Id.* at 63-64.)  Lobato does not believe that any of the witnesses

12   lied or provided false information at the preliminary hearing.  (Ex. H at 172:18-21.)

13   **D.    LOBATO'S 2002 CRIMINAL TRIAL.**

14   Lobato's first criminal trial occurred in May 2002.  (2002 Criminal Jury Trial

15   Transcript, **Exhibit V**.[2])  At the trial, the State argued that Lobato murdered Bailey.  Lobato

16   denied committing the murder, set forth a theory that she had injured another man in May

17   2001 at a Budget Suites, and argued that the State was conflating the two events.

18   **1.    The State's case-in-chief.**

19   The first witness called by the State was Bailey's cousin, Lueron Williams

20   ("Williams").  (Ex. V at I:43.)  She testified that Bailey had an account at the bank near

21   where his body was found.  (*Id.* at I:43-48.)  Following Ms. Williams, witness Shott testified

22   to finding Bailey's body while "dumpster diving." (*Id.* at I:49-50.)  He also testified that the

23   police investigated him as a suspect and what actions they took.  (*Id.* at I:58-59.)  The next

24   witness was Palms Hotel & Casino security manger Iain Anderson to discuss the dumpster

25

26

27   [2] Relevant portions of Lobato's 2002 criminal trial transcript are attached as Exhibit V.  This
Motion's citations refer to the volume of the transcript and the page.  So, a reference to page 1 of
volume I of the 2002 criminal trial will be cited as "Ex. V at I:1."

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  area where the body was located. (*Id.* at I:60-72.) Officer Testa was then called to discuss
2  his efforts as the first arriving officer to preserve the crime scene. (*Id.* at I:76-109.)

3       The State then called Lobato's ex-boyfriend Jeremy Davis. He testified that Lobato
4  would drive back and forth between Las Vegas and Panaca to see him and that, due to a
5  known shortcut, the drive could be made in two hours. (*Id.* at I:124-26.) He testified that,
6  after they broke-up, Lobato left her car in his driveway for about five days during Memorial
7  Day weekend the end of May 2001. (*Id.* at I:127-28.) Davis also testified to Lobato's
8  methamphetamine use and the role it played a role in their break-up. (*Id.* at I:133-34.)
9  Finally, Davis testified that Lobato was known to carry knives. (*Id.* at I:146-48.)

10      Following Davis, the State called Lobato's former-roommate Pyszkowski to the
11 stand. Pyszkowski testified that Lobato lived with him and girlfriend, Reininger, in May
12 2001. (*Id.* at I:153-154.) He also testified that Lobato would drive back and forth to Panaca
13 in 2001. (*Id.* at I:154.) Pyszkowski testified that Lobato worked with him servicing fire
14 extinguishers and that his "territory" included the area where Bailey's body was found. (*Id.*
15 at I:155-56.) On cross-examination, Pyszkowski testified that it was his opinion the police's
16 timeline was off because he "had heard about [Blaise being attacked] months before." (*Id.*
17 at I:157, 171.) Psyzkowski also testified that he helped retrieve Lobato's car from Davis's
18 house in May 2001 because Davis and Lobato "were fighting." (*Id.* at I:161.) On re-direct,
19 Pyszkowski admitted that, during his police interview, he never told the police about a prior
20 attack where Lobato claimed to cut someone's penis off because "I didn't think she had."
21 (*Id.* at I:169-170, 175-176.) Eventually, Pyszkowski admitted that he actually heard about
22 the prior attack from his girlfriend, Reininger, and not from Lobato, herself. (*Id.* at I-177.)
23 So, in short, with respect to the prior attack, Pyszkowski testified to an alibi he had no
24 personal knowledge of and, in the end, conceded that he only heard about the alibi second
25 hand despite being Lobato's roommate and lover just after the attack. Finally, Pyszkowski
26 confirmed that Lobato used methamphetamine and carried a switchblade knife. (*Id.* at
27 I:178-80.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

The second day of testimony began with Dr. Simms, the Chief Medical Examiner of Clark County who performed the Bailey autopsy. (*Id.* at II:27.) Dr. Simms testified that Bailey suffered a number of blunt force injuries all over his head and face, a number of stab wounds to the neck and face, defensive wounds on the hands, a stab wound to the abdomen, and post-mortem sexual mutilation including a severed penis and a large slash to the rectum. (*Id.* at II:32-36.) Bailey also had a skull fracture and six missing front teeth most likely caused by blunt force trauma that could be consistent with someone using the large end of a bat. (*Id.* at II:36-38.) Finally, Dr. Simms stated his opinion with a "high degree of confidence" that the victim had been dead between 8 and 24 hours when his body was discovered and "more likely than not" had been dead "between 10 and 18 hours." (*Id.* at II:54-57.)

Dixie Tienken took the stand after Dr. Simms. Tienken testified that she had been Lobato's teacher in Panaca and that Lobato confided in her "many times." (*Id.* at II:954-96.) According to Tienken, Lobato showed up at her house early in the morning (*id.* at II:97) on a Wednesday in July 2001[3] (*id.* at II:98) and said, "I need to talk to you, I did something bad." (*Id.* at II:96.) Because Tienken had just gotten out of bed, Lobato waited outside for a few hours. (*Id.*) When the two finally talked, Lobato told her that she was approached by a "smelly" man who had "his penis out." (*Id.* at II:100-101.) The man "propositioned" or "asked for money" and then knocked Lobato down and "tried to rape her." (*Id.* at II:101-102.)

Lobato left Tienken with the impression that the "bad" thing she had done "had happened shortly before" she came to her house and that she indicated to the police it was her belief the "bad" event occurred just "a couple of days" earlier. (*Id.* at II-100.) Lobato told Tienken that the man "was trying to put his penis in her mouth" and so "[s]he got her knife out … grabbed his penis and she said that she cut it off" and gestured that she just

---

[3] Tienken testified she did not recall the exact date Lobato visited, but she did know that she talked to Laura Johnson "that [same] day." *Id.* at II-98. Johnson testified she talked to Tienken on July 18, 2001. *Id.* at II-127.

threw it. (*Id.* at II:103-104.) Lobato then said she "ran towards her car" and looked back and saw the man "grabbing" and "holding" himself. (*Id.* at II:104.) Tienken acknowledged that she told the police Lobato had indicated the incident occurred "off of like a hotel [named] street" and it "could have been "[Desert Inn], Flamingo, Tropicana . . ." (*Id.* at II:110-111.) Tienken testified that Lobato told her she wanted to get the "ick" off of her so she went to an unknown friend's house to clean up and then went home to Panaca. (*Id.* at II:104.) Lobato told Tienken she was concerned someone might have seen her distinctive red car. (*Id.* at II:105.) Tienken noted that Lobato was driving her father's pick up and concluded that Lobato "was still a little bit afraid that someone might" recognize her car. (*Id.* at II:106-107.) Tienken was clear that the time that Lobato left her car at her former-boyfriend Davis' house on Memorial Day weekend had nothing to do with her attack. (*Id.* at II:105-106.) After talking to Lobato, Tienken began searching the internet "to see if anyone had come into a hospital or anybody had complained about having his penis cut off." (*Id.* at II:99.)

Tienken was followed by Laura Johnson. (*Id.* at II:127.) According to Johnson, Tienken came to her place of work on July 18, 2001 at 12:30 p.m. (*Id.* at II:128.) Tienken told Johnson that Lobato had been in Las Vegas where "a man tried to attack her with his penis hanging out of his pants and that [Lobato] had cut off his penis." (*Id.* at II-130.) Johnson was also told that Lobato was "hiding up in Panaca" and that her "parents were hiding [her] vehicle in Panaca and that they were possibly going to have it painted or get rid of it." (*Id.* at II:131-132.) The next day, Johnson began calling Las Vegas area police departments and was eventually connected to LVMPD's homicide department and Det. Thowsen. (*Id.* at II:132-133.)

Lobato's friend, Michele Austria, testified next. (*Id.* at II:141-142.) Austria confirmed that Lobato would drive back-and-forth between Las Vegas and Panaca. (*Id.*) During the "weekend after" the Fourth of July, Austria and Lobato went "four wheeling" and hung out. Lobato told Austria "that she had been attacked and that she pulled a knife

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  from her bag." (*Id.* at II:146.)  According to Austria's testimony, she knew the incident

2  happened in Las Vegas, and Lobato never told her what she did with the knife.  (*Id.* at

3  II:148-149.)  Austria also testified that Lobato was depressed, "[h]aving a problem dealing

4  with her conscience," and going to a doctor for anti-depression medication.  (*Id.* at II:150.)

5  (This places Austria's conversation with Lobato sometime after July 16, 2001.[4])  At trial,

6  Austria backed away from her original statement to the Detectives that Lobato had

7  confessed to "slash[ing] [her attacker's] penis."  (*Id.* at II:152.)  She did not deny telling the

8  Detectives this, but now testified that her current story "is now my testimony" and that her

9  original statement was "not true."  (*Id.* at II:152-153.)  Under cross-examination, Lobato's

10  attorneys suggested that conversation with Lobato occurred on July 1st, 7th, or 8th, and

11  Austria agreed.  (*Id.* at II:157-158.)  She also admitted to talking to Lobato's parents the day

12  after Lobato's arrest.  (*Id.*)

13       The State called Paul Brown, Austria's boyfriend, as its next witness.  Brown

14  testified to hearing the conversation between Lobato and Austria.  (*Id.* at II:166-167.)

15  Lobato told Austria that "she was attacked or – by a man and she used – she defended

16  herself with a knife and . . . [s]he reached down and . . . cut off his penis."  (*Id.* at 167.)

17  Brown confirmed that this conversation "definitely" occurred "[a]bout a week" before

18  Lobato's arrest on July 20, 2001.  (*Id.* at II:169-170.)

19       On the third day of witness testimony, the State opened with Det. Thowsen.  (*Id.* at

20  III:5.)  Before testifying before the jury, Det. Thowsen was questioned in front of the Court

21  regarding Lobato's voluntary statement.  (*Id.* at III:6-20.)   The Court, after hearing

22  argument, ruled that Lobato's *Miranda* rights were not violated and that her voluntary

23  statement was admissible.  (*Id.*) In front of the jury, Det. Thowsen began by explaining the

24  homicide investigation process and the actual crime scene.  (*Id.* at III:21-25.)  He explained

---

[4] According to Lobato's medical records, she first saw her doctor on July 5, 2001 believing she was
being poisoned.  On July 5, there is no mention of depression.  On July 13, 2001, her mother called
and now reported "restlessness and anxiety."   On July 16, 2001, Lobato returned but now
complained of "depression" and "anxiety." Lobato, for the first time, was prescribed anti-depression
medication. (Lobato's Medical Records introduced at trial, **Exhibit W**.)

1  his contact with Diane Allen, her alleged sexual assault by Bailey, and his investigation into
2  her (and her roommate's) potential involvement in the homicide. (*Id.* at III:36-39.) He then
3  explained how he learned from Johnson about Lobato and her potential involvement in the
4  crime. (*Id.* at III:39-42.) Det. Thowsen explained why he does not immediately begin
5  recording the conversation when he talks to a witness and/or suspect and why it is important
6  to develop a rapport with the person before taping the statement. (*Id.* at III:42-43.)

7  Det. Thowsen testified that after interviewing Johnson, he traveled to Lobato's house
8  with Det. LaRochelle and a sergeant from the Lincoln County Sheriff's Office. (*Id.* at
9  III:45.) Upon meeting Lobato, Det. Thowsen told her that "we understood that she had been
10  attacked in Las Vegas and had to defend herself," that her car had a "very distinctive license
11  plate," and that he knew that "she'd been hurt in the past." (*Id.* at III:46.) In response, and
12  prior to telling Lobato they were investigating a homicide, Lobato "dropped her head and
13  started to cry" and said "I didn't think anybody would miss him." (*Id.*) Lobato then
14  voluntarily agreed to speak with the Detectives and waived her *Miranda* rights. (*Id.* at
15  III:47-49.)

16  After Lobato signed her *Miranda* card, she spoke with the Detectives for about
17  twelve minutes before they began recording. (*Id.* at III:58.) Once the recording began, Det.
18  Thowsen asked "pretty much the same questions as [they] did before [the recording]." (*Id.*
19  at III:59.) The State then played Lobato's recorded statement. (*Id.* at III:60; Ex. E.) On re-
20  direct by the State, Det. Thowsen testified that Lobato specifically said she might be
21  confused about the location of the crime in her voluntary statement. (*Id.* at III:116.) Det.
22  Thowsen testified that drug users can confuse two stories into one. (*Id.*) He also pointed out
23  that Lobato told him that she did not recall hitting her attacker with anything but did say
24  "but it's poss---I have a baseball bat that I keep behind my seat or had a baseball bat." (*Id.*
25  at III:117.) Also, Det. Thowsen testified that Lobato admitted there was a dumpster "not far
26  from where it happened" and, more importantly, she volunteered that she did not think she
27  was capable of putting the attacker in the actual dumpster. (*Id.* at III:121.) Det. Thowsen

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1   testified that Lobato told him her attacker "was a black man, older" who "smelled like dirty
2   diapers and old alcohol." (*Id.* at III:123.) After being present at the crime scene and
3   viewing Bailey, Det. Thowsen said that description "was very accurate" of Bailey. (*Id.* at
4   III:123-124.)

5        After Lobato was arrested, Det. Thowsen testified that her step-mother arrived home.
6   Lobato, while crying and still upset, told her stepmom, "Mom, I did it. Now, I have to what
7   I have to do." (*Id.* at III:61.) In addition, her father also arrived home. After the Detectives
8   allowed the father to kiss Lobato good bye, Lobato said: "I'm sorry daddy; told you I did
9   something awful." (*Id.* at III:66.)

10      After the arrest, the Detectives transported Lobato to CCDC. During the drive from
11  Panaca to CCDC, Lobato told the Detectives that the knife she used "was actually given to
12  her by her father as a Christmas present." (*Id.* at III:70.) At CCDC, Lobato was taken to a
13  side cell that "has a painted cement floor, cement walls and a cement or hard ceiling and it's
14  about, approximately, ten-foot by ten-foot." (*Id.* at III:74.) Det. Thowsen said that the cell
15  resembled the dumpster area where the Bailey homicide occurred, and Lobato commented
16  that "the room looked similar to the area she was in during the attack; however, it seemed a
17  little bit smaller in that when she looked up, she could see the awning of the parking
18  structure." (*Id.* at III:75.)

19      Det. Thowsen was also questioned about information that Lobato provided him that
20  was inconsistent with the Bailey homicide and how it was his opinion that Lobato was
21  "minimizing" her involvement or unclear due to her drug use. (*Id.* at III:75-80.) In addition
22  to interviewing numerous witnesses, Det. Thowsen testified that he also investigated
23  whether anyone had reported a penis injury to a medical provider because NRS 629.041
24  required the healthcare provider to contact the police. (*Id.* at III:81-82.) He learned of no
25  such reports. (*Id.*)

26      On cross-examination, Det. Thowsen answered questions on: (1) Lobato's
27  representation the attack happened at a Budget Suites on the east side of Las Vegas "over a

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

month [before her interview]", (2) the fact that some facts told by Lobato did not match the Bailey crime scene, (3) that no physical evidence tied Lobato to the crime scene, (3) that the bat Lobato had in her car was negative for blood, (4) his handling of the crime scene, and (5) follow-up questions he did not ask Lobato after her statement. (*Id.* at III:83-98 & 105-113.) He was also cross-examined on his handling of Diann Parker and the "Mexican people" who knew about Bailey's sexual assault of Parker. (*Id.* at III:99-101.)

Lobato's friend, Heather McBride, followed Det. Thowsen on the witness stand. (*Id.* at III:129.) McBride testified that on a date between July 1st and July 4th, 2001, Lobato and McBride's boyfriend, Chris Collier, were at her house. (*Id.* at III:131.) [McBride admitted she told the police the visit occurred *after* July 4th but, by the time of trial, "I had time to go back and think about it." (*Id.* at III:141.)] Lobato told McBride "[t]hat someone had done her wrong and she had stabbed [them] in the abdomen," and she did not know if the person died because "she didn't stick around to find out." (*Id.* at III:132-133.) McBride did not believe Lobato "[b]ecause she tends to exaggerate." (*Id.*) McBride had no further contact with Lobato because "I had thought she was on drugs and I didn't agree with it being around my family." (*Id.* at III:135-135.)

Lobato's ex-boyfriend from Panaca, Chris Carrington, testified next. (*Id.* at III:145.) He testified that he had seen Lobato on July "3rd and then, again, on the 5th through the 8th." (*Id.*) Carrington agreed that when he spoke to the Detectives, he did not tell the them he had seen Lobato on July 5th, 6th, 7th, or 8th. (*Id.* at III:146.) He also agreed that after his visit with the Detectives, Lobato's stepmom came to his house to make sure he knew about the importance of the July 8th date. (*Id.* at III:151&166.) It was through this conversation that he concluded he saw Lobato on July 8th. (*Id.*) Carrington testified he provided incorrect information to the Detectives because he "panic[s]" and "get[s] scared" when "people are asking me questions." (*Id.* at III:161.) Finally, Carrington admitted he came to court "to testify *for* [Lobato]." (*Id.* at III:159) (emphasis added).

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Korinda Martin, a former cellmate of Lobato at CCDC testified next. Martin

2  testified that Lobato bragged that she severed a man's penis and placed it "down his throat."

3  Lobato was concerned that blood might be found in her car. Martin also testified she

4  contacted the District Attorney's Office (not the Detectives) with her story, but that the

5  Detectives did take her statement. (*Id.* at III:167-187 & IV:21-41.)

6    After Martin, the State then called Carrington's grandmother, Diane Allen ("Allen"),

7  to the stand. (*Id.* at IV:41-42.) The grandmother began by calling her grandson "brain

8  dead" and agreed she would characterize him "as a little slow." (*Id.* at IV:44-45.)

9  According to Allen, Lobato's stepmom had approached her "at the supermarket looking for

10 [Carrington] because she wanted to tell him some dates to remember before the attorney or

11 police came to talk to him." (*Id.* at IV:45&50.) Allen told Lobato's stepmother that

12 Carrington would not lie for her, and the stepmom left the store "mad." (*Id.* at IV:51.)

13 Allen testified that Carrington was at Lobato's house on July 5th and 6th, but told her

14 Lobato was arguing with her stepmother, and he did not want to get in the middle of it, so he

15 left. (*Id.* at IV:46-47.) She testified that Carrington probably did not see Lobato on July 7th

16 or 8th, because his grandfather had heatstroke, and they were at the hospital both days. (*Id.*

17 at IV:53-54.) But she acknowledged Carrington was not with her the entire time. (*Id.*)

18    The State next called LVMPD Crime Scene Analyst Louise Renhard ("Renhard").

19 (*Id.* at IV:63.) Renhard testified regarding the processing of the Bailey crime scene. (*Id* at

20 IV:64-70.) She also testified to the processing of Lobato's vehicle and stated they were

21 directed to look for fingerprints, possible weapons, and bloodstains. (*Id.* at IV:72.) One of

22 the tests they performed was a luminol test that "is considered a presumptive test and it is

23 very, very sensitive and is used for looking for the possibility of blood that isn't seen or has

24 been cleaned up." (*Id.* at IV:73.) Renhard described the car as "an older vehicle and it was

25 kind of dirty . . . but the seat covers . . . were very clean" and possibly laundered. (*Id.* at

26 IV:74-76.) The luminol tests had positive hits for blood on the driver's door panel, the

27 driver's seat, and the driver's seat "hit" showed a pattern consistent with wiping. (*Id.* at

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  IV:76-84.)  Renhard also found a baseball bat in the car, but tests on the bat were negative

2  for blood.  (*Id.* at IV:76-77.)

3        Thomas Wahl ("Wahl"), an LVMPD DNA specialist, took the stand next.  (*Id.* at

4  IV:106.)  Wahl testified that Lobato's DNA was not present from any of the items recovered

5  from the crime scene.  (*Id.* at IV:108-114.)  He conducted further testing on the areas of

6  Lobato's vehicle which yielded presumptive positive chemiluminescent (Luminol) results

7  for blood.  Wahl utilized phenolphthalein testing, which yielded presumptive positive results

8  for the presence of blood on the front left seat cover and the door panel.  Wahl was unable to

9  confirm that the presumptive positive areas were blood; however, he noted that human blood

10 which has been degraded through cleaning solutions would not yield a confirmatory result.

11 (*Id.* at IV:114-127.)

12       LVMPD latent print examiner, Joel Geller ("Geller"), testified after Wahl.  Geller

13 testified that none of the latent prints recovered at the crime scene belonged to Lobato, and

14 the two footprints found at the scene did not match Lobato.  (*Id.* at IV:140-144.)  Also,

15 Lobato's own finger prints *were not* found in her own car.  (*Id.* at IV:146-147.)  Geller

16 stated that fingerprints could be destroyed by wiping a surface clean or wearing gloves.  (*Id.*

17 at IV:149.)  He also agreed that tire tracks near the scene of the crime did not match

18 Lobato's vehicle.  (*Id.* at IV:153.)

19            **2.    Lobato's case-in-chief.**

20       Lobato began her case-in-chief on the fifth day of testimony, May 14, 2002.  She

21 began by calling Diann Parker.  (Ex. V at V:10.)  Parker testified that Bailey raped her on

22 July 1, 2001, inside her apartment.  (*Id.* at V:12; 14-17.)  According to Parker, Bailey also

23 slapped her face "real hard" in front of several "Mexican" men.  (*Id.* at V:13-14.)  On July

24 4th or 5th, LVMPD sexual assault officers came to her apartment to investigate the rape.

25 (*Id.* at V:18-22.)  Parker also testified that Bailey lived in the dumpster enclosure where he

26 was killed, and the enclosure was about half a block away from her apartment.  (*Id.* at V:23.)

27 On July 8, 2001, Parker learned of Bailey's homicide.  (*Id.* at V:27.)  Parker acknowledged

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  that she had spoken with Lobato's counsel "[f]our or five times" prior to trial.  (*Id.* at V:29.)

2  She stated she did not know the "Mexican" men who saw Bailey slap her very well, and she

3  never told them she had been raped by Bailey.  (*Id.* at V:29-30.)  She denied any personal

4  involvement in the Bailey homicide and denied knowing anyone involved.  (*Id.* at V:42.)

5      Lobato next called her stepmom, Rebecca Lobato, to the stand.  (*Id.* at V:74.)

6  Rebecca testified that Lobato had been sexually abused as a child and, therefore, came to

7  live with her at six-years-old.  (*Id.* at V:75-76.)  In 2001, Lobato was living in Las Vegas but

8  returned to Panaca in her red Pontiac Fiero on July 2, 2001.  (*Id.* at V:78.)  Rebecca testified

9  that Lobato stayed at their home until July 9, 2001, when she returned to Las Vegas with

10  Doug Twining in his car.  (*Id.*)  During her stay, Lobato and Rebecca went to the doctor on

11  July 5th because Lobato "was faint and couldn't stand up."  (*Id.* at V:80.)  Rebecca also

12  testified that Lobato was "depressed" and "up and down" with her emotions.  (*Id.* at V:81.)

13  Lobato did not tell her doctor about her depression because she wanted to go into the

14  military and did not want anti-depressants on her permanent record.  (*Id.* at V:82-83, 118.)

15  (However, she acknowledged calling in and obtaining the prescription just a week later on

16  July 13.  *Id.* at V:140-141.)  On July 8th, Rebecca testified she saw Lobato outside their

17  house just after 4:30 p.m. with Carrington.  (*Id.* at V:87.)  Generally, Rebecca testified that

18  Lobato never left the home on July 8th and that her phone records supported her testimony.

19  (*Id.* at V:83-102.)  Lobato's car remained parked in front of their house the entire week.  (*Id.*

20  at V:156-157.)

21      On cross-examination, Rebecca admitted that she and Lobato "fought an awful lot."

22  (*Id.* at V:109.)  And, the two fought the week of July 2 - July 9 because Lobato wanted to

23  return to Las Vegas.  (*Id.* at V:143.)  She also admitted that Lobato had a methamphetamine

24  problem and that she had called the police looking for her in May 2001 after she visited the

25  family home and had "taken off."  (*Id.* at V:111.)  Rebecca admitted she called the local

26  police department on July 6, 2001 at 5:27 p.m.  (*Id.* at V:115, 150.)  She also admitted to

27  telling Carrington the importance of the July 8th date.  (*Id.* at V:124-126.)  Rebecca claimed

MAC:14687-221 3890205_1

1    that although she was in regular contact with Lobato's criminal defense attorney, she did

2    learn that the crime Lobato was arrested for occurred on July 8 until July 25 when she read a

3    newspaper article. (*Id.* at V:158-159.)

4         Lobato took the stand on her own behalf on the sixth day of testimony. (Ex. V at

5    VI:4.)  She denied killing Bailey and testified that she was in Panaca on the date of the

6    homicide.  (*Id.* at VII:5.)  She denied ever being at the scene of the crime prior to the

7    homicide.  (*Id.* at VI:6.)  She admitted that the Detectives told her that they were discussing

8    an event from "a couple of weeks ago" but she never used that term.  (*Id.* at VI:8.)  At the

9    very end of the interview, she told the Detectives her incident occurred "over a month ago"

10   and that she "was out of my mind on drugs." (*Id.* at VI:10-11.)  Lobato now testified that

11   she had no trouble "remembering details about the attack."  She testified the incident she

12   described to the Detectives occurred Memorial Day Weekend in an open parking lot at

13   Boulder Suites where she was living and where she was attacked by a large, older black

14   man.  (*Id.* at VI:11-15.)  After being pushed to the ground, Lobato stated she grabbed her

15   knife and "just reached for whatever I could grab for down there and I cut." (*Id.* at VI:16.)

16   She now denied knowing exactly where she cut the man.  (*Id.* at VI:16-17.)  She never hit

17   the man with anything, and, when she left, he was alive and "crying."  (*Id.* at VI:17.)

18        Lobato admitted that when the Detectives first contacted her, she told them "I didn't

19   think anybody would miss someone like that." (*Id.* at VI:18.)  She explained that she made

20   the unsolicited past-tense statement because "I didn't think anybody would miss a rapist."

21   (*Id.*)  After escaping, Lobato said she got in her car and went to her ex-boyfriend Jeremy

22   Davis' house.  (*Id.* at VI: 19.)  She claims she "hid" the car at Davis' house because she

23   "was afraid that this man would come after me." (*Id.*)  After changing her clothes in her car,

24   Lobato went "to the church right around the corner" from Davis' house.  (*Id.* at VI:21.)

25   Despite it still being early morning, Lobato testified "[t]hey were having some kind of choir

26   practice and the doors were open. (*Id.* at VI:103.)  She never asked the "choir people" for

27   help.  (*Id.* at VI:106.)  She called some unidentified people that she had just met, and they

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1  picked her up at the church, and, then she, went to their motel.  (*Id.* at VI:21-22; 103-104.)

2  Later that same week, she and Pyszkowski returned to Davis' house and retrieved her car.

3  (*Id.* at VI:22.)

4         Lobato also admitted that, after she was arrested, she was placed in holding cell at

5  CCDC and told Det. Thowsen the room reminded her of the scene where the crime occurred.

6  (*Id.* at VI:26-27.)  She told the jury she was actually referring to a "cave" located at the

7  Budget Suites.  (*Id* at VI:27; 71-72.)  With respect to Tienken, Lobato denied telling her that

8  she had severed someone's penis.  (*Id.* at VI:30-31.)  She described Tienken's testimony as a

9  "misunderstanding" and "mistaken."  (*Id.* at VI:56; 65.)  Lobato then testified that she talked

10  about the Memorial Day attack to several people prior to July 8, 2001.  She also testified to

11  several other facts in support of her alibi.  (*Id.* at VI:32-41.)

12         On cross-examination, Lobato confirmed she did not commit the homicide and

13  testified that she agreed with the Detectives that her assault occurred "a couple of weeks

14  ago" because "I didn't catch the couple of weeks ago part."  (*Id.* at VI:54.)  Lobato testified

15  she spoke in past-tense about her attacker because "I assumed" he was dead because the

16  Detectives were from homicide.  (*Id.* at VI:102-103.)  Despite the fact that she testified she

17  acted in self-defense, she agreed that she wanted to hide her car out of concern that

18  somebody saw her.  (*Id.*)  She also testified that prior witness testimony claiming that she

19  confessed to cutting someone's penis (including her own statement to the Detectives[5]) was

20  inaccurate because she does not know what she cut.  (*Id.* at VI:60-63.)  She admitted she did

21  not remember if she hit her assailant with anything when talking to the Detectives, but now

22  is confident she did not hit him.  (*Id.* at VI:64.)

23         Lobato agreed that the Budget Suites' parking lot was very populated but that she did

24  not recall screaming and never sought help.  (*Id.* at VI:100-101.)  She left the scene without

25  getting help because she did not want the man to know where she lived.  (*Id.* at VI:102.)

26

27  [5] She told the Detectives in her Mirandized statement, "I cut his penis. I remember that" and that she
was trying to "cut it off."  Ex. I.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    She admitted to getting rid of the clothes she was wearing, along with the knife, while

2    driving to Davis' house. (*Id.* at VI:72-73.) She could not explain why her own fingerprints

3    were not found in her car. (*Id.* at VI:77.) In discussing her Panaca doctor visits, Lobato

4    admitted she did not receive any anti-depressant medication on the July 5th visit, but did get

5    an anti-depressant prescription on July 13th. (*Id.* at VI:109.) Lobato said the reason she

6    refused on July 5th was due to her desire to join the military (which apparently ended by

7    July 13th). (*Id.* at VI:109; *see also* Ex. W.)

8        After Lobato testified, Douglas Twining took the stand. (Ex. V at VI:150.) Twining

9    testified that Lobato had lived with him until July 2, 2001, and, then, she returned to Panaca,

10    and he did not see her again until July 9, 2001. (*Id.* at VI:152-153.) However, he knows she

11    was in Panaca on those dates due to phone calls. (*Id.* at VI:152-153.) He, then, testified

12    regarding numerous phone calls made from July 8, 2001-July 9, 2001. He picked Lobato up

13    in Panaca after midnight on July 9, 2001 and took her back to his parents' house in Las

14    Vegas. (*Id.* at VI:161.) Lobato then stayed with him in Las Vegas until July 13th, when her

15    father picked her up. (*Id.* at VI:161-162.) Twining did not testify that Lobato ever told him

16    about the Budget Suites' attack.

17        On cross-examination, Twining estimated he met Lobato the end of April or first of

18    May 2001. (*Id.* at VI:164.) During the months of May and June 2001, Twining testified that

19    he saw Lobato quite frequently and that she lived with Pyszkowski, and he never testified

20    she lived at the Budget Suites. (*Id.* at VI:164, 166.) She eventually moved in with him for

21    ten to fourteen days after their relationship turned romantic. (*Id.*) He acknowledged that

22    after Lobato's arrest, but before he spoke to the Detectives, he had talked to Lobato's

23    parents "[m]aybe a half dozen" times about the importance of dates. (*Id.* at VI:173-174,

24    176.) Twining agreed that when he spoke with the Detectives on August 5, 2001, he told

25    them he picked Lobato up in Panaca on July 9th to return her to Las Vegas so they could

26    "lay low." (*Id.* at VI:178-179.)

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    After Twining, Richard Gloeckner took the stand. (*Id.* at VI:198.) He testified that

2  Lobato's stepmom took a sick day from work on July 6, 2001. (*Id.* at VI:198-201.)

3    Lobato's attorney read a report into the record from William J. Bodziak, a forensic

4  consultant who was a specialist in the area of shoe impressions and footwear. The report

5  concluded that footprints found at the Bailey crime scene did not match Lobato. (*Id.* at

6  VII:3-6.) Lobato then called witness Shayne Kraft ("Shayne") – Lobato's step cousin. (*Id.*

7  at VII:7-8.) Shayne testified she saw Lobato July 4, 2001 at a barbeque and July 8, 2021 in

8  the evening between 6:00 p.m. and 8:30 p.m. (*Id.* at VII:8.) She was able to establish the

9  date because she took her husband to the hospital the next day, and he received a

10  prescription. (*Id.* at VII:10-11.) On cross-examination, Shayne admitted that after Lobato's

11  arrest, Lobato's stepmom had discussed important dates with her. (*Id.* at VII:13.) During

12  these conversations, she realized that July 8th was the date she saw Lobato. (*Id.*)

13    Forensic science expert George Schiro ("Schiro") was called next. (*Id.* at VII:14.)

14  He offered testimony regarding the State's blood testing results. In his opinion, the positive

15  results were not indicative of human blood. (*Id.* at VII:21.) And, that if it was actually

16  human blood, there is no way to date the age of the blood. (*Id.* at VII:23.) Schiro testified

17  (in response to none of Lobato's own fingerprints being found in her own car) that

18  individuals do not always leave fingerprints. (*Id.* at VII:62-64.)

19    Lobato's next door neighbor, Jo Ann Dennert ("Dennert"), was the next witness. (*Id.*

20  at VII:69.) She testified to seeing Lobato on July 8, 2001, outside her home at around 1:30

21  p.m. riding a four-wheeler. (*Id.* at VII:72-73; 78.) She recalled the date because it was one

22  of her friend's birthdays. (*Id.* at VII:73-74.) Dennert also acknowledged that, after Lobato's

23  arrest, she talked to Lobato's parents about the importance of the July 8th date.[6] (*Id.* at

24

25

26  ──────────
[6] Interestingly, Dennert testified that Lobato's stepmother stressed this date the day after Lobato's
arrest—i.e., July 21, 2001. *Id.* at VII:77-78. This, despite the fact that the stepmother testified she
27  did not know the murder occurred on July 8th until July 25, 2001, when she read it in a newspaper
article. *Id.* at V:158-159.

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   VII:76-77.)  She never called the police and admitted that the stepmother provided her name

2   only to Lobato's defense attorneys.  (*Id.* at VII:82.)

3        After Dennert, Lobato's defense rested.

### 3.    State's Rebuttal Witnesses.

5        The first rebuttal witness was Zachory Robinson ("Robinson"), an assistant general

6   manager with the Budget Suites.  (Ex. V at VIII:47-48.)  He testified to the Budget Suites

7   being a busy 24-hour business.  (*Id.* at 47-48&50-52.)  He testified the spot where Lobato

8   claimed to have been assaulted was within view of the front office - maybe thirty-five to

9   forty feet away.  (*Id.*)  Robinson also testified that the hotel had twenty-four-hour security.

10  (*Id.* at VII:51.) After reviewing Budget Suites' records, he found no reports of a man being

11  assaulted with his penis being slashed and that, if there had been, management would have

12  "absolutely" been made aware.  (*Id.* at VII:51-53.)

13       The next rebuttal witness was Jean Page, the officer manager from the Holy Family

14  Church (i.e., the church Lobato claimed to visit immediately after her Memorial Day attack).

15  (*Id.* at VII:59.)  She testified that the church's office hours were "8:30 to 4:30."  (*Id.* at

16  VII:59.)  The church had one phone in the lobby (not the chapel) that was open to the public.

17  (*Id.* at VIII:61.)  Finally, the church's two choirs only practice on Tuesdays and Thursdays

18  from 6:30 p.m. to 7:30 p.m. – not a.m.  (*Id.* at VIII:62.) Lobato's attorneys asked the witness

19  no questions.  (*Id.* at VIII:64.)  The final rebuttal witness was Det. Thowsen.  (*Id.* at

20  VIII:64.)  Det. Thowsen explained his conversation with Lobato where she stated the CCDC

21  holding cell resembled the crime scene.  (*Id.* at VIII:67-68.)

22       Following Det. Thowsen, the parties made closing arguments.  (*Id.* at VIII:78-161.)

### 4.    The Verdict.

24       On May 18, 2002, the jury returned its verdict.  The jury found Lobato guilty of first-

25  degree murder with use of deadly weapon and sexual penetration of a human body.  (Ex. V

26  at IX:5.)

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### 5.      The Appeal of the 2002 Criminal Trial.

Lobato appealed her conviction to the Supreme Court of Nevada.  *See Lobato v. State*, 96 P.3d 765 (Nev. 2004).  In the appeal, Lobato raised thirteen issues.  Relevant to this case, Lobato claimed the trial court committed error: (1) in not allowing Lobato to impeach jail house informant Korinda Martin's testimony, (2) by allowing Lobato's pre-mirandized statement to be admitted, and (3) by allowing Det. Thowsen's interview of Lobato to be used against her because Lobato's statement was not voluntary and was the result of psychological coercion.

The Nevada Supreme Court held that the trial court erred in not allowing Lobato to impeach jailhouse informant Korinda Martin's testimony and remanded the case for a new trial.  Importantly, the Court found that Lobato's claims regarding her police interview were "without merit." *Lobato*, 96 P.3d at 772-73.

### E.      2006 CRIMINAL TRIAL.

Lobato's second trial for the murder of Duran Bailey occurred in September of 2006.  For this trial, Lobato retained new defense counsel.  The same prosecutors handled the prosecution. (Ex. A.)

### 1.      State's case-in-chief.

On the night of July 8, 2001, Shott was dumpster diving in the area of West Flamingo, near a Nevada State Bank, when he saw the stomach of what he believed was a dead body, behind the dumpster.  (Ex. A at IV:54-55, 56.)  Shott immediately left and went to the Terrible Herbst gas station a block away.  (*Id.* at IV:57.)  Not knowing what to do, Shott eventually called 911 two hours later, at 10:36 p.m.  (*Id.* at IV:58, 63, 64.)

Officer Testa, a field training officer with LVMPD, was dispatched to the scene of a sick or injured person at approximately 10:45 p.m.  (*Id.* at IV:108-109.)  He met with Shott, who showed him where the body was.  (*Id.* at IV:110-11.)  Testa moved the dumpster, to access the body, and immediately saw several spots of blood, some shoe prints, and a foot sticking out.  (*Id. at* IV:116, 117.)  Testa noticed blood so he backed away and called for

MAC:14687-221 3890205_1

1  medical assistance. The fire department confirmed that the person was dead. (*Id.* at IV:118-
2  19.) Testa testified that, although he indicated to the medical team where to step, there was
3  low light, and it was possible that someone could have stepped in areas they shouldn't have.
4  (*Id.* at IV:151.) Testa further testified that there was some saran or plastic wrap around part
5  of the body. (*Id at* IV:140, 152.) The victim was later identified as Bailey, a homeless man
6  who lived in that area. (*Id.* at IV:67, 75.) Bailey was 5'10" and weighed 133 pounds at time
7  of death. (*Id.* at VIII:42.)

8        Dr. Simms, the forensic pathologist who performed the autopsy on Bailey, testified
9  that the cause of death was likely a combination of the severing of the carotid artery and the
10  blunt force injury to the head.   (Ex. A at VII:141.)   Based on the injuries, Dr. Simms
11  categorized the homicide as a sexually motivate homicide. (*Id.* at VII:137.)   Dr. Simms
12  further testified that he believed a high probability for time of death was between 8 to 24
13  hours before 03:50 a.m. on July 9, 2001. (*Id.* at VII:146.)  He was 95% confident that the
14  death occurred within this time frame. (*Id.* at VIII:79.) Dr. Simms stated that he had lower
15  confidence in a time window of 12 to 18 hours, but it was still possible to a reasonable
16  medical certainty. (*Id.* at VII:147; VIII:20.)

17        Bailey suffered bruising at the back of his head, a superficial incised wound on his
18  neck, multiple abrasions, contusions and scratches on his face, as well as a patterned
19  abrasion on his face. (*Id.* at VII:71-72.) Bailey had also suffered a stab wound in the right
20  forehead area, several small incised wounds on the neck, a stab wound on his chin, and a
21  stab wound in the front of the neck. (*Id.* at VII:72.) There were abrasions and four stab
22  wounds on Bailey's side, defense wounds on his hands, a large 6-inch slash in his rectal
23  area, a stab wound to the scrotum, and Bailey's penis had been amputated. (*Id.* at VII:75-76,
24  81.) Dr. Simms testified that the stab wound in the front of the neck, as well as the stab
25  wounds in Bailey's side, the rectal slash, and the penis amputation had been done post-
26  mortem. (*Id.* at VII:84, 86.) The stab wound through the scrotum was made ante-mortem,
27  with an upward thrust. (*Id.* at VII:86, 111.) Dr. Simms testified that the stab wounds were

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    created by a single-edged knife or weapon. (*Id.* at VII:85.) However, he stated it would be

2    very improbable that the wounds were caused by scissors, and none of the wounds were

3    consistent with a snipping wound. (*Id.* at VII:111, 120-21, 153.)

4    Dr. Simms further testified that the injuries to Bailey's face could be consistent with

5    being struck in the face with a bat, possibly by a female. (*Id.* at VII:132-33, VII:80-81.)

6    Simms also testified that the stab wound to the scrotum could have been the first wound, and

7    Bailey would have been in severe pain. (*Id.* at VII:134, 136.) The blunt force trauma to the

8    back of the head was consistent with Bailey striking his head when falling down, and the

9    accompanying skull fracture would likely have rendered him unconscious. (*Id.* at VII:131.)

10    Thomas Wahl, the DNA analyst, examined the medical examiner's assault report of

11    Bailey, and noted that semen was detected on the penile swabs and rectal swabs, although

12    there were no sperm cells to examine. (*Id.* at V:174-75.) Dr. Simms testified that given the

13    injuries to Bailey's genital and rectal area, it would be possible for semen to transfer from

14    the prostate gland to the injuries. (*Id.* at VII:86-88; VII:107-08.) Bailey was not wearing his

15    pants at the time of the injuries to the genital area, and Dr. Simms testified that the blood

16    pattern on the pants was consistent with Bailey standing or kneeling at the time of the stab

17    wound to the scrotum. (*Id.* at VII:127-28.)

18    On July 18, 2001, Lobato visited Tienken, her former middle school and high school

19    teacher. (Ex. A at V:12.) Lobato visited Tienken in the early hours of Wednesday morning,

20    and told Tienken that she had done something bad, stating, "I really need to talk to you."

21    (*Id.* at V:15-16, VII:11.) Tienken, in the 2002 trial, testified that this occurred on July 18th,

22    but, at the 2006 trial, testified that "[she] realized that that had to have been wrong." (*Id.* at

23    V:16.) In her August 7, 2001 preliminary hearing testimony, Tienken testified that she had

24    talked to Johnson the same day she talked to Lobato. (*Id.* at V:18-19.) Lobato told Tienken,

25    "I did something and I could have hurt somebody but I'm not sure what all I did." (*Id.* at

26    V:22.) Lobato disclosed that a man approached her, scared her, knocked her down and tried

27    to place his penis inside her mouth; in response, she tried to stab up with her knife, then

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    grabbed the man's penis and "cut it off." (*Id.* at V:22-24, 54.) She, then, threw the severed

2    penis away from her. (*Id.* at V:26-27.) Lobato told Tienken after she cut the penis off, she

3    got "ick" on her, and she got up and ran back to her car. (*Id.* at V:34-35.) Lobato told

4    Tienken the man was alive and groping at his groin as she ran off. (*Id.* at V:72.) This

5    happened either in the early morning or late at night, on a west hotel street, such as West

6    Flamingo or West Desert Inn. (*Id.* at V:28, 29, 56-57.) Tienken, in her voluntary statement

7    to the police on July 26, 2001, told them that Lobato said her attacker was "old and smelly."

8    (*Id.* at V:30.) In the 2002 trial, Tienken only testified to Lobato saying the attacker was

9    "smelly." (*Id.* at V:32.) Tienken, at the second trial, added that Lobato also told her the

10    attacker was "big" and "black," adding new details to the attacker's build that were not in

11    Tienken's voluntary statement or two prior testimonies. (*Id.* at V:29-30, 124-26.) Lobato

12    stated she then went to take a shower at a friend's place in Las Vegas, and then wanted to go

13    home to Panaca. (*Id.* at V:35-36.) Lobato told Tienken that this had happened a few days

14    earlier, while she had been using methamphetamine, stating "I'm don't [sic] with it, I've got

15    to get clean, I want to get off of it." (*Id.* at V:36-37, 45.)

16        Lobato and Tienken searched newspapers and the internet for any mention of a man

17    with a severed penis. (*Id.* at V:37-38, 39.) Tienken testified for the first time that they

18    searched as far back as July 1, 2001; although, in her voluntary statement, Tienken told the

19    police she thought the attack had happened only one or two days before. (*Id.* at V:37-38.)

20    On cross-examination, Tienken further added she researched as far back as June 1, 2001, in

21    response to defense counsel's suggestion that "isn't it true, and I just want to clarify this,

22    that you did research all the way back to June 1st, not July lst?" (*Id.* at V:82-83.) Tienken

23    later admitted on re-direct examination that she had not mentioned this date range in her

24    voluntary statement, or in either of her two prior sworn testimonies. (*Id.* at V:121, 122-23.)

25        Tienken testified that Lobato was not driving her new car because her ex-fiancé,

26    Davis, had vandalized her car. (*Id.* at V:40-41.) In her voluntary statement, two weeks after

27    Lobato's visit, Tienken made no mention of Davis, but, instead, told police Lobato said "I'm

1   not driving that car. I don't want anybody to see it," because she was afraid someone may

2   have seen it when she left the site of her attack. (*Id.* at V:40-41.) Lobato told Tienken her

3   father would help get her car cleaned. (*Id.* at V:52.)

4          Tienken related the incident to her friend Laura Johnson, a Lincoln County Juvenile

5   Probation/Parole officer, that same day, on Wednesday, July 18, 2001. (*Id.* at V:47-48;

6   VII:38-39, 49.) Tienken told Johnson that Lobato was hiding out in Panaca with her step-

7   mother and father, who were also hiding Lobato's car and planning on either selling or

8   painting it. (*Id.* at VII:42-43, 59.) Johnson called the LVMPD on Friday, July 20, 2001, to

9   find out whether a man had recently had his penis cut off, and was transferred to Det.

10  Thowsen. (*Id.* at VII:45-46.) Det. Thowsen drove to Panaca to speak with Johnson

11  immediately. (*Id.* XI:203.)

12         Johnson testified that Tienken came to see her on July 18, 2001. (*Id.* at VII:38.)

13  Tienken told her that Lobato was "hiding out in Panaca." (*Id.* at VII:43.) Johnson also

14  testified that prior to the second trial, Tienken called her and tried to give her articles on the

15  case that she had printed out from the internet. (*Id.* at VII:50.) Moreover, Tienken "was

16  absolutely trying to convince [Johnson]" that Tienken had related the description of

17  Lobato's attacker at the time they first spoke of the incident. (*Id.* at VII:51-53, 54.) Johnson

18  testified she did not remember Tienken ever mentioning a description of the attacker. (*Id.* at

19  VII:63.)

20         Michele Austria testified that Lobato claimed she was attacked sometime in the two

21  weeks surrounding July 4, 2001, although Lobato did not give a definite date. (*Id.* at VI:61-

22  63, 66.) Austria testified on cross-examination that she could not give a specific time or

23  dates as to when the conversation about the attack took place. (*Id.* at VI:81-82, 103-04.)

24  She testified she went four-wheeling around Panaca with Lobato during the summer, and

25  that she saw Lobato the weekend of June 30, 2001. She also stated she went four-wheeling

26  with Lobato either on July 7 or 8, 2001, however, Austria did not recall four-wheeling with

27  Lobato in the afternoon of July 8. (*Id.* at VI:86, 87, 108.) Austria further testified that she

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    went rock-climbing with Lobato during one of these four-wheeling excursions, during which

2    Lobato scratched her stomach. (*Id.* at VI:90, 99-100.) Austria added that she thought she

3    may also have gone four-wheeling with Lobato on the weekend of July 14th and 15th. (*Id.*

4    at VI:91, 101.) Austria knew Lobato was going to the doctor because she was having

5    trouble dealing with her conscience and was depressed because of this incident. (*Id.* at

6    VI:68-69.) Lobato told Austria she was upset because she was not sure whether she had

7    killed the person or not. (*Id.* at VI:70, 85.) Austria admitted she only assumed the attack

8    took place a few weeks before Lobato returned to Panaca. (*Id.* at VI:93, 104.) At the time

9    Lobato disclosed the attack to Austria, Lobato also told Austria she was on medication,

10   including Prozac. (*Id.* at VI:93-95.) [Lobato was not prescribed Prozac before July 16,

11   2001. (*Id.* at XVIII:158.)]

12           Austria's boyfriend, Paul Brown, testified that he overheard Lobato tell Austria that

13   "she'd reached down and cut a man's penis off." (*Id.* at VI:117, 118.) Brown testified he

14   saw Lobato's car in front of her parents' house around the weekend of July 7 and 8, but

15   could not be sure of whether the car was moved during that time period in July. (*Id.* at

16   VI:139.)

17           Christopher Carrington, Lobato's high school boyfriend, testified he told police that

18   the first time he saw Lobato since she returned from Vegas was seven or eight days prior to

19   his statement to police on July 26, 2001. (*Id.* at VIII:91-93.) Carrington testified in the

20   2002 trial that Lobato told him she had driven herself back from Vegas in her red car, but

21   testified, in the 2006 trial that, "that was a mistake in [his] last testifying." (*Id.* at VIII:96-

22   97.) Carrington, in the second trial, testified that he initially saw Lobato on July 3, in

23   Caliente, and at her house on July 5th, July 6th, July 7th, and July 8th after he was done with

24   his yard work around Panaca. (*Id.* at VIII:97-98, 130-31.) He admitted to never having told

25   the police this. (*Id.* at VIII:98, 111-12.) Carrington testified he "vaguely remembered"

26   leaving her house on July 5th, but did not remember telling his grandmother that this was

27   because Lobato and her mother were fighting. (*Id.* at VIII:99-100.) Carrington remembered

MAC:14687-221 3890205_1

1    seeing Lobato in the afternoon and evening of Sunday, July 8th, when Lobato was packing

2    for Las Vegas. (*Id.* at VIII:113-14.) Carrington testified he had gone over the dates in a

3    calendar with his mother after speaking with police, in order to identify the dates he saw

4    Lobato. (*Id.* at VIII:118.) In the first trial, Carrington testified that the only time he was

5    positive about the date was after Rebecca Lobato discussed July 8 with him. (*Id.* at

6    VIII:121; VIII:101-02.) In the second trial, Carrington claimed this was again "a mistake in

7    [his] last testimony." (*Id.* at VIII:121.) Carrington also testified that he had once seen

8    Lobato punch a man and knock him out. (*Id.* at VIII:104-05, 117.)

9        Diane Allen, Carrington's grandmother, testified that Carrington was a "lame brain"

10   and "slow." (*Id.* at VIII:152.) On July 5, Carrington went to Lobato's house, but returned

11   early because Lobato and her mother were fighting about Lobato wanting to return to Las

12   Vegas, and he did not want to be in the middle of it. (*Id.* at VIII:153-54.) Allen testified

13   that on July 7, her husband had heatstroke around 1:00 p.m., and she and Carrington went to

14   the hospital in Caliente with him, after Carrington had mowed her grass in the morning. (*Id.*

15   at VIII:156-57, 170.) Later, sometime after Lobato's arrest, Allen saw Rebecca Lobato at

16   the store, at which point, Allen told Lobato that Carrington would not be "giving false

17   testament for anybody or anything." (*Id.* at VIII:158-59.)

18       Jeremy Davis, Lobato's ex-boyfriend, testified in 2002 that when Lobato was on

19   drugs, she didn't care about anything. (*Id.* at VI:162.) He testified that getting more drugs

20   was her number one priority while they were together. (*Id.* at VI:163.) He also testified that

21   Lobato also supplied the methamphetamine they took together, but although he did not

22   know where the drugs came from; Lobato told him she had sources. (*Id.* at VI:163-64.)

23   Davis testified that although the drive from Panaca to Las Vegas was two hours, there was a

24   shortcut Lobato knew about which would reduce the trip to an hour. (*Id.* at VI:152.) After

25   their breakup, Lobato left her car in his driveway around May 23rd, before he left town for a

26   softball tournament on Friday, May 25th. (*Id.* at VI:156.) When Davis returned on Monday

27   the 28th, Lobato's car was already gone. (*Id.* at VI:157.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

Stephen Pyszkowski testified he met Lobato through Davis, who worked for him, and Lobato came to live with him and his girlfriend for three or four weeks, starting in June of 2001. (*Id.* at VI:7-8, 41.)  Lobato occasionally helped him with his work servicing fire extinguishers. (*Id.* at VI:7-8.)  Their work covered an approximate 10-square-mile territory between Charleston and Tropicana; Rainbow on the west and the interstate on the east. (*Id.* at VI:8-9, 26.)  Pyszkowski and Lobato took methamphetamine together when she lived with him, as well as with Twining. (*Id.* at VI:17, 22-23.)  He also testified that he saw Lobato with a butterfly knife that she would draw it out and flip it open one-handed. (*Id.* at VI:17-18, 31, 38-39.)  Pyszkowski testified he had no knowledge of an attack on Lobato at any point in June 2001. (*Id.* at VI:34.)  A few days before July 4, 2001, Lobato moved in with Twining. (*Id.* at VI:10, 51-52.)  Pyszkowski testified that after Lobato moved out of his house, she stayed with Twining, who then helped her move to Panaca on July 2, 2001. (*Id.* at VI:10, 47, 52.)  Pyszkowski testified that Lobato hid her car in a parking lot because she was worried about her car being recognized by Davis, after Lobato and Davis broke up in early June, 2001. (*Id.* at VI:41.)  Pyszkowski accompanied Lobato to pick up her car after she had left it in front of Davis' residence, and Pyszkowski testified one of the headlights did not work, and the inside of the car had been trashed, with "garbage and maybe beer." (*Id.* at VI:41, 47.)  Pyszkowski stated he was not close enough to notice feces or urine in the car. (*Id.* at VI:47.)

Zachory Robinson, the assistant general manager of the Budget Suites, testified that the property included a water fountain with a small tunnel going through the waterfall, which looked like a cave. (*Id.* at XIV:163-64.)  He reviewed the daily security records, and, despite there being a security patrol on the property and an office that was open 24-hours a day, there was no mention made of a man with an injured penis, no report of blood on the ground close to the fountain area, and no weapon found on the property. (*Id.* at XIV:167-70, 173-75.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    Next, Det. Thowsen testified regarding his investigation.  (Ex. A at XI:172-73.)

2    Initially, Det. Thowsen investigated the possibility that Diann Parker, whom Bailey had

3    previously sexually assaulted, was involved, but ruled her out as no evidence pointed to her.

4    (*Id.* at XI:193-94.) Det. Thowsen testified that Bailey's body had clearly been moved from

5    the corner where it had bled to the location in which it was found.  (*Id.* at XI:184.)  Det.

6    Thowsen explained that the police withheld the detail of the severed penis.  (*Id.* at XI:198.)

7    Upon receiving the telephone call from Johnson asking whether LVMPD had a victim who

8    was killed and whose penis was severed, on July 20, he drove up to Lincoln County with

9    Det. LaRochelle and crime scene analyst Maria Thomas.  (*Id.* at XI:201-203.)  Because

10   Johnson warned him that if he spoke with Tienken first, she might warn Lobato, Det.

11   Thowsen went to Lobato's house to interview her first.  (*Id.* at XI:203, 207-08.)  He

12   introduced himself as a homicide detective and stated that her car and license plate were

13   distinctive.  (*Id.* at XI:212.)  Lobato immediately responded that someone could have

14   borrowed her car.  (*Id.* at XI:213.)  Det. Thowsen replied that he had heard she had been

15   attacked a few weeks earlier, without mentioning someone had been murdered.  (*Id.* at

16   XI:213.)  Lobato started crying, and said, "I didn't think anybody would miss him." (*Id.* at

17   XI:213, XIII:8.)  Lobato then waived her Miranda rights and said she would speak with the

18   Detectives.  (*Id.* at XIII:9, 11-14.)  Det. Thowsen then taped Lobato's statement.  (*Id.* at

19   XIII:22-23.)

20   In her taped statement, Lobato stated that she was attacked by a very smelly man, at

21   nighttime, "late at night like probably more into early morning," when she was coming back

22   from going out one night. (Ex. I at 4, 12.)  She told the Detectives she was out of her mind

23   on drugs at the time, and a man, who seemed like a giant to her 5'7" and 101-pound frame,

24   grabbed her from behind and threw her on the ground.  (*Id.* at 3-4, 5.)  Lobato stated she

25   drew out her knife, "everything [went] black from then on," and all she remembered was

26   throwing out her clothes afterward. (*Id.* at 5.)  She stated she remembered cutting his penis,

27   but didn't remember whether she had hit him with anything, although it was possible she hit

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    him with the baseball bat she kept in her car. (*Id.* at 6, 21.) Lobato told the Detectives, "I

2    figured nobody would care if I just drove off," and "I didn't think anybody would miss

3    somebody like that." (*Id.* at 8.) Lobato said that although she thought it was at the Budget

4    Suites off Boulder Highway, which had a fountain, it was possible she had the location

5    mixed up, as she didn't remember much. (*Id.* at 15, 20; Ex. A at XI:102.) Lobato also told

6    police, "well there was a dumpster not far away, it happened - where it happened but I don't

7    remember putting him in it or anything. I don't think there's any way that I could have."

8    (Ex. I at 16.)

9          After her statement, Det. Thowsen placed Lobato under arrest and drove back down

10    to Las Vegas with her, while her car was towed. (Ex. A at XIII:25-26, 28.) Before leaving

11    the house, Lobato told her mother, "Mom, I did it, now I have to do what I have to do." (*Id.*

12    at XIII:31.) Lobato also told her father, Larry, "I'm sorry daddy. Told you I did something

13    awful." (*Id.* at XIII:33.) Rebecca asked permission to give Lobato her Prozac and

14    Lorazepam before Det. Thowsen left with Lobato. (*Id.* at XIII:39.) While Lobato was in

15    jail getting photographed and booked, Lobato volunteered that the room she was in "looked

16    similar to the structured area where the attack had occurred," and that during the attack, she

17    could look up and see the covered parking in the parking lot from her position. (*Id.* at

18    XIII:50, 53.) Det. Thowsen testified that the crime scene had a parking structure above and

19    behind the dumpster enclosure, and that the dumpster enclosure had similarities with the

20    inside of the jail. (*Id.* at XIII:51-53, 86−87, 141.)

21          Once Lobato was in custody, Det. Thowsen researched whether anyone had been the

22    victim of a slashed or severed penis for the months of May, June and July, and found no

23    information. (*Id.* at XIII:62-63.) Det. Thowsen testified that based on his experience,

24    people often perceive attackers as much larger, and that Lobato's description at the time

25    matched Bailey's. (*Id.* at XIII:98-99.) He also testified that, based on his experience,

26    suspects often minimize their acts; meaning that persons giving statements to police

27    regarding their involvement with a crime will often tell the police things they feel the police

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    already know and then try to minimize their actions by justifying their actions.  (*Id.* at

2    XIII:69.)    Det. Thowsen further testified that individuals claiming they were on

3    methamphetamine at the time of a crime often jumble things together and put things together

4    with unrelated events - especially if that person was on a multi-day "binge," during which

5    it's "not that uncommon for them not to be able to remember certain things and to remember

6    things strangely sometimes." (*Id.* at XIII:71.)   In Det. Thowsen's opinion, Lobato was

7    minimizing when she said her attacker was still alive when she left. (*Id.* at XIII:69-70, 104.)

8            Lobato's car, a red 1984 Pontiac Fiero with the license plate "4NIK8R" was seized

9    by law enforcement in front of the Lobato's' house and towed to the Metro Crime Lab for

10   analysis.  (Ex. A at IX:21, 74; XI:57; XIII:127; VI:138.)   Crime Scene Analyst Louise

11   Renhard ("Renhard") processed the vehicle on July 22, 2001. (*Id.* at IX:73-74.)   Renhard

12   utilized Luminol testing on the interior of the vehicle, which yielded presumptive positive

13   results for the presence of blood on the driver's side floral seat cover, the driver's side

14   factory installed grey seat cover, the driver's side interior door panel and the driver's side

15   floor board. (*Id.* at IX:89-91.)   Renhard noted that the vehicle was old and not very clean,

16   however, the seat covers were very clean as though they had been laundered. (*Id.* at IX:94-

17   94.)

18           DNA analyst Thomas Wahl ("Wahl") conducted further testing on the areas which

19   yielded presumptive positive chemiluminescent (Luminol) results for blood.  (*Id.* at V:152,

20   154, 159-60.)  Wahl utilized phenolphthalein testing, which yielded presumptive positive

21   results for the presence of blood on the front left seat cover and the door panel. (*Id.* at

22   V:165.)   Wahl was unable to confirm that the presumptive positive areas were blood;

23   however, he noted that human blood which has been degraded through cleaning solutions

24   would not yield a confirmatory result. (*Id.* at V:167-68, 215.)

25

26

27

MAC:14687-221 3890205_1

2.    **Lobato's Case-in-Chief.**

a.    **Lobato's witnesses and experts.**

The defense called Diann Parker to testify regarding Bailey having beaten and sexually assaulted her on July 1, 2001. (Ex. A at XIV:14-16, 18-21, 22-23.) Parker testified she knew that Bailey stayed behind the Nevada State Bank on West Flamingo and Arville. (*Id.* at XIV:24.) On cross-examination, Parker stated that Bailey often traded sex for drugs. (*Id.* at XIV:34-35.) Parker was present at the crime scene early on Monday, July 9th, and talked to the Detectives who sent someone to her home. (*Id.* at XIV:16-17.)

The defense called Dr. Michael Laufer ("Dr. Laufer") as an expert witness. Dr. Laufer, an emergency room trauma surgeon and expert in forensic medicine, testified that based on his experience, he believed that scissors may have inflicted the injuries on Bailey. (*Id.* at XII:52-53, 71-72, 85.) He further testified that the blunt force trauma could be caused by someone holding the scissors in a closed fist, "like brass knuckles." (*Id.* at XII:65.) Based on the distance between injuries, Dr. Laufer testified that the spacing between handles was consistent with someone with a large hand, and that Lobato's hand was too small to have caused the injuries. (*Id.* at XII:66-67, 93-94.)

On rebuttal, the State recalled Dr. Simms, who testified that he disagreed with Dr. Laufer for several reasons, being that scissors are commonly used as a stabbing tool, and are not opened up; moreover, when scissors are used to stab, the resulting wound is specific. (*Id.* at XVIII:215-17.) Furthermore, the wounds had no tissue bridging - or blunt force trauma across the wound - which Dr. Simms testified meant the wounds were caused by sharp force injuries that severed the tissue. (*Id.* at XVIII:217-18.) Dr. Simms further testified that the wound to the carotid artery could not be caused by scissors: he stated this would have been anatomically impossible, and the perpetrator would have had to cut half the neck to get down to the carotid artery with scissors. (*Id.* at XVIII:221-22.) Dr. Simms testified that the patterned injuries on the abdomen could only be caused by prolonged pressure after death, not by a hand holding scissors. (*Id.* at XVIII:227.) Generally, Dr.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1   Simms testified that none of the wounds could have been caused by scissors. (*Id.* at
2   XVIII:231, 234-35.)

3       The defense also called Shelley Pierce-Stauffer, an investigator with the Clark
4   County Coroner's office, and Sergeant Kevin Manning, a sergeant with LVMPD Homicide
5   Unit. (*Id.* at XV:49, 57.) Defense elicited testimony that the police had withheld evidence
6   of Bailey's penis having been amputated from the public. (*Id.* at XV:52-53, 62-64.)

7       The State stipulated to a footwear examination report done by William J. Bodziak, a
8   forensic consultant who was a specialist in the area of shoe impressions and footwear, who
9   had been an expert in prior proceedings. (*Id.* at XV:133-34.) The report found that the shoe
10  impressions found at the crime scene did not match those of Lobato. (*Id.* at XV:136-37.)

11      Finally, Lobato's defense called Brent Turvey ("Turvey") as a defense expert in the
12  fields of forensic science, crime reconstruction, and crime scene analysis. (*Id.* at XVI:96-97,
13  109.) Turvey testified to the physical evidence found at the crime scene and in Lobato's
14  vehicle, and DNA evidence from the sexual assault kit. Turvey further reviewed Dr.
15  Simms' testimony as to the sexual motive behind the injuries. (*Id.* at XVI:120.) Turvey
16  testified that, in his opinion, there was no physical evidence associating Lobato with the
17  crime scene; that there was no physical evidence associating Lobato's vehicle with the crime
18  scene; that there was exculpatory physical evidence that was not examined; that the DNA
19  evidence from the sexual assault kit was inconsistent with Lobato; and that, in his opinion,
20  the homicide was more consistent with a male-on-male homicide. (*Id.* at XVI:119-21.)

21                    **b.    Lobato's alibi witnesses.**

22      Jo Wuori ("Wuori") (fka Jo Dennert), Lobato's neighbor, stated she saw Lobato ride
23  a four-wheeler in front of her house sometime between 11:00 a.m. and 1:00 p.m. on July 8,
24  2001. (Ex. A at XV:9.) In her May 2002 testimony, Wuori never mentioned the time range
25  during which she saw Lobato, or provide details as to what Lobato was doing. (*Id.* at
26  XV:14-15.) Wuori did not remember Lobato's vehicle being parked in front of her house.
27  (*Id.* at IX:13.) Wuori admitted that she was friendly with the Lobato family and talked with

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    Rebecca and Larry on a daily basis back then. (*Id.* at XV:18-19.) Wuori further admitted

2    that, the day after Lobato was arrested, Rebecca discussed the July 8th date with her. (*Id.* at

3    XV:19.) Rebecca gave Wuori's name to the defense investigator. (*Id.* at XV:27.)

4    Robert McCrosky ("Robert"), and his wife, Wanda ("Wanda"), were the Lobato's

5    neighbors. Robert testified that he remembered seeing Lobato' car at some point in the

6    first part of July 2001, and that he did not see it move, although he and his wife were out of

7    town for two or three days around July 4, 2001. (*Id.* at XVI:10, 12, 14.)

8    Heather McBride, who lived in Caliente in 2001, testified that, although she saw

9    Lobato on between July 1st, 3rd, and 4th, 2001, she did not remember seeing Lobato at any

10    time after July 4, 2001. (*Id.* at XVI:58.) However, in her statement to police, Heather said

11    Lobato confided in her about her attack on July 5th or 6th, which is after July 4, 2001. (*Id.*

12    at XVI:68-69.)

13    Clint Hohman ("Clint") testified he saw Lobato four-wheeling sometime after he

14    went to church on the morning July 8, 2001. (*Id.* at XVII:98-99.) However, Clint admitted

15    he only became a defense witness three years after the first trial, in October 2005, and that

16    Rebecca talked to him after Lobato's arrest. (*Id.* at XVII:103-04.) Clint further admitted

17    Rebecca talked to him on the same day he was testifying. (*Id.* at XVII:106.)

18    Kendre Thunstrom testified that she saw Lobato standing in the driveway of her

19    parents' house between 5 to 6 p.m., on July 8, 2001. (*Id.* at XVII:113.)

20    Shayne Kraft ("Shayne"), Lobato's cousin, testified that she saw Lobato on July 8th,

21    sometime between 6:00 p.m. and 8:00 p.m., when she went to the Lobato's' house to pick up

22    Tiger Balm for her husband. (*Id.* at XV:87-88.) She also saw Lobato on July 4th, for the

23    barbecue at the Lobato's' home, and found Lobato to look sick and pale. (*Id.* at XV:96.)

24    Shayne admitted she talked to Rebecca the day after Lobato was arrested, and she spoke

25    with her several times about Lobato and what she was arrested for. (*Id.* at XV:104.) Shayne

26    further testified that while Lobato was home the week of July 4th, Rebecca was trying to

27    help get Lobato off drugs. (*Id.* at XV:110-11.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Page 42 of 76                    MAC:14687-221 3890205_1

1    John Kraft ("John"), Shayne's husband, testified he saw Lobato around 7:00 a.m. on

2  July 8th when he went to talk to Larry about taking care of his wife and unborn child while

3  he was away for work. (*Id.* at XV:118-19.) He added that he and Shayne discussed the day

4  of July 8th after Lobato was arrested, but admitted he had never disclosed any of this to the

5  police or told anyone this story until four weeks prior, when he was first contacted by the

6  defense. (*Id.* at XV:129-30, 133.) John admitted that the first time he offered what he

7  testified to in the 2006 trial was four weeks before his testimony in September 2006. (*Id.* at

8  XV:130.)

9    Ashley Lobato ("Ashley"), Lobato's stepsister, testified she spent July 4th with her

10  family. (*Id.* at XVII:123.) She testified that on July 8th, she only saw Lobato in the late

11  afternoon, around 3:00 or 4:00 p.m. (*Id.* at XVII:129, 134.) Ashley further testified that

12  around midnight, Lobato was getting ready to return to Vegas. (*Id.* at XVII:132.) Ashley

13  testified that Lobato was in Vegas from July 2nd until July 8th. (*Id.* at XVII:133.) Ashley

14  admitted she didn't remember whether she saw Lobato on July 5th, July 6th, or July 7th,

15  because she was in and out of the house all week. (*Id.* at XVII:125, 126, 161.) She also

16  admitted Lobato's car could have moved without her knowing about it. (*Id.* at XVII:157.)

17  Rebecca and Larry had a cell phone that Ashley and Lobato were allowed to borrow. (*Id.* at

18  XVII:149.) Ashley testified that she was noticed as an alibi witness for the defense in the

19  first trial, but the Court, after her October 3, 2006 testimony, took judicial notice of the fact

20  that Ashley was listed as an alibi witness for the first time on October 20, 2005. (*Id.* at

21  XVII:170-71, 173-74.)

22    Larry Lobato testified that Lobato returned to Panaca on July 2nd, and that she went

23  to the doctor the morning of July 5, 2001. (*Id.* at XVII:178-79.) He further testified that he

24  saw Lobato every morning between July 2nd and July 9th, 2001. (*Id.* at XVII:185.) Larry

25  testified Rebecca took Lobato to the doctor on July 5th, and then took the day off work on

26  July 6th in order to take care of Lobato, who was sick. (*Id.* at XVIII:44-45.) On July 7th,

27  Larry went to work from 4:00 p.m. to 2:00 a.m. on July 8th, and that Lobato came to his

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   workplace for approximately forty-five minutes around 6:00 p.m. on July 7, 2001.  (*Id.* at

2   XVIII:186-87.)  Larry testified that Austria and Brown had driven Lobato to his workplace.

3   (*Id.* at XVIII:187.)  He further testified that Rebecca picked Lobato up around 7:00 p.m.,

4   and that when he got home, he saw Lobato sleeping.  (*Id.* at XVIII:187-88, 189.)  Larry

5   stated that he woke Lobato around 7:00 a.m. on July 8, 2001, because John Kraft had come

6   over.  (*Id.* at XVIII:191.)  He stated he saw Lobato around noonish, and again after midnight

7   on July 9th, before Lobato left for Las Vegas.  (*Id.* at XVIII:193-94, 196; XVII:42.)  Lobato

8   called Larry the morning of July 13th, and Larry went to pick her up in Las Vegas.  (*Id.* at

9   XVII:197; XVIII:49.)  Lobato was at home in Panaca on July 14th through 20th.  (*Id.* at

10  XVIII:51.)  Larry admitted he saw scratch marks on Lobato's belly sometime between the

11  14th and the 20th.  (*Id.* at XVIII:52.)  He also admitted that he had not told anybody before

12  about the morning of July 8th, when John Kraft visited.  (*Id.* at XVIII:54.)  Larry agreed he

13  would do anything he could to help his daughter (he did not testify at the first trial).  (*Id.* at

14  XVIII:54.)  Larry couldn't remember whether Carrington was at his house the week of July

15  2nd through July 9th, but remembered something happened with Carrington's grandfather.

16  (*Id.* at XVIII:64.)

17        Rebecca, Lobato's stepmother, testified Lobato returned from Las Vegas on July 2,

18  2001.  (*Id.* at XVIII:78.)  On July 5th, Rebecca called the doctor about Lobato because

19  Lobato thought she was being poisoned, and on July 6th, Rebecca stayed home from work to

20  take care of Lobato.  (*Id.* at XVIII:95, 156.)  In July 2001, Rebecca had a cell phone and a

21  landline number.  (*Id.* at XVIII:87.)  On July 6, 2001, Rebecca's cell phone called Larry's

22  work, the Hide Away Bar, at 9:50 p.m., despite Rebecca stating she was at home.  (*Id.* at

23  XVIII:97-98.)  From her home phone, several calls were made on July 6, 2001: to Doug

24  Twining's cell phone at 1:11 p.m., the Hide Away bar, an unknown number, Doug's house

25  phone at 2:12 p.m., Doug's cell phone at 4:51 p.m., the Pioche Sheriff's Department at 5:27

26  p.m., and to the Hide Away again at 8:38 p.m.  (*Id.* at XVIII:110-14.)  Rebecca testified that

27  the phone call she made to the Sheriff's Department was to request a jumpsuit for Larry,

1  despite testifying in May 2002 that the phone call to the Sheriff was probably because she

2  was looking for her truck. (*Id.* at XVIII:165.)

3       Rebecca returned to work on July 7th.  On July 7th, the cell phone made and

4  received several calls to and from the Lobatos' home, the Hide Away, and family members,

5  including a call to the Lobatos' landline at 8:35 a.m.  (*Id.* at XVIII:98-100.)  The landline

6  called the cell phone at 8:37 a.m., Lorenzo's parents at 9:37 a.m., Doug's cell phone at 9:39

7  a.m., Doug's home at 12:41 p.m., and again Doug's cell phone at 9:19 p.m.  (*Id.* at XVIII:

8  98-100; 114-16.)  The landline also made calls to the Hide Away bar on that day, at 4:08

9  p.m., 4:20 p.m., 4:26 p.m., 5:05 p.m., 7:04 p.m., and 8:38 p.m.  (*Id.* at XIX:116-17.)

10  Rebecca claimed that she was in possession of her cell phone on July 7th.  (*Id.* at

11  XVIII:115.)  Rebecca testified that on July 7th, around 4:05 p.m., she went to the Hide

12  Away Bar to stay for a couple of hours and visit with her husband, before leaving around

13  7:30 p.m.  (*Id.* at XVIII:123-34.)  Rebecca stated that she then had to return to the bar

14  around 8:15 p.m. to pick up Lobato because there was a message left asking her to call her

15  husband at the bar.  (*Id.* at XVIII:124.)  Larry had testified Rebecca·picked Lobato up

16  around 7:00 p.m.  (*Id.* at XVII:187-88.)  Rebecca stated she and Lobato were not fighting on

17  July 5th or July 6th, and that Carrington was around on a daily basis on the 5th, 6th, 7th, and

18  8th of July.  (*Id.* at XVIII:127-28.)  Rebecca testified that Carrington came over on the

19  evening of July 7th, around 8:30 p.m.  (*Id.* at XVIII:128-29.)  Rebecca testified on cross-

20  examination that she and Lobato fought the evening of July 7th until around 11:00 p.m.

21  because Rebecca did not want Lobato to return to Las Vegas to the people she believed were

22  poisoning her.  (*Id.* at XVIII:149-50.)  In her 2002 testimony, Rebecca failed to mention she

23  and Lobato had an argument.  (*Id.* at XVIII:153-54.)

24       On July 8th, a call was placed from the cell phone to the landline at 10:17 a.m.  (*Id.*

25  at XVIII:101.)  The landline called Doug's cell phone or landline at 11:57 a.m., 5:06 p.m.,

26  and 6:38 p.m.  Rebecca testified that Lobato left Panaca for Las Vegas around 1:00 a.m. on

27  July 9th, when Doug Twining picked her up.  (*Id.* at XVIII:108.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Rebecca testified that she did not see Lobato between July 9th at 1:00 a.m. and

2    Friday, July 13. (*Id.* at XVIII:154.) On July 13, Rebecca called the doctor asking for some

3    anxiety and depression medication for Lobato, and the doctor provided a prescription for

4    Ativan that Rebecca filled that day. (*Id.* at XVIII:156-57, 182.) Rebecca testified Lobato

5    received another prescription on July 16, for Prozac. (*Id.* at XVIII:158.)

6    After Lobato was arrested on July 20th, Rebecca admitted she made a phone call

7    from the landline to Doug's landline at 7:20 p.m., but said she didn't remember the phone

8    call. (*Id.* at XVIII:163.) On July 24th at 7:38 p.m. and July 25th at 9:00 a.m. and 12:49

9    p.m., Rebecca likewise admitted phone calls took place from her landline to Doug's

10   landline, but stated that she did not recall them. (*Id.* at XVIII:162-64.) She admitted it was

11   possible that she had conversations with Doug after Lobato was arrested. (*Id.* at XVIII:164.)

12   Rebecca also admitted she "vaguely" remembered talking to a few people, including

13   Carrington, Shayne, Wuori, and Allen about what happened, and about the July 8th date

14   with Carrington, Shayne, and Wuori. (*Id.* at XVIII:166-68.)

15   Twining testified Lobato returned to Panaca from his house in Las Vegas on July 2,

16   2001. (*Id.* at XIX:33-34.) He testified he picked her up in Panaca in the early hours of July

17   9th. (*Id.* at XIX:36.) Twining admitted on cross-examination that after July 9th, he and

18   Lobato wanted to "lay low" and did not leave the house other than for food. (*Id.* at XIX:68.)

19   On July 9th or 10th, he and Lobato watched the news, including a news report regarding a

20   homicide. (*Id.* at XIX:69-71.) Twining testified there had been multiple phone calls

21   between July 2nd and July 9th between himself and Lobato. (*Id.* at XIX:36.) Twining

22   admitted that when he met Lobato, possibly at the end of April, he did meth with

23   Pyszkowski and Lobato. (*Id.* at XIX:54-55.) He admitted he wanted to be in a relationship

24   with Lobato. (*Id.* at XIX:56.) Twining testified he did not provide the phone records from

25   his landline. (*Id.* at XIX:63.) Twining admitted that he spoke numerous times to Rebecca

26   after Lobato was arrested and before speaking to the police on August 2, 2001, probably a

27   dozen times. (*Id.* at XIX:64, 67.) He also stated he spoke to Larry about the date of July 8th

MAC:14687-221 3890205_1

1    before the police interviewed him.  (*Id.* at XIX:49.)  He also exchanged numerous phone

2    calls with Lobato between July 20th and August 2nd.  (*Id.* at XIX:67.)

### 3.    The Verdict.

4        On October 6, 2006, the jury found Lobato guilty of Voluntary Manslaughter with

5    Use of a Deadly Weapon and Sexual Penetration of a Dead Human Body.  On February 2,

6    2007, the Court sentenced Lobato to the Nevada Department of Corrections as follows:

7    Count 1 - 48 to 120 months, plus an equal and consecutive 48 to 120 months for the Deadly

8    Weapon enhancement; Count 2 - 60 to 180 months, consecutive to Count 1.  Additionally,

9    the Court imposed a special sentence of lifetime supervision and ordered Lobato to register

10   as a sex offender upon release.  The Judgment of Conviction was filed on February 14,

11   2007.

### 4.    The Appeal.

13       Lobato's initial appeal to the Nevada Supreme Court was unsuccessful.  *Lobato v.*

14   *State*, 281 P.3d 1196 (Nev. 2009).  On August 1, 2011, Lobato filed a new appeal making

15   four arguments: (1) the District Court filed to consider new evidence of actual innocence,

16   (2) the State failed to disclose exculpatory and impeachment evidence to Lobato (i.e., a

17   *Brady* claim[7]), (3) ineffective assistance of counsel of Lobato's criminal defense attorney,

18   and (4) the District Court failed to hold a *Brady* hearing or an ineffective assistance of

19   counsel hearing.  The Nevada Supreme Court issued an "Order Affirming in Part Reversing

20   in Part and Remanding."  *See Lobato v. State*, 385 P.3d 618 (Nev. 2016).

21       At the outset, the Court rejected Lobato's *Brady* claims against the Detectives,

22   finding that "Lobato failed to demonstrate that the evidence was withheld by the State or

23   that it was material, that is, that there was reasonable probability that the evidence would

24   have affected the outcome of trial."  The Court did agree with Lobato *on her ineffective*

---

[7] In *Brady v. Maryland*, 373 U.S. 83 (2009), the Court held "that the suppression by the prosecution
of evidence favorable to an accused upon request violates due process where the evidence is material
either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *See*
*Strickler v. Greene*, 527 U.S. 263, 280 (1999).

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

*assistance of counsel* claim. In that claim, Lobato "submitted affidavits from three forensic entomologists who opined" that the victim's time of death coincided with a time period that Lobato was physically in Panaca. (*Id.*) The Court remanded the case on these grounds.

In short, the Nevada Supreme Court remanded the case due to the failures of Lobato's own criminal defense counsel. It found no wrongdoing on the part of the Detectives. (*Id.*)

**F.   THE EVIDENTIARY HEARING.**

From October 9, 2017 to October 13, 2017, an evidentiary hearing was held pursuant to Lobato's post-conviction Petition for Writ of Habeas Corpus, "to address the alleged ineffective assistance of Defendant's trial counsel." (*See* Decision and Order at 3, **Exhibit X**.) The court issued its written Decision and Order on December 19, 2017. (*Id.*) After summarizing the evidentiary hearing testimony, the court analyzed whether "Defendant's counsel was ineffective for failing to provide evidence that narrowed Decedent's time of death . . ." (*Id.* at 41.) First, the court found that Lobato presented evidence of a valid alibi and that the time of death was "a crucial aspect of [Lobato's] case." (*Id.* at 47.) (The State offered contradicting scientific evidence at the evidentiary hearing.) Second, the court concluded that Lobato's own attorneys had "failed to meaningfully consult with [both] a forensic pathologist . . . [and] a forensic entomologist." (*Id.* at 47-51.) The court granted Lobato's Petition for Writ of Habeas Corpus and ordered a new trial. (*Id.* at 54.) The district court did not find any wrongdoing on the part of the defendant detectives and did not find plaintiff innocent. The court only concluded that a new trial was proper because Lobato's own attorneys failed her, and the jury should have heard the evidence from the entomologists.

In this civil case, the LVMPD Defendants retained the same expert that testified for the State in the evidentiary hearing regarding the entomology evidence. (*See* Expert Reports of Jeffrey Wells, Ph.D., **Exhibit Y**.) Lobato also identified one expert who testified at the evidentiary hearing. (Expert Report of Jeffery K. Tomberlin, Ph.D., **Exhibit** Z.) The

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    reports generally confirm that the reason Lobato's criminal case was remanded for a new

2    trial was due to a scientific dispute as to the time of death.  This scientific dispute cannot be

3    imputed to the Detectives and whether probable cause existed to arrest Lobato.

4    **G.    AFTERMATH.**

5    **1.    The dismissal of the criminal charges.**

6    On December 29, 2017, a hearing was held regarding the case.  The State informed

7    the court of the following:

> . . . the District Attorney's Office has made a decision regarding this case and
> that prior to dismissing it, the State would like to place the following on the
> record: this crime occurred in July 2001 and in May 2002 Kristin Lobato was
> tried for open murder with use of a deadly weapon and sexual penetration of
> a dead human body  for the brutal murder of Duran Bailey; at the conclusion
> of the trial, 12 jurors unanimously rejected the Defendant's alibi and found
> beyond  reasonable doubt that she was guilty of first degree murder . . .  On
> direct appeal, the Nevada Supreme Court reversed the Defendant's
> conviction in September 2004 due to an erroneous ruling the trial court made.
> The State was not responsible for the reversal. At the conclusion of the 2006
> re-trial the Defendant was again convicted . . .  Once again, all 12 jurors
> unanimously rejected the Defendant's alibi and found beyond a reasonable
> doubt that Ms. Lobato was responsible for the death of Duran Bailey. [The
> case was again remanded in 2016 for ineffective assistance and] the State was
> in no way responsible for the reversal of the second trial. Now, the State was
> faced with the prospect of trying the case for a third time due to no fault of its
> own, 17 years after the crime occurred and also, by the time a third trial could
> proceed, the Defendant would be immediately eligible for parole if convicted
> again. Although the State believes in her guilt as well as 24 members of the
> community who unanimously found the Defendant guilty beyond a
> reasonable doubt, their limited resources are such that they are electing not to
> proceed with a third trial, considering the Defendant has served more than 15
> years in prison.

20    (*See* 12/29/2017 Court Minutes, **Exhibit AA.**  The charges against Lobato were dismissed

21    with prejudiced.)

22    **2.    Clark County Conviction Review Unit.**

23    After dismissal of the criminal charges, Lobato filed an application with the Clark

24    County Conviction Review Unit ("CRU").   The CRU reviewed Lobato's preliminary

25    hearing transcript, both trial transcripts, and "the complete investigation conducted by

26    [LVMPD], and all of the motions, petitions, and other documents in the case." (Conviction

27    Review Letter, **Exhibit BB.**)  The CRU stated its role is "not intended to function as a

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

'thirteenth juror.'" (*Id.*) It noted that the issues raised by Lobato "have been presented to and considered by two separate juries, and have twice been answered with unanimous findings of guilty beyond a reasonable doubt" and that the CRU "would simply be substituting its own judgment for that of twenty-four jurors." (*Id.*)

## III.   **LEGAL STANDARDS**

### A.   **SUMMARY JUDGMENT STANDARDS.**

Under Rule 56 of the Rules of Federal Procedure, "[a] party may move for summary judgment, identifying each claim or defense - - or the part of each claim or defense - - on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is well established that the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The rule, however, is not a "procedural short cut," but a "principal tool [] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . . or other materials; or (B) showing that the material cited do not establish the absence or presence of a genuine dispute . . ." Fed.R.Civ.P. 56(c)(1)(A) and (B).

### B.   **42 U.S.C. §1983 STANDARDS.**

Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by which to vindicate federal rights elsewhere conferred. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). To make out a prima facie case under §1983, a plaintiff must show that a defendant: (1) acted under color of law, and (2) deprived the plaintiff of a

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    constitutional right. *See Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1989). The

2    Detectives do not dispute that they acted under color of law. Therefore, the task of this court

3    is to determine whether the Detectives violated the Constitution. *See Albright*, 510 U.S. at

4    271. In addition, the Detectives have raised the affirmative defense of qualified immunity.

5        A defendant in a §1983 action is entitled to qualified immunity from damages for

6    civil liability if his conduct did not violate clearly established statutory or constitutional

7    rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S.

8    800, 818 (1982). The Supreme Court has often stressed the importance of deciding qualified

9    immunity "at the earliest possible stage in litigation" in order to preserve the doctrine's

10    status as a true "immunity from suit rather than a mere defense to liability." *Hunter v.*

11    *Bryant*, 502 U.S. 224, 227 (1991).

12        "In determining whether an officer is entitled to qualified immunity, [a court]

13    consider[s] (1) whether there has been a violation of a constitutional right; and (2) whether

14    that right was clearly established at the time of the officer's alleged misconduct." *Lal v.*

15    *California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted). Consequently, at

16    summary judgment, a court can "only" deny an officer qualified immunity in a §1983 action

17    "if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show

18    that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly

19    established at the time of the incident such that a reasonable officer would have understood

20    [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119,

21    1123 (9th Cir. 2011).

22    **IV.    LEGAL ARGUMENT**

23        Lobato's Complaint alleges ten causes of action: (1) a 42 U.S.C. §1983 Involuntary

24    Confession claim; (2) a 42 U.S.C. §1983 Fourteenth Amendment due process claim for

25    fabricating false evidence, withholding exculpatory evidence, and coercive investigative

26    techniques; (3) 42 U.S.C. §1983 false arrest/malicious prosecution; (4) a 42 U.S.C. §1983

27    failure to intervene; (5) a 42 U.S.C. §1983 civil conspiracy; (6) state law malicious

prosecution; (7) state law abuse of process; (8) state law intentional infliction of emotional distress ("IIED"); (9) state law civil conspiracy; and (10) state law indemnification.

**A.    COUNT I: 42 U.S.C. §1983 INVOLUNTARY CONFESSION**

Lobato's first claim for relief involves her recorded statement.  (Ex. E, Ex. I) According to the Complaint, the Detectives conspired to "force[] [Lobato] to incriminate herself falsely and against her will, in violation of her rights secured by the Fifth and Fourteenth Amendments" and used the "confession" against Lobato "to her detriment throughout her criminal case."  (ECF No. 1 at ¶128.)  More specifically, Lobato alleges the Detectives "rushed to interrogate [Lobato] without her parents present, declined to inform [Lobato] of what crime they were investigating and when it took place, provided [Lobato] with details of the Duran Bailey murder and suggested those details to her, used psychologically manipulative tactics including discussing her past trauma and history of sexual abuse, asked leading questions designed to create the incorrect impression she was involved in the Bailey murder or that she did not recall the details of her attack, and selectively recorded the interview to manipulate Plaintiff's statement (i.e., had prior conversations that were not recorded)" and in their reports stated that Lobato "had confessed to the Bailey murder. . ." (Lobato Interrog. Answers, at No. 5, 6, & 10, **Exhibit CC**.)

Discovery revealed that Lobato's coerced confession claim is unsupported. According to Lobato and her experts, the statement that Lobato provided the Detectives is truthful and accurate.  However, Lobato (and her experts) complain that the Detectives failed to realize she was discussing a different, unrelated event.  This same theory was argued by Lobato at both of her criminal trials and rejected by twenty-four jurors.

**1.    Fifth and Fourteenth Amendment coercive interrogation law.**

Lobato alleges that the Detectives violated her Fifth and Fourteenth Amendment rights to be free from a coercive interrogation.

The Fifth Amendment provides that no person shall be "compelled in any criminal case to be a witness against himself."  U.S. Const., AMEND. V.  The Fifth Amendment's

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1   self-incrimination clause encompasses a proscription against using coerced confessions

2   against a suspect." *See Crowe v. Cty. of San Diego*, 593 F.3d 841, 862 (9th Cir. 2010).  "A

3   coercive interrogation exists when the totality of the circumstances shows that the officer's

4   tactics undermined the suspect's ability to exercise [her] free will." *Cunningham v. City of*

5   *Wentachee*, 345 F.3d 802, 810 (9th Cir. 2003) (quoting *Haynes v. Washington*, 373 U.S.

6   503, 513 (1963)); *see also Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("Under

7   the Fifth Amendment, a confession is coerced or involuntary if the defendant's will was

8   overborne at the time he confessed.")  Thus, the Fifth Amendment protects against claims

9   that a coerced confession was used against a suspect in criminal proceedings.     In

10   determining whether a statement is coerced, "[c]ourts . . . often consider the following

11   factors: the youth of the accused, [her] intelligence, the lack of any advice to the accused of

12   his constitutional rights, the length of the detention, the repeated and prolonged nature of the

13   questioning, and the use of physical punishment such as the deprivation of food or sleep."

14   *Tobias v. Arteaga*, 996 F.3d 571, 581 (9th Cir. 2021) (quoting *United States v. Haswood*,

15   350 F.3d 1024, 1027 (9th Cir. 2003)).  Even if an officer commits a "clear-cut" *Miranda*'

16   violation, "that fact alone is not sufficient to establish that the resulting confession was

17   involuntary." *Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019).

18        A person subjected to coercive interrogation techniques can also bring a substantive

19   due process claim under the Fourteenth Amendment.  *See Tobias*, 996 F.3d at 584 (citing

20   *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009)).  The substantive due process

21   standard requires showing that an officer engaged in an "abuse of power [that] 'shocks the

22   conscience' and 'violates the decencies of civilized conduct'." (*Id.*)  The Supreme Court has

23   described "police torture or other abuse" as the type of claim cognizable under the

24   Fourteenth Amendment." *Chavez v. Martinez*, 538 U.S. 760, 773-74 (2003).

25

26

27

**MARQUIS AURBACH COFFING**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**2.    Both Lobato and her experts agree that the Detectives did not coerce a false statement.**

Here, there is no evidence that the Detectives' interview of Lobato was coercive, and there is no evidence it violated either the Fifth or Fourteenth Amendment.

***Fifth Amendment***

Lobato's statement to the Detectives does not meet any of the requirements necessary to establish a Fifth Amendment violation. As stated above, courts examine the youth of the accused, her intelligence, failure to provide *Miranda* rights, the length of the interview and prolonged questioning, and the use or threat of physical punishment. Lobato admits she (1) was a legal adult, (2) was a high school graduate who was living on her own, (3) was interviewed for under an hour, (4) was read (and understood) her *Miranda* rights, and (5) was never physically threatened with incarceration, punishment, or even leniency for cooperation. (Ex. H at 133-135, 162, 167; Ex. I.) Thus, Lobato's own admissions end this claim.

Lobato retained two expert witnesses who rendered opinions regarding her statement: Susan Peters (police practices expert) and Dr. Allison Redlich (false confession expert). First, with respect to age and cognitive abilities, both experts agree that there was nothing wrong with the Detectives interviewing Lobato. (Peters Depo. at 27, **Exhibit DD**; Redlich Depo. at 33, **Exhibit EE**.) Second, both experts agree there is no evidence that Lobato did not understand her *Miranda* rights. (Ex. DD 27-28; Ex. EE at 33-35; Ex. G.) Third, with respect to the length of the interview, both experts agree that it was not too long and did not overbear Lobato's will – in fact, Peters felt the interview was "too short," and they should have moved Lobato to a different location (i.e., arrested her sooner). (Ex. DD at 28-33; Ex. EE. at 50.) Fourth, both experts agree that the Detectives did not threaten or use punitive measures to secure information. (Ex. DD at 35; Ex. EE at 52.) Fifth, they offered no evidence that the Detectives lied to Lobato or attempted to coerce her. (Ex. EE at 64.)

MAC:14687-221 3890205_1

1    Sixth, and finally, neither expert ever found any evidence that either detective even labeled

2    the statement a "confession." (Ex. DD at 54-55.)

3        In attempting to salvage the coerced confession claim, both Lobato and her experts

4    make very general and vague criticisms of the Detectives' interview. Lobato complains that

5    the Detectives "were going a certain direction" with their questions and "implied" the

6    answer. (Ex. H at 135-137.) Peters complained that the statement was rushed and not

7    thorough. (Ex. DD at 26-37.) Both experts characterize this is as a "unique" case because it

8    is their opinion that Lobato's confession is truthful, but the Detectives failed to recognize

9    she was "confessing" to a different incident. (*See e.g.,* Ex. EE at 65, 68.) Regardless of

10   whether the Detectives asked leading questions or "implied" answers, Lobato is firm that her

11   statement is truthful, and she did not fall for the Detectives' tactics. In other words, she

12   withstood their efforts to elicit a false confession.

13       Finally, Lobato, in her Complaint, has made several other arguments regarding her

14   statement that are easily defeated. The Complaint alleges the Detectives "only recorded a

15   portion of their questioning and her answers." (ECF No. 1 at ¶94.) Lobato denies that the

16   Detectives "selectively recorded" her statement and admits all of the information she told

17   the Detectives can be found in her statement. (Ex. H at 167.) The Compliant also says the

18   Detectives "suggested facts to her about the crime." (ECF No. 1 at ¶94.) Lobato admits that

19   the Detectives accepted her answers and that her statement is accurate. (Ex. H at 137-139,

20   141.) Finally, Lobato agrees her statement gave the Detectives probable cause to arrest her,

21   but that she wishes they had "looked further instead of stopping" their investigation with

22   her. (*Id.* at 170-171.)

23       In sum, it is Lobato's and her two experts' opinions that her statement violates her

24   constitutional rights because the Detectives did not interpret it correctly. Lobato complains

25   that based upon her self-serving statement, they intentionally and knowingly misinterpreted

26   her statement to be about the murder of Bailey, when they knew it was not. This is pure

27   speculation, and the Detectives (and the State) remain convinced that probable cause exists

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

that Lobato committed the crime. Lobato's theory was put forth to two separate criminal juries who rejected it. There is no constitutional law that requires detectives to accept everything a murder suspect says as true. The Detectives are allowed to reach their own conclusions on the evidence so long as they provide all of the evidence to the district attorney.

### Fourteenth Amendment

The Fourteenth Amendment standard is much higher than the Fifth Amendment standard. Lobato must provide this court with "conscience-shocking" behavior that violates "the decencies of civilized conduct." Lobato admits that the Detectives obtained a truthful statement from her and that they were "nice" and "compassionate" during the interview. Ex. H at 137-139, 141, 195. Again, her only complaint is that the Detectives (and two criminal juries) believed she was talking about the Bailey murder and not a separate incident. This is not conscience-shocking.

### 3.    Qualified immunity.

If this court finds a triable issue of fact on Lobato's involuntary confession claim, the plaintiff must then provide this court with "clearly established" law that existed in July 2001 that would have put the Detectives on notice of their unconstitutional behavior.

First, with respect to the Fifth Amendment claim, the particular circumstances of Lobato's interview do not present the same sort of confluence of features that the Ninth Circuit has previously held to be coercive. *See, e.g., Cunningham v. Perez*, 345 F.3d 802, 810-11 (9th Cir. 2003) (Ninth Circuit held that an interrogation was not coercive where the officer questioned a suspect for 8 hours even after the suspect denied guilt, did not allow the suspect to "call his therapist," and told the suspect that he "has put people in prison." The court also found in part that "emotionalism and confusion do not invalidate confessions" or render an interrogation "coercive" or undermine the suspect's "free will." *Id.* (collecting cases with "far more outrageous" interrogation techniques); *Taylor v. Maddox*, 366 F.3d 992, 1015-16 (9th Cir. 2004) (confession was clearly involuntary where 16-year-old suspect

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  was arrested late at night, questioned until 3:00 AM, threatened with a jab to the face, and

2  had his repeated requests for counsel denied), *overruled on other grounds by Murray v.*

3  *Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014); *Gladden v. Holland*, 366 F.2d 580, 582

4  (9th Cir. 1966) (finding coercion where officers ignored a request for counsel but also

5  conducted the interrogation "throughout the night" and called in alleged rape victims to view

6  the suspect); *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (noting that coercion is

7  not established where police merely indicate that a cooperative attitude would benefit a

8  minor suspect); *Cunningham v. Perez*, 345 F.3d at 810 (finding no coercion where

9  interrogation went for eight hours without a break, officers continued to question the suspect

10 after claims of innocence, and officers played on the suspect's fear of prison).

11      Qualified immunity is also appropriate on Lobato's Fourteenth Amendment right to

12 substantive due process. *See, Stoot*, 582 F.3d at 928. Although this claim (unlike the Fifth

13 Amendment claim) does not require a showing that the confession was used against Lobato,

14 "[t]he standard ... is quite demanding," requiring something akin to "police torture or other

15 abuse" or comparable conduct that "shocks the conscience." The facts of this case are

16 materially different from previous cases in which the Ninth Circuit has found a substantive

17 due process violation for police conduct during an interrogation. *See, e.g., Cooper v.*

18 *Dupnik*, 963 F.2d 1220, 1248-50 (9th Cir. 1992) (en banc) (finding a substantive due process

19 violation when officers subjected a suspect to" hours of mistreatment and what can fairly be

20 described as sophisticated psychological torture" and intentionally ignored the suspect's

21 repeated invocations of his right to counsel and right to silence and for the express "purpose

22 of making it difficult, if not impossible, for [the defendant] to take the stand in his own

23 defense"), overruled on other grounds, *Chavez v. Martinez*, 538 U.S. 760, 773 (2003).

24

25 **B.    COUNT II: PLAINTIFF'S 42 U.S.C. §1983 DUE PROCESS/DENIAL OF FAIR TRIAL CLAIM**

26      Lobato's second claim alleges that her Fourteenth Amendment rights were violated

27 because the Detectives "fabricated and solicited false evidence, as well as withheld

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    exculpatory evidence from [Lobato] and from state prosecutors. . . thereby misleading and

2    misdirecting the criminal prosecution of [Lobato.]"    She also claims that the Detectives

3    "used investigative techniques that were so coercive and abusive that they knew, or were

4    deliberately indifferent to, the fact that those techniques would yield false information that

5    was used to convict [Lobato]." (ECF No. 1 at ¶145.)  In her interrogatory answers, Lobato

6    elaborates that the Detectives "made direct or implied threats to witnesses . . . attempting to

7    drum-up false inculpatory evidence" and "failed to . . . record in written reports statements

8    made by witnesses before audio recording devices were turned on."  (Ex. CC at Rog No. 1

9    and 8.)

10        1.    **Relevant Fourteenth Amendment law.**

11        "[T]here is a clearly established constitutional due process right not to be subjected

12    to criminal charges on the basis of false evidence that was deliberately fabricated by the

13    government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).  A plaintiff can

14    prove deliberate fabrication in several ways.  The easiest way is for a plaintiff to produce

15    direct evidence of deliberate fabrication.  *See Caldwell v. City and Cty. of San Francisco*,

16    889 F.3d 1105, 1112 (9th Cir. 2018) (citations omitted).   Alternatively, a plaintiff can

17    produce circumstantial evidence related to a defendant's motive.  *Id.*  Under *Devereaux*, a

18    plaintiff may show a deliberate-fabrication-of-evidence claim in one of two ways:

19        (1) Defendants continued their investigation of [plaintiff] despite the fact they
          knew or should have known that [s]he was innocent; or (2) Defendants used
20        investigative techniques that were so coercive and abusive that they knew or
          should have known that those techniques would yield false information.
21

22    263 F.3d at 1076.  The test is a stringent one.  *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir.

23    2003).

24        Finally, any alleged wrongdoing on the Detectives part is superseded by the fact that

25    the District Attorney reviewed the file and believed (and still believes) that probable cause

26    existed to arrest and prosecute Lobato.  Typically, in a constitutional tort case the "[f]iling of

27    criminal complaint immunizes investigating officers . . . because it is presumed that the

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1   prosecutor filing the complaint exercised independent judgment in determining that probable

2   cause for an accused's arrest exists at the time." *Caldwell v. City and Cty. of San Francisco*,

3   889 F.3d 1105, 1115-16 (9th Cir. 2018) (quoting *Smiddy v. Varney*, 665 F.2d 261, 266 (9th

4   Cir. 1981), *overruled on other grounds by Beck v. v. City of Upland*, 527 F.3d 853 (9th Cir.

5   2008).

2.    **Analysis of Lobato's fabrication of evidence claim.**

a.    **Argument No. 1: Lobato generated no evidence of a Fourteenth Amendment fabrication of evidence claim.**

9   During discovery, Lobato failed to generate any evidence supporting her fabrication

10  of evidence claim. In her interrogatory responses, Lobato states this claim is based upon her

11  belief that the Detectives: (1) unconstitutionally coerced her confession; (2) manipulated

12  witness interviews by asking leading questions, suggested facts about the crime, and coerced

13  plaintiff's confession; (3) threatened witnesses; and (4) failed to record statements of

14  witnesses prior to turning on recording devices. (Ex. CC at Rog's Nos. 1 and 8)

15  *Lobato's confession*

16  Any Fourteenth Amendment claim based upon Lobato's alleged "coerced

17  confession" is untenable as a matter of law because the Ninth Circuit is clear that coerced

18  confession claims are not cognizable under a *Devereaux* fabrication-of-evidence theory. *See*

19  *Hall v. City of Los Angeles*, 697 F.3d 1059, 1069-70 (9th Cir. 2012). Further, as discussed

20  directly above, there is no evidence that the Detectives "coerced" a confession from Lobato

21  as she maintains that her statement to the Detectives is truthful and given of her own free

22  will.

23  *The witness interviews*

24  The Detectives interviewed multiple witnesses during their investigation. Many of

25  the witnesses were alibi witnesses provided to the Detectives by Lobato, herself. (Ex. C.)

26  Det. Thowsen testified that when he met with each witness, he would first introduce himself,

27  then build a rapport with the witness, find out if they had relevant information and, if so,

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    obtain permission to record them.  (Thowsen Depo. at 99:14-100:19, **Exhibit FF**.)  Lobato

2    attempts to imply some nefarious motive for Det. Thowsen's practice.  However, Lobato's

3    own expert, Sue Peters, agrees that this is standard practice. (Ex. DD at 68:12-15.)  And,

4    contrary to Lobato's representations, no witness has ever testified that the Detectives

5    coerced their statements, threatened them, or included false information in their statements.

6    During discovery, Lobato deposed the following criminal trial witnesses: (1) Dixie Tienken,

7    (2) Doug Twining, (3) Stephen Pyszkowski, and (4) Catherine Reininger.

8          Tienken testified that she voluntarily spoke with the Detectives at her house.

9    (Tienken Depo. at 125:9-19, **Exhibit GG**.)  She was honest with the Detectives and told the

10   truth.) (*Id.* at 130:2-13.)  Her voluntary statement (Ex. J) accurately captures what she told

11   them. (*Id.* at 130:21-131:19.)  Tienken did claim that the Detectives stopped and started the

12   tape during her interview, however when asked to review the recording, she could not

13   identify where this occurred.  (*Id.* at 132:19137:20.) (Tienken's recorded statement confirms

14   that the tape was only stopped one time – when the tape needed to be turned over. Ex. E.)

15   Tienken also felt that the Detectives tried to ask leading questions, but also admits they did

16   not challenge or attempt to change her answers.  (*Id.* at 130:14-20.)  Tienken testified

17   truthfully at both Lobato's criminal trials. (*Id.* at 146:13-15.)  Further, Tienken testified that

18   the Detectives never threatened her or attempted to get her to change her story.  (*Id.* at

19   161:17-163:15.)  In fact, the only person to threaten Tienken and attempt to get her to

20   change her story was Lobato's father, Larry.  (*Id.* at 151:25-153:1 & 157:7-20[8].)  She

21   offered no evidence of fabricated or withheld evidence.

22         Doug Twining testified that detectives spoke to him for 15-30 minutes before turning

23   on the recorder and, during this time, asked him "the same question in different ways."

24   (Twining Depo. at 120:14-22, **Exhibit II**.)  The information in his transcribed statement is

25
_____
[8] Interestingly, the only individuals who had Tienken sign a false declaration was Lobato's
26   Innocence Project attorneys.  (Ex. GG at 126:15-128:17.)  The declaration the Innocence Project
drafted and had Tienken sign contained knowingly false information as to when Tienken's initial
27   conversation with Lobato occurred.  (*Id.*; Tienken Decl., **Exhibit HH**.)  Lobato herself implies that
the declaration is false as she admits she visited Tienken after July 13, 2001.  (Ex. H at 123.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  accurate and is still truthful. (*Id.* at 121:15-122:10 & 124:9-15.) He agrees the Detectives

2  did not "stop and start" the recording and only turned the recorder off one time to turn the

3  tape over. (*Id.* at 121:24-122:18 & 125:2-126:6.) When the recorder was off, Det. Thowsen

4  "just sat there" and did not provide any information or ask any questions. (*Id.* at 126:7-11.)

5  The only complaint Twining could muster against the Detectives is that it was "weird" the

6  way they asked questions because "they would look at one another" and "write things

7  down." (*Id.* at 122:19-123:2.) He found this intimidating. (*Id.*) Still, Twining maintained

8  he told the Detectives the truth and testified truthfully at Lobato's criminal trials. (*Id.* at

9  78:12-79:3, 89:24-90:6.) He offered no evidence of fabricated or withheld evidence.

10      Steve Pyszkowski agrees that he spoke with the Detectives "willingly" and that they

11  talked for about 20 minutes before they turned on their recorder. (Pyszkowski Depo. at

12  84:12-85:6, **Exhibit JJ**.) During the unrecorded time period, he claims he told the police

13  their timeline was wrong. (*Id.* at 85:7-86:14.) When they started recording, Pyszkowski

14  admits he did not bring up the timeline issue, and it is found nowhere in his recorded

15  statement. (*Id.* at 86:15-87:9; Ex. K.) Pyszkowski admits that the Detectives never asked

16  him to change his story or lie. (*Id.* at 88:1-8, 93:1-3.) He acknowledges that the Detectives

17  never threatened him or treated him inappropriately. (*Id.* at 89:6-18.) The most the

18  Detectives did was challenge his timeline, but they never asked him to change it or

19  suggested alternative dates. (*Id.* at 90:4-15.) The Detectives only stopped the recording one

20  time - to turn the tape over. (*Id.* at 102:16-103:1.) They did not feed him information or

21  attempt to influence his story when the recorder was off. (*Id.*) Pyszkowksi testified at both

22  of Lobato's criminal trial and told the truth. (*Id.* at 58:10-22.) He offered no evidence of

23  fabricated or withheld evidence.

24      Catherine Reininger also agrees that the Detectives never tried to intimidate her or

25  ask her to lie. (Reininger Depo. at 45:24-46:18, **Exhibit KK**.) All the statements in her

26  voluntary statement are truthful. (*Id.* at 44:14-45:2.) Prior to the recording, she talked to the

27  Detectives about Lobato's prior sexual trauma as a child, and the Detectives did not ask her

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    about that information once they started recording. (*Id.* at 45:3.) According to Reininger,

2    she provided her alibi information to Lobato's criminal defense attorneys, but they chose not

3    to call her as a witness. (*Id.* at 55:2-58:1.) She offered no evidence of fabricated or

4    withheld evidence.

5        In sum, Lobato, during discovery, generated no evidence that the Detectives coerced,

6    threatened, intimidated, or otherwise manipulated the witnesses' stories and testimony. All

7    of the witnesses deposed testified that the Detectives treated them fairly and that the story

8    they told the Detectives was truthful and that they were able to testify truthfully at Lobato's

9    criminal trials. No witness has ever implied wrongdoing on the part of the Detectives.

10       ***Fabricated Evidence and Withheld Evidence***

11       According to Lobato's interrogatory answers, the evidence supporting her *Brady*

12   claim is that the Detectives talked to the witnesses (and Lobato) before turning on the

13   recording device. (Ex. CC at Rog Nos. 8 and 9.) As set forth above, none of the witnesses

14   ever testified that the Detectives omitted relevant evidence from their statement,

15   manipulated their statements, or in any way attempted to intimidate them. Further, every

16   alibi witness testified that Lobato's criminal defense attorneys interviewed them and were

17   told what they told the Detectives. During discovery, Lobato failed to generate a single

18   piece of exculpatory evidence that the Detectives withheld from the District Attorney

19   and/or Lobato's criminal defense attorneys. Lobato also claims that the Detectives

20   unconstitutionally influenced the witness' statements. However, each witness testified both

21   their voluntary statements and their later criminal trial testimony was truthful. Plaintiff has

22   provided no evidence of fabricated or withheld evidence. Lobato's own expert witness

23   agrees that all exculpatory evidence told to the Detectives was not only available to Lobato's

24   criminal defense attorneys, but can be found in the Detectives' own Arrest Report. (Ex. DD

25   at 80:10-81:9; *see also* Ex. C.)

26

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**b.    Argument No. 2: The District Attorneys exercised independent judgment.**

Typically, in constitutional tort cases the "[f]iling of a criminal complaint immunizes investigating officers ... because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981), overruled on other grounds by *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).  The plaintiff bears the burden or producing evidence to rebut this presumption.  *See Newman v. Cty. of Orange*, 457 F.3d 991, 994-95 (9th Cir. 2006).  Moreover, the Ninth Circuit held in *Newman* that a plaintiff's account of the incident, without more, does not overcome the presumption.  *Id.* at 994 (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994)).  "If charges are filed, *Smiddy* protects the officers unless such evidence shows that officers interfered with the prosecutor's judgment in some way, by omitting relevant information, by including false information, or by pressuring the prosecutor to file charges."  *Id.* at 995.  Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence.  *Caldwell*, 889 F.3d at 1116.  A plaintiff can overcome the presumption by showing the officers presented the district attorney with "information known by them to be false" or "knowingly withheld relevant information."  *Id.*  (citing *Smiddy*, 665 F.2d at 266-67).

Here, the *Smiddy* presumption breaks the chain of causation between Lobato's alleged fabrication of evidence and the harm that Lobato suffered in being criminally charged.  Lobato has failed to identify a single piece of evidence that the Detectives "knowingly fabricated" or "knowingly withheld" from the prosecutor.  (*See* Ex. H at 196:2-200:5.)  She also admits she has never even been told of such evidence.  (*Id.* at 198:21-199:9.)  Lobato's own expert agrees that she is unaware of any "fabricated" or "withheld" evidence in this case, and she is only critical of how the Detectives interpreted and documented the evidence.  (Ex. DD 72:21-74:20 & 105:7-106:54 (no opinions of any *Brady*

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

violations)).  It is the expert's opinion that the Detectives did not perform a "thorough investigation" and were "negligent." (*Id.* at 66:3-10.)  However, negligence, in general, is not actionable under §1983 because deliberate acts are required. *See Daniels v. Williams*, 474 U.S. 327, 328-36 (1986); *Von Williams v. City of Albany*, 936 F.2d 1256, 1260-61 (11th Cir. 1991).

Finally, the district attorney who handled both criminal trials, Sandra DiGiacomo, Esq., agrees that she is unaware of any evidence (or any allegation) of the Detectives fabricating evidence, withholding evidence, manipulating evidence, or otherwise influencing the criminal trials.  And, she never felt pressure by either detective to bring charges. (Decl. of DiGiacomo, Exhibit LL.)  The two criminal trials establish that the state pursued charges based upon the Officer's Report and the district attorney's independent investigation that included the retention of experts, the obtaining of Lobato's medical records, the obtaining of various phone records, and the interviewing of new witnesses not known to the Detectives at the time of the arrest.  It is DA DiGiacomo's independent opinion that probable cause existed to arrest and charge Lobato and that probable cause still exists for the charges. (*Id.*)  According to DA DiGiacomo, the State declined to try Lobato a third time due to the fact Lobato had served the bulk of her sentence and would be eligible for parole if convicted a third time. (*Id.*; Ex. AA)  Thus, the Detectives are immunized from §1983 liability due to the prosecutor's independent judgment.

3. **The Detectives are entitled to qualified immunity on the fabrication of evidence claim.**

None of the witnesses (or even Lobato) has ever asserted that the Detectives created false statements or fabricated evidence.  At most, the witnesses (and Lobato) expressed frustration that the Detectives did not believe their alibi statements.  Still, it is undisputed that the Detectives documented the exculpatory evidence and provided it to the District Attorney who then provided it to Lobato's defense attorneys.  Lobato admits that she was able to present her alibi story and alibi witnesses to the jury. (Ex. H at 181:11-182:10.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    (Lobato did testify that some witnesses' testimony was limited - but that was the court's

2    decision, not the Detectives' decision.)

3         The Ninth Circuit has never held that failing to believe a witness's story is a

4    constitutional violation.   In *Costanich v. Dep't. of Soc. & Health Servs.*, 627 F.3d 1101,

5    1111 (9th Cir. 2010), the court found evidence of intentional fabrication sufficient to survive

6    summary judgment where "witnesses pointed out that the [investigation] report contained

7    evidence of statements they never made."   *Id.* at 1112.   But, the statements must be provably

8    false as the Ninth Circuit has held that, even if officers are careless with facts or make

9    misstatements, it does not rise to constitutional violation.   *Gausvik v. Perez*, 345 F.3d 813,

10    817 (9th Cir. 2003); *see also Caldwell*, 889 F.3d at 1114-15 (issue is whether errors are

11    careless or direct misrepresentations).   Here, there is no allegation that the Detectives placed

12    knowingly false statements in their Officer's Report or withheld information from the report.

13    It is undisputed that the Officer's Report identifies both Lobato's alibi witnesses and their

14    story.   Lobato is simply upset the jury did not believe her witnesses.   Thus, there is no

15    clearly established law that the Detectives' actions in this case could be considered a

16    constitutional violation.

17

18    **C.    COUNT III: 42 U.S.C. §1983 CONTINUED DETENTION WITHOUT PROBABLE CAUSE CLAIM.**

19         Lobato's third claim alleges that the Detectives conspired with one another, arrested

20    Lobato without probable cause, and then continued to "perpetuate judicial proceedings

21    against [Lobato] without probable cause . . . [when] they knew [Lobato] was innocent."

22    (ECF No. 1 at ¶153.)   Generally, this is a false arrest claim.   According to Lobato, the

23    Detectives "fabricated" Lobato's "false confession," while knowing that Lobato "was in

24    Panaca at the time" of the murder and her "confession" involved a "wholly separate event."

25    (Ex. CC at Rog No. 11.)

26

27

MAC:14687-221 3890205_1

1.  **Relevant Fourth Amendment law.**

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137 (1979). The Fourth Amendment prohibits "unreasonable searches and seizures." *See* U.S. Const., AMEND. IV. The appropriate inquiry under the Fourth Amendment is an objective one. The question is, would "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution and the belief that the action taken was appropriate?" *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (quotation marks omitted). Any arrest is privileged if it is made pursuant to probable cause. *Id.* The probable cause analysis is the same whether under federal law or Nevada state law. *See Marschall v. City of Carson*, 86 Nev. 107, 110, 464 P.2d 494 (1970). When the underlying facts claimed to support probable cause are not in dispute, whether those facts constitute probable cause is an issue of law. *See Ornelas v. United States*, 517 U.S. 690, 696-97 (1996).

The District Attorney's decision not to try the case for a third time in **2017** does not alter the probable cause analysis that existed in **2001**. *See, e.g., Freeman v. Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause."); *Howell v. Tanner*, 650 F.2d 610, 615 (5th Cir. 1981) ("Once probable cause has been established, the legality of the arrest is not affected by . . . a subsequent dismissal or acquittal of the charges").

2.  **Analysis of Lobato's Fourth Amendment lack of probable cause claim.**

Here, it cannot be seriously disputed that the Detectives had probable cause to arrest Lobato.

First, Lobato is collaterally estopped from pursuing this claim due to the probable cause finding at Lobato's preliminary hearing. It is undisputed that a preliminary hearing was held, and the presiding judge found probable cause after hearing testimony from Tienken, Dr. Simms, and Det. Thowsen. (Ex. U at 63-64; Ex. H at 172:3-6.) Lobato admits that there was no false evidence presented at the preliminary hearing. (Ex. H at 172:18-21.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

1    This probable cause finding serves as collateral estoppel in this case because Lobato has not

2    alleged that the probable cause determination was based upon "false testimony or

3    suppressed facts." *See Scafidi v. Las Vegas Metro Police Dep't.*, 966 F.3d 960, 963-64 (9th

4    Cir. 2020) (Under Nevada law, probable cause determination at a preliminary hearing has

5    preclusive effect unless evidence of misrepresented facts or manipulated evidence exists).

6         Second, Lobato's own police practices expert agrees that probable cause existed to

7    arrest her.  (Ex. DD at 34; 51; 54; & 77.)  The expert simply boasts she would have done a

8    better job at establishing probable cause by taking a longer interview.  (*Id.* at 53:19-54:12.)

9    Even Lobato admits that "perhaps" the Detectives had probable cause – but it is her opinion

10   they still should have looked "further." (Ex. H at 170:7-21.)

11        Third, this court can determine as a matter of law that probable cause existed for

12   Lobato's arrest.    The Detectives determined probable cause existed based upon the

13   following facts:

14   •    Duran Bailey was violently murdered.

15   •    Bailey's penis had been severed from his body with additional injuries to his
          face, neck, and abdomen.

16   •    No knife or other murder weapons were found at the scene.

17   •    The autopsy determined the cause of death to be blunt force trauma with
          multiple stab wounds.  The body had been mutilated post-mortem including
18        the removing of the penis and stab sounds to the anus.

19   •    On July 20, 2001, Laura Johnson reported second-hand information to Det.
          Thowsen that Lobato recently told a second person that she was involved in a
20        Las Vegas incident where she severed a man's penis.

21   •    Lobato was interviewed and reported being attacked by an older black male
          in a parking lot.  Although Lobato reported a different location of the attack
22        (the east side of Las Vegas), she "appeared unsure" because of drug use and
          unfamiliarity with the city.  Lobato reported using a butterfly knife to cut the
23        man's penis and possibly sever it.  She reported leaving the man on the
          ground, fleeing in her vehicle, getting rid of the knife and her clothes, and
24        hiding her car.  Lobato also told the Detectives, "I didn't think anyone would
          miss him."

25   •    After the interview, Lobato told the Detectives that the incident occurred in
26        an enclosed area similar to the CCDC jail cell.

27   (Arrest Report, **Exhibit MM**.)

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Based upon these known facts, the Detectives made the decision that a "fair

2    probability" existed that Lobato committed the murder of Bailey.  The District Attorney,

3    preliminary hearing judge, trial judge, two juries, and the Nevada Supreme Court all agree,

4    as none of these individuals or entities has ever found that probable cause was lacking to

5    arrest Lobato.

6    Because probable cause existed to arrest Lobato, her false arrest claim necessarily

7    fails, as does her unlawful detention claim.  *See Lacy v. County of Maricopa*, 631 F.Supp.3d

8    1183, 1195 (D.Az. 2008).

9    **D.    COUNT IV: 42 U.S.C. §1983 FAILURE TO INTERVENE.**

10    Lobato's fourth claim is a §1983 failure to intervene claim.  She alleges that the

11    Detectives "each stood by without intervening to prevent the violation of [Lobato's]

12    constitutional rights, even though they had the opportunity to do so." (ECF No. 1 at ¶161.)

13    **1.    <u>Relevant failure to intervene law.</u>**

14    A failure to intervene (a/k/a failure to intercede) claim is a subpart of the Fourth

15    Amendment right to be free of excessive force.  *Cunningham v. Gates*, 229 F.3d 1271, 1289

16    (9th Cir. 2003) ("police officers have a duty to intercede when their fellow officers violate

17    the constitutional rights of a suspect or other citizen").  Generally, a failure to intervene

18    claim exists when bystander officers have an opportunity to intervene, but fail to do so.

19    *Lolli v. Cty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003).  "[T]he constitutional right

20    violated by the *passive* defendant is analytically the same as the right violated by the person

21    who [uses excessive force]." *U.S. v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994) *rev'd in*

22    *part on other grounds*, 518 U.S. 81 (1996) (emphasis added).  "Importantly, however,

23    officers can be held liable for failing to intercede only if they had an opportunity to

24    intercede." *Cunningham v. Gates*, at 1290.

25    The Ninth Circuit has only recognized a claim for failing to intervene in the

26    excessive force context.  Police officers do not have a general duty to intervene in all alleged

27    wrongdoings by a fellow officer.  *Briscoe v. Madrid*, 1:17-CV-0716-DAD-SKO, 2018 WL

4586251, at *5 (E.D. Cal. Sep. 21, 2018); *Dental v. City Salem*, No. 3:13-CV-01659-MO, 2015 WL 1524476, at *5 (D. Or. Apr. 2, 2015). The duty to intercede is "clearly limited to the context of excessive force" claims under the Fourth Amendment. *Dental*, 2015 WL 1524476, at *5 (finding that the duty to intercede did not apply to the plaintiff's wrongful arrest claim); *Gillette v. Malheur Cty.*, 2:14-CV-01542 -SU, 2016 WL 3180228, *7 (D. Or. 2016); *Milke v. City of Phoenix*, No. CV-15-00462-PHX-ROS, 2016 WL 5339693 (D.Az. Jan. 8, 2016) (no duty to intervene outside of excessive force context).

### 2. Analysis of Lobato's failure to intervene claim.

Lobato's failure to intervene claim requires plaintiff to first prove a substantive constitutional violation. Because Lobato has failed to do so, this claim fails. In addition, this is not an excessive force case, and, therefore, no general duty to intercede claim even exists.

Because this circuit has never recognized a duty to intervene in a case such as this, at a minimum, the LVMPD Defendants are entitled to qualified immunity because there is no clearly established law that the individual defendants had a duty to intercede under these facts.

### E. COUNTS V AND IX: 42 U.S.C. §1983 CONSPIRACY CLAIM AND STATE LAW CONSPIRACY CLAIM.

Lobato's fifth claim and ninth claims allege that the Detectives conspired to violate her rights. She claims the Detectives conspired amongst each other "to frame" Lobato and "agreed to investigate and to exert influence to cause the prosecution of Plaintiff for a crime she did not commit." (ECF No. 1 at ¶ 166 & 190-193.) This claim is based upon Lobato's belief the Detectives "coerced" her confession and manipulated witness statements.

### 1. Relevant conspiracy law.

To establish a cause of action for conspiracy under §1983, a plaintiff must present facts sufficient to demonstrate: (1) the existence of an express or implied agreement among the defendant officers to deprive a person of his constitutional rights, and (2) an actual

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

deprivation of those rights resulting from that agreement. *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991). One can infer an agreement from the defendant's acts pursuant to the conspiratorial scheme or from other circumstantial evidence. *Id.* at 1170. "Conspiracy is not an independent basis of liability in a § 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Thus, the failure to prove a substantive constitutional injury precludes relief on a conspiracy claim. *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000).

Similarly, in Nevada, "[a]n actionable civil conspiracy consists of a combination of two or more persons who, by some concert of action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1988) (citations omitted).

### 2.    Analysis of Lobato's civil conspiracy claim.

First, Lobato must provide evidence of an underlying constitutional violation or tort before this claim need be addressed. As set forth above, Lobato has not established an independent constitutional violation. Therefore, because no constitutional violation occurred, this claim fails as matter of law.

Second, there is no evidence the Detectives conspired with one another. Neither of Lobato's experts issued any opinions even suggesting the officers knowingly conspired to deprive Lobato of her rights. With respect to Lobato's recorded interview, Lobato testified that her statement is truthful and that the Detectives did not elicit any false statements or try to influence her statement. (Ex. H at 136-137.) Further, not a single witness has ever testified that the Detectives coerced them into giving a false statement or misrepresented their story. And, Lobato's own expert agrees that the Detectives' Officer Report and the witnesses' voluntary statements contain all the exculpatory evidence. (Ex. DD at 80-81.) As discussed *ad nauseum* above, Lobato's real allegation is that the Detectives erred in this case because they *misunderstood or misinterpreted* her confession—not that they coerced a

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  false confession—and that they conducted a negligent (not an intentionally false)

2  investigation. (Ex. DD at 66 & 92 -93; Ex. H at 138-139, 141, 196.) The fact that the

3  Detectives (and two criminal juries) interpreted Lobato's statement and her alibi witness'

4  statements differently, is not a valid basis for a civil conspiracy claim.

5  Third, even if a conspiracy occurred between the Detectives, the claim is barred by

6  the intra-corporate conspiracy doctrine, which states that a conspiracy requires agreement

7  between two or more persons or distinct business entities, would bar such a claim. *See*

8  *Rabkin v. Dean*, 856 F.Supp. 543, 550-52 (N.D. Cal. 1994) (applying doctrine in §1985

9  case); *Hofmann v. City and Cty. of San Francisco*, 870 F.Supp.2d 799, 809 (N.D. Cal.

10  2012). The doctrine provides that, as a matter of law, an entity cannot conspire with its own

11  employees or agents. The Ninth Circuit has not expressly addressed whether the doctrine

12  applies either to government entities or to civil rights claims. *Id.* District courts have

13  extended the doctrine to §1983 claims. *See Stuart v. City of Scottsdale*, 2021 WL 977166,

14  *6 (D.Az. March 16, 2021) (Civil rights allegations "fall squarely within the intracorporate

15  conspiracy doctrine" and "[w]here the individual defendants are all employees of the

16  institutional defendant, a claim of conspiracy will not stand." (citations omitted));

17  *Hasbrouck v. Yavapai Cty.*, 2021 WL 321894, *15 (D. Az. Feb. 1, 2021) ("district courts [in

18  the Ninth Circuit] that have addressed the issue consistently have held that it does apply");

19  *Ruble v. Escola*, 898 F.Supp.2d 956, 986 (N.D. Ohio 2012) (applying the doctrine to both

20  federal law and Ohio state law conspiracy claims).

21  At a minimum, the Detectives enjoy qualified immunity on the issue because the law

22  is not clearly established as to whether such a claim exists. *See Fazaga v. FBI*, 965 F.3d

23  1015, 1060 & n.41 (9th Cir. 2020) (qualified immunity barred claim because there is not

24  clearly established Ninth Circuit law on whether "an intracorporate agreement could subject

25  federal officials to liability under § 1985(3)").

26

27

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

**F.    COUNT VI: STATE LAW MALICIOUS PROSECUTION.**

Lobato's sixth claim alleges state law malicious prosecution against the Detectives. She claims the Detectives "instituted or continued the prosecution of [Lobato] without probable cause." (ECF No. 1 at ¶174.)

**1.    Relevant malicious prosecution law.**

A malicious prosecution claim can be maintained not only against prosecutors, but also against others – including police officers and investigators – who wrongfully caused the prosecution. *See Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (citing *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)). In Nevada, the elements of a malicious prosecution claim are: "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage." *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877 (2002). The standard for a state law claim is the same as federal law malicious prosecution claim. *See Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009). ("[P]robable cause is an absolute defense to malicious prosecution." *Id.* at 1054-55.

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the district attorney, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adalanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (citing *Smiddy v. Varney*, 665 F.2d 261, 266-68 (9th Cir. 1981)). However, "the presumption of prosecutorial independence does not bar a subsequent section 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.*; *see also Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997) (holding that a probable cause determination "that is 'tainted by the malicious actions of the

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    government officials [involved]' does not preclude a claim against the officials involved.")

2    (quoting *Hand v. Gary*, 838 F.2d 1420, 1426 (5th Cir. 1988)).

3              **2.    Analysis of Lobato's malicious prosecution claim.**

4              Lobato's state-law malicious prosecution claim fails because the Detectives had the

5    requisite probable cause to arrest her.  The analysis is identical to Lobato's §1983 unlawful

6    detention claim addressed *supra* in Section IV(C).

7              In addition, there is no evidence of malice.  "In order to prove malice, it must be

8    shown that the defendant knew that the statement was false or acted in reckless disregard of

9    its truth or falsity."  *Rowland v. Lepire*, 313 P.2d 1332, 1335 (Nev. 1983).  Lobato has not

10   identified any statement made by either detective that was knowingly false or reckless.  In

11   fact, Lobato believes the Detectives were "fair" with her.  (Ex. H at 162.)  She is only upset

12   with the manner the Detectives interpreted her voluntary statement.  (*Id.* at 169 & 199-200.)

13   She also admits she has no evidence that the Detectives improperly coerced any of her alibi

14   witnesses.  (*Id.* at 197-198.)

15   **G.    COUNT VII: STATE LAW ABUSE OF PROCESS.**

16             Lobato's seventh claim is for state law abuse of process.  She claims the Detectives

17   "exerted influence to continue the criminal proceeding . . . with an ulterior purpose other

18   than resolving a legal dispute or resolving guilt or innocence of [Lobato] in the murder of

19   Duran Bailey."  (ECF No. 1 at ¶180.)

20             **1.    Relevant abuse of process law.**

21             "Abuse of process is a tort recognized to provide a remedy for cases in which legal

22   procedure has been set in motion in proper form, with probable cause, but nevertheless has

23   been perverted to accomplish an ulterior purpose for which it was not designed."  *Rashid v.*

24   *Albright*, 818 F. Supp. 1354, 1358 (D. Nev. 1993) (citing Prosser & Keaton, LAW OF TORTS

25   896 (1984)).  The essence of the tort of abuse of process is the use of the legal system to

26   accomplish some end which is without the regular purview of the process, or which compels

27   the party against whom it is used to do some collateral thing which he could not legally and

1    regularly be required to do. *See Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994). To

2    successfully state a claim for abuse of process under Nevada law, a plaintiff must allege:

3    (1) the defendant had an ulterior purpose in the underlying lawsuit other than resolving a

4    legal dispute, and (2) the defendant willfully and improperly used the legal process to

5    accomplish that purpose. *LaMantia v. Redisi*, 38 P.3d 877, 880 (Nev. 2002). An action for

6    abuse of process hinges on misuse of regularly issued process. *Dutt v. Kremp*, 844 P.2d 786,

7    790 (Nev. 1992) (internal citations omitted), *overruled on other grounds by LaMantia v.*

8    *Redisi*, 38 P.3d 877 (Nev. 2002); *Mirch v. Clifton*, 2015 WL 6681231, *5 (Nev. 2015)

9    (citing *Nev. Credit Rating Bureau, Inc. v. Williams*, 88 Nev. 601, 606, 503 P.2d 9, 12

10   (1972)).

11       The Nevada Supreme Court has stated that an "ulterior purpose" includes any

12   improper motive underlying the issuance of legal process. *Dutt*, 844 P.2d at 790. However,

13   there is no liability when the defendant has done no more than carry out the process to its

14   authorized conclusion, even if he or she does so with bad intentions. *See generally*, Prosser,

15   LAW OF TORTS, § 121, 857 (4th ed. 1971). Unless a plaintiff points to evidence that the

16   officers were motivated by some collateral objective, the existence of probable cause

17   constitutes a defense to an action for abuse of process. *Shiels v. City of New York*, 141 A.D.

18   3d 421, 422, 35 N.Y.S. 3d 330 (1st Dept. 2016).

19       **2.    Analysis of Lobato's abuse of process claim.**

20       Here, there is no evidence that either detective used the legal process in an improper

21   manner in the regular conduct of the proceeding and Lobato has not generated any evidence

22   of an "ulterior purpose by the defendants" to arrest her. *See Posadas v. City of Reno*,

23   851 P.2d 438, 445 (Nev. 1993); *Bull v. McCuskey*, 615 P.2d 960 (Nev. 1980) (attorney

24   knowingly filed frivolous lawsuit in hopes of coercing a nuisance settlement). In *Posadas*

25   the plaintiff avoided summary judgment by making "a sufficient showing . . . [by]

26   present[ing] to the district court sufficient evidence that criminal charges were brought

27   against him for the purpose of forcing his resignation. (*Id.* at 851 at 445.)

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Lobato has generated no evidence showing the Detectives had an ulterior motive in

2    arresting her.  She has not identified an "ulterior purpose" beyond a regular criminal arrest.

3    The evidence is also clear that once Lobato was arrested, all decisions regarding the

4    prosecution of Lobato were controlled and made by the District Attorney's office.  The

5    Detectives simply allowed the District Attorney to carry out the charges against Lobato to its

6    authorized conclusion. (Ex. LL.)

7    **H.    COUNT VIII: STATE LAW IIED.**

8    Lobato's eighth claim is a state law IIED claim.  She claims that all of the actions

9    discussed above caused her to suffer emotional distress.  (ECF No. 1 at ¶185.)  It appears

10   that Lobato's IIED claim is based upon her belief that the Detectives fabricated evidence,

11   withheld evidence, and "framed" her for the murder of Bailey.

12   **1.    Relevant IIED law.**

13   The elements of an IIED claim are "(1) extreme and outrageous conduct with either

14   the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff having

15   suffered severe or extreme emotional distress, and (3) actual or proximate causation." *Star*

16   *v. Rabello*, 97 Nev. 124, 625 P.2d 90, 91-92 (1981).  Analysis of Lobato's IIED claim.

17   **2.    Analysis of Lobato's IIED complaint.**

18   Lobato's IIED claim is predicated upon her first establishing that the Detectives

19   violated her federal-law and/or state-law rights.  There is no evidence of "extreme or

20   outrageous" conduct on behalf of the Detectives as Lobato has failed to deliver any evidence

21   that the Detectives did anything wrong – let alone "extreme or outrageous."  Lobato, herself,

22   testified that she felt the Detectives were "fair" with her.  (Ex. H at 162:7-21.)  And, her own

23   expert only concluded that the Detectives were, at most, negligent and not thorough.  (Ex.

24   DD at 66:3-10.)

25   **I.    COUNT X: INDEMNIFICATION.**

26   Lobato's final claim for relief is one for "indemnification."  (ECF No. 1 at ¶¶195-

27   197.)  This is not a claim for relief under federal or state law.  *See e.g., Sims v. City of*

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

*Columbus*, 2013 WL 3394001, n.2 (S.D. Ohio July 8, 2013).  In Nevada, NRS 41.0349 governs the indemnification of public officers.  Indemnification is required unless the official acted outside the course and scope of his employment and/or "the act or omission of the person was wanton and malicious." (*Id.*)

## V.    **CONCLUSION**

Based upon the above, the LVMPD Defendants request summary judgment on all claims.

Dated this _28_ day of June, 2021.

MARQUIS AURBACH COFFING

By: _____
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
*Attorneys for LVMPD Defendants*

### **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **LVMPD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the _28th_ day of June, 2021.

☒    I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☐    I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

_____
An employee of Marquis Aurbach Coffing

MAC:14687-221 3890205_1

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816