# Exhibit EE - Dr. Allison Redlich Deposition

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

Page 80

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF NEVADA   )
                        ) ss
 3    COUNTY OF CLARK   )

 4
                 I, Lori-Ann Landers, a duly commissioned
 5    Notary Public, Clark County, State of Nevada, do hereby
      certify:
 6
                 That I remotely reported the taking of the
 7    deposition of the witness, ALLISON REDLICH, at the time
      and place aforesaid;
 8
                 That prior to being examined, the witness
 9    was by me duly sworn to testify to the truth, the whole
      truth, and nothing but the truth;
10
                 That I thereafter transcribed my shorthand
11    notes into typewriting and that the typewritten
      transcript of said deposition is a complete, true and
12    accurate transcription of my said shorthand notes taken
      down at said time to the best of my ability.
13
                 I further certify that I am not a relative
14    or employee of an attorney or counsel of any of the
      parties, nor a relative or employee of any attorney or
15    counsel involved in said action, nor a person financially
      interested in the action; and that transcript review FRCP
16    30(e) was requested.

17               IN WITNESS WHEREOF, I have hereunto set my
      hand in the County of Clark, State of Nevada, this 5th
18    day of March 2021.

19

20               LORI-ANN LANDERS, CCR 792, RPR

21

22

23

24

25
```

# Kirstin Blaise Lobato

# v.

# Las Vegas Metropolitan Police Department, et al.

## Transcript of

# Allison Redlich

## Volume I

## March 5, 2021



400 South Seventh Street, Suite 400, Box 7, Las Vegas, NV 89101

702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                    UNITED STATES DISTRICT COURT

2                      CLARK COUNTY, NEVADA

3
     KIRSTIN BLAISE LOBATO,        )
4                                  )
             Plaintiff,            )
5                                  ) Case No.
         vs.                       ) 2:19-cv-01273-RFB-EJY
6                                  )
     LAS VEGAS METROPOLITAN        )
7    POLICE DEPARTMENT,            )
     THOMAS THOWSEN, and           )
8    JAMES LaROCHELLE,             )
                                   )
9            Defendants.           )
                                   )
10

11

12
            VIDEOCONFERENCE DEPOSITION of ALLISON REDLICH
13               Taken on Friday, March 5, 2021
                      At 9:01 a.m.
14                 Manassas, Virginia

15

16

17

18

19

20

21

22

23

24   Reported by:  Lori-Ann Landers, CCR 792, RPR

25

Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 5 of 24

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

2

```
 1   A P P E A R A N C E S:
 2   For the Plaintiff Kirstin Blaise Lobato
 3       ELIZABETH WANG, ESQ. (Via videoconference)
         Loevy & Loevy
 4       2060 Broadway, Suite 460
         Boulder, Colorado 80302
 5       Email: elizabethw@loevy.com
 6   For the Defendants LVMPD, James LaRochelle and Thomas
     Thowsen
 7
         CRAIG R. ANDERSON, ESQ. (Via videoconference)
 8       Marquis Aurbach Coffing
         10001 Park Run Drive
 9       Las Vegas, Nevada 89145
         Email: canderson@maclaw.com
10
11
     ALSO PRESENT VIA VIDEOCONFERENCE:
12
     LEAH DELL
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                I N D E X
 2   WITNESS                               PAGE
 3   ALLISON REDLICH
 4   Examination by Mr. Anderson            4
 5
 6             EXHIBIT INDEX
 7        (No exhibits were marked.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              P R O C E E D I N G S
 2   (Prior to the commencement of the deposition proceedings,
     a discussion was held off the record among the court
 3   reporter and counsel, wherein counsel stipulated to waive
     the reporter requirements under Rule 30(b)(4).)
 4
 5        THE REPORTER:  Will all counsel please
 6   stipulate to the swearing in of the witness remotely?
 7        MS. WANG:  Stipulated by plaintiff.
 8        MR. ANDERSON:  The defendants stipulate.
 9        (Witness sworn.)
10            ALLISON REDLICH,
11   having been first duly sworn, was examined and
12   testified as follows:
13            EXAMINATION
14   BY MR. ANDERSON:
15   Q.   Can I get you to state your name for the record.
16   A.   Sure.  It's Allison Redlich.
17   Q.   And is it okay if I call you Dr. Redlich?
18   A.   Sure.
19   Q.   Okay.  Dr. Redlich, have you had your deposition
20   taken before?
21   A.   Yes.
22   Q.   About how many times?
23   A.   A deposition, in the past four years, it's been
24   three times.
25   Q.   Okay.  Are you comfortable with what we are
```

5

```
 1   going to do here today?  Do you want me to explain to you
 2   what a deposition is, or do you want me to skip the
 3   formalities?
 4   A.   I think I would like a brief overview.
 5   Q.   Okay.  No problem.  So, Dr. Redlich, as you are
 6   aware, you have been retained as an expert by Kirstin
 7   Blaise Lobato in a civil lawsuit she's filed against the
 8   Las Vegas Metropolitan Police Department and two
 9   detectives.
10        Do you understand that?
11   A.   Yes.
12   Q.   Okay.  A deposition is an opportunity for me to
13   question you about your opinions that you are going to
14   offer in the case, the report that you have authored and
15   any opinions that you may or will give at the time of
16   trial.
17        Does that make sense?
18   A.   Yes.
19   Q.   It's a question-and-answer period where I will
20   ask questions; you will give answers.
21        Do you understand that?
22   A.   Yes.
23   Q.   Okay.  Do you understand that you have taken an
24   oath to tell the truth, the same oath that you would take
25   in a court of law?
```



Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

6

1    A.  Yes.
2    Q.  I only want answers to questions that you know
3  the answer to.  It's perfectly fine to say, "I don't
4  know," "I don't remember," or "I don't have any
5  information on that."
6        Does that make sense?
7    A.  Yes.
8    Q.  I don't take too long of depositions.  I suspect
9  this might go two, two and a half hours maybe.  If at any
10  time you want to take a break, you want to speak with
11  Ms. Wang, just let me know, and we can arrange that.
12  Okay?
13    A.  Okay.  Sounds good.
14    Q.  Is there any reason why you couldn't give
15  truthful testimony today?  Are you feeling ill?  Are you
16  on any medication?
17    A.  No.
18    Q.  Do you have any questions for me about the
19  deposition process before we start?
20    A.  No, I don't think so.
21    Q.  Okay.  What is your current occupation?
22    A.  I am a professor in the Department of
23  Criminology, Law and Society at George Mason University.
24    Q.  And how long have you been employed by George
25  Mason University?

7

1    A.  About five and a half years.
2    Q.  Prior to George Mason University, were you
3  employed?
4    A.  Yes.
5    Q.  Okay.  Where did you work then?
6    A.  I was first an assistant and then an associate
7  professor at the University at Albany, SUNY Albany for
8  seven years.
9    Q.  Can you give me a brief sketch of your
10  educational history.
11    A.  Sure.  I received my Ph.D. in Developmental
12  Psychology at the University of California at Davis in
13  1999.  I then spent three years at Stanford University
14  School of Medicine in the Department of Psychiatry and
15  Behavioral Sciences.  Two of those years were as a
16  postdoctoral fellow, and one year was as a research
17  scientist.
18        I think you said -- just said education?  Not my
19  employment background?
20    Q.  If you would just fill us in on your employment.
21    A.  We hit most of it.  I will just say that after I
22  left Stanford, I took a job at a private research firm
23  for six years in Albany, New York.
24    Q.  And did you do a dissertation for your Ph.D.?
25    A.  I did.

8

1    Q.  And what was the topic of your dissertation?
2    A.  It was a laboratory study in which I compared
3  juveniles, ages -- it's been so long.  I think they were
4  age 13 to 17, maybe 11 to 17 -- I'm sorry, I don't
5  remember, it's been about 25 years -- but to young adults
6  ages 18 to 25, 24 maybe -- looking at their likelihood of
7  giving a false confession in a mock interrogation
8  situation.
9    Q.  Okay.  So during your education when you were
10  earning your degrees, you had a focus at that point on
11  false confessions?
12    A.  Yes.
13    Q.  Okay.
14    A.  My training was about best practices in
15  interviewing youths as victim witnesses, and I took what
16  I learned in that context and applied it to interviewing
17  youth in interrogation context, more as a suspect.
18    Q.  Okay.  So about how many years have you been
19  researching, studying, and testifying regarding false
20  confessions?
21    A.  Well, I have been researching, studying false
22  confessions for about 25 years, I would say.  In terms of
23  testifying, the first time that I gave testimony was in
24  2004, so that's about 15, 16 years maybe.
25    Q.  How many times have you testified in court with

9

1  respect to false confessions?
2    A.  Not very often.  I would say less than five.
3    Q.  Were those in a criminal context, a civil
4  context, or both?
5    A.  Both.
6    Q.  So you were retained as an expert in both
7  criminal cases and civil cases; correct?
8    A.  Yes.
9    Q.  Now, as part of your research and developing
10  this expertise, have you ever received any specific
11  police training?
12    A.  By the police?
13    Q.  Yeah.  Have you ever gone through police
14  interrogation training, anything along those lines?
15    A.  No.  I am familiar with the written manual of
16  the Reid Technique.  It's written by Inbau, et al., but I
17  have not received direct training face to face.
18    Q.  I was just wondering, as part of your
19  background, you had taken police training courses, saw
20  how they were trained in interrogation just out of
21  curiosity in order to further your career.
22        Never done anything like that?
23    A.  No.
24    Q.  Have you ever assisted police departments in
25  writing policies for interrogations?



10

1    A.  No.
2    Q.  Have you ever been asked to assist police
3  departments in developing interrogation techniques that
4  are fairer to the youth or juveniles?
5    A.  I would say informally, but not on a formal
6  basis, no.
7    Q.  Okay.  Now, the scope of your work in this case,
8  in the Kirstin Lobato case, simply involves the
9  July 20th, 2001, interview by Detectives Thowsen and
10  LaRochelle; is that correct?
11    A.  Well, I have reviewed material that is
12  tangential to that, to the interrogation as well.
13    Q.  That probably wasn't a fair question.  What I'm
14  trying to get, are you offering any opinions on police
15  practices or about how the police conducted their
16  investigation outside of this interview?
17    A.  Not per se, no.
18    Q.  Okay.  I will give you a chance to flesh that
19  out, because I don't think that's a very good question,
20  so I will come back to that.
21        Now, I think I might have asked this, so I
22  apologize if I'm asking it again, but you have never
23  been -- you have never trained police officers on how to
24  interrogate; correct?
25    A.  Well, I have given presentations to police -- to

11

1  police.
2    Q.  How does that come about?
3    A.  They usually contact me and ask me if I'm
4  willing to give a presentation at their conference,
5  something along those lines.
6    Q.  Do you have, like, a set presentation you give,
7  like a PowerPoint presentation or materials you use in
8  those trainings?
9    A.  It really depends on the focus.  I mean,
10  sometimes people want me to focus on juveniles, sometimes
11  they want me to focus on mental health problems,
12  sometimes just interrogation practices in general.
13        I have another related line of research that's
14  on human intelligence so kind of in a military or a
15  federal setting, so I would say that I don't have one set
16  or, you know, one specific PowerPoint, and it certainly
17  changes over the years as the science is updated.
18    Q.  Okay.  What was the first year you published in
19  the field of false confessions?
20    A.  May I look at my CV?
21    Q.  Please.  Please.
22    A.  I would say a peer-reviewed publication, my
23  first one for false confessions, on that topic, would be
24  my dissertation in 2003.
25    Q.  And you published fairly consistently since that

12

1  time; correct?
2    A.  Yes.
3    Q.  I have a February 5th, 2000, [sic] expert report
4  that you drafted to David Owens and Elizabeth Wang.  Is the
5  CV attached to that still current with your publications?
6    A.  There might be one or -- one or two more that
7  have come up since, but generally very current, yeah.
8    Q.  Okay.  And when were you retained by the law
9  firm Loevy & Loevy in this matter?
10    A.  I mean, retained by them?  The first time they
11  contacted me?
12    Q.  Yes.
13    A.  I would have to check my record, but my estimate
14  is about a year ago maybe, maybe six months ago.
15    Q.  And if I understand correctly, you had done some
16  earlier work on this case in the criminal case that was
17  ongoing; correct?
18    A.  Yes.
19    Q.  Okay.  And that was roughly in the years 2017,
20  2016?
21    A.  Yes.  2017, and then I was first contacted by
22  Hans Sherrer -- I'm not sure of his last name -- in -- I
23  believe it was 2010.
24    Q.  And what is your understanding as to who Hans
25  Sherrer is?

13

1    A.  Well, we're going back 10, 11 years now, but my
2  recollection, he's just a -- he was somebody who was
3  interested in the case.  I'm not really -- I don't
4  remember.
5    Q.  Did he pay you for your work?
6    A.  No.
7    Q.  Okay.  You just did a pro bono for free?
8    A.  Yes.  It wasn't as in-depth a review I did in
9  2017.  It's -- I think I just reviewed maybe her
10  statement, a few documents that he had prepared, and I
11  had written a very brief letter or report.  It was, like,
12  maybe one page.
13    Q.  Okay.  And your 2017 report or letter to her
14  criminal defense attorneys was more of a thorough review?
15    A.  Yes.
16    Q.  And were you paid for that?
17    A.  Yes.
18    Q.  How much are you charging Loevy & Loevy in this
19  matter?
20    A.  $300 per hour.
21    Q.  Do you know how much you have charged to date?
22    A.  Not precisely, but it's about 4,000.
23    Q.  Can you estimate how much you charged
24  Ms. Lobato's criminal defense attorneys in 2016, 2017?
25    A.  I can certainly look, but I don't recall off the

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

14

1  top of my head.
2      Q.   Have you been retained in other false confession
3  cases by Loevy & Loevy?
4      A.   Not to my knowledge.  Not to my recollection,
5  no.
6      Q.   This is your first case with them?
7      A.   Yes, I believe so.
8      Q.   Do you have any other open cases with the law
9  firm of Loevy & Loevy?
10     A.   No.
11     Q.   Now, how much of your time is spent doing expert
12 work?
13     A.   I would say very little.
14     Q.   Your primary occupation is you're a professor;
15 correct?
16     A.   Yes.
17     Q.   Do you have an estimate as to how much money you
18 make a year doing expert work?
19     A.   I can estimate it.  It really varies from year
20 to year.  But I would say it ranges from 5,000 to 15,000.
21     Q.   How many open cases do you have right now where
22 you are a retained expert?
23     A.   I would say maybe four, and a large part of that
24 is because of COVID that, you know, certain cases that
25 should have been wrapped up by now, but I would say just

15

1  sitting there, dormant.
2      Q.   We all have those right now.  Have you ever been
3  retained as a forensic expert by a defendant in a civil
4  case, so on behalf of the police department, so to speak?
5      A.   No.
6      Q.   Have you ever testified or been retained in a
7  criminal trial on behalf of the prosecution?
8      A.   No.
9      Q.   So all of your work is for plaintiffs in civil
10 context?
11     A.   And defendants in criminal context.
12     Q.   Okay.  That was my next question.
13     A.   Well, you said, "all," so just want to make
14 sure --
15     Q.   I ask horrible questions.  So none of your work
16 has been on behalf of the individual being questioned by
17 the police; is that fair?
18     A.   Yes.
19     Q.   Have you ever rendered an expert opinion, in
20 either the civil or criminal context, that a confession
21 was not coerced, that the police did the right thing?
22     A.   In a court of law, like at a testimony or in a
23 deposition?
24     Q.   Correct.
25     A.   No.

16

1      Q.   Have you ever been asked as an expert witness to
2  review a file where you told the attorney, "There is
3  nothing here," that this interrogation is fine?
4      A.   Yes.
5      Q.   Can you think of an example of that?
6      A.   No, because -- you know, there -- I don't really
7  get into it that -- I don't get into the case that much.
8  It's my initial opinion, you know.  I really -- I am
9  contacted often, but I most -- I come to a response to
10 decline.  I don't take on that many cases.
11     Q.   So what's the criteria you look for to take on a
12 case?
13     A.   Well, the first thing that's, you know -- is my
14 time, you know, and when they are looking for an expert,
15 and oftentimes, you know, it doesn't fit into my
16 schedule, so kind of ends the conversation there.
17     Q.   Now, I'm aware of the 2017 letter that you
18 drafted to Ms. Lobato's criminal attorneys, and I am
19 aware of the February 5th, 2021, letter to Mr. Owens and
20 Ms. Wang.
21         Have you drafted any other reports in this case?
22     A.   No.  Well, the letter that I sent to Hans
23 Sherrer in 2010.  Yeah.
24     Q.   Fair enough.  At this point does your
25 February 5th, 2021, report reflect all of your opinions

17

1  in this case?
2      A.   Yes.  I have not reviewed any materials since I
3  wrote that report.
4      Q.   Do you have any intention of drafting any
5  rebuttal reports or supplement reports as you sit here
6  today?
7      A.   Not without new information or a report to
8  rebut.
9      Q.   And so what was the scope of your retention in
10 the Lobato case?  What were you asked to do?
11     A.   To review materials related to the case.
12     Q.   And let me just find the materials you reviewed.
13 The materials -- and you can refer to your report.
14         So the materials that you reviewed for the 2017
15 letter was the transcript of Ms. Lobato's statement, the
16 audio of that same statement, the arrest report, autopsy
17 report, interview with Laura Linn Johnson, interview with
18 Dixie Tienken, opening trial statements by the State and
19 Defense, Tom Thowsen's criminal testimony, the transcript
20 of Ms. Lobato's criminal testimony, transcript of Dixie
21 Tienken's criminal testimony, list of grounds for a
22 habeas corpus petition, and the Supreme Court of Nevada
23 judgment.
24         That's what you reviewed in 2017; correct?
25     A.   Correct.



Allison Redlich                  Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

18

1    Q.  And since that time, you have been provided the
2  civil depositions of Thowsen, LaRochelle, Lobato; the
3  training of the two detectives; the same transcript of
4  Ms. Lobato's statement; the Metropolitan Police
5  Department interviewing techniques and deception
6  detection; and the officer's report in this case.
7        Is that everything you reviewed?
8    A.  Yeah.  Most recently, yes.  That's everything
9  that I reviewed in this case, yes.
10   Q.  Okay.  And your opinions in this case are about
11 whether -- and I know this case is kind of tricky, so let
12 me see if I can say this correctly -- about whether
13 Ms. Lobato confessed to the July 8th, 2001, murder of
14 Duran Bailey; is that fair?
15   A.  Yes.
16   Q.  Okay.  Are you offering any opinions as to
17 whether the officers had probable cause to arrest
18 Ms. Lobato?
19   A.  No.
20   Q.  Okay.  Are you offering or do you intend to
21 offer any opinions that the defendant detectives
22 fabricated evidence in this case?
23   A.  Is their report evidence, the police report?
24   Q.  Okay.  Do you believe there is fabricated
25 evidence in the police report?

19

1    A.  I don't believe so, but -- I mean, there was
2  some discussion of the word "snapped," and, you know, I
3  think that's part of their theory, but I don't really
4  have an opinion about that.
5    Q.  Okay.  I will give you a chance to talk about
6  that, because I saw your report.  So, yeah, I'm not
7  trying to be tricky here.  I'm trying to just narrow this
8  down.
9    A.  Okay.
10   Q.  So do you have an opinion as to whether the
11 detectives fabricated, made up, or created evidence in
12 this case to frame Ms. Lobato?
13   A.  Intentionally?
14   Q.  Intentionally.
15   A.  I do not have an opinion about that.
16   Q.  Okay.  Are you offering or do you intend to
17 offer any opinions that the defendant detectives withheld
18 evidence from the prosecution or Ms. Lobato in this case?
19   A.  No.  I'm not going to offer an opinion on that.
20   Q.  And I'm going to go through your report with
21 you.  You have a copy of it with you; is that correct?
22   A.  Yes.
23   Q.  Okay.  Feel free to refer to it.  It's not a
24 memory test.
25       Did you review your report before the deposition

20

1  today?
2    A.  Yes.
3    Q.  What else did you review, if anything, to
4  prepare for this deposition?
5    A.  I received an email with the documents that we
6  plan to go over today, so I focused on those materials.
7  Included, I think, the officer's report, my report,
8  Ms. Lobato's deposition.  I think there was one more.
9  Oh, and her statement from 2001.  I focused on those,
10 yes.
11   Q.  And I just included those because I may refer to
12 them.  I may use them to refresh your memory.  I don't
13 know if I will or not.  We will see where it goes.
14   A.  Okay.
15   Q.  When you reviewed those documents, did they
16 change any of your opinions or add any opinions?
17   A.  No.
18   Q.  So let me ask you generally about false
19 confessions, just in general.
20       How would you define a false confession?
21   A.  A false confession is a statement taking
22 responsibility for a crime that the person did not
23 commit.
24   Q.  And on Page 2 of your report, it begins, and it
25 mentions it a couple of times in your report; this is not

21

1  a typical false confession, in referring to Ms. Lobato;
2  correct?
3    A.  Correct.  I said that, yeah.
4    Q.  What did you mean by that?
5    A.  What I meant by that is that I believe that
6  Ms. Lobato was describing an event that happened to her.
7  I do not think it was the same event that the police
8  think it was or appear to think it was, and that's why I
9  thought it was not a typical false confession case.
10   Q.  Okay.  So let's see if we agree on this.  We
11 agree that Ms. Lobato confessed to an actual event that
12 occurred.
13   A.  Well, I hesitate to use the word "confess"
14 because it sounds like she's taking responsibility for
15 something.  I think she was describing a sexual assault
16 that happened to her.
17   Q.  Okay.  So but we agree that she was talking
18 about an actual event?
19   A.  Yes.
20   Q.  Okay.  But it's your opinion that she was
21 talking about an event completely separate from the Duran
22 Bailey murder?
23   A.  Yes, that's my opinion.
24   Q.  Okay.  So I understand the word "confession" is
25 difficult, but -- so we agree that she was talking about



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 10 of 24

Allison Redlich                Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

22

1 an attempted assault on her where she used force against
2 somebody that actually happened?
3    A. I don't know what you mean by "used force,"
4 but --
5    Q. Well, she admitted that she tried to fight off
6 her attacker by stabbing a knife in him.
7       Do you agree with that?
8    A. By stabbing a knife in him, yes. She's -- yeah.
9 Yes.
10   Q. I think we are on the same page. I'm not trying
11 to be tricky.
12   A. Yeah.
13   Q. We can agree that she was talking about
14 something that actually happened. You just disagree with
15 how the police interpreted that; correct?
16   A. Yes. I think -- I do not think that it was the
17 murder of Duran Bailey that she was talking about.
18   Q. Okay. You believe she was confessing or
19 referring to an event that occurred prior to the Duran
20 Bailey murder?
21   A. Yes.
22   Q. So, in your opinion, did the detectives in this
23 case elicit a false confession, or how would you describe
24 it?
25   A. I believe that the detectives believe that they

23

1 obtained a confession to the Duran Bailey murder.
2    Q. Okay. And we're going to talk about this a lot.
3 So you believe that what the detectives suffered from is
4 tunnel vision; correct?
5    A. Yes.
6    Q. Okay. So going back to your report, according
7 to your report, there are three main types of false
8 confessions: voluntary, compliant, and internalized; is
9 that correct?
10   A. Yes.
11   Q. Can you explain to me what a voluntarily
12 confession is.
13   A. It's somebody -- I mean, it's somebody who
14 voluntarily confesses to the police to a crime that they
15 did not commit. The quintessential examples are people
16 who confess to protect the true perpetrator, or perhaps
17 they have mental health problems where they are seeking
18 notoriety or trying to gain infamy, something like that,
19 yeah.
20   Q. Does the Lobato case have any characteristics of
21 voluntary confession?
22   A. Voluntary false confession?
23   Q. Sorry, voluntary false confession.
24   A. I think, you know, overall, if you are going to
25 go over all of these, I think this is a good instance

24

1 where the taxonomy of false confessions doesn't really
2 apply to Ms. Lobato's case.
3    Q. What do you mean by that?
4    A. Well, if you ask me to categorize, do I think
5 this is a voluntary, a coerced internalized, coerced
6 compliant false confession, I think it would be difficult
7 to do so.
8       I just don't think that the tax -- because this
9 is not a typical false confession case, I'm not sure that
10 the taxonomy applies here, but as I have mentioned in my
11 report, I do think that there is a lot of commonalities
12 that are shared between known proven false confession
13 cases and Ms. Lobato's case.
14   Q. Have you ever rendered an opinion in a case
15 similar to this where the confession doesn't meet any of
16 the three primary types but is still under the umbrella
17 of false confession?
18   A. I cannot think of another instance, no.
19   Q. So this was a unique case for you?
20   A. I would say so, yes.
21   Q. So maybe save some time then. So you are not
22 going to testify this was a characteristic --
23 characteristic of a -- strike that. I don't know my
24 words.
25      You are not going to testify that this was a

25

1 voluntary confession.
2    A. Voluntary false confession, not as is typically
3 defined in the literature, no.
4    Q. That's a good way to put it. And you are not
5 going to testify that, as typically defined in the
6 literature, this was a compliant false confession.
7    A. No.
8    Q. Okay. And you are not going to testify, as
9 identified in the literature, that this is an
10 internalized confession.
11   A. No.
12   Q. Okay. Would you even have a term for this type
13 of confession?
14   A. Not as -- not in the scientific literature, no.
15   Q. Okay. Now, your report also discusses the three
16 dispositional characteristics that are common in false
17 confessions: juvenile status, mental illness, and drug
18 use; correct?
19   A. Yes.
20   Q. Why are those dispositional characteristics
21 here? How did you come to reach those three? Why are
22 they important?
23   A. Because they are relevant to Ms. Lobato's
24 circumstances in that she was 18 years of age at the time
25 and that she's a known drug user and that she has mental



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 11 of 24

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

26

1 health issues.
2    Q.  So just generally speaking, why does juvenile
3 status play a role in false confessions?  What has your
4 research told you on that?
5    A.  Well, all the things that I have mentioned in my
6 report about -- sorry, I'm trying to bring up my report.
7 That they are socially, emotionally, neurologically
8 different than adults, that our brains and -- continue to
9 mature and develop into our 20s, that they may be more
10 suggestible.
11       They may be more risk taking or -- use better
12 judgment as we get older.  That's certainly true of
13 18-year-olds.  Those kinds of things that -- maybe some
14 adherence to authority figures, those kind of issues that
15 make youth in general more at risk for false confessions.
16    Q.  Okay.  And I understand mental illness.  I will
17 skip that one, but, now, with drug use, in the false
18 confession context, is that referring to someone who is
19 on drugs when they confess or someone that has just used
20 drugs at some point?
21    A.  I would say both are risk factors.  Certainly if
22 somebody is on drugs during the interrogation, that can
23 absolutely affect their ability to answer questions and
24 answer the questions truthfully and be suggestible and
25 those kinds of things.

27

1       But also if somebody is a long-term drug user,
2 that affects their executive functioning, and they may
3 have a brain damage if they're, you know, certainly a
4 long-time drug user.
5       There is also the issue of withdrawals, and if
6 somebody is a drug addict or a drug -- has a drug abuse
7 problem and they are in need of a drug, that's going to
8 affect their ability to withstand the interrogation and
9 give in to suggestions of the police.
10    Q.  Okay.  You have reviewed countless confessions;
11 correct?
12    A.  I missed the beginning of your question.  You
13 kind of cut out there.
14    Q.  You have reviewed and evaluated hundreds if not
15 thousands of confessions in your career; correct?
16    A.  I wouldn't say anywhere near thousands.
17    Q.  Okay.
18    A.  Maybe 200, 500 maybe.  Yeah.
19    Q.  Okay.  So but you are familiar with the
20 different ways that police operate.  You are familiar
21 with different tactics they use.  You have seen a lot of
22 different things; correct?
23    A.  Yes.
24    Q.  So I want to talk about the Lobato case and see
25 what we agree on and don't agree on.  So do you agree

28

1 with me that the detectives only interviewed Ms. Lobato
2 one time, and that was on July 20th, 2001?
3    A.  In a formal interview, yes.
4    Q.  It's my understanding, and I could be wrong,
5 that was the only date.  And I'm not talking just about
6 the interview.  I'm talking about the interaction with
7 her.
8       So let me say it this way:  Do you agree with me
9 that the only day that the detectives interacted with
10 Ms. Lobato was on July 20th, 2001?
11    A.  I'm just -- my hesitation is about that incident
12 in the jail cell where she said it was -- I don't know.
13 Was that the same day?  Was that with the police
14 officers?  I'm not really sure.
15    Q.  It was the same day with the same detectives.
16    A.  Okay.  Then yes.
17    Q.  But they only formally interviewed her one time;
18 correct?
19    A.  Yes, to my knowledge.
20    Q.  So going to how the police met up with
21 Ms. Lobato, do you have any opinions as to whether it was
22 reasonable for the detectives to go interview her after
23 they had talked to Ms. Johnson?
24    A.  As I said in my report, I thought that it was --
25 it was hearsay information and that they viewed her as a

29

1 suspect, which, in my opinion, they made clear in their
2 depositions, perhaps their trial testimony, that they
3 brought the forensic crime scene team with them.
4       They read her her Miranda rights, so I think
5 it's -- in my opinion, they were clearly viewing her as a
6 suspect after having an initial phone call with the
7 person.  I can't -- is it --
8    Q.  Ms. Johnson.
9    A.  Johnson.  Thank you.  And then going to meet
10 with her, Ms. Johnson, and then they interviewed
11 Ms. Lobato the same day.
12    Q.  Okay.  So I think we agree that the detectives
13 interviewed Ms. Johnson.  They viewed Ms. Lobato as a
14 suspect and traveled to her home to interview her as a
15 suspect.
16       You agree with all that; correct?
17    A.  Yes.
18    Q.  Okay.  Do you believe that it was reasonable for
19 them to do that?
20    A.  If you are asking me about probable cause, I'm
21 not --
22    Q.  Okay.
23    A.  -- a police officer or anything like that, so...
24    Q.  Are you critical of them for doing that?
25    A.  In my report you could construe it as critical,



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 12 of 24

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

30

1  yes.
2  Q.  Now, do you dispute that the officers had the
3  legal right to go and talk to Ms. Lobato?
4  A.  I don't have an opinion on that.
5  Q.  Okay.  In your report you were critical that
6  they didn't talk to Ms. Tienken first; is that correct?
7  A.  Yes.
8  Q.  Why do you believe the officers should have
9  talked to Ms. Tienken before interviewing Ms. Lobato?
10  A.  Because, in my opinion, the discussion they had
11  with Ms. Johnson was -- there was a lot of ifs and maybes
12  and I don't knows and I assume.  It just seemed like a
13  lot of hearsay to me, and it was -- my recollection is
14  that Ms. Johnson was describing her conversations she had
15  with Ms. Tienken, so it seemed reasonable to me to go to
16  Ms. Tienken first.
17  Q.  To verify the information?
18  A.  Yes.
19  Q.  Now, if they had hypothetically gone and met
20  with Ms. Tienken, what she told them would also have been
21  hearsay; correct?
22  A.  Well, at least it would have come directly from
23  Ms. Lobato.
24  Q.  Okay.  So it would have been one layer less of
25  hearsay?

31

1  A.  Well, you know, I'm not sure of the exact
2  definition of "hearsay" because, I mean, Ms. --
3  Ms. Johnson was certainly one removed, whereas
4  Ms. Tienken had a direct conversation with Ms. Lobato.
5  Q.  Okay.  And I looked at what you reviewed.  Do
6  you know -- are you familiar with the reason why
7  Detective Thowsen said they didn't go talk to Ms. Tienken
8  first?
9  A.  I saw something today in the officer's report I
10  don't remember seeing before, but it's been several
11  years, that they thought she was going to run, something,
12  or they were told she was going to run.
13  Q.  They were concerned that she would warn
14  Ms. Lobato --
15  A.  Yeah.  Yeah.
16  Q.  Do you have any criticisms of the reasoning in
17  that they wanted to catch Ms. Lobato by surprise and not
18  have time to prepare?  Are you critical of that?
19  A.  You know, you asked me what I was asked to do in
20  this case, and primarily it was to review the statement.
21  And you asked me specifically am I going to be talking
22  about police procedure and those kind of things, and my
23  answer was no.
24  Q.  Okay.  The only reason I'm asking about this is
25  it was in your report that it seemed you were critical of

32

1  them not interviewing Ms. Tienken first.  And so I just
2  want to get the foundation for that.
3  But if you are comfortable saying, "I'm not
4  offering any opinions on police practices or procedure,"
5  then I can move on from that.
6  Are you okay with that?
7  A.  Well, I do want to add and make clear, again,
8  that, to me, I think the important thing is that they
9  viewed her as a -- they viewed Ms. Lobato as a suspect,
10  starting from the initial phone call that they had with
11  Ms. Johnson.
12  Q.  And do you think that was unreasonable?
13  A.  I think it's -- it started the tunnel vision,
14  the confirmation bias.
15  Q.  Okay.  Do you agree that we have a somewhat
16  unique crime in this case in that the decedent had his
17  penis severed?  Do you think that's a unique
18  characteristic?
19  A.  I have no opinion on that.
20  Q.  Okay.  So going to Ms. Lobato, you agree with me
21  that she was 18 years old on the date of the interview?
22  A.  Yes.
23  Q.  And you would agree with me that once a person
24  turns 18 they are legally classified as an adult?
25  A.  Yes, according to the bright line of the

33

1  criminal justice system.
2  Q.  Do you have any criticisms of the detectives
3  interviewing Ms. Lobato alone without a parent present?
4  A.  No.
5  Q.  You are aware that Ms. Lobato was read her
6  Miranda rights and signed a Miranda card; correct?
7  A.  Yes.
8  Q.  Do you have any opinions as to whether
9  Ms. Lobato was capable or incapable of understanding her
10  Miranda rights?
11  A.  I can speak to the literature and in
12  generalities, and, you know, overall I see my role as
13  educating the jury if I were to testify at trial.  And
14  there is much research, science to support that younger
15  individuals and persons with mental health problems do
16  not fully understand.
17  But can I speak to Ms. Lobato 20 years ago and
18  her ability to understand and whether or not she did
19  understand her Miranda rights, whether or not it was a
20  voluntary signature?  I cannot opine on that.
21  Q.  Okay.  So you can render an opinion as to
22  generally how people Ms. Lobato's age react and respond
23  or understand, but you don't have any opinions
24  specifically to Ms. Lobato's situation?
25  A.  That's true, yes.



Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

34

1    Q.   And you would agree with me that Ms. Lobato had
2   a high school diploma equivalent?
3    A.   At the time of the interrogation, I don't
4   recall.
5    Q.   Okay.  Are you aware that Ms. Lobato had been
6   living on her own and not with her parents for a time
7   period prior to the interview?
8    A.   You mean in Las Vegas?
9    Q.   Yes.  She left home.  She was living on her own.
10    A.   Yes.
11    Q.   Are you aware of Ms. Lobato having any
12   documented learning disabilities in July of 2001?
13    A.   No.
14    Q.   Did you review any of Ms. Lobato's academic
15   records?
16    A.   No.
17    Q.   Did you review any IQ tests taken by Ms. Lobato?
18    A.   No, I didn't know that any IQ tests were
19   available.
20    Q.   And I don't know that they are.  I didn't know
21   if you had something -- so I think you answered this
22   question, but you don't have any personal understanding
23   of Ms. Lobato's cognitive abilities on the date of the
24   interview?
25    A.   No.  I will say that she was very upset.  She

35

1   claimed that she was -- didn't feel well, that she was
2   going to -- felt sick, felt nauseous, throw up.
3        I would say that, you know, there is some
4   evidence that she was depressed around that time and also
5   that she hadn't taken her medication that had been
6   prescribed to her for depression prior to the
7   interrogation, because my understanding is that it was
8   given to her either in the car ride back up to Las Vegas
9   or soon thereafter.
10    Q.   Okay.  And would those opinions right there
11   involve the mental illness category, so to speak?
12    A.   Well, I forgot your previous question, but it
13   was speaking to her demeanor, I think, during the
14   interrogation.
15    Q.   Okay.  I'm going to come back to all that.  I
16   will head to that a little bit later.  So my question for
17   you is based upon your -- most of your research, if I
18   reviewed it correctly, and I didn't review everything.
19        It's on juveniles, but you do have some research
20   on young adults, like 18 to 24; is that correct?
21    A.   I would not say that most of my research is on
22   juveniles in regards to false confessions.  I would say
23   maybe 25 percent of it is.
24    Q.   My question is, in your opinion, should police
25   officers treat an 18-year-old suspect differently than a

36

1   middle-age suspect?
2    A.   I can't answer that question in one...
3    Q.   Okay.  Do you -- have you ever issued
4   recommendations through your professional capacity or
5   through your training on how police should interview
6   adults but young adults differently than older adults?
7    A.   No.
8    Q.   Now, we talked briefly about how substance abuse
9   affects false confessions.  Do you believe that substance
10   abuse played a role in Ms. Lobato's confession?
11    A.   Played a role in Ms. Lobato's what?
12    Q.   In her confession, her statement.
13    A.   In a sense it did because she doesn't have a
14   clear memory of the incident that she's describing.  In
15   part that was because of the drug abuse.  She said she
16   had been up for three days, taking meth during that time.
17        It's also memory is affected because, you know,
18   in her mind -- you know, is -- she said it happened
19   Memorial Day weekend which was more than a month before
20   the interrogation.
21    Q.   Okay.  And so the substance abuse plays a role
22   in her confession due to the fact that she had a vague
23   memory as to what occurred and had a difficult time
24   placing the time of the event, that sort of thing?
25    A.   I think she's pretty clear in her mind about

37

1   when it occurred.  I think the drugs and her vague memory
2   of the event is -- opened her up to more suggestibility
3   from the police officers, allowing her to accept some of
4   the scenarios that they brought up, because she didn't
5   have a clear recollection.
6    Q.   In your research and studies, generally, does
7   drug abuse affect a suspect's ability to place things in
8   sequential order, timing, that sort of thing?
9    A.   I haven't really conducted research on that, but
10   my overall sense is that, yes, but I'm not an expert on
11   that.
12    Q.   Once the detectives learned that there was a
13   meth history, a methamphetamine history with Ms. Lobato,
14   in your opinion, should they have conducted the interview
15   differently or taken any different action?
16    A.   Not due to that per se, no.
17    Q.   Moving on to mental illness.  Is it your
18   understanding that on July 20th, 2001, Ms. Lobato had not
19   been diagnosed with any mental disabilities?
20    A.   She hadn't been diagnosed with bipolar disorder.
21   If she had been diagnosed with something else I didn't
22   remember.  I don't remember seeing that.
23    Q.   Is it your opinion that mental illness played a
24   role in this event?
25    A.   I think that it could have, yes.



38

1   Q.   And what's that based upon?
2   A.   The event -- to clarify, "the event," meaning
3 the interrogation?
4   Q.   The interrogation, I'm sorry.   Yeah.
5   A.   It's okay.   Well, like I said, I mean, she could
6 have been depressed -- I mean, it seems like she was
7 depressed if -- she was very emotional during the
8 interrogation, very upset.
9       I did not listen to the tape this time, but I
10 listened back in 2017, and, you know, it's clear on the
11 transcript as well that she was very upset and that, like
12 I said, she had gone to the doctor and was prescribed
13 medication for her depression, either shortly before or
14 shortly after the interrogation.   I don't remember the
15 date.   Must have been before because she had Prozac and
16 another medicine that starts with an L, I don't remember
17 the name of.
18       So that I do think that that could have played a
19 role, again, with her suggestibility to the -- to the
20 detectives' suggestion.
21   Q.   And you are correct; I believe she was diagnosed
22 on July 15th and provided medication 13th through 15th,
23 somewhere in that time period.
24       If the detectives knew that she was on
25 antidepressants or should be taking antidepressants, do

39

1 you believe that they should have conducted the interview
2 any differently?
3   A.   Well, I think a lot of this, to me, is not just
4 the interview itself, the questions, but how they
5 approached it before and after.   And like the quote that
6 I included in my report from Reid, you know, from the
7 Reid Technique from the Inbau, et al. manual, they should
8 have corroborated evidence.   They should have, you know,
9 basically not had tunnel vision.
10       I think they had tunnel vision.   I don't think
11 that they -- it ever occurred to them that they --
12 Ms. Lobato was not discussing the murder of Duran Bailey.
13       You know, again, they should have been a little
14 bit more cautious in how they interpreted her statements
15 as -- I'm trying to find this quote.
16       You know, so "the investigator should exercise
17 extreme diligence in establishing the accuracy of such a
18 statement through subsequent corroboration."
19 Specifically when a juvenile or person with mentally --
20 with -- who is mentally or psychologically impaired.
21       It's -- "In these situations imperative that
22 interrogators do not reveal details of the crime so that
23 they can use the disclosure of such information by the
24 suspect as verification of the confession's
25 authenticity."   And I think overall that's what's lacking

40

1 in this case.
2   Q.   Let me see if I understand that.   You are not
3 necessarily critical of how the detectives conducted the
4 interrogation on what they asked, what they did, but they
5 should have taken the information they received and
6 investigated it further and --
7   A.   No.   I'm glad you asked me to clarify.   I think
8 it's both of those things.   I do think that, you know,
9 they had the mindset when they interrogated Ms. Lobato
10 that she was guilty, as taught by Reid, the Reid
11 Technique, that, you know, you assume guilt.
12       It's clear that she was a suspect.   They had no
13 other suspects, no other leads, and I think, you know,
14 they heard of this incident with a penis and being cut,
15 and they, you know, went from A to Z pretty quickly in my
16 opinion.
17   Q.   Okay.   Now, in your research and work, you look
18 at the interrogation.   Do you look at the setting the
19 interrogation takes place in, like whether it's in a
20 police station, when it's in a home, whether it's in a
21 jail cell?   Is that part of your research?
22   A.   Sometimes.
23   Q.   Okay.   Do you have any criticisms with the
24 detectives interviewing Ms. Lobato in her home?
25   A.   No, I don't think so.

41

1   Q.   Do you have any concerns or opinions, critical
2 opinions of the way the detectives physically set up the
3 interview, like with how they sat, how they positioned
4 themselves?
5   A.   I don't remember seeing or reading anything
6 about that.   I thought it was an audio.
7   Q.   Yeah.   Well, no, it is audio.   Now, why -- do
8 you have an opinion as to why Ms. Lobato was emotionally
9 upset during the interview?
10   A.   It could be because the detectives and
11 Ms. Lobato had a conversation before the audio recorder
12 was turned on where they raised her -- the issue of her
13 sexual abuse.
14   Q.   Okay.
15   A.   And I think it's also that she was describing a
16 very traumatic event in her life.
17   Q.   Okay.   So let's start with the prior sexual
18 abuse that she had suffered that they brought up.
19       Are you critical of the fact that Detective
20 Thowsen brought that up at -- once he initially met
21 Ms. Lobato?
22   A.   I'm not sure how appropriate it was.   I think
23 it's very consistent with the detectives' hypothesis of
24 why they think she snapped.
25   Q.   Okay.   But do you believe that bringing that up



42

1  caused Ms. Lobato to falsely confess or do something she
2  would not normally have done?
3      A.  I think it could have played a role in her
4  suggestibility, in her willingness to accept the
5  scenarios that the police officers developed across the
6  course of the interrogation.
7      Q.  You have used the term a couple of times.  Will
8  you define for me what "suggestibility" means to you.
9      A.  The way I'm using it is that their -- their
10  vulnerability, their amenability to accepting the
11  suggestions of the police officers to adopt them as their
12  own.  So it's for Ms. Lobato to adopt the suggestions of
13  the detectives as her own.
14      Q.  Now, is -- is another term for tunnel vision
15  confirmatory bias?
16      A.  Confirmation bias, yes.
17      Q.  Confirmation bias, sorry.  Thank you.  It's your
18  opinion that the detectives had confirmation bias in this
19  case?
20      A.  Yes.
21      Q.  And why is that a problem?
22      A.  It's a problem because in confirmation bias, as
23  I wrote in my report, it leads to basically confirming
24  evidence that is consistent with their hypothesis, in
25  this case that Ms. Lobato killed Mr. Duran, and a very

43

1  important part of it is also that the -- you ignore or
2  discount information that's contrary to your hypothesis.
3      So anything that's not consistent with this
4  theory that she killed Mr. Duran is just discounted,
5  ignored, reinterpreted to be consistent with their
6  theory.
7      Q.  Okay.  So the confirmatory bias is when a
8  detective takes whatever facts they receive, either
9  discard them or try to shoehorn them into the box they
10  are trying to make somebody fit in?
11      A.  I would say basically, yes.  Yeah.
12      Q.  And how -- do you have any opinions or have you
13  ever written on how a detective could avoid
14  confirmatory -- confirmation bias, what they can do?
15      A.  Well, I mean, clearly one thing that sets up the
16  confirmation bias -- increases the risk of confirmation
17  bias is the way the Reid Technique is taught is with the
18  guilt-presumptive interrogations, that you don't
19  interview people who you believe are innocent because in
20  theory you're supposed to have weeded them out at an
21  earlier phase.
22      Q.  Now, your report mentions a couple of times that
23  the detectives talked to Ms. Lobato prior to turning on
24  their tape recorder; correct?
25      A.  Yes.

44

1      Q.  And you think that is a problem?
2      A.  I do think that it is a problem because it's --
3  the way that I read it is that it was -- they questioned
4  her.  They had her tell her story, and then they had her
5  retell it on the tape, and that is problematic.
6      Q.  Okay.  And why is it problematic?
7      A.  Because you don't know, then, where the
8  information is coming from.  You know, the best practice
9  recommendations are to videotape or audiotape from
10  beginning to end so that you have a clear record of who
11  said what first, when and how statements came about.
12  Without having a recording of that, we just don't know.
13      Q.  And you mentioned that that's the best practice.
14  Where is that best practice located?  Is it in a written
15  form anywhere?
16      A.  I said it was the best practice recommendation,
17  and it is in the white paper that I mentioned, the 2010
18  paper that was sponsored and approved, represents the
19  American Psychology Law Society.  It's also best practice
20  recommendation of many different organizations.  I would
21  say -- I should know this.  I would say maybe up to 20 to
22  25 states have now made it law to record interrogations.
23      Q.  Now, record the interrogation or record the
24  entire interaction?
25      A.  To -- well, to me that's what it would be, the

45

1  interrogation, the entire interaction, not the confession
2  statement, absolutely.  The recording policies differ
3  across states.  Sometimes they are only for youth.
4  Sometimes they are only in serious crimes, you know.
5      But states that do have these videotaping or
6  electronic recording policies, I would say all of them
7  would make it clear that the entire interactions need to
8  be electronically recorded.
9      Q.  And do you have any idea or an opinion as to how
10  long the conversation occurred prior to recording?
11      A.  No, I don't.
12      Q.  Now, do you agree with me that the suspect
13  should consent to recording?
14      A.  I don't really have an opinion on that.
15  State -- sorry, states differ on that.
16      Q.  I'm picking up some feedback.
17      A.  Me too.  I was like, "Is somebody else talking?"
18  Maybe it was me.  No, but states differ on whether or not
19  they have to inform the suspect of -- that they are being
20  recorded or not.
21      Q.  And Detective Thowsen testified that he tries to
22  build a rapport with the suspect and make them at ease
23  before he has permission to record.
24      Do you have any criticisms of that?
25      A.  No.



Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

46

1    Q.   I will represent to you that, based upon the
2  signing of the Miranda card and then the start of the
3  recorded statement, it's about 15 minutes.
4        Do you think 15 minutes is too long for the
5  detectives to have gone without recording?
6    A.   Yes.  I think any -- any -- all interactions,
7  whether it be a minute or two minutes, you know, they
8  should all be recorded so we have a clear record of what
9  occurred.
10   Q.   Now, when you reviewed Ms. Lobato's deposition,
11 which you did not have in 2017, did you see where she
12 testified that a conversation prior to recording was
13 almost identical to the tape recorded statement?
14   A.   I don't recall seeing that, but --
15   Q.   Did you see anything in her deposition where she
16 said that, in the unrecorded conversation, any
17 information was suggested to her, told to her, or fed to
18 her?
19   A.   Well, I do see that she makes it clear in her
20 2020 deposition that she felt that the detectives were
21 suggesting information to her, and if you are telling me
22 that the 15 minutes prior was identical to this, then I
23 would say, yes, she would make that claim that they were
24 being suggestive.
25   Q.   What she said in her deposition was after the

47

1  recording was over, they suggested to her about a
2  dumpster, about a parking lot, and so we suggested
3  material actually occurred during the recording.
4    A.   Okay.  Then it would be identical, but I think
5  my point is that we just don't know what happened during.
6  I don't even know if it was 15 minutes.  I assume that
7  was something that the detective said.  I don't know.
8    Q.   Okay.  Are you aware of any testimony from
9  Ms. Lobato in her 2020 deposition that she said the
10 detectives tried to change her story?
11   A.   I don't recall that.
12   Q.   Are you aware of any evidence that the
13 detectives in any way tried to change Ms. Lobato's story?
14   A.   I don't know about firm evidence, but I will
15 talk about that "snapped" again that I mentioned in my
16 report.  You know, I mean, even within the interrogation
17 itself, I felt that the interrogators, the detectives
18 mischaracterized the statements that Ms. Lobato had just
19 made, saying that, you know, "You describe the situation
20 where you lost it," but she never said anything like
21 that.
22   Q.   Now, Ms. Lobato, in her recorded statement, did
23 say that she blacked out.  Do you recall that?
24   A.   Yeah.  That's what I wrote in my report, but
25 that's not anything close to losing it.

48

1    Q.   Okay.  But that's an opinion, correct, as to
2  what the terms mean?
3    A.   What "lost it" means?  I took "lost it" to mean,
4  like, she snapped, that -- you know, the theory that I --
5  the way that I understand it is the detectives believe
6  that her -- Ms. Lobato's prior sexual abuse as a child
7  made her in a frenzied state and attack Mr. Bailey, but I
8  don't -- I didn't see anything like that in Ms. Lobato's
9  words herself.
10   Q.   And I don't mean to be argumentative here, but
11 that's -- people can interpret statements and words
12 differently.
13   A.   Blacked out?
14   Q.   Any.  Yeah.  I will move on.
15       Did you see any evidence that the detectives
16 ever tried to get Ms. Lobato to change her story?
17   A.   I'm going to say no because they thought she was
18 talking about the murder of Duran Bailey, and they
19 wouldn't try and get her to change it then, because I
20 think it was a situation where they thought they were
21 talking about the same event, but I don't believe that
22 they were.
23   Q.   Now, you've probably listened to, watched, read
24 a lot more interrogations than I have.  To me, so that
25 means nothing, but, to me, this interrogation or

49

1  interview seemed really laid back and mellow.
2        Was it unusual for you in any way in that
3  respect?
4    A.   No, not at all.  I think it's a common
5  misconception about interrogations, that they're
6  intimidating and threatening and yelling.  They are often
7  very laid back.  I mean, it's -- it's better to catch
8  flies with honey than vinegar.
9    Q.   Do you have any criticisms of the questioning
10 method that Detective Thowsen used during the interview?
11   A.   Was he the primary interrogator?
12   Q.   Yeah, he's the primary.  Sorry.
13   A.   It's okay.  I mean, just the -- the only example
14 that comes to my mind is how he, you know, reinterpreted
15 her statements to say that she lost it.  And, I mean,
16 that's a perfect example of a suggestive question, to say
17 things, attribute them to the suspect, that they never
18 said.
19   Q.   And besides the "snapped" and "lost it," did you
20 see anything else in the reports or statement that you
21 believe the detectives misconstrued?
22   A.   Do you mind, I'm going to take a minute, and I'm
23 going to review her statement again.
24   Q.   No.  We have been going a little bit over an
25 hour.  Would you like to take, like, a ten-minute break?

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

50

1    A.  Sure.  That sounds good.
2    Q.  Okay.  And, you know, I don't have terribly too
3  much longer, so let's take a ten-minute break, and you
4  can read your statement -- her statement, and we will
5  come back.
6    A.  Okay.  That sounds good.  Thanks.
7        (Whereupon, a recess was taken at this
8  time.)
9  BY MR. ANDERSON:
10    Q.  Doctor, you understand that you are still under
11  oath?
12    A.  Yes.
13    Q.  Okay.  And did you get a chance to read
14  Ms. Lobato's -- the transcription of her interview?
15    A.  Yes.  Yeah.
16    Q.  Okay.  Now, in interviews -- in police
17  interviews of suspects in general, I think we can agree
18  on some things.  One problem that the research has shown
19  is that interrogations can be unreasonably prolonged by
20  police officers; correct?
21    A.  Yes.
22    Q.  Okay.  Do you believe that Ms. Lobato's
23  interview was unreasonably prolonged by the detectives?
24    A.  No.
25    Q.  Another problem in the literature is that the

51

1  police officers use the threat or use of physical
2  punishment to get a confession; is that correct?
3    A.  Just to be clear, I think you are talking about
4  risk factors in false confession cases or risk factors
5  that -- factors that increase the risk of a likelihood of
6  a false confession.
7    Q.  It's probably something I got off Wikipedia,
8  so...
9    A.  No, I just -- you know, I wanted to clarify
10  that.  Also, you know, I always like to point out to
11  people, a very important facet of false confessions is
12  that the person is innocent, and so the factors that you
13  are talking about are factors that would increase the
14  risk of a false confession.
15    Q.  Okay.  And that didn't occur in this case per
16  se, is that correct, the --
17    A.  Threats of punishment?
18    Q.  Yes.
19    A.  No, I don't recall any.  No.
20    Q.  Okay.  Did you see where the detectives denied
21  Ms. Lobato food or water or other comfort that would make
22  the interview uncomfortable?
23    A.  That, I'm not sure you are going to find in
24  literature.  That is more of a -- you know, what the
25  courts use to determine voluntariness, and I have

52

1  actually written about that, where I don't think that
2  those are appropriate markers of voluntariness, and they
3  certainly aren't appropriate markers of reliability in a
4  confession statement.
5    Q.  And another characteristic was that the police
6  made promises of leniency or reduced criminal sentences.
7        Did you see that in this case?
8    A.  No.
9    Q.  And, you know, it's -- we mentioned at the
10  start, this is kind of a unique case; correct?
11    A.  In terms of a false confession, yes.
12    Q.  Thank you.  In terms of a false confession.
13  Now, when police interview a suspect -- and I don't mean
14  to be facetious, but is it your opinion that criminal
15  suspects tell the truth all the time?
16    A.  No.
17    Q.  So should detectives believe every -- take at
18  face value everything a suspect says?
19    A.  No.  I just -- you know, that, to me, is one of
20  the issues with this case.
21    Q.  Okay.  Explain that to me, please.
22    A.  Is that they didn't investigate further.  They
23  only investigated things that were consistent with her --
24  every time that they heard something that wasn't
25  consistent, like all of the dates that didn't line up

53

1  and, you know, the -- for instance, with her driving her
2  car to her ex-boyfriend's house and when it was towed and
3  all of these events that occurred prior to, they just --
4  they seemed to ignore them and didn't reconcile --
5  reconcile them.
6    Q.  Okay.  And are you talking specifically about
7  the date of the interview?
8    A.  No.  I'm talking about the date that -- the date
9  of the -- inconsistencies between the dates of the two
10  events of when Ms. Lobato was attacked, which she claims
11  to be Memorial Day weekend, and when Mr. Duran was
12  murdered, which was July 8th, July 9th.
13    Q.  Okay.  But so my question is -- is you are
14  saying the detectives had confirmation bias.  They get
15  her statement, and they arrest her that day; correct?
16  They arrest her immediately after her interview?
17    A.  Yes.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  Are you aware of any investigation the
21  detectives did after her arrest?
22    A.  Well, I read the -- I reviewed the report this
23  morning, and I saw on the interview, subsequent
24  interviews that they had done -- again, were very focused
25  on Ms. Lobato as the suspect, and there was a lot of



54

1 information in those -- you know, the brief reports of
2 the write-ups with the interviews of those folks that
3 were very inconsistent with the details of Mr. Duran's
4 death.
5      Q.   Okay. So you would agree that in the -- you are
6 referring to the officer's report; correct?
7      A.   Yes.
8      Q.   Okay. You would agree that in the officer's
9 report, there is a fair amount of statements and evidence
10 that did not support Ms. Lobato of committing the crime
11 of the murder of Duran Bailey; correct?
12      A.   There was a fair -- I just want to repeat so
13 we're sure. There was a fair amount of information that
14 did not support her as the perpetrator of the --
15      Q.   Yeah.
16      A.   -- crime? Yes, I would agree with that.
17      Q.   And that was all in the report?
18      A.   I mean, yeah, they were synopses of interviews
19 they had with people who were connected to Ms. Lobato.
20      Q.   But as you saw in the report, the detectives
21 documented the evidence that was unfavorable towards what
22 they believed to be the truth; correct?
23      A.   Yeah. I guess you can construe it that way,
24 yes.
25      Q.   Did you ever see where either detective referred

55

1 to Ms. Lobato's statement as a confession?
2      A.   There is too much material. I don't remember.
3      Q.   In your report, your February 5th, 2021, report,
4 you do refer to the fact that the State referred to it as
5 a confession, the State of Nevada, the prosecutors.
6      A.   Yes.
7      Q.   But you are not aware of anywhere where the
8 detectives referred to it as a confession; correct?
9      A.   I don't remember is my answer.
10      Q.   Do you agree or disagree, after reviewing
11 Ms. Lobato's statement, that she is vague as to the date
12 and time of the crime?
13      A.   I missed what you said. Sorry.
14      Q.   No problem. Do you agree or disagree that in
15 Ms. Lobato's recorded statement, she is vague as to the
16 date and time of the crime she is discussing?
17      A.   I believe she started off being more certain,
18 and then as the interview progressed and the detectives
19 introduced more information in when she started to --
20 "Well, maybe that could have happened. I don't
21 remember," those kind of statements.
22      Q.   Now, when detectives interview a suspect, I know
23 there is issues with them suggesting evidence, placing
24 things in a suspect's mind. Certainly detectives are
25 allowed to ask follow-up questions; correct?

56

1      A.   Yes, they absolutely should. Yes.
2      Q.   Okay. So one thing I don't understand is when
3 does questioning become suggestive and when does it
4 become improper, in your opinion, compared to just asking
5 basic routine follow-up questions or trying to jog
6 someone's memory?
7      A.   A big part of being a suggestive question is by
8 introducing information that the suspect did not say but
9 attributing it to the suspect.
10      Q.   Did you see that in this case?
11      A.   Yes.
12      Q.   Okay. And give me the examples.
13      A.   The example is what I said before with the --
14 saying that she lost it.
15      Q.   Okay.
16      A.   And, you know, there is -- introducing things
17 like the -- "Well, did you hit him with anything else?
18 Are you sure about the location?" I mean, I think she
19 was certain about where -- you know, when she first
20 describes the event, about where it happened at the
21 Budget Suites and everything, but the -- that is
22 inconsistent with what the police believe, so they
23 questioned things that wasn't consistent with their
24 hypothesis.
25      Q.   Okay. So help me with this. So let's start

57

1 with the Budget Suites location, the statement she made.
2      So the detectives ask her, "Are you sure? Could
3 it have been somewhere else?" Do you believe those are
4 inappropriate questions?
5      A.   In really depends on the circumstances.
6      Q.   Because, you know, we've established that
7 suspects don't always tell the truth, that police are
8 used to people lying to them, so how should a police
9 officer handle that situation? Someone says, "The crime
10 happened at Spot A," and the detective says, "Are you
11 sure? Could it have been B?" What's the problem with
12 that?
13      A.   The problem is -- is that I don't think that the
14 police officer, the detectives in this case -- sorry,
15 losing my word here -- considered the fact -- or
16 considered that they were talking about two different
17 crimes.
18      And so they would only ask questions that were
19 inconsistent with the evidence in a way or inconsistent
20 with what they believed happened. And because of her
21 suggestibility, she would just say, "That could have -- I
22 could have hit him with a bat, you know, if I had a bat
23 in my car," and then all of those kinds of little details
24 added up to confirm, in the detectives' mind, that she
25 was truly guilty.



Allison Redlich            Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

58

1    Q.  Okay.
2    A.  And that's the problem with it.  So it's really
3  better to ask open-ended questions.
4    Q.  Okay.  So here we have a very violent crime, as
5  you know, the detectives are investigating.  So when they
6  asked her, "Did you hit him with anything?" would you
7  have asked that in a different way, or what's your
8  criticism of that type of a question?
9    A.  It's not -- it's not the criticism of the
10  question per se; it's the things that have come after
11  that and how they are interpreted.
12    Q.  So, again, it's not the question or the answer;
13  it's how the detectives are viewing the answer --
14    A.  Yes.
15    Q.  -- with the confirmation bias.
16    A.  Yes.
17    Q.  And you would agree that during the interview,
18  Ms. Lobato indicated on several times that she didn't
19  remember a lot, that she had -- she blacked out, she had
20  memory issues about what occurred; correct?
21    A.  I would say that, but I think oftentimes it was
22  in response to these kinds of pointed-put questions from
23  the detectives.
24    Q.  Now, in your opinion, did she make any
25  incriminating statements during the interview?

59

1    A.  Incriminating herself in the crime against
2  Mr. Bailey?
3    Q.  Thank you.  Yes; correct.
4    A.  That's a very difficult question to answer
5  because -- no, I would say no because she did not -- I
6  don't even think she knew of the event with Mr. Bailey,
7  who that was or anything, at that time.
8    Q.  Now, she did tell the detectives that she cut
9  the man's penis and that it was her intention to cut it
10  off.
11      Do you agree with that?
12    A.  Can you point me to where that is.  I don't
13  remember that.
14    Q.  Page 6 on her voluntary statement.  When I say,
15  "Page 6," I'm referring to the top, underneath where it
16  says, "Voluntary Statement."
17    A.  I'm reading Page 6.
18    Q.  Halfway down.
19    A.  Well, she says, "I think I was trying to cut it
20  off but I don't know if I actually did."
21    Q.  Yeah.  She never says she cut it off, but she
22  says that she knew it was her intention to cut it off.
23      Do you agree with that?
24    A.  Well, that's what I'm saying.  I'm saying she
25  was a little bit more tentative than you are making it.

60

1  She says, "I think it was my intention," if you will.
2    Q.  And, in your opinion, was that consistent with
3  the crime committed against Duran Bailey?
4    A.  It could be.  I mean, it's very tentative.  She
5  says, "I don't know if I actually did."  We know that in
6  his case, his penis was cut off.  We also know that he
7  had head trauma.  We also know that he had lacerations to
8  his anus, all of those things that she does not describe.
9    Q.  So does -- when we talked about prior drug use,
10  in your research or your understanding, when a suspect
11  has abused drugs, does it impact -- can it impact the
12  accuracy of the suspect's statement?
13    A.  Yes, it can.  Yes.
14    Q.  So when we get into the statements where -- I'm
15  paraphrasing here, but they ask her if she had hit him
16  with anything, and she denies it.  She says, "No" but
17  then says, "But it's possible," or, you know, "But it's
18  poss," and the end of the word trails off.
19      How is a detective to interpret those type of
20  statements or use those?
21    A.  I think you are asking me during the course of
22  the interrogation, but I keep returning to the point that
23  it's often, like, how they interpreted that information
24  and what they did with it after the interview ended.
25      Did they follow up on it, and did they

61

1  investigate it?  Did they investigate other suspects?
2  Did they investigate all of these inconsistencies?
3    Q.  I kind of touched upon this, but in your report,
4  you mentioned that Ms. Lobato -- how the detectives were
5  implying or suggesting the answers to their questions.
6      Did you really see any evidence of that in this
7  case?
8    A.  Well, I think it's important to note that this
9  is what -- how Ms. Lobato is feeling.
10    Q.  Okay.  So that's based upon her subjective
11  perception as to what was going on?
12    A.  You know, and I think that there is some
13  evidence of it in the statement -- I mean, in the
14  questions themselves by -- I mean, that's just a natural
15  thing for the way people interpret questions.  Well,
16  that's how -- that's what makes them leading in a way.
17    Q.  The example that you use in your report is --
18  excuse me -- is that they implied or suggested about the
19  cutting off of the penis.
20      Do you recall that in your report?
21    A.  I missed the beginning of what you said.
22    Q.  Okay.  The example in your report of implying or
23  suggesting information is the fact of cutting off the
24  penis.
25    A.  Okay.  Yeah.



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 20 of 24

Allison Redlich        Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

62

1    Q.  Do you believe that the officers suggested or
2  implied that?
3    A.  I'm going to take a minute and look at the
4  statement again.
5    Q.  I didn't have a page.  Let me see if I can find
6  it for you.
7    A.  Where we were just on Page 6, they talk about
8  cutting -- she says, "I think I was trying to cut it off
9  but I don't know if I did."  I don't know if there is
10  another spot.
11    Q.  I should have put the page in there.
12    A.  It's okay.
13    Q.  My question about that is the issue of the penis
14  being cut off was put into -- I mean, Ms. Lobato said she
15  told many people about it prior to meeting with the
16  police; correct?
17    A.  She says she told many people about the
18  incident.  I don't agree that she told a lot of people
19  about cutting it off.  I think, you know, there is a lot
20  that's been said about whether she cut it off or just cut
21  it.
22    Q.  Okay.  Fair enough.  And in reading the
23  officer's report, the witnesses in this case who she
24  allegedly told that she had had this interaction at the
25  Budget Suites, it varied in detail as to what she did

63

1  with the gentleman's penis or what she did in general;
2  correct?
3    A.  Their reports, yes.
4    Q.  And Ms. Tienken, in her statement, said that
5  Lobato told her that she had cut the penis off and threw
6  it.
7       Do you recall that?
8    A.  No, but that -- that interview came after the
9  interrogation.
10    Q.  Okay.  So do you think that information -- are
11  you critical of that information to Ms. -- I will strike
12  that.
13       Are you critical at all of the interview of
14  Ms. Tienken?
15    A.  I didn't review that recently.  I don't know.
16    Q.  Now, when we talked about her high emotional
17  state in the interview, I think you already answered
18  this, but what do you believe attributed, caused her to
19  be so highly emotional before the interview was recorded?
20  It brought up her past trauma, and you said also, I
21  believe, discussing the actual event; correct?
22    A.  Yes.
23    Q.  I think I lost your volume.
24    A.  Oh, yeah.  Yeah.
25    Q.  Now, in Ms. Lobato's deposition, she said she

64

1  never felt bad about the Budget Suites incident.  In
2  fact, she was proud of it.  It gave her a level of
3  confidence or increased her self-esteem.
4       Did you see that?
5    A.  Yes, I do remember that.  Yeah.
6    Q.  Does that impact your decision as to why she was
7  so emotional at the time she was interviewed?
8    A.  No.  I take that to mean -- to indicate, you
9  know, 20 years had passed.  I don't put too much weight
10  into that at all.
11    Q.  Okay.  Did you see any evidence in the record
12  that the detectives lied to Ms. Lobato during the
13  interview?
14    A.  No, I don't recall that.  No.
15    Q.  Did you see any evidence that you would
16  characterize as an attempt to coerce Ms. Lobato?
17    A.  No.  I think I said, in fact, in my report that
18  I didn't find the questions to be coercive or
19  threatening.  I can't remember the words I used.
20    Q.  And, in your opinion, having watched and
21  reviewed so many interviews, do you believe that the
22  detectives were trying to suggest answers to Ms. Lobato,
23  or do you think they were truly just trying to fact-find?
24    A.  I think that if they were trying to suggest
25  answers, they weren't doing it intentionally.  I don't

65

1  think that they had any -- any inkling that -- I don't
2  think it occurred to them that she was talking about a
3  different event.
4    Q.  And is it your opinion that Ms. Lobato told the
5  truth to the detectives, I mean, when she was speaking,
6  she was telling what she thought to be the truth?
7    A.  Yes, that is my opinion.  Yeah.
8    Q.  And you would agree that, in reviewing
9  Ms. Lobato's 2020 deposition, that she maintains that her
10  statement is truthful and accurate; correct?
11    A.  Yes.
12    Q.  Ms. Lobato has never said that the detectives
13  elicited false information from her, to your knowledge;
14  correct?
15    A.  I don't know about that.  I don't know.
16    Q.  Now, when I was looking for the one thing I
17  failed to document in my questions, I did come across the
18  part where Detective LaRochelle wrote in the report that
19  Ms. Lobato, quote, snapped.  Okay.  And he said that she
20  used that word while the recorder was off.  Okay.
21       So he's not -- according to him, he's not
22  interpreting that from her statement.  He's saying that's
23  a word she actually used.
24    A.  Before or after her statement?
25    Q.  So this is from your report, Page 8.  It says,



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 21 of 24

Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

66

1  "Although LaRochelle claims that Ms. Lobato said she,
2  quote, snapped, unquote, while the recorder was off and
3  that he put this word in quotes in the officer report,
4  this same language does not appear in the arrest report
5  description."
6       My only point there was, according to
7  LaRochelle, he didn't use the word "snapped" based on his
8  interpretation of the recorded statement but a word she
9  actually used when it was off.
10  A.  Right.  And my point was that the only place
11  where it appears is the officer's report, which was
12  written in -- later, August, over a month after the
13  interrogation.  It didn't appear in the arrest report,
14  which I thought was strange.
15  Q.  Okay.  So there is two separate documents, the
16  officer's report and the arrest report.
17  A.  Yes.  Yes.
18  Q.  I'm with you.  I got you.  Now, did you also see
19  in Ms. Lobato's deposition that at the time, she thought
20  the detectives were fair to her.  Her criticism of the
21  detectives is that basically she thinks they were being
22  nice to get a confession from her.
23       Do you recall seeing that?
24  A.  I don't recall per se, but, again, it's very
25  consistent with how confessions, whether they are true or

67

1  false, are obtained.
2  Q.  So if I understand your opinion -- so correct me
3  here if I'm wrong -- is that this is not a typical false
4  confession case, that the detectives did not necessarily
5  do anything wrong during the interrogation and the
6  gathering of information.
7       The criticism of the detectives is the way they
8  interpreted that information and followed up on it
9  afterwards; is that fair?
10  A.  I just want to be careful with how I say this.
11  I mean, you said, "The gathering, that they did nothing
12  wrong with the gathering of information or evidence
13  or" -- you know --
14  Q.  Let me break it down.  That's probably not a
15  fair question to you.
16       What criticisms, if any, do you have of the
17  manner in which the recorded conversation was conducted?
18  A.  Well, one thing that bothers me is that they had
19  an entire conversation before the recorder was turned on.
20  That makes -- it's hard to just base my opinion solely on
21  the recorded session, which is what you're asking me to
22  do, I think --
23  Q.  Okay.
24  A.  -- and that makes me feel uncomfortable.
25  Q.  I don't want to make you uncomfortable, so I

68

1  apologize.
2       So understanding what you just said, Ms. Lobato
3  has testified that her recorded statement is still
4  accurate, that it's truthful so that there essentially
5  was nothing in the prerecorded conversations that
6  impacted her statement.
7  A.  Are you asking me, you know, because she said
8  this 20 years later?  I mean, we just don't know what was
9  said in those first whatever number of minutes.
10  Q.  Okay.
11  A.  And that, I find concerning.  And, to me, it's
12  just like we just don't know what was said during those
13  unrecorded statements.
14  Q.  Okay.  But your main criticism of the
15  detectives -- I mean, obviously you would have preferred
16  that they interview Dixie Tienken first, that they would
17  have recorded the entire thing, but -- so let me focus
18  solely on the information they obtained from Ms. Lobato.
19       You don't believe that they obtained a false
20  confession or any incorrect information.  Your criticism
21  is the way they interpreted the information provided by
22  Ms. Lobato.
23  A.  I would say that's true.  I don't see any -- I
24  don't think there was a confession from Ms. Lobato about
25  the murder of Duran Bailey, but I do believe that the

69

1  police interpreted it as such, her statements as such.
2  Q.  Okay.  So your primary, not your only, but your
3  primary criticism in this case is the manner in which the
4  detectives interpreted Ms. Lobato's statement.
5  A.  I would say the primary concern I had was the
6  confirmation bias, the tunnel vision which I think
7  relates to what you're saying.  I don't think what you
8  said captured all of it, though.
9  Q.  Okay.  Do you agree or disagree with the
10  statement that everyone suffers from tunnel vision?
11  A.  I believe that we're all susceptible to it, yes.
12  Q.  Do you believe that when you are retained as an
13  expert in a case like this, you have tunnel vision on the
14  case yourself?
15  A.  I believe that it's a possibility.  I --
16  because I know about it and I studied it and I have been
17  trained as a scientist to approach things objectively, I
18  would like to think that that helps guard against it,
19  safeguard against it.
20  Q.  But we all have -- we're all predisposed to
21  certain biases; correct?
22  A.  That's correct.
23  Q.  Do you agree or disagree with this statement
24  that Ms. Lobato's statement to the detectives provided
25  conflicting evidence as to whether she was involved in



Case 2:19-cv-01273-RFB-EJY    Document 67-58    Filed 06/28/21    Page 22 of 24

Allison Redlich                Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

70

1 the murder of Duran Bailey?
2    A.  I'm sorry, I cannot parse that question.  I
3 don't even know if I agree or disagree.
4    Q.  Fair enough.  In your review of the record, did
5 you see any evidence that you believe supported the
6 theory that Ms. Lobato was involved in the murder of
7 Duran Bailey?
8    A.  There were some similarities.  Like, I
9 believe -- I think Duran Bailey was African-American.
10 She described an African-American man.  I mean, honestly,
11 the penis cutting is not very consistent to me, but I
12 could see how others might construe that.  But, you know,
13 there is -- in my estimation there was a lot more
14 inconsistencies than there were consistencies.
15    Q.  And those inconsistencies and consistencies are
16 found in the detective officer's report; correct?
17    A.  That's not the only place.  They are in the
18 autopsy and people's statements which I guess could be
19 partly in the officer's report, yeah.
20    Q.  And you probably don't know the answer to this,
21 but are you aware of any of that evidence that was not
22 provided to Ms. Lobato's criminal defense team or the
23 prosecution in the criminal matter in this case?
24    A.  I don't know the answer to that.
25    Q.  Did you read any of the criminal trial

71

1 transcripts in this case?
2    A.  In 2017 I believe I did.
3    Q.  Okay.  In those transcripts did you see the
4 arguments being made that Ms. Lobato was confessing to a
5 different crime?
6    A.  You mean was that her defense at trial?  I
7 believe that it was, yes.
8    Q.  Okay.  And clearly a jury disagreed with that;
9 correct?
10    A.  Yes.
11    Q.  Almost done here.  Let me talk to you a little
12 bit about a term that I really don't get, "minimizing."
13       What is "minimizing" to you?
14    A.  Minimizing is -- what's most common in the
15 scientific literature is talking about from the detective
16 and their techniques to minimize the crime.  So this is
17 a -- I related it to Theme 2 -- or Step 2 in the theme
18 development of the Reid Technique, the nine-steps Reid
19 Technique.
20       So it's a way to make the suspect more -- it's
21 more morally acceptable for the suspect to confess
22 because the detective uses these minimization techniques.
23 The way the detectives are using it in this case is to
24 talk about the suspect and his or her language and that
25 they minimize their involvement.

72

1    Q.  Did you see evidence of minimization in this
2 case?
3    A.  From the suspect or from the detective?
4    Q.  Let's start with Ms. Lobato.
5    A.  No, I didn't because I believed she was telling
6 the truth as far as she remembered it about an incident
7 that occurred to her.
8    Q.  Did you see evidence of minimization on the part
9 of the detectives?
10    A.  I'm going to take a minute and I'm going to look
11 at the statement -- the questions again just to make
12 sure.
13    Q.  Please.
14    A.  I'm going to say, no, I didn't because one of
15 the -- another thing that makes this more unique in a
16 false confession case is because false confessors deny
17 for a long period of time, and then the detectives use
18 minimization techniques in order to get that denial and
19 turn it into a confession.
20       So she was never denying anything because, in
21 her mind, she was talking about an incident that occurred
22 to her.
23    Q.  Okay.  So we talked a little bit and glanced --
24 glancing references to the Reid interrogation technique.
25       In your opinion, was the Reid interrogation

73

1 technique used against Ms. Lobato?
2    A.  I would say it's very consistent with it.  I
3 mean, as I think I said in my report, the Reid Technique
4 has kind of been -- becomes synonymous with the
5 accusatorial, confrontational method of interrogation.
6       And it's kind of a misnomer, as we discussed,
7 because I think they didn't use threatening techniques or
8 anything, but they did start out with this assumption
9 that she was guilty.
10    Q.  So when I look at this, which means absolutely
11 nothing, there are characteristics that could be part of
12 the Reid Technique, but this would not be an example of
13 the Reid Technique, this case?
14    A.  If I were to teach a class on the Reid
15 Technique, this would not be a great example of it, no.
16    Q.  Okay.  We agree.  Okay.
17    A.  But it does absolutely have some commonalities
18 and -- yeah.
19    Q.  So I'm just going to sum up here.  I think we
20 have been over most of this.
21       Do you believe that the detectives should have
22 interviewed Ms. Lobato differently, just the way that
23 they performed the interview, not the questions, not the
24 way they interpret the answers, just the way they did the
25 interview?  Do you have any criticisms of that?



Allison Redlich          Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

74

1    A.  I'm not really sure what you are asking because
2  if you're not asking about the questions -- you mean at
3  the location or --
4    Q.  Just the setting.  Like, do you believe it
5  should have been done at a police house?  Do you believe
6  they should have done it outside?  Do you believe they
7  should have had a woman present, something along those
8  lines?
9    A.  No.
10   Q.  Okay.  And so, again, I'm just summing up here.
11 We both -- I'm sorry.
12       It's your opinion that Ms. Lobato confessed to
13 an event that was different than the killing of Duran
14 Bailey?
15   A.  Yes, and I will -- I want to add something to
16 my -- the previous question that you just asked me.  I
17 think that they should have had the recorder on the
18 entire time.
19   Q.  Correct.  Sorry.  Do you have an opinion or
20 believe that the detectives intentionally committed any
21 misconduct against Ms. Lobato during the interview?
22   A.  No, I don't believe that, but that's very common
23 in -- I don't -- I am of the opinion that when the police
24 obtain a false confession, they are not doing -- they're
25 not getting -- knowingly getting a false confession from

75

1  someone they believe to be innocent.  I believe that in
2  the false confession cases that I have seen, the police
3  think that the person is guilty.
4    Q.  Okay.  Are there any opinions or criticisms of
5  the detectives that you intend to offer at the time of
6  trial that we have not talked about today?
7    A.  I will take a minute to look at my report.
8    Q.  Please do.
9    A.  I would say the section of my report that talks
10 about the commonalities associated with false confession
11 cases and the ones that I have highlighted in the later
12 section of my section on Ms. Lobato's case, talking about
13 how the evidence is inconsistent with the evidence in the
14 case, you know, her statements are inconsistent with the
15 evidence in the case, and also that there was no new
16 information learned to the police from Ms. Lobato's
17 statements.
18       And I also think it's important to mention
19 that -- I think it was Detective Thowsen made the
20 statement that, you know, essentially he doesn't believe
21 that false confessions exist, that an innocent person --
22 he claims that an innocent person would deny killing
23 someone regardless of what techniques were used.  And I
24 think that speaks to his state of mind in a way that he
25 believes false confessions don't occur, but indeed they

76

1  do.
2    Q.  Now, I read his statement differently, and
3  that's fine.  But I read it that you would expect someone
4  that didn't commit the crime to deny committing the
5  crime, and then later, I mean -- we can strike that.  We
6  just have a different opinion on it.  But my question to
7  you was very bad, I realize now.
8        So my question to you that I should have asked
9  was are all of the opinions you intend to offer at the
10 time of trial contained in today's deposition and in your
11 February 5th, 2021, report?
12   A.  Yes.
13   Q.  Okay.  Let me just take you to the last
14 page, 11, of your report.
15   A.  I will say unless there is new information
16 that's provided to me.
17   Q.  If new information is provided and your opinions
18 change or you develop new opinions, will you supplement
19 your report?
20   A.  Yes.  Yes.
21   Q.  Okay.  Thank you.  So in your very last
22 paragraph right above your rate, you write the following:
23 "In sum, over 11 years and the review of numerous
24 materials specific to this case, my opinion of whether
25 Ms. Lobato confessed to killing Duran Bailey has not

77

1  changed.  In my expert opinion, the detectives in this
2  case suffered from tunnel vision/confirmatory biases,
3  which led to an exclusive focus on Ms. Lobato, despite
4  numerous and glaring inconsistencies in the attack she
5  described and the facts of the Duran Bailey homicide, and
6  led them to write reports, suggest theories, and document
7  a version of events did not, in fact, happen."
8        So my question there is with respect to the term
9  "write reports of events that did not happen," do you
10 believe that there were false reports written or just
11 reports that have the wrong theory of the case?
12   A.  I think that's a difficult question for me to
13 answer, because I didn't review all of the things that --
14 you know, that might be in that report, so I don't know
15 if they are false or not.
16   Q.  Okay.  As you -- based upon your review of the
17 record, are you aware of any reports that you believe are
18 false?
19   A.  In their entirety, no.
20   Q.  Okay.  Well, I really appreciate your time.
21 Now, just so it's on the record, Ms. Wang and I have
22 agreed that we are going to pay our own experts, so
23 Loevy & Loevy will be paying for your deposition.  Okay?
24   A.  Okay.
25   Q.  Don't send me to collections, okay, if you don't



Allison Redlich                Kirstin Blaise Lobato v. Las Vegas Metropolitan Police Department, et al.

78

1  get anything.
2      MS. WANG:  Just send us an invoice.
3      A.  There is no -- is Ms. Wang going to ask me
4  questions or no?
5      Q.  She may.
6      A.  I thought we were done.
7      Q.  Thank you very much for your time.  I appreciate
8  your patience with me today.
9      A.  Okay.  Thank you.
10      MS. WANG:  I actually don't have any questions,
11  based on the questioning done by Mr. Anderson.
12      THE WITNESS:  Okay.  Great.
13      MR. ANDERSON:  That means she feels really good
14  about that.  Okay.
15      THE WITNESS:  Everybody have a nice weekend.
16      THE REPORTER:  Really quick, Counsel, did you
17  need to order electronic?
18      MR. ANDERSON:  Yes.  I will order electronic,
19  regular and a mini.
20      THE REPORTER:  Counsel?
21      MS. WANG:  I am not going to order it yet.
22          -oOo-
23       (Whereupon, the deposition of
24    ALLISON REDLICH was concluded at 11:11 a.m.)
25

79

1              CERTIFICATE OF DEPONENT
2  PAGE  LINE  CHANGE            REASON
3
4
5
6
7
8
9
10
11
12
13
14              *  *  *  *  *
15    I, ALLISON REDLICH, deponent herein, do hereby
   certify and declare under penalty of perjury the within
16  and foregoing transcription to be my deposition in said
   action; that I have read, corrected and do hereby affix
17  my signature to said deposition.
18
        ALLISON REDLICH
19      Deponent
20      Subscribed and sworn to before me the     day
   of          2021.
21
22      Notary Public
23
24
25

80

1              REPORTER'S CERTIFICATE
2  STATE OF NEVADA  )
                     ) ss
3  COUNTY OF CLARK  )
4
        I, Lori-Ann Landers, a duly commissioned
5  Notary Public, Clark County, State of Nevada, do hereby
   certify:
6
        That I remotely reported the taking of the
7  deposition of the witness, ALLISON REDLICH, at the time
   and place aforesaid;
8
        That prior to being examined, the witness
9  was by me duly sworn to testify to the truth, the whole
   truth, and nothing but the truth;
10
        That I thereafter transcribed my shorthand
11  notes into typewriting and that the typewritten
   transcript of said deposition is a complete, true and
12  accurate transcription of my said shorthand notes taken
   down at said time to the best of my ability.
13
        I further certify that I am not a relative
14  or employee of an attorney or counsel of any of the
   parties, nor a relative or employee of any attorney or
15  counsel involved in said action, nor a person financially
   interested in the action; and that transcript review FRCP
16  30(e) was requested.
17      IN WITNESS WHEREOF, I have hereunto set my
   hand in the County of Clark, State of Nevada, this 5th
18  day of March 2021. 
19
20      LORI-ANN LANDERS, CCR 792, RPR
21
22
23
24
25