Luke Busby
NV Bar# 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com
*Designated Resident Nevada Counsel for Plaintiff Kirstin Blaise Lobato*

Elizabeth Wang*                    David B. Owens*
Loevy & Loevy                      Loevy & Loevy
2060 Broadway, Ste. 460            100 S. King St., #100-748
Boulder, CO 80302                  Seattle, WA 98104
O: 720.328.5642                    O: 312.243.5900
elizabethw@loevy.com               david@loevy.com

Megan Pierce*
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
megan@loevy.com
*Admitted *pro hac vice*
*Counsel for Plaintiff Kirstin Blaise Lobato*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| KIRSTIN BLAISE LOBATO, ) | Case No. 2:19-cv-01273-RFB-EJY |
| Plaintiff, ) | |
| v. ) | Judge Richard F. Boulware, II |
| ) | Magistrate Judge Elayna J. Youchah |
| LAS VEGAS METROPOLITAN POLICE ) | |
| DEPARTMENT, NEVADA, THOMAS ) | |
| THOWSEN, and JAMES LAROCHELLE, ) | **PLAINTIFF'S RESPONSE TO** |
| ) | **DEFENDANTS' MOTION FOR** |
| Defendants. ) | **SUMMARY JUDGMENT [DKT. 67]** |

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff, Kirstin Blaise Lobato, through her attorneys, hereby submits her Memorandum of Points and Authorities in Response and Opposition to Defendants' Motion for Summary Judgment, stating as follows:

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

LEGAL STANDARD...................................................................................... 1

MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ......................................... 2

I.      Plaintiff Was Arrested, Prosecuted, And Convicted Of A Crime She Did Not Commit ... 2

II.     Plaintiff Was The Victim Of An Attempted Sexual Assault In May 2001 ...................... 2

III.    Plaintiff Was In Panaca From July 2 To July 9, 2001 ....................................... 5

IV.     Duran Bailey Was Murdered In Las Vegas On July 8, 2001........................................ 7

V.      Defendants Were Assigned To Investigate The Duran Bailey Murder ............................. 8

VI.     Defendants Decided To Pin The Crime On Plaintiff ........................................... 9

VII.    Defendants Fabricated Evidence That Plaintiff Confessed To Duran Bailey's Murder
        When They Knew She Did Not Confess To The Murder .............................................. 10

VIII.   Defendants' Conduct Confirms That They Knew Blaise Did Not Kill Bailey But
        Chose To Pin the Crime On Her Rather Than Conduct An Honest Investigation.......... 20

IX.     Defendants Fabricate Evidence In Their Police Reports ..................................... 26

X.      As A Result Of Defendants' Misconduct, Plaintiff Spent Almost 17 Years
        Wrongfully Imprisoned ...................................................................... 32

ARGUMENT ................................................................................................ 35

I.      Plaintiff Is Entitled To A Trial On Her Fourteenth Amendment Fabrication Of
        Evidence Claim ............................................................................. 35

        A.      Defendants Thowsen and LaRochelle Fabricated Evidence against Plaintiff........ 35

                1.      A Reasonable Jury Could Easily Find Defendants Directly Fabricated
                        Evidence ....................................................................... 36

                        a.      Impossible timing.......................................................... 37

                        b.      The Budget Suites Inn is not the Nevada State Bank ........................ 39

   c. The person who attacked Plaintiff could not have been Duran Bailey ........................................................................................ 40

   d. A single knife swipe is nowhere near the extensive damage suffered by Duran Bailey ........................................................ 41

  2. A Reasonable Jury Could Easily Find Sufficient Evidence of Fabrication by Looking at the Direct and Circumstantial Evidence ................................ 43

 B. Defendants' Fabrication Caused Plaintiff's Deprivation of Liberty ..................... 45

 C. Defendants Are Not Entitled to Qualified Immunity ............................................ 51

II. Plaintiff Is Entitled To A Trial On Her Fourth Amendment Detention Absent Probable Cause Claim ............................................................................................................ 52

 A. Plaintiff Was Detained without Probable Cause ................................................... 52

  1. Collateral Estoppel Has No Application Here ............................................. 53

  2. Probable Cause Cannot Be Based upon Fabricated Evidence ..................... 55

  3. Plaintiff's Police Practices Expert Cannot Decide, or Opine on, an Issue of Law (and Defendants Misconstrue Her Testimony) ................................ 56

III. A Jury Must Decide Plaintiff's Conspiracy Claim ............................................................. 58

IV. A Jury Must Decide Plaintiff's Failure To Intervene Claim.............................................. 64

V. A Jury Must Decide Plaintiff's State Law Claims ............................................................. 69

 A. A Reasonable Jury Could Find that Defendants Maliciously Prosecuted Plaintiff........................................................................................................................ 69

 B. A Reasonable Jury Could Find that Defendants Abused the Legal Process .......... 70

 C. A Reasonable Jury Could Find that Defendants Intentionally Inflicted Emotional Distress ................................................................................................ 71

 D. LVMPD Is Liable under *Respondeat Superior* and Must Indemnify .................. 72

CONCLUSION.................................................................................................................... 73

# TABLE OF AUTHORITIES

**Cases**

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ................................................. 66

*Ace Truck v. Kahn*, 746 P.2d 132 (1987) ................................................................................. 55

*Alcantara ex rel. Alcantara v. Wal-mart Stores, Inc.,* 321 P.3d 912 (Nev. 2014) ................ 54

*Allen v. McCurry*, 449 U.S. 90 (1980) .................................................................................... 54

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) ................................................................... 66

*Anderson v. Creighton*, 483 U.S. 635 (1987) .................................................................. 66, 67

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .............................................................. 1

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ........................................................................ 63, 67

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) ............................................ 47, 49

*Aziz v. Eldorado Resorts, LLC*, 72 F. Supp. 3d 1143 (D. Nev. 2014) ................................... 69

*Bagley v. CMC Real Estate Corp.*, 923 F.2d 758 (9th Cir. 1991) .......................................... 54

*Bailey v. Newland*, 263 F.3d 1022 (9th Cir. 2001) ................................................................ 53

*Baker v. Roman Catholic Archdiocese of San Diego*, 725 F. App'x 531 (9th Cir. 2018) ............. 2

*Baldwin v. Placer Cty.*, 418 F.3d 966 (9th Cir. 2005) ..................................................... 61, 64

*Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991) ................................................................ 46

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ........................................ 46, 48

*Bonamy v. Zenoff*, 362 P.2d 445 (Nev. 1961) .................................................................. 69, 70

*Bower v. Harrah's Laughlin, Inc.,* 215 P.3d 709 (Nev. 2009) ............................................... 54

*Braxton-Secret v. Robins Co.*, 769 F.2d 528 (9th Cir. 1985) ................................................ 59

*Briscoe v. Madrid*, 2018 WL 4586251 (E.D. Cal. Sept. 21, 2018) ....................................... 68

*Brousseau v. Haugen*, 543 U.S. 194 (2004) ................................................................... 67, 67

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015) ........................................ 67

*Bull v. McCuskey*, 615 P.2d 957 (Nev. 1980) ............................................................ 55

*Burgess v. Lowery*, 201 F.3d 942 (7th Cir. 2000) .................................................... 67

*Caldwell v. City & Cty. of San Francisco*, 899 F.3d 1105 (9th Cir. 2018) ......................... passim

*Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ............................................... 61, 64

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ............................................................ 68

*Catrone v. 105 Casino Corp.*, 414 P.2d 106 (Nev. 1966) ........................................... 69

*Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090 (9th Cir. 2005) .................................... 2

*Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010) ............... 35, 39, 43

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) ................................... 56

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) ....................................... 58

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003) ................................... 52

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) ............................... 64, 65, 66, 67

*Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008) ............................................. 1

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) .............................................. 67

*Devereaux v. Abbey*, 263 F.3d 1070, 1075-76 (9th Cir. 2001) ...................... 35, 43, 46, 52, 67

*Dirks v. Martinez,* 414 F. App'x 961 (9th Cir. 2011) ......................................... 61, 62, 64

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) .............................................. 66

*Douglas v. City of New York*, 595 F. Supp. 2d 333 (S.D.N.Y. 2009) ................................. 68

*Dukes v. City of Albany*, 289 F. Supp. 3d 387 (N.D.N.Y. 2018) ................................... 54

*Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990) ...................................... 35, 72

*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006) ................................................. 54

*Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020) ............................................... 62, 63

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ................................................ 68

*Frank v. City of Henderson*, 2015 WL 5562582 (D. Nev. Sept. 21, 2015) ........................... 69

iv

*Franklin v. Fox*, 312 F.3d 423 (9th. Cir. 2002) ........................................................ 58

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999)............................ 61, 64

*Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2006)................................... 46

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)..................................................... 51

*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979) ............................................ 58

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997).............................................. 61

*Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006)....................................................... 53

*Hebert v. Louisiana*, 272 U.S. 312 (1926)............................................................ 48

*Hill v. City of Chicago*, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009)....................... 68

*Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517 (9th Cir. 2020)..................... 1

*Holt v. Regional Trustee Servs. Corp.,* 1266 P.3d 602 (Nev. 2011)....................... 54

*Hope v. Pelzer,* 536 U.S. 730 (2002) ................................................................... 66

*Horvath v. Gladstone*, 637 P.2d 531 (Nev. 1981) ................................................ 54

*Hurt v. Vantlin*, 2017 WL 1021396 (S.D. Ind. Mar. 16, 2017) .............................. 68

*In re Sandoval,* 232 P.3d 422 (Nev. 2010) ......................................................... 54

*Jimenez v. Chicago*, 732 F.3d 710 (7th Cir. 2013) .............................................. 44

*Jones v. LVMPD*, 873 F.3d 1123 (9th Cir. 2017) .............................. 1, 39, 42, 57

*Jordan v. State ex rel. Dep't of Motor Vehicles and Pub. Safety*, 110 P.3d 30 (Nev. 2005)........ 55

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)............................................................ 66

*Kunik v. Racine County,* 946 F.2d 1574 (7th Cir. 1991) ...................................... 58

*LaMantia v. Redisi*, 38 P.3d 877 (Nev. 2002) ................................................. 69, 70, 71

*Lu Hang v. County of Alameda*, 2011 WL 5024641 (N.D. Cal. Oct. 20, 2011)....................... 68

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) .................................................... 52

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ...................................... 1

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011)......................................................... 67

*McEnroe v. AT&T Mobility Servs. LLC*, 2016 WL 7369238 (N.D. Cal. Dec. 20, 2016)....... 35, 73

*Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390 (D. Nev. Mar. 30, 2016).............. 35, 73

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ............................................................. 44

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999) ...................... 58, 60

*Migra v. Warren City Sch. Dist.*, 465 U.S. 75 (1984)...................................................... 54

*Milke v. City of Phoenix*, 2016 WL 5339693 (D. Ariz. Jan. 8, 2016)............................... 68

*Miller v. Pate,* 386 U.S. 1 (1967)................................................................................. 48

*Mills v. Covina*, 921 F.3d 1161 (9th Cir. 2019)............................................................. 54

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ...................... 62

*Monroe v. Pape*, 365 U.S. 167 (1961) .......................................................................... 46

*Mooney v. Holohan*, 294 U.S. 103 (1935) ..................................................................... 48

*Napue v. Illinois*, 360 U.S. 264 (1959) ......................................................................... 48

*Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016)......................................... 1

*Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918 (9th Cir. 1988) ... 35, 72 ,73

*Nunes v. Arata, Swingle, Van Egmond & Goodwin (PLC)*, 983 F.3d 1108 (9th Cir. 2020) ........ 66

*O'Connell v. Alejo*, 2020 WL 1244852 (D. Colo. Mar. 16, 2020) ................................... 54

*Olivero v. Lowe*, 995 P.2d 1023 (Nev. 2000) ................................................................ 71

*Ornellas v. Oakley*, 618 F.2d 1351 (9th Cir. 1980) ....................................................... 54

*Pac. Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142 (9th Cir. 2013)............. 46

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019)........................................................ 54

*Posadas v. City of Reno*, 851 P.2d 438 (Nev. 1993)....................................................... 71

*Randall v. Prince George's County*, 302 F.3d 188 (4th Cir. 2002).................................. 66

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) ........................................................ 44

*Reid v. Wren*, 57 F.3d 1081 (10th Cir. 1995) ................................................................ 66

*Ricks v. City of Pomona*, 2019 WL 296199 (C.D. Cal. July 25, 2019) ........................ 68

*Rivera v. Corr. Corp of Am.*, 999 F.3d 647 (9th Cir. 2021) ........................................ 71

*Rowland v. Lepire,* 313 P.2d 1332 (Nev. 1983) ........................................................... 70

*Sampson v. Cty. of Los Angeles*, 974 F.3d 1012 (9th Cir. 2020) ................................. 63

*Scafidi v. LVMPD*, 966 F.3d 960 (9th Cir. 2020) ....................................................... 55

*Smith v. Hemet*, 394 F.3d 689 (9th Cir. 2005) ............................................................ 44

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ............................................... 35, 36, 40, 48

*Stewart v. Jacobs*, 2010 WL 11519288 (D. Ariz. Apr. 16, 2010) .............................. 68

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ............................................... 46

*Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138 (D. Nev. 2014) .......................... 72

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021) ................................................. 65, 67

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008) .................................... 56

*Tubar v. Clift*, 2009 WL 1325952 (W.D. Wash. May 12, 2009) ................................ 56

*United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825 (1983) .................................................................................................. 63

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ............................................. 68

*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994) ........................................... 64, 65

*United States v. Lanier*, 520 U.S. 259 (1997) ............................................................ 66

*United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539 (9th Cir.1989) ................. 58

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983) ............................................................ 58

*Washington v. Duty Free Shoppers*, 696 F. Supp. 1323 (N.D. Cal. 1988) ................. 61

*White v. Roper*, 901 F.2d 1501 (9th Cir. 1990) .......................................................... 46

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ..................................... 45, 46

*Woods v. City of Reno*, 2018 WL 493015 (D. Nev. Jan. 18, 2018) ...................... 55, 71

*Woods v. City of Reno*, 2020 WL 4194844 (D. Nev. July 21, 2020) ................................ 35, 72, 73

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ............................................................... 66

*Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017) ............................................................ passim

**Other Authorities**

Wright & Miller, Fed. Prac. & Proc. §§ 4427, 4432-4433 ......................................... 54

**INTRODUCTION**

Plaintiff Kirstin Blaise Lobato ("Blaise") was just 18 years old when she suffered an attempted rape in Las Vegas. Rather than treat her as a survivor of a horrific crime and investigate the attack, Defendants, pursuant to LVMPD policies and practices, framed her for a murder they knew she did not commit. As a result of Defendants' misconduct, Blaise was wrongfully prosecuted and convicted of a crime of which she was innocent. Ultimately, Blaise spent 17 years of her young adult life in prison—years she can never get back.

Defendants have moved for summary judgment on all of Plaintiff's claims except her Monell claim against LVMPD. The motion should be denied, as a reasonable jury can easily conclude, among other things, they fabricated evidence in their reports falsely claiming that Blaise had confessed to the murder, when she had not. There is no doubt that it is unlawful to fabricate evidence against criminal defendants and, thus, summary judgment must be denied.

**LEGAL STANDARD**

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Summary judgment is not appropriate if a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a verdict in his favor." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). When deciding a motion for summary judgment, the Court must "'view the evidence in the light most favorable' to the nonmoving party and draw all reasonable inferences in that party's favor." *Jones v. LVMPD*, 873 F.3d 1123, 1127 n.1 (9th Cir. 2017) (quoting *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111 (9th Cir. 2016)); *accord. Holley v. Techtronic Indus. N. Am.*, 812 F. App'x 517, 517 (9th Cir. 2020) ("When evaluating evidence 'we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and the weight to be accorded to particular evidence.'") (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991)). Every reasonable factual inference must be drawn in favor of the party opposing the motion for summary

judgment, from both direct and circumstantial evidence. *See Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1095 (9th Cir. 2005) (plaintiff can defeat motion for summary judgment by pointing to either direct or circumstantial evidence); *Holley*, 812 F. App'x at 517 ("The nonmoving party may rely on circumstantial evidence to defeat a motion for summary judgment."); *Baker v. Roman Catholic Archdiocese of San Diego*, 725 F. App'x 531, 532 (9th Cir. 2018) (reversing grant of summary judgment for failure to "properly consider various pieces of circumstantial evidence").

## MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

### I.    Plaintiff Was Arrested, Prosecuted, And Convicted Of A Crime She Did Not Commit

1.    Blaise was just a teenager when she was arrested, prosecuted, and subsequently convicted for a crime she did not commit—the murder of Duran Bailey. Dkt. 67-28 (Blaise Statement) at LVMPD 57; Dkt. 67-66 (Arrest Report); Dkt. 67-26 (Blaise Dep.) at 96; Dkt. 67-27 (Blaise Dep.) at 184, 191.

2.    Blaise is completely innocent of that crime, and she spent 17 years wrongfully imprisoned until the presentation of scientific evidence about that murder conclusively proved her innocence and that she could not have committed the murder. Ex. 14 (Baker Evid. Hrg. Testimony) at Lobato 6942, 6970-71 (Bailey died after 8:01 p.m. on 7/8/01); Ex. 13 (Tomberlin Evid. Hrg. Testimony) at Lobato 7045-47, 7131-32 (Bailey died after sunset, approximately 9:00 p.m.); Dkt. 67-27 at 202-03, 206-07; Dkt. 67-51 (12/19/17 Order) at 12-16, 19-20, 28 (court summarizing expert testimony that Bailey must have died after sunset),[1] 47-48 (court noting Plaintiff's undisputed evidence that she was in Panaca when Bailey was killed).

### II.    Plaintiff Was The Victim Of An Attempted Sexual Assault In May 2001

3.    In 2001, Blaise was an 18-year-old girl who stood 5-feet and six-inches tall and weighed roughly 100 pounds. Dkt. 67-28 at LVMPD 57, 61; Dkt. 67-26 at 44-45. She was

---

[1] Page numbers refer to the page number in the docket file-stamp at the top of the page, unless otherwise indicated.

friendly, respectful, and outgoing. Ex. 4 (Wuori Dep.) at 11. She was close with her family and friends, and had recently graduated from high school a year early. Dkt. 67-60 (Tienken Dep.) at 15. Blaise grew up in the small town of Panaca, Nevada, about 165 miles and a 3-hour drive away from Las Vegas. Dkt. 67-26 at 29; Dkt. 67-14 (2006 Boucher Testimony) at XV-47.

4.    As a child, Blaise was the victim of multiple sexual assaults. When she reported these incidents to the police, they did nothing to investigate, compounding the trauma she faced and making her wary of calling the police for help in the future. Dkt. 67-46 (2002 Blaise Testimony) at VI-33-36; Dkt. 67-26 at 68-69.[2]

5.    By May 2011, Blaise was staying on the east side of town, at the Budget Suites Inn on Boulder Highway at the intersection of Nellis and Flamingo. Dkt. 67-46 at VI-12; Dkt. 67-26 at 27-29. Blaise was staying with a woman named Misty and watching Misty's child while Misty worked. Dkt. 67-26 at 32-33; Dkt. 67-46 at VI-13.

6.    At some point during Memorial Day weekend at the end of May, Blaise drove back to the Budget Suites after a night with friends; it was late and dark. Dkt. 67-46 at VI-12; Ex. 67-26 at 37-38.

7.    Blaise got out of her car and began walking back to her room when a man attacked her—a vulnerable teenage girl—from behind and knocked her to the ground. Dkt. 67-46 at VI-14; Ex. 67-26 at 43-44.

8.    The attacker was a very large (over 6" tall and more than 200 pounds), Black man, he had his penis exposed and he got on top of Blaise and attempted to rape her. Dkt. 67-46 at VI-15-16, 129; Dkt. 67-26 at 43-44, 46-47.

9.    Even though Blaise was crying, the attacker slapped her, told her to shut up, and called her a bitch. Dkt. 67-28 at LVMPD 63.

---

[2] Tragically, this falls into a national trend. *See, e.g.*, Cameron Kimble, *Sexual Assault Remains Dramatically Underreported*, Brennan Center for Justice (Oct. 4, 2018) (statistics showing that only about 23% of sexual assault survivors report these crimes to the police, with approximately 13% saying they think the police would not do anything to help as well as noting emotional difficulties like revictimization or not being believed).

10.     Blaise struggled and pulled out a small knife that she carried in her pocket for protection after having previously being sexually assaulted, grabbed for whatever she could reach, and made a cutting or stabbing motion one time. Dkt. 67-46 at VI-16; Dkt. 67-26 at 43-44, 47-48; Dkt. 67-42 (2002 Austria Testimony) at II-147.

11.     Blaise does not know what she stabbed, but she knows she did not cut anything off, did not slice off the attacker's penis, and did not throw anything. Dkt. 67-26 at 48, 50-51. She was unsure if the attacker was seriously injured. Dkt. 67-26 at 51.

12.     Blaise cut her attacker only once. Dkt. 67-26 at 48-49.

13.     Blaise's action to defend herself from the attack worked; the attacker fell backward and Blaise was able to escape and leave in her car. Dkt. 67-26 at 50-51.

14.     The entire incident lasted less than 5 minutes. Dkt. 67-26 at 44.

15.     When Blaise left, the attacker was alive, on his knees, crying, and making sounds of discomfort. He was also holding his midsection. Dkt. 67-46 at VI-17; Dkt. 67-26 at 51-52.

16.     Blaise was afraid and wanted to get away from the attacker, who she worried might come after her. Blaise drove to the house of her ex-boyfriend, Jeremy Davis, who lived less than a mile from the Budget Suites, off Harmon and Mountain Vista. He was not home. Dkt. 67-46 at VI-19; Dkt. 67-26 at 53-54, 57-58; Dkt. 67-33 (Davis Statement) at 6-8.

17.     After dropping off her car and leaving Davis a note, Blaise went to a church around the corner. Dkt. 67-46 at VI-21; Dkt. 67-26 at 59, 64-67; Dkt. 67-28 at LVMPD 66, 75.[3]

18.     Blaise used a phone at the church to call friends, who came to pick her up. Dkt. 67-26 at 65-67; Dkt. 67-46 at VI-21-22.

---

[3] There is a church at Harmon and Mountain Vista. *See* https://www.google.com/maps/place/E+Harmon+Ave+%26+S+Mountain+Vista+St,+Paradise,+NV+89121/@36.1077676,-115.0750107,16.52z/data=!4m5!3m4!1s0x80c8dac1064b1d9b:0x6219e11beef43fb2!8m2!3d36.1076205!4d-115.0734814

19.     As with many survivors of sexual assault, *supra* n.1, Blaise did not call the police to report the incident because, in her prior experience reporting sexual assault, it did not do any good to call them and they would not help. Dkt. 67-26 at 68-69.

20.     At the same time, Blaise told some people she knew about what happened because she was proud of herself for getting away from her attacker and defending herself. Dkt. 67-26 at 68, 80, 88-89.

21.     Even though she was rightfully defending herself, Blaise nonetheless had some concern about her attacker and did not know if his injury was serious. Dkt. 67-26 at 69, 108-11.

22.     Following the attack Memorial Day weekend, Blaise spent the next few weeks in Las Vegas with Steve Pyszkowski and his girlfriend Cathy Reininger; she thought it was a safe place to stay. Dkt. 67-46 at VI-22, VI-31; Dkt. 67-28 at LVMPD 72-73; Dkt. 67-26 at 65-67, 71-72; Dkt. 67-30 (Pyszkowski Statement) at LVMPD 383.

23.     Blaise and Pyszkowski picked up her car from Davis's house about a week after she was attacked at the end of May. Dkt. 67-46 at VI-22; Dkt. 67-28 at LVMPD 65; Dkt. 67-26 at 73-74; Dkt. 67-30 at LVMPD 381-83; Dkt. 67-31 (Reininger Statement) at LVMPD 525-26.

24.     At the end of June, Blaise went to stay with a friend, Doug Twining, for a few days. They stayed at his parents' home in Las Vegas. Dkt. 67-62 (Twining Dep.) at 97; Dkt. 67-21 (Officer's Report) at LVMPD 33; Dkt. 67-26 at 89-90.

**III.     Plaintiff Was In Panaca From July 2 To July 9, 2001**

22.     Blaise left Las Vegas and Doug's house and returned to Panaca on July 2, 2001. Dkt. 67-46 at VI-32, VI-38; Dkt. 67-62 at 69; Dkt. 67-26 at 90, 95, 101. The travel time between Las Vegas and Panaca was about 3 hours. Dkt. 67-26 at 29.

23.     Blaise remained in Panaca from July 2 to July 9, 2001, and could not have committed the Bailey murder, which took place in Las Vegas the evening of July 8, 2001. Dkt. 67-26 at 96; Dkt. 67-21 at XVII (2006 L. Lobato Testimony) at 181, 184-197. Things that took place during this period of time include:

a.  From July 2 to 9, 2001, Blaise's car was parked on the street in front of her parents' home. Dkt. 67-46 at VI-38-39; Dkt. 67-21 at LVMPD 33; Dkt. 67-15 (2006 McCroskys' Testimony) at XVI-9-12, 22-24; Dkt. 67-5 (2006 Brown Testimony) at VI-126-27; Dkt. 67-26 at 96.

b.  On July 4, 2001, Blaise celebrated the holiday at a barbecue at her parents' house. Dkt. 67-14 (2006 S. Kraft Testimony) at XV-85; Ex. 2 (Grindstaff Aff.); Ex. 3 (Austria Aff.).

c.  On July 5, 2001, Blaise visited the medical clinic in Panaca. Dkt. 67-50 (Blaise Medical Records) at Lobato 12511.

d.  Blaise spent time with a friend, Chris Carrington, in Panaca, on July 5, 6 and 7, 2001. Ex. 2; Ex. 3; Dkt. 67-7 (2006 Carrington Testimony) at VIII-127-33.

e.  Around 6:00 p.m. on July 7, 2001, Blaise visited her dad at work. Dkt. 67-16 (2006 L. Lobato Testimony) at XVII-186-87. After that, Blaise's stepmother picked her up, and they were together until her stepmother went to bed around 11:00 p.m. or midnight. Dkt. 67-17 (2006 R. Lobato Testimony) at XVIII-149-50.

f.  On July 8, 2001, at around 7:00 a.m., Blaise was at her parents' house sleeping. Dkt. 67-14 (2006 J. Kraft Testimony) at XV-117-118.

g.  During the late morning and early afternoon of July 8th, Blaise rode four wheelers with friends on her parents' street in Panaca. Dkt. 67-46 at VI-39; Ex. 4 at 16-21; Dkt. 67-16 (2006 Hohman Testimony) at XVII-88-92; Ex. 3; Dkt. 67-5 (2006 Austria Testimony) at VI-86-87; Dkt. 67-42 at II-145-46.

h.  Around 3:00 or 4:00 p.m. on July 8, Blaise hung out in the family garage with Chris Carrington. Dkt. 67-16 (2006 A. Lobato Testimony) at XVII-128-30; Dkt. 67-17 at XVIII-104; Dkt. 67-7 (2006 Carrington Testimony) at VIII-110-13.

i.  During the late afternoon of July 8, 2001, Blaise talked with a second neighbor after the neighbor's car broke down. Ex. 1 (Thunstrom Dep.) at 9-11.

j.  Blaise was at her parents' house on July 8, 2001, at around 6:00 or 6:30 p.m. when her cousin, Shayne Kraft, stopped by. She was there during the entire evening of July 8 into the early morning of July 9, 2001. Dkt. 67-14 (2006 S. Kraft Testimony) at XV-87-89; Dkt. 67-16 at XVII-130-33.

k.  After extensive phone calling back and forth (where Blaise was on a landline in Panaca, not in Las Vegas (or anywhere else)), Doug Twining picked Blaise up from her parents' house in Panaca in the early morning of July 9, 2001. Dkt. 67-26 at 115; Dkt. 67-18 (2006 Twining Testimony) at XIX-35-47; Dkt. 67-21 at LVMPD 33; Dkt. 67-32 at LVMPD 490. Dkt. 67-18 at XIX-45-49; Ex. 6 (Twining cell phone records showing numerous calls to the Lobato house number, 728-4589, in Panaca, between July 2-9, 2001) at Lobato 50578-86; Ex. 28 (Twining Aff.) ¶¶ 7-8; Dkt. 67-62 at 70; Dkt. 67-17 at XVII-92 (2006 R. Lobato Testimony) (testifying that 728-4589 was her home phone number).

## IV.    Duran Bailey Was Murdered In Las Vegas On July 8, 2001

24.    On July 8, 2001, Duran Bailey's body was discovered behind a dumpster in the Nevada State Bank parking lot at 4240 W. Flamingo in Las Vegas—the west side of town. Dkt. 67-41 (2002 Schott Testimony) at I-50.

25.    Bailey was killed on July 8, 2001 after sunset, at about 8:00 or 9:00 p.m. Ex. 13 (Tomberlin Report) ¶¶ 29-38; Ex. 13 (2017 Tomberlin Testimony) at Lobato 7045-47, 7131-32; Ex. 14 (Baker Report) at Lobato 9669-72; Ex. 14 (2017 Baker Testimony) at Lobato 6942, 6970-71. 911 was called at 10:36 p.m. Dkt. 67-21 at LVMPD 7-8, 13-14; Dkt. 67-59 at 30.

26.    Bailey was an unhoused man who often stayed in the trash enclosure near the Nevada State Bank. Dkt. 67-22 (Parker Statement) at LVMPD 319.

27.    At the time of his death, Bailey was 44 years old, 5'10", and weighed 133 pounds. Ex. 8 (Coroner's Report) at LVMPD 115.

28.     Bailey's body was covered with plastic garbage bags, cardboard boxes, and other loose trash, and there was blood on his face, chest, and legs. There was a collapsed cardboard box covering the victim's head and upper body, and this box had a bloody shoeprint on it. Dkt. 67-21 at LVMPD 16.

29.     The cause of death was blunt head trauma, with multiple stab and incised wounds as significant contributing conditions. Dkt. 67-20 (Autopsy Report) at LVMPD 118. Bailey had been brutally attacked, had put up a struggle, and had many defensive and offensive wounds, including injuries revealed during the autopsy: a fracture on the left side of his head; a fractured rib; multiple abrasions, contusions, scratches and even stab wounds to the face; multiple stab wounds to the neck; fractured and missing teeth, which were found nearby; multiple stab wounds to the abdomen; abrasions to the upper back; a stab wound to the scrotum; lacerations to the arms and hands (defensive wounds); a stab wound to the anus that occurred *postmortem*; and Bailey's penis had been completely amputated *postmortem*. Dkt. 67-20 at LVMPD 119-23; Dkt. 67-59 at 41, 165-66; Dkt. 67-21 at LVMPD 16-18; Ex. 12 at 122.

30.     There was a lot of blood spatter, as well as pooled and smeared blood, in the trash enclosure on the south and southwest sides. Dkt. 67-21 at LVMPD 17.

31.     There were bloody shoe prints in the trash enclosure. These shoeprints were not made by anyone who responded to the scene or by the 911 caller, who were all eliminated as the source of the prints and/or directed not to step in the prints. The shoeprints were left by the killer. Dkt. 67-21 at LVMPD 16; Ex. 9 (Renhard Dep.) at 15-16, 22-25, 27, 54-56; Ex. 10 (Crime Scene Report) at LVMPD 133-35; Ex. 11 (Forensic Lab Reports) at LVMPD 224-26; Dkt. 67-59 at 154, 183; Ex. 12 (LaRochelle Dep.) at 81-82, 84, 92.

**V.      Defendants Were Assigned To Investigate The Duran Bailey Murder**

32.     Following the 911 call, emergency medical personnel and LVMPD officers were dispatched to the scene late on July 8, 2001. Dkt. 67-21 at LVMPD 14. The homicide section

was called in, and Defendants Thowsen and LaRochelle arrived at the scene sometime after 12:48 a.m. on July 9, 2001. *Id.*

33.     LaRochelle and Thowsen were the detectives assigned to investigate the Bailey homicide. LaRochelle was responsible for documenting the scene and Thowsen was responsible for interviewing any available witnesses. Thowsen was the lead Detective. Dkt. 67-21 at LVMPD 14; Dkt. 67-59 at 16.

34.     When Defendants arrived at the scene, some of the blood was still wet. Dkt. 67-59 at 30-31. Thowsen understood that this meant the blood had not even had time to dry. *Id.*

35.     Defendants spent about six hours at the crime scene and were briefed on all information learned before they arrived. They were informed about every decision to leave, collect, or test any evidence. Defendants were responsible for directing and approving all decisions about what to do with each piece of evidence at the scene. Dkt. 67-59 at 143, 149-51; Ex. 12 at 66, 104; Ex. 9 at 26-27, 37, 42, 60; Ex. 15 (Ford Dep.) at 15-16, 22-23, 27.

36.     Defendants were present for the autopsy and saw the condition of Bailey's body, which they also observed at the crime scene. They knew about each of the injuries described above. Dkt. 67-59 at 137-140, 143, 162, 184-86; Ex. 12 at 104, 114.

**VI.      Defendants Decided To Pin The Crime On Plaintiff**

49.     Between July 9 and 20, 2001, Defendants took no steps to investigate Bailey's murder beyond subpoenaing an ATM record from the Nevada State Bank and requesting an aerial photograph of the crime scene. Defendants had no viable leads. Dkt. 67-21 at LVMPD 21; Ex. 16 (Redlich Report) at 6; Ex. 5 (Peters Report) at 9; Dkt. 67-59 at 17-18, 177-78, 191-93; Ex. 12 at 124-25.

50.     On July 20, Thowsen received a call from Laura Johnson, who purported to provide third-hand information that Blaise was the survivor of an attempted sexual assault by a man who tried to rape her in Las Vegas, and that she defended herself from this attack by cutting the man's penis with a knife. Johnson did not say anything about Blaise being involved in

anything remotely like a murder, let alone the brutal attack that took place against Bailey. Ex. 17 (Johnson Dep.) at 45, 73-74; Dkt. 67-21 at LVMPD 21.

51.    Defendants then searched Blaise's name in their criminal history database and learned she has no criminal record. They also learned Blaise was the victim of sexual assault at the age of six. Dkt. 67-59 at 196-98; Dkt. 67-21 at LVMPD 21.

52.    Defendants went to Johnson's house to interview her. Dkt. 67-21 at LVMPD 22.

53.    Defendants interviewed Johnson without recording it. Dkt. 67-59 at 199. Then, they decided to record their subsequent conversation. LaRochelle took contemporaneous notes of what was said during the unrecorded portion of the interview but later destroyed this documentation of what Johnson said. Dkt. 67-21 at LVMPD 22; Ex. 12 at 107-08, 168-70; Ex. 17 at 68; Dkt. 67-59 at 99-100, 104.

54.    Destruction of notes was common practice at the LVMPD. Dkt. 67-59 at 53-54.

55.    Johnson told Defendants that Blaise was the survivor of an attempted rape, where the attacker sprung on Blaise with his penis out, Blaise defended herself by cutting the attacker's penis, and that Blaise was very frightened. Dkt. 67-24 at LVMPD 356-57.

56.    As Defendants admit, the information provided by Johnson did not show a connection between Blaise and the murder, and there was no probable cause to arrest Blaise for the murder based on the information provided by Johnson. Ex. 12 at 138, 142-44, 146-47.

**VII.    Defendants Fabricated Evidence That Plaintiff Confessed To Duran Bailey's Murder When They Knew She Did Not Confess To The Murder**

57.    Blaise's fears came true: when she told Thowsen and LaRochelle about the Memorial Day weekend assault at the Budget Suites, they did not take it seriously. Instead, they used this horrific experience to frame her for a crime she did not commit.

58.    After speaking with Johnson, Defendants went to the home of Blaise's parents. Blaise was home alone with her younger sister, Ashley. Dkt. 67-21 at LVMPD 21, 23-24. Defendants knew Blaise was a teenager who stayed with her parents. Yet, they intentionally

sought to evade Blaise's parents, fearing they would not let their daughter be interviewed outside of their presence or that of an attorney. Dkt. 67-59 at 86-87, 259.

59.     Defendants knew they were about to interrogate a teenager who had recently been the victim of an attempted rape in Las Vegas and had survived being molested as a child. Dkt. 67-59 at 70-71; Dkt. 67-24 (Johnson Statement) at LVMPD 356-57. Despite this, they never treated Blaise as a victim and survivor, or even a potential victim, of sexual assault. Ex. 16 at 7.

60.     Blaise's car was sitting out on the street in front of her parents' house, visible to the public, just as it had been the week of July 2-9. Dkt. 67-21 at LVMPD 22; Dkt. 67-15 at XVI-9-12, 22-24; Dkt. 67-5 at VI-126-27.

61.     In seeking to quickly question Blaise before her parents could possibly intervene, Defendants introduced themselves to Blaise as homicide detectives from the LVMPD and told her they knew she had been attacked in Las Vegas and had defended herself. Dkt. 67-21 at LVMPD 22; Dkt. 67-28 at LVMPD 58; Dkt. 67-27 at 134. Defendants also told Blaise at the outset of the interrogation that they knew she had been sexually assaulted as a child, causing her to become upset and to immediately start crying. Dkt. 67-27 at 195-96.

62.     Despite confronting Blaise with their knowledge that she had survived multiple sexual assaults, Defendants refused to tell her why they were speaking with her or provide even the most the general information about the death they were investigating, including the date of the death or location where it occurred. Dkt. 67-59 at 238-39; Dkt. 67-27 at 217.

63.     Defendants knew that, in order to get reliable, knowing, and voluntary information, it was important Blaise knew what event they would be asking her about. Ex. 12 at 155-60; Dkt. 67-59 at 85. But they refused to orient her to what crime they were even investigating. *See* Ex. 12 at 269. As a result, Blaise was unable to make knowing and voluntary statements and, instead, was misled into thinking they were asking her about the Memorial Day weekend attack she survived at the Budget Suites. Dkt. 67-27 at 134, 142; Ex. 16 at 8-9 ("[I]t did not occur to [Blaise] that she and Thowsen and LaRochelle were discussing two separate

incidents."), 11 ("Ms. Lobato did not confess to killing Duran Bailey, but rather 'confessed' to defending herself during a sexual assault.").

64.     Blaise did not understand that Defendants were investigating and asking about an event that had occurred after the Fourth of July—over a month after she was attacked—and of which she had absolutely no knowledge. Dkt. 67-27 at 143. In fact, Blaise did not find out she was arrested for the July 8th murder of Duran Bailey until she saw a newspaper and talked to her stepmother sometime after her arrest. *Id.* at 158, 216.

65.     From the beginning of her interaction with Defendants, not knowing she was being misled by the police who invoked a sexual assault she had survived as the basis for speaking with her, Blaise unwittingly spoke with Defendants about what happened to her and told them the truth. Dkt. 67-27 at 141; Dkt. 67-59 at 175, 235-37; Ex. 12 at 155; 195; Dkt. 67-21 at LVMPD 22.

66.     Blaise signed a *Miranda* rights card, but what she was agreeing to talk about was the Memorial Day weekend attack and not Bailey's murder, since she knew nothing about that, and Defendants had not told her that was what they wanted to ask her about. She allowed Defendants to take a sample of her DNA, allowed Defendants to search her room and her car, and answered all of Defendants' questions. Dkt. 67-59 at 235-37; Ex. 12 at 155; Dkt. 67-25 (*Miranda* card) at LVMPD 49-50; Dkt. 67-28 at LVMPD 57-83.

67.     Defendants talked to Blaise for about 15-20 minutes before they turned on the tape recorder. During this period, Blaise talked about the Memorial Day weekend attack she suffered at the Budget Suites on the east side of town—the opposite side of town from the Bailey murder. Dkt. 67-46 at VI-8; Ex. 12 at 149, 162; Dkt. 67-27 at 135.

68.     Blaise was forthcoming in this interview and, given what she described, any reasonable officer would have known that she was not involved in the Bailey murder and that she was describing an entirely different event altogether. Ex. 16 at 8, 9, 11; Ex. 5 at 5-10; *see also* Dkt. 67-59 at 167-68, 174; Ex. 12 at 155.

69.     Even though Blaise was cooperative during the interview, Defendants decided not to have her sign a document or statement specifically indicating what she said was related to the Bailey murder at 4240 W. Flamingo. Dkt. 67-59 at 109.

70.     Defendants had no other leads and knew that a fulsome presentation of what Blaise told them would lead to the obvious conclusion she was not involved in Bailey's murder, but instead had survived an attempted rape a month earlier on the other side of town. In response, they suppressed and destroyed evidence while simultaneously fabricating evidence through misrepresentations, material omissions, and by generating reports purporting to illustrate Blaise confessed to the murder of Bailey when, in fact, she had not. Ex. 5 at 6-7; Ex. 16 at 10. For example, Detectives turned off the tape recorder at some point during the interrogation and continued to speak with Blaise about information related to her attack. Dkt. 67-27 at 140-41, 167; Dkt. 67-46 at VI-132-34.

71.     LaRochelle took detailed and meticulous notes of this unrecorded conversation. Dkt. 67-59 at 222-23; Ex. 12 at 128-29, 168.

72.     Thowsen and LaRochelle destroyed these notes. Ex. 12 at 168-70; Dkt. 67-59 at 223.

73.     Defendants' conduct fell well below accepted standards of law enforcement investigation and resulted in an incomplete and inaccurate record of the interrogation, which was a fact they knew but disregarded. Ex. 5 at 6-7; Ex. 16 at 10.

74.     Defendants knew the importance of seeking and memorializing key information—namely the who, what, when, where, and why of the incident—from the suspect during an interrogation, but they refused to do so. Ex. 12 at 163-165; Ex. 5 at 5. They knew that the attack Blaise described did not match what they knew about the Bailey murder in any of these fundamental ways. *See infra*, PSOF ¶¶ 80-81.[4]

---

[4] "PSOF" refers to the Plaintiff's Statement of Facts.

75.     Defendants also knew it was important to get as much information as possible during an interrogation of a suspect before arresting that suspect, ask follow-up questions, and take good notes so there would be a clear and accurate record of what was said. Ex. 12 at 27-28, 147; Dkt. 67-59 at 82.

76.     Defendants knew that they should be comparing the information received from Blaise to see if it matched what they knew about the crime and crime scene; they knew this was necessary to ensure that Blaise was actually talking about the murder and to determine whether her statement was reliable. Ex. 12 at 31-32, 164-65; Dkt. 67-59 at 91-92.

77.     Defendants knew that it was important to familiarize themselves with the facts of the crime so that they would have more information than any suspects they were interviewing. Ex. 12 at 31. They understood that if a suspect tells them information about a crime that is inconsistent with what they know about the crime scene, it makes it more likely that suspect was not involved. *Id.* at 31-32; Dkt. 67-59 at 91-92. They knew that if a suspect provided them with non-public information about the crime, then it would be an indication that the suspect was actually involved. Ex. 12 at 33.

78.     Defendants admitted that when they are obtaining a statement from a suspect, they want to find out key information, including core information about "who," "what," "when," "where," and "why." Ex. 12 at 163-64. They wanted to know whether the information the suspect provides matches with what they know about the facts of the crime. *Id.* at 164. This is important because they want to ensure that a statement from a suspect is reliable. *Id.* at 165.

79.     Despite this, Defendants conducted a cursory interview in which they purposefully refused to inquire about key information about the attack Blaise survived, which would have further confirmed that she had no involvement in the Bailey murder. As a result, and in addition to other intentional misrepresentations and omissions, through both their reports and the audio recording itself, Defendants knowingly created a misleading, materially incomplete narrative that they represented as a confession to the Bailey murder when they knew she was talking to them about something else entirely. Ex. 12 at 5, 9-10; *see infra*, PSOF ¶¶ 80-81.

14

80.    Defendants knew that the information—including "who," "what," "when," "where," and "why"—that Blaise provided did not match the known facts of the Duran Bailey murder. Ex. 5 at 6; Ex. 12 at 30-31. Examples include:

a.  <u>Who</u>: Blaise told Defendants that her attacker was "older" and that he was "like a giant compared to [her]." Dkt. 67-28 at LVMPD 60-61. In contrast, Bailey was only 44 years old and weighed a mere 133 pounds—just 13 pounds heavier than Blaise. Ex. 8 at LVMPD 115; Dkt. 67-28 at LVMPD 61. When Defendants showed Blaise a photo of Bailey, she did not recognize him. Dkt. 67-27 at 217-18.

b.  <u>What</u>: Blaise told Defendants that she cut her attacker once *during* the struggle, that she grabbed whatever she could "down there" and that believed she cut his penis; she did not tell Defendants that she hit him with anything. She told Defendants her attacker was alive when she left. Ex. 12 at 208; Dkt. 67-28 at LVMPD 62, 78-79. She did not say anything about stabbing her attacker in the face, neck, anus or hands, knocking his teeth out, fracturing his skull, or covering him with cardboard, plastic, paper towels and other trash. Ex. 12 at 215-18. Nor did she say anything about stabbing the man in the anus or cutting off his penis *postmortem. See* Dkt. 67-28. In contrast, Bailey was brutally beaten, had all of these injuries, including stab wounds on his neck, stomach, and face, and was covered in trash, and his penis was severed *postmortem. See supra*, PSOF ¶ 29.

c.  <u>When</u>: Blaise was attacked on Memorial Day weekend, and she told Defendants that her attack occurred "over a month" before Defendants interrogated her on July 20. Dkt. 67-28 at LVMPD 83; Dkt. 67-27 at 144. In contrast, Bailey was killed on July 8, 12 days before the interrogation. *See supra*, PSOF ¶¶ 24-25.

d.  <u>Where</u>: Blaise told Defendants that she was (1) attacked in the parking lot, (2) of the Budget Suites motel, which was on the east side of Las Vegas off of Boulder Highway and Nellis, close to the Sam's Town Casino, and (3) she gave a detailed description of where the attack occurred in proximity to a shopping center across

the street and a nearby fountain. Dkt. 67-21 at 17, Dkt. 67-28 at LVMPD 22, 59, 63, 76. In contrast, Bailey was attacked and killed (1) in a dumpster enclosure, (2) outside of the Nevada State Bank on the west side of town, and (3) where there was no shopping center across the street or fountain anywhere nearby. Dkt. 67-59 at 147-48; Ex. 12 at 96-99; Dkt. 67-12 at XIII-102.

  e.  <u>Why</u>: Blaise told Defendants she was defending herself from a sexual assault. Dkt. 67-28 at LVMPD 60-62; Dkt. 67-21 at LVMPD 22. Defendants believed Bailey was killed in a drug-exchange-gone-wrong (despite a lack of any evidence to support this theory and a failure to conduct any investigation to verify it). Ex. 12 at 231, 233; Ex. 5 at 8.

81.    In addition to the differences described above, there were myriad additional statements from Blaise that made clear she was not—and no reasonable officer would believe she was—describing the murder of Bailey. Ex. 16 at 8. For example:

  a.  Blaise told Defendants she did not hit anything with her car when she left the Budget Suites. In contrast, there were fresh black tire marks on the curb of a landscaped median at the Nevada State Bank, which Defendants believed were left by the killer and knew were not left by Blaise's car. Dkt. 67-59 at 153; Ex. 12 at 77; Dkt. 67-21 at LVMPD 15; Ex. 9 at 15.

  b.  When asked whether Blaise covered her attacker with anything or moved him, she said no. Dkt. 67-28 at LVMPD 63-64. In contrast, the body of Bailey had been covered in trash, including plastic and pieces of cardboard. There were paper towels pressed into Bailey's groin area, and a piece of plastic was pressed around the hips. There were also smear marks of blood in the trash enclosure that indicated the body had been dragged. Ex. 9 at 17, 47; Dkt. 67-21 at LVMPD 16; Dkt. 67-20 at LVMPD 124; Dkt. 67-59 at 144; Ex. 12 at 226-27.

c. Blaise told Defendants the attack occurred in an open parking lot. Dkt. 67-28 at LVMPD 63. In contrast, Bailey was killed in a trash enclosure. Dkt. 67-59 at 144; Ex. 12 at 97, 99; Dkt. 67-21 at LVMPD 15.

d. Blaise told Defendants that right after the attack, she drove her car to Davis's house and left it there for a week. Dkt. 67-28 at LVMPD 65; *see also* Dkt. 67-46 at VI-21; Dkt. 67-26 at 73; Dkt. 67-30 at LVMPD 381-82. When Defendants interviewed Davis, he confirmed that Blaise left her car at his house between May 25-28, 2001 (Memorial Day weekend). Dkt. 67-33 at LVMPD 463-64; Dkt. 67-21 at LVMPD 27; Ex. 12 at 272-74; Dkt. 67-59 at 265-66. When Defendants interviewed Pyszkowski, he confirmed that he helped get Blaise's car from Davis's house at the beginning of June. Dkt. 67-30 at LVMPD 381-83; Dkt. 67-59 at 266. Pyszkowski gave Defendants a receipt dated June 6, 2001 from a tow company that tried to tow her car from near Steve's house a few days after they retrieved it from Davis's house. Dkt. 67-21 at LVMPD 26.

e. Blaise told Defendants that she was wearing a pair of black high-heeled shoes the night she was attacked. She provided those shoes to Defendants. These shoes did not have Bailey's blood on them and did not match the bloody shoeprints left at the crime scene. Blaise's shoe size was much smaller than the killer's shoeprints left at the crime scene, and the shoeprints were determined to have been left by a male shoe. Dkt. 67-21 at LVMPD 23; Dkt. 67-28 at LVMPD 68; Ex. 19 (Crime Scene Report) at LVMPD 132; Ex. 11 at LVMPD 224-25; Ex. 12 at 92, 19-23.

f. Blaise told Defendants that after she left her car at Davis's following the attack, she went to stay with Pyszkowski, and that she mentioned being attacked to Pyszkowski. Dkt. 67-28 at LVMPD 72-73. Pyszkowski and Reininger told Defendants that Blaise stayed with them and that they had not seen Blaise since before the Fourth of July. Thus, Defendants knew that, during her interrogation,

Blaise could not have been describing the Bailey murder or any attack that

occurred on July 8. Dkt. 67-31 at LVMPD 529; Dkt. 67-30 at LVMPD 383.

82.    Defendants engaged in guilt-presumptive questioning where, despite the obvious

evidence that Blaise was being truthful and describing a different incident than the murder they

were investigating, they sought to mischaracterize and portray any statement Blaise made as

inculpatory, regardless of whether it matched or did not match the facts of the crime. Dkt. 67-59

at 39-42, 94-95, 248-58, 263, 265-79, 284, 294-95, 311; Ex. 12 at 36-38, 154, 174-209, 212, 216-

18, 222-27, 230-41, 265-66, 272-76, 278, 281; Ex. 16 at 3, 9-11; Ex. 5 at 9-10.

83.    This type of guilt-presumptive questioning, in which Defendants were committed

to rejecting any information that was inconsistent with their theory of the crime, was pursuant to

their training from LVMPD. Ex. 12 at 13-15, 22-24. Based on such training, Defendants believed

that the goal of an interrogation was to get a confession, rather than to conduct an objective

search for the truth. *Id.* at 14.

84.    As part of their guilt-presumptive approach, Defendants refused to ask follow-up

questions when Blaise told them things that contradicted what they knew about the Bailey

murder, instead trying to interrogate and arrest her as soon as possible and before her parents

came home. Dkt. 67-59 at 86-87, 259; Ex. 12 at 132-34. For example:

a.    When Blaise said that the Memorial Day weekend attack happened over a month

ago, Defendants did not ask any questions to clarify, despite knowing that

Bailey's murder occurred on July 8. Ex. 12 at 237. In fact, Defendants refused to

ask Blaise at any point about her whereabouts on the day of (or within a day or

two of) Bailey's murder (July 8), something Defendants knew was important and

necessary, especially in light of other information obtained during the

interrogation and remaining limited investigation. Dkt. 67-28 at LVMPD 83; Ex.

5 at 7-8; Ex. 12 at 260; *see also* Ex. 12 at 238-39.

b.    When Blaise said her attacker was like a "giant" compared to her, Defendants

knew that this was inconsistent with Bailey (who weighed just 133 pounds), but

18

they refused to ask any follow-up questions about the attacker's approximate weight. Ex. 5 at 7; Dkt. 67-28 at LVMPD 61. Refusing to ask such questions fell well below generally accepted police standards in 2001. Ex. 5 at 7; Dkt. 67-28 at LVMPD 61; Ex. 8 at LVMPD 115; Dkt. 67-59 at 186-87; Ex. 12 at 123.

    c.    When Blaise told them that another person nicknamed "Mumblina" may have been a second victim of her attacker, Defendants refused to conduct any follow up to determine when this occurred despite the fact that this statement confirmed, as Blaise had told them, that the person who attacked her was alive after the attack, and despite knowing this contradicted what Defendants knew about the Bailey murder (that his penis was cut off). Ex. 5 at 9; Dkt. 67-28 at LVMPD 82-83.

85.    In addition to omitting critical questions during the interrogation, Defendants repeatedly suggested non-public facts about the crime to Blaise (so that they could characterize her statement as a confession to the Bailey murder even though they knew she was describing an entirely different incident). Dkt. 67-27 at 136-37, 148, 167-68, 219; *see, e.g.* Dkt. 67-28 at LVMPD 62, 76 (asking if she hit Bailey), LVMPD 63, 76-77 (asking if she moved her attacker), LVMPD 64 (asking if she covered her attacker); *see also* Ex. 16 at 8; Dkt. 67-27 at 219 (Blaise clarifying that she did not put her attacker in a dumpster because she felt that that was what Defendants were suggesting).

86.    Defendants also knew that by suggesting facts to Blaise, they were contaminating the entire process. Ex. 16 at 9; Ex. 12 at 32-34.

87.    Blaise was especially susceptible to Defendants' suggestions of fact to her because of her young age, trauma, and depression. Ex. 16 at 4-5, 8-9.

88.    Blaise trusted Defendants and believed they were being helpful and wanted to get to the truth, so, at times, she unwittingly and involuntarily accepted their (false) suggestions. Dkt. 67-27 at 222. As it was designed to do, Defendants' conduct made Blaise doubt herself and her own memory and sanity/mental health. *Id.* at 148, 153, 218, 221-23.

89.    Defendants decided to arrest Blaise simply because she said she tried to cut her attacker's penis while he attacked her, despite all the information provided by Blaise making clear that she was not discussing the Bailey murder. Ex. 12 at 214, 240-42. This was not sufficient to establish probable cause. *Id.* at 144-45.

90.    Indeed, Defendants interrogated Blaise with the intent to confirm their theory that she killed Bailey and to manipulate the evidence to fit the facts of the Bailey murder, despite numerous inconsistencies. Ex. 5 at 6; Ex. 16 at 7-8, 11; Dkt. 67-59 at 294-95; Ex. 12 at 154. Defendants did this despite knowing that they should keep an open mind and follow the evidence to determine who the perpetrator was (or was not). Dkt. 67-59 at 93-94; Ex. 12 at 40-42.

91.    Defendants also knew that they needed to corroborate a statement or "confession" from a suspect in order to determine its reliability. This would mean interviewing witnesses and evaluating what the forensic evidence showed. Ex. 12 at 34-35; *see also id.* at 42-43.

**VIII.    Defendants' Conduct Confirms That They Knew Blaise Did Not Kill Bailey But Chose To Pin the Crime On Her Rather Than Conduct An Honest Investigation**

92.    Defendants knew that, although the crime scene was rich with evidence, none of it implicated Blaise in any way. Dkt. 67-59 at 72.

93.    Significantly, Blaise was excluded as a source of any of the DNA, fingerprints, and footprints collected at the scene, and her car was excluded as the source of the tire tracks. Ex. 11 at LVMPD 211-14, 218-22, 224-25, 237-38, 239-41; Ex. 16 at 10; Ex. 5 at 5; Dkt. 67-59 at 72, 153; Ex. 9 at 47-48. Similarly, there was no blood found in Blaise's car or on the baseball bat that was in her car. Ex. 11 at LVMPD 218-19; Ex. 20 (Crime Scene Report) at LVMPD 141-42; Ex. 12 at 197. In fact, the DNA and other physical evidence showed that Bailey's attacker was a man. Ex. 12 at Lobato 10097. Despite this, Defendants refused to consider other suspects and decided to implicate Blaise in the murder.

94.    Despite zero physical evidence connecting Blaise to the murder and the numerous statements from Blaise and other witnesses that made clear that Blaise was innocent, Defendants decided to mischaracterize her statements in their reports in order to prosecute her for a murder

she did not commit. Defendants knew follow-up investigation was necessary and required by generally accepted police practices in 2001, but they refused to conduct reasonable steps (doing so would have further illustrated her innocence), even though many obvious actions were available. Ex. 5 at 13; Ex. 12 at 34-35, 40, 42-43. The reasonable inference from their refusal to conduct any follow-up investigation was that they did not want to create additional evidence that would support Blaise's innocence and contradict their story. For example:

a. Twining gave his phone records from July 8, 2001, showing Blaise was in Panaca that evening, to Thowsen and LaRochelle, but they disregarded this objective evidence and told him to "mind his own business." Dkt. 67-18 at XIX-45-49; Ex. 6 at Lobato 50578-86; *see also* Ex. 7 at Lobato 50591-602; Dkt. 67-62 at 37-40.

b. Defendants could have but refused to talk to any of Blaise's neighbors to see if she was in Panaca on July 8. Dkt. 67-59 at 208-09, 308-09; Ex. 12 at 276; Ex. 4 at 26; Ex. 1 at 20; Dkt. 67-21 at LVMPD 7-34; Ex. 5 at 9; Dkt. 67-59 at 17-18, 309.

c. Defendants could have but refused to interview known or readily identifiable witnesses who would have confirmed Blaise did not—and could not have—committed the murder of Bailey, including Blaise's father, stepmother, and sister; Blaise's friend Mitch who she stayed with in June; Twining's parents; and Blaise's cousin Shayne Kraft and her husband John Kraft. Ex. 5 at 9, 16-18; Dkt. 67-62 at 57; Dkt. 67-21 at LVMPD 7-34; Dkt. 67-59 at 17-18, 308-09.

d. Defendants could have but refused to investigate if anyone else suffered a penis injury in Las Vegas in May or June 2001. Dkt. 67-21 at LVMPD 7-34; Ex. 5 at 9; Dkt. 67-59 at 17-18, 308-09; Ex. 26 (Homicide File Index) at LVMPD 5.[5]

---

[5] Thowsen testified that all pertinent investigative information was required to be included in the homicide binder. Dkt. 67-59 at 17-18. Experienced detectives like Defendants would have known the importance of documenting all investigatory steps and, in the law enforcement investigation context, if an investigative step or finding was not recorded in any report, it most likely was not carried out. Ex. 5 at 9. Thus, the evidence strongly suggests that Thowsen took no action to review records or otherwise determine if another individual suffered an injury to the penis or groin in the Las Vegas area in May or June 2001.

e.    Defendants knew that Budget Suites, on the east side, that Blaise described was not where Bailey was murdered. In fact, they asked her to clarify which Budget Suites she was referring to, and Thowsen admitted that he knew that this Budget Suites was eight miles away from the crime scene of the Bailey murder on the west side. Dkt. 67-59 at 240-42.

f.    Defendants could have but refused to conduct any meaningful investigation at Budget Suites; they refused to visit the Budget Suites or to have Blaise identify where the attack occurred at the scene. Dkt. 67-13 (2006 Robinson Testimony) at XIV-183; Dkt. 67-21 at LVMPD 7-34; Ex. 5 at 9 ("if investigatory steps are not documented in police reports, they most likely were not carried out."); Dkt. 67-59 at 17-18 (all pertinent information is required to be in the homicide binder).

g.    Defendants refused to take any steps to identify or interview any of the individuals who Blaise said were present when she was attacked. Dkt. 67-59 at 72-73, 259; Dkt. 67-28 at LVMPD 63. Defendants even declined to contact the woman that Blaise was staying with at the Budget Suites, despite having her name and the room number she was staying at. Ex. 5 at 9, 11; Dkt. 67-21 at LVMPD 7-34; Dkt. 67-31 at LVMPD 535-37.

h.    Blaise told Defendants that she got blood on her and put on new clothes from a bag in her car. Dkt. 67-28 at LVMPD 66. Defendants could have but refused to examine her bag for blood evidence, or to examine and test the jewelry she indicated she was wearing on the night of the attack. Ex. 5 at 12.

i.    Defendants could have but refused to ask Pyszkowski or Reininger any questions about Mumblina, despite the fact that Blaise said Mumblina had likely been attacked by her same attacker, and that she met Mumblina at Pyszkowski's house. Ex. 5 at 12-13; Dkt. 67-28 at LVMPD 82-83.

95.    Shockingly, Defendants even refused to seek testing of significant pieces of evidence, including: most of the evidence collected with the sexual assault kit conducted on

22

Bailey, three cigarette butts found *under* the plastic wrapped around Bailey's abdomen, and various pieces of plastic/paper towels that were on his body. Ex. 12 at 100-01; Ex. 22 (Evidence Impound Report) at LVMPD 172-75; Ex. 11 at LVMPD 211-41; Ex. 21 (Forensic Lab Report) at Lobato 10097-98; Ex. 23 (Lab Reports) at Lobato 50148-52; Ex. 24 (Forensic Lab Exam Request) at Lobato 49272. Had such evidence been tested, it would have further exculpated Blaise. Defendants were responsible for requesting that evidence be tested and knew that, absent their request, the evidence would not be tested. Ex. 12 at 246-47; Ex. 9 at 68-69; Ex. 15 at 23-24, 39-40. Moreover, Defendants knew this was important evidence to test. Ex. 12 at 244.

96.    Defendants knew that multiple witnesses confirmed that Blaise was in Panaca at the time of the attack or stated that she had told them about the attack *before* Bailey died. Dkt. 67-59 at 49; *see e.g.*, Dkt. 67-21 at LVMPD 28-29 (Austria statement), LVMPD 29 (McBride statement), LVMPD 32 (Reininger statement), LVMPD 33 (Twining statement); Dkt. 67-62 at 23-24, 40-41 (when Twining told Defendants that Blaise could not have committed the Bailey murder because she was in Panaca and offered his phone records as proof, they told him to mind his own business or he could end up where she's at (i.e., jail)); Ex. 28 ¶¶ 12-18. They also rejected objective evidence of Blaise's innocence, such as phone records. Dkt. 67-62 at 37-40, 75-76; Dkt. 67-21 at LVMPD 28, 29, 32, 33; Dkt. 67-32 at LVMPD 489-90.[6]

---

[6] Defendants now claim they discounted such evidence because they purportedly believed that Larry Lobato was intimidating, "persuading," or threatening witnesses into lying for Blaise, which they knew would constitute a crime. Dkt. 67-59 at 49-50, 60-64. However, a reasonable jury could easily elect not to credit these new explanations as self-serving excuses. Such a finding, and inference, is amply supported by the fact that: Defendants never interviewed or sought to question Larry or Rebecca Lobato; they did not contemporaneously document their purported concern that Larry Lobato—himself a member of law enforcement (a correctional officer)—was pressuring witnesses (again, a crime); and they never took any steps to investigate their purported belief that Larry was trying to pressure or coerce witnesses into changing their testimony or lying for Blaise. Dkt. 67-59 at 60-64, 66, 205, 208; Ex. 12 at 250, 256-59. Nor did Defendants ever uncover any information that Larry Lobato had threatened or pressured any witnesses into testifying falsely. Dkt. 67-59 at 51-52. The refusal to interview Larry and Rebecca Lobato is especially notable given Johnson's suggestion to Defendants that the Lobatos knew about the attack, as well as the alleged statements from Blaise suggesting that she had told her parents about the attack. Dkt. 67-24 at LVMPD 356-57; Dkt. 67-21 at LVMPD 23-24; Ex. 12 at 250-52; Dkt. 67-59 at 204-05. The reasonable inference from these facts is that Defendants knew the Lobatos had no relevant information to provide because Blaise did not kill Bailey.

97.     Defendants could have but refused to conduct any meaningful investigation into other suspects and dismissed other possible and likely suspects who emerged because they were cooperative or did not have any criminal history (even though Blaise was also cooperative and had no criminal history). For example, Defendants knew that just three days before Bailey was killed—on July 5, 2001—a woman named Diann Parker reported to the LVMPD that she had been raped at knife point and beaten on July 1, 2001 by Bailey, who she knew by the name "St. Louis." Ex. 25 (Incident Report re: Parker) at LVMPD 277-82; Dkt. 67-21 at LVMPD 19-20. Parker came to speak with them at the crime scene immediately after Bailey's body was found wanting to know if Bailey was the man who had been killed. Dkt. 67-59 at 167.

98.     Defendants could have but refused to take any meaningful steps to investigate Parker, instead simply looking at Parker and her roommate's hands/physical appearance and some clothes and shoes and decided that they did not see anything to link them to the crime. Dkt. 67-59 at 167-68; Ex. 12 at 111-12. For example, Defendants did not compare the shoe sizes of Parker and her roommate to the bloody shoeprints left at the scene or investigate where they were at the time of the murder. Ex. 5 at 9, 13-16; Dkt. 67-59 at 171-72. Defendants dismissed Parker and her roommate as suspects simply because they were cooperative and voluntarily talked with Defendants, even though Blaise was also cooperative with them. Dkt. 67-59 at 167-68, 172-74; Ex. 12 at 112-13. Defendants did this despite knowing that additional investigation was necessary. Ex. 12 at 34-35, 40, 42.

99.     Similarly, Defendants conducted no investigation of individuals who were identified by Parker as having seen Bailey physically assault Parker. Dkt. 67-59 at 171-72; Ex. 5 at 13-16. Defendants did not speak with these individuals, but simply looked up their criminal history. Defendants concluded that these individuals should be dismissed as suspects without investigation. Dt. 67-59 at 171-72.

100.    Defendants also failed to fully record the statements of any of the witnesses they interviewed, which they knew would lead to inaccurate records. Ex. 16 at 9; Dkt. 67-59 at 99-100. Defendants did this in a manner that created a partial record that made it appear there was

some possibility Blaise was involved in the Bailey murder, when she was not, and that excluded exculpatory evidence of her innocence.

101.    Specifically, Defendants went through each witness's statement with them before turning on the recording device. Dkt. 67-59 at 100, 199-201; Dkt. 67-61 (Tienken Aff.) ¶ 11 (Thowsen "talked with me for a long time before he turned on his tape recorder. He tried to feed me answers as he tried to get me to say what he wanted me to say that Blaise told me and not what she actually said."); Dkt. 67-62 at 19, 24-25, 27-28, 86-88; Ex. 28 ¶¶ 12-18. When Defendants did turn the tape recorder on, they asked the questions carefully to get just the information they wanted and to exclude exculpatory evidence of Blaise's innocence. Dkt. 67-61 ¶ 11 ("Even after he turned on the tape recorder he repeatedly stopped it to interject and attempt to influence me about what to say, and then restart it."); Dkt. 67-64 (Reininger Dep.) at 18-25, 50-51; Ex. 28 ¶¶ 12-13, 17; Dkt. 67-62 at 88-89, 122-23 (Twining felt Defendants were trying to intimidate him). In this manner—just as with their interrogation of Blaise—Defendants manipulated the evidence to construct the story that they wanted of Blaise's purported guilt.

102.    Defendants knew it was important to take notes during interviews and interrogations to accurately record what was said. Dkt. 67-59 at 96, 98-99. LaRochelle took detailed and meticulous notes during the entirety of every interview, interrogation, call, or statement. Dkt. 67-59 at 98, 100-01, 194; Ex. 12 at 107-08, 126-29; Dkt. 67-62 at 73-74. Defendants also took notes at the scene. Ex. 12 at 68; Ex. 9 at 37; Ex. 15 at 27. LaRochelle also took notes when he spoke to Blaise at the jail. Ex. 12 at 220.

103.    However, Defendants destroyed all of their notes and did not include them verbatim in any other report. Dkt. 67-59 at 52-54, 104; Ex. 12 at 129-30, 168-70. As a result, Defendants created, and knew they were creating, an incomplete, misleading, and inaccurate record of their actions and the information they learned.

**IX.    Defendants Fabricate Evidence In Their Police Reports**

104.    Detectives knew Blaise was telling them about a different event—the Memorial Day weekend attack at Budget Suites—during her interrogation and was not providing a confession to the Bailey murder at Nevada State Bank on July 8 on the opposite side of the city. *See supra*, PSOF ¶¶ 80-81.

105.    Despite this, Defendants wrote reports falsely portraying and labeling Blaise's statements about the May attack at the Budget Suites as a confession to the Bailey murder on July 8. Ex. 12 at 192-93; Ex. 16 at 11 ("[T]he detectives in this case suffered from tunnel vision/confirmatory biases, which led to an exclusive focus on Ms. Lobato, despite numerous and glaring inconsistencies in the attack she described and the facts of the Duran Bailey homicide, and led them to write reports, suggest theories, and document a version of events that did not, in fact, happen."); *see, e.g.*, Dkt. 67-21 at LVMPD 23 (writing that Lobato said she had put Duran Bailey out of her mind, when in fact Blaise indicated that she put her attacker out of her mind and stated she did *not* recognize Bailey); *id.* at LVMPD 24 (as a result of her statement, Detectives arrested her for murder with a deadly weapon and transported Blaise to Las Vegas for booking); Dkt. 67-28 at LVMPD 57 (labeling Blaise's statement as being about a "murder" that occurred on "07/08/01" at "4240 W. Flamingo, Las Vegas, NV," the address where Bailey was killed, not the location of the attack Blaise described); Dkt. 67-66 at LVMPD 101 (identifying incident date for which she was arrested as 7/8/01); Ex. 16 at 2; Ex. 12 at 157, 192-93.

106.    These fabricated reports included (1) the Arrest Report, which purports to detail the circumstances under which they arrested Blaise, and (2) the Officer's Report, which purports to detail the actions Defendants took to investigate the Bailey murder and all the information and evidence they obtained. Dkt. 67-21 at LVMPD 7-34; Dkt. 67-66.

107.    In both the Officer's Report and the Arrest Report, Defendants falsely wrote that, after Blaise was arrested and booked at the Clark County Detention Center, Blaise said that the jail cell enclosure in which she was incarcerated reminded her of the location in which she had

been attacked, that the location of the attack did not have a covering, and that she could see the metal covering of a carport area from where she was attacked. Dkt. 67-21 at LVMPD 24; Dkt. 67-66 at LVMPD 102. Blaise never said this to Defendants. Dkt. 67-27 at 139, 162-64.

108.    The Arrest Report likewise includes falsehoods, including that:

a.    Blaise was "unsure" where the attack occurred "because of her using methamphetamine at the time and her unfamiliarity with the city." Dkt. 67-66 at LVMPD 102. This was not what Blaise said. When talking to Blaise about different locations where she danced, Defendants asked if she could be confused about the locations. Dkt. 67-59 at 271-74; Dkt. 67-46 at VI-23. Blaise said she could be mistaken about where she met up with people to dance, but she was very specific and clear about where the attack occurred: in the parking lot of the Budget Suites at Boulder Highway and Nellis, by Sam's Town, with a fountain nearby. Dkt. 67-28 at LVMPD 59, 68-71, 76; Dkt. 67-27 at 151; Ex. 12 at 265. Defendants knowingly misrepresented her statement about where the attack occurred. *See* Ex. 5 at 8; Ex. 12 at 267-69.

b.    Blaise thought she completely severed the penis from her attacker's body. Dkt. 67-66 at LVMPD 102. This was not what Blaise said. She told Defendants, "I cut his penis" but did not know if she cut it off. Dkt. 67-28 at LVMPD 62; Dkt. 67-26 at 98; Dkt. 67-26 at 49-50.

c.    Blaise "hid her car at her ex-boyfriend's house." Dkt. 67-66 at LVMPD 102. What Blaise said was that she "ditch[ed]" her car at Davis's house. Dkt. 67-28 at LVMPD 63. She did not "hide" a car parked in plain sight. *See* Ex. 12 at 269-70.

d.    Blaise last saw her attacker lying on the ground. Dkt. 67-66 at LVMPD 102. Blaise did not say her attacker was *lying* on the ground. Dkt. 67-28 at LVMPD 63. Her attacker was kneeling. Dkt. 67-26 at 51-52.

e.    "[O]n Friday, July 13th, [Blaise] returned to Panaca sometime after the incident." Dkt. 67-66 at LVMPD 102. This was not what Blaise said. Blaise said she

returned to Panaca on July 13th in order to stay away from drugs. Dkt. 67-28 at LVMPD 71. Nothing about returning on July 13 referred to the attack at all. *Id.* at LVMPD 59, 71.

109.    To complement its affirmative falsehoods, the Arrest Report also includes material omissions of information illustrating that Blaise was not discussing Bailey's murder, but rather the Memorial Day weekend attack at Budget Suites, including:

a.    That the man who attacked her was like a giant compared to Blaise. *Compare* Dkt. 67-66 at LVMPD 101-02 *with* Dkt. 67-28 at LVMPD 61.

b.    That Blaise's attacker was crying when she drove away. *Compare* Dkt. 67-66 at LVMPD 101-02 *with* Dkt. 67-28 at LVMPD 63.

c.    That the attacker knocked her down from behind and got on top of her with his penis out. *Compare* Dkt. 67-66 at LVMPD 101-02 *with* Dkt. 67-28 at LVMPD 60-62.

d.    The detailed description provided by Blaise of where the attack occurred and the surrounding environment, such as the fountain in the parking lot. *Compare* Dkt. 67-66 at LVMPD 101-02 *with* Dkt. 67-28 at LVMPD 76.

e.    That Blaise said the attack occurred more than a month ago. *Compare* Dkt. 67-66 at LVMPD 101-02 *with* Dkt. 67-28 at LVMPD 83.

110.    In the Officer's Report (which Defendants jointly created and completed by 8/22/01), Defendants falsely wrote that Blaise told them she "cut [her attacker's penis] off." Dkt. 67-21 at LVMPD 23; Dkt. 67-59 at 55-56, 70-71, 105-07; Ex. 12 at 69, 172-73. This was not what Blaise told them. Dkt. 67-28 at LVMPD 62; Dkt. 67-26 at 98.

111.    Defendants also falsely wrote in the Officer's Report that Blaise said "she 'snapped' and [could not] remember what else happened." Dkt. 67-21 at LVMPD 23. But Blaise never made such a statement. Ex. 18 (Blaise Decl.) ¶¶ 3-4; *see also* Ex. 12 at 165-67 (agreeing that this was not in the recorded part of the interrogation). Defendants also suggested that Blaise said she "completely lost it" during the attack, but she never said those words. Dkt. 67-46 at VI-

28

26-27; Dkt. 67-28 at LVMPD 77; *see also id.* at LVMPD 57-83; Ex. 12 at 205-07; Ex. 16 at 8. The implication from Defendants' report is that Blaise, given that she told them she lost control during the attack, she therefore could have possibly killed someone without actually knowing it. But Blaise never said this; the report and its implications are false; and Blaise actually said her attacker was alive (and crying) when she escaped. Dkt. 67-28 at LVMPD 63.

112.    Defendants made the additional false or intentionally misleading statements in the Officer's Report:

    a.   Defendants wrote that they determined that the incident where Plaintiff left her car at Davis's house for several days "had actually happened the month previously" because Pyszkowski stated that it happened before the car was towed from near his house, for which he produced a receipt dated June 6, 2001. Dkt. 67-21 at LVMPD 26. This statement that the car incident occurred a month before the attack is an admission and a misrepresentation about what Defendants knew: it is an admission that Defendants knew the attack Blaise survived did, in fact, take place long before Bailey was killed and, it attempts to mischaracterize the car being left as separate from the incident Blaise described when in fact, it was part of the same exact sequence and that could not have involved the killing of Bailey. *See* Dkt. 67-28 at LVMPD 64, 72, 75. Defendants knew this information at the time that they completed the Officer's Report on 8/22/01.

    b.   Defendants wrote that Heather McBride told them: "in July on what she thought was the 5th or 6th, she was at home with her boyfriend, Chris Collier when Lobato came for a visit. Lobato explained that she had a butterfly knife that came in handy because she had to use it the other night when some guy did her wrong so she stabbed him in the abdomen." Dkt. 67-21 at LVMPD 29. This statement characterizes McBride was being unsure of the date this conversation occurred. But McBride said definitively: "I know [the conversation] was before the weekend and … after the Fourth of July, I think, so it was either [July 5 or 6]."

Dkt. 67-37 at LVMPD 426. From this information, Defendants knew that the incident Blaise described occurred before Bailey's murder.

c.  Defendants wrote that Pyszkowski said Blaise left his house near the Fourth of July and stayed with Twining for 4 to 10 days. Dkt. 67-21 at LVMPD 26. But this is not what Pyszkowski said. He said Blaise was definitely gone by the 4th, and Defendants' statement was intended to suggest Blaise was staying with Twining at the time of the murder when they knew she was not. Dkt. 67-30 at LVMPD 383; Dkt. 67-31 at LVMPD 529; *see* Dkt. 67-62 ¶¶ 5-8.

d.  Defendants wrote: "Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident." Dkt. 67-21 at LVMPD 23. This was not what Blaise told them. Blaise stated that she went back to Panaca on July 13 in the context of a discussion about using drugs; she told them that she came home on July 13 and that she had stayed away from drugs for two weeks while she was in Las Vegas, but she needed to come home because she knew where to get them in Las Vegas. Dkt. 67-28 at LVMPD 71. Given that Blaise had told Defendants the attack occurred *over a month* before the interrogation and that following her attack she had been on drugs for a week, Defendants intentionally included this misleading statement to falsely suggest that Blaise returned home on July 13 shortly after killing Bailey on July 8 because she was depressed.

113.  In addition, in the Officer's Report, Defendants omitted numerous material facts as part of their attempt to link Blaise's statements about the Memorial Day Budget Suites attack to the Bailey murder at Nevada State Bank in July, including:

a.  Clear and unequivocal statements from Blaise that the attack occurred at the Budget Suites on Boulder Highway and Nellis, close to Sam's Town, with a shopping center across the street and a fountain nearby to the left of where she was attacked. Dkt. 67-28 at LVMPD 59, 76. To further sow doubt about Blaise's

statements, Defendants wrote that Blaise was attacked "in a parking lot which she believed was at the Budget Suites near Flamingo and Boulder Highway." Dkt. 67-21 at LVMPD 22.

b. The statement from Plaintiff that her attacker was a "giant" compared to her— something that made clear she was not referring to someone as slight as Bailey. Dkt. 67-28 at LVMPD 61. Defendants wrote that Blaise said her attacker was "an older, smelly black male," a material omission. Dkt. 67-21 at LVMPD 22.

c. That Blaise was attacked from behind and out of nowhere. *Compare* Dkt. 67-28 at LVMPD 60 *with* Dkt. 67-21 at LVMPD 7-34.

d. That Blaise did not hit, move, or cover her attacker with anything. *Compare* Dkt. 67-28 at LVMPD 62-64 *with* Dkt. 67-21 at LVMPD 7-34.

e. That Blaise said the attack she suffered occurred over a month ago. *Compare* Dkt. 67-28 at LVMPD 62-64 *with* Dkt. 67-21 at LVMPD 7-34.

f. That her attacker was crying and alive when she drove away. *Compare* Dkt. 67-28 at LVMPD 63 *with* Dkt. 67-21 at LVMPD 7-34.

114.    Apart from the reports, Defendants actually manipulated the record of the interrogation, too. For example, Defendants asked Blaise a question that began "And you were explaining to us what happened a couple of weeks ago in Las Vegas." Dkt. 67-28 at LVMPD 58. Blaise never said this. She said the attack occurred "over a month ago." Dkt. 67-28 at LVMPD 83; Dkt. 67-59 at 240; Ex. 12 at 175. She did not initially correct them when they said "couple of weeks ago" because she did not know they were talking about a July 8 murder. Dkt. 67-27 at 142-43. By inserting this statement ("a couple weeks ago"), Defendants inserted fabricated facts into the statement. Ex. 5 at 6.

**X.      As A Result Of Defendants' Misconduct, Plaintiff Spent Almost 17 Years Wrongfully Imprisoned**

115.    After writing an Arrest Report with falsehoods and material omissions, Defendants provided it to a magistrate judge in order to seek a preliminary hearing regarding whether there was probable cause to charge Plaintiff. Ex. 27 at Lobato 16-88.

116.    Defendants also knew that the Officers' Report, Arrest Report, and transcribed interview statements would all go to the prosecutor. Dkt. 67-59 at 103-04; Ex. 12 at 176; Dkt. 67-40. These documents and the rest of the homicide binder were in fact provided to prosecutors, who used them to assess probable cause and prosecute the case. Dkt. 67-65 (Giacomo Decl.) ¶¶ 4-5. Thowsen testified about the Officer's Report in court, including the claim that Blaise said the holding cell area looked like where the attack occurred. Dkt. 67-12 (2006 Thowsen Testimony) at XIII-83-84. Defendants also used the selectively recorded statement of Blaise against her at trial. *Id.* at XIII-23-24.

117.    Defendants understood that they must not be deceptive to the prosecutors regarding whether Blaise confessed to the Bailey murder. Ex. 12 at 160. Despite this, they intentionally misled the prosecutors with fabricated statements and material omissions. *See supra*, PSOF ¶¶ 116-17.

118.    Relying on Defendants' Arrest Report and sworn statement, a preliminary hearing was held. Thowsen made numerous false and misleading statements during the hearing before the Justice Court to assess probable cause, as well as omitted material evidence of Plaintiff's innocence. For example:

    a.   Thowsen testified that Johnson called and asked him if they had anyone who had been killed and had their penis severed. Ex. 27 (Prelim. Hrg. Tr.) at Lobato 61. But Johnson did not ask or tell Thowsen about any person who had been killed, and Johnson did not believe, based on the information she had from Tienken, that Blaise's attacker had died. Ex. 17 at 73-74; Dkt. 67-21 at LVMPD 21.

b.  Thowsen said that Blaise referred to the attacker as "an older black man that smelled of alcohol and dirty diapers," but omitted the important information that he was a giant comparted to Blaise and that Bailey was only 133 pounds and 5'10". Ex. 27 at Lobato 64; Dkt. 67-28 at LVMPD 61. Thowsen even omitted this material information when the prosecutor asked pointed questions about whether the description matched Duran Bailey. Ex. 27 at Lobato 66.

c.  Thowsen said that Blaise said she snapped and could not remember what else happened. This is false. Ex. 27 at Lobato 64-65; Ex. 18 ¶¶ 3-4.

d.  Thowsen testified that Blaise told him the attack occurred in a parking lot somewhere close to Sam's Town. Ex. 27 at Lobato 64. When the prosecutor asked for any details Blaise had provided about the location, Thowsen responded simply that "she talked about down by Flamingo and Boulder Highway." Ex. 27 at Lobato 66. This was false. Blaise never mentioned Flamingo, which Thowsen knew, and knew that this referred to the location of where Bailey was killed. Dkt. 67-28 at LVMPD 57-83; Ex. 27 at Lobato 67. And Thowsen omitted the detailed information that Blaise provided, including that the attack occurred at a Budget Suites at Boulder Highway and Nellis, that there was a shopping center across the street, and that there was a fountain to the left of where she was attacked. *See supra*, PSOF ¶ 80d. Given that Thowsen was asked directly for the information that Blaise provided about the location, this was a false and material misrepresentation to the court, especially regarding how clearly Blaise remembered where the attack occurred.

e.  Thowsen testified that when he asked Blaise if she recalled hitting her attacker with anything other than a knife, she "mentioned that possibly she had because she had a ball bat or something to that effect and she didn't remember if she used it." Ex. 27 at Lobato 68. But Blaise stated that she did not recall hitting her attacker with anything. In response to suggestive questioning, Blaise added that

she had a baseball bat in her car. Dkt. 67-28 at LVMPD 77. The Detectives mentioned a baseball bat to Blaise before the recording started. Dkt. 67-27 at 221.

f.  When Thowsen was asked if Blaise told him when the attack occurred, he testified that "she didn't recall exactly." Dkt. 67-28 at Lobato 76. This is a materially false statement because Blaise stated it occurred over a month before her interrogation. Dkt. 67-28 at LVMPD 83.

g.  Thowsen testified that Blaise told him the holding cell appeared similar to the area she was attacked, but this was a false statement. Ex. 27 at Lobato 76; *see supra*, PSOF ¶ 107.

h.  When asked for any additional information he recalled about what Blaise said about the attack, Thowsen omitted the material fact that Blaise said the attack occurred over a month prior. Ex. 27 at Lobato 68; Dkt. 67-28 at LVMPD 83.

i.  Thowsen also omitted the material fact that witnesses told him that Blaise had told two friends in Panaca about her attack before July 8, and Pyszkowski confirmed that Blaise left her car at Davis's house in late May or early June, meaning her attack occurred in late May or early June. *See supra*, PSOF ¶¶ 81d, 81f, 112a.

119.  Thowsen understood that it was Defendants' job to provide the prosecutor with everything they knew about the case, including exculpatory evidence. Dkt. 67-59 at 96.

120.  Witnesses to Blaise's presence in Panaca from July 2-9, 2001 were not permitted at her trials to testify to the date that Blaise told them about her attack, and fabricated statements were introduced at trial. Dkt. 67-27 at 181, 189; Ex. 28 ¶ 21; PSOF ¶ 116.

121.  As a result of Defendants' misconduct, Blaise spent just short of 17 years wrongfully imprisoned, where she faced constant stress and physical and emotional pain. Dkt. 67-27 at 202-03, 206-07.

# ARGUMENT[7]

## I.    Plaintiff Is Entitled To A Trial On Her Fourteenth Amendment Fabrication Of Evidence Claim

There has long been a clearly established and in fact "virtually self-evident" "due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1075-76 (9th Cir. 2001). "A plaintiff prevails on a due process fabrication of evidence claim if she establishes that '(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty.'" *Woods v. City of Reno*, 2020 WL 4194844, at *9 (D. Nev. July 21, 2020) (quoting *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017)). Plaintiff contends that Defendants Thowsen and LaRochelle fabricated evidence, including investigative reports, that she was responsible for the Duran Bailey murder when they knew she was not, and that this evidence was used to prosecute her for that crime. Given the ample evidence discussed above, this claim must go to a jury.

### A.    Defendants Thowsen and LaRochelle Fabricated Evidence against Plaintiff

A plaintiff may prove deliberate fabrication using either direct or circumstantial evidence. *Spencer*, 857 F.3d at 793. Examples of direct evidence include mischaracterizations of witness statements in investigative reports, *id.*, or where those reports contain statements that were "never made." *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010); *see also, e.g.*, *Caldwell v. City & Cty. of San Francisco*, 899 F.3d 1105, 1112 (9th Cir. 2018) (triable issue of fact as to evidence fabrication where allegation included the claim that the officer authored "falsified notes").

---

[7] Plaintiff no longer pursues her Involuntary Confession Claim (Count I). Defendant LVMPD does not mention or make any argument that LVMPD is entitled to summary judgment on Plaintiff's *Monell* claim. *See* Dkt. 67 (no mention of Plaintiff's *Monell* claim against LVMPD). "It is well established that 'the general rule is that [parties] cannot raise a new issue for the first time in their reply briefs.'" *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (quoting *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988)); *Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390, at *4 (D. Nev. Mar. 30, 2016); *McEnroe v. AT&T Mobility Servs. LLC*, 2016 WL 7369238, at *5 (N.D. Cal. Dec. 20, 2016). Any argument for summary judgment on Plaintiff's *Monell* claim has therefore been waived and cannot be raised in reply. As a result, Plaintiff will not address that claim here.

Fabrication can also be proven circumstantially, via evidence showing either that "(1) [d]efendants continued their investigation … despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Caldwell*, 889 F.3d at 1112 (quoting *Devereaux*, 263 F.3d at 1076).

Here, there is both direct and circumstantial evidence of fabrication.

### 1. A Reasonable Jury Could Easily Find Defendants Directly Fabricated Evidence

Though Defendants here knew Plaintiff was innocent, PSOF ¶¶ 74, 76, 78, 80-114, that fact is irrelevant when assessing direct evidence of fabrication. The Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 800; *see id.* at 799 ("Because Plaintiff introduced direct evidence of deliberate fabrication, he did not have to prove that Krause knew or should have known that he was innocent."); *Caldwell*, 899 F.3d at 1112 (same). With regard to direct evidence, Plaintiff contends that Defendants affirmatively and falsely represented her statements about an attempted rape she suffered on Memorial Day weekend as a confession to the July 8 Bailey murder. In their reports, Defendants falsely labeled and portrayed Plaintiff's statements during the interrogation as a confession to the murder despite knowing that the information she provided during the interrogation did not match the key facts of the Bailey murder and in fact belied any belief that Plaintiff was confessing to the Bailey murder. PSOF ¶¶ 74-114.

Defendants labeled the statement made by Plaintiff as referring to a "murder" that occurred on "07/08/01" at "4240 W. Flamingo, Las Vegas, NV" (the date and location of Bailey's death); wrote that they arrested Blaise for murder with a deadly weapon following her purported confession; and arrested her based solely on their (false) designation of her statement as a confession. *Id.* ¶ 105. To be clear: it is *Defendants' deliberate mischaracterization* of the statements made by Plaintiff during the interrogation as being somehow related to the Bailey

36

murder—when those statements were about something else entirely—that constitute fabrication, *not* the statements made by Plaintiff during the interrogation.

The same is true of other reports Defendants authored. For example, Defendants deliberately fabricated the Officer's Report and Arrest Report by including false and misleading statements, mischaracterizations, and critical omissions that falsely portrayed her statements as a confession to the Bailey murder when it absolutely was not. *Id.* ¶¶ 104-114. Defendants knew that Blaise's statement strongly contradicted the known information from the Bailey murder in myriad ways, including: (1) when the attack on Blaise occurred; (2) the location of the attack; (3) the description of the attacker; and (4) what actually occurred during the attack of Plaintiff that was impossible to reconcile with the Bailey murder. *Id.* ¶¶ 80-81. Nonetheless, the Officer's Report and Arrest Report directly misrepresent or omit the information provided by Blaise in order to hide and secrete these contradictions and attempt to falsely create a plausible narrative that Blaise confessed to a murder they knew she did not commit.

### a.    Impossible timing

With regard to timing, Blaise was attacked over Memorial Day weekend, over a month before Defendants interrogated and arrested her on July 20. *Id.* ¶¶ 5-15, 80c, 81d, 81f, 84a, 109e, 113e, 114. It was, or should have been to a reasonable officer, clear that Blaise was not describing the Bailey murder which occurred only a week and a half earlier. Yet, in addition to their report affirmatively indicating that Blaise had confessed to something that happened on July 8, Defendants purposely omitted from both the Arrest Report and Officer's Report the fact that the attack of Blaise occurred long before Bailey was murdered.

For example, to bolster their efforts to obscure and falsely make it appear that Blaise was referring to the July 8 Bailey murder, Defendants wrote in the Arrest Report simply that "on Friday, July 13th, [Blaise] returned to Panaca sometime after the incident." *Id.* ¶ 108e. Likewise, and despite definitively knowing that Blaise was in Panaca, not Las Vegas, before the murder, in the Officer's Report, Defendants wrote that "Lobato said she went back to Panaca on July 13th

and contacted a doctor and was prescribed Prozac due to her depression from the incident." *Id.* ¶ 112d. The implication of these false reports, then, is that Blaise was in Las Vegas at the time of the July 8 Bailey murder and went to Panaca after the murder. This, of course, is false. *Id.*; *see also id.* ¶¶ 5-15, 80c, 81d, 81f, 84a, 109e, 113e, 114. Blaise was not talking about returning to Panaca because she was depressed from killing Bailey. *Id.* ¶ 112d. Instead, she was describing events that Defendants themselves wrote occurred long before the Bailey murder where she was attacked and left her car at her friend's house, which they *knew* took place long before Bailey was killed.

Defendants' Officer's Report indicated that they *knew* the Budget Suites attack Blaise described to them took place long before the Bailey murder in July. Defendants had incontrovertible evidence from Pyszkowski in the form of a tow receipt showing that Blaise's car was retrieved from Davis's house before June 6, 2001. Defendants admitted that Blaise left her car at Davis's house "the month previously." *Id.* ¶ 112a. Defendants, then, knew the entire ordeal Blaise described had nothing to do with Bailey's murder, but occurred *over a month before her interrogation and arrest*. *Id.*

Likewise, even though they knew the events were unrelated and over a month apart, Defendants took steps to obscure the fact that Blaise had told people *before the Bailey murder* about being attacked over Memorial Day weekend. Defendants had this information from several witnesses. *Id.* ¶¶ 94, 96, 118a. Nonetheless, Defendants wrote in the Officer's Report that McBride was unsure of when Blaise told her about the attack. *See id.* ¶ 112b. This statement is purposely misleading because it misrepresents the nature of what McBride told them. McBride was sure that Blaise told her about the attack on July 5th or 6th. *Id.* In short, Defendants misrepresented, and tried to obscure, the simple fact that McBride heard about Blaise's Memorial Day weekend attack *before* the murder on July 8.

The flipside of Defendants' mischaracterizations is also the omission of any reference to information, including Blaise's own statements, confirming she was discussing the Memorial Day weekend attack that occurred well before the Bailey murder. *Id.* ¶¶ 109, 112. Together,

these misrepresentations and omissions belie any contention that the false information and implications created by Defendants' reports were merely careless or trivial, especially at the summary judgment stage. *Caldwell*, 889 F.3d at 1115 (concluding that "the potential 'errors' are not obviously the product of carelessness and that there is a triable issue as to whether [the defendant] intentionally fabricated his notes"); *Spencer*, 857 F.3d at 798-99 (trivial errors in reports are not sufficient to show a constitutional violation); *see also Jones*, 873 F.3d at 1127 n.1 (court must take all evidence and inferences in plaintiff's favor). These facts alone—which falsely paint a Memorial Day Weekend attack as happening after the Fourth of July—are sufficient to deny summary judgment on Plaintiff's fabrication claim.

    **b.**  **The Budget Suites Inn is not the Nevada State Bank**

    With regard to location, Defendants wrote in the Arrest Report that Blaise "thought the incident occurred on the east side of Las Vegas, however, she appeared unsure because of her using methamphetamine at the time and her unfamiliarity with the city." These statements are extremely and purposely misleading because they suggest that Blaise doubted where the attack occurred. But she was very clear about where the attack occurred. PSOF ¶¶ 80d, 108a, 109d, 113a. Again, Defendants omitted from the Arrest and Officer's Reports the clear and unequivocal statements from Blaise that the attack occurred at the Budget Suites on Boulder Highway and Nellis, close to Sam's Town, with a shopping center across the street and a fountain nearby to the left of where she was attacked. *Id.* ¶¶ 107-13. These misrepresentations and omissions were misleading and suggest Blaise's attack could have occurred at the Nevada State Bank (where Bailey was killed), rather than at the Budget Suites, and were not careless or mere differences of "tone or characterization." *Costanich*, 627 F.3d at 1113; *see also Jones*, 873 F.3d at 1127 n.1. Defendants knew Blaise was certain the attack happened on the opposite side of town from where Bailey was killed (and over a month earlier), and falsely portrayed that she was unsure of the location in order to portray her statement as a confession to a murder she did not commit.

In addition, even putting aside that Defendants' falsely portrayed events happening on opposite sides of town and in different types of businesses (a bank instead of a hotel), Defendants' reports also fabricated information about how Blaise described the parking lot where she was attacked. Plaintiff was attacked in a parking lot, near her car, and not in a concrete garbage enclosure. PSOF ¶¶ 80d, 81c, 107. To attempt to rectify this contradiction, Defendants wrote in both their Officer's Report and Arrest Report that Plaintiff told them her cell at the jail following her arrest reminded her of the location where she was attacked, and that the location of the attack did not have a covering and that the metal covering of a carport was visible. *Id.* ¶ 107. Blaise never made this statement. *Id.* Blaise never made any such statement, which Defendants included to falsely indicate that Blaise's attack occurred in the dumpster enclosure, despite the fact that she said it occurred in an open parking lot and *never* mentioned a dumpster enclosure even in the face of Defendants' suggestive questioning about whether a dumpster was involved in her attack. *Id.* ¶ 85. The inclusion of statements that were "never made" is a quintessential form of fabrication. *Spencer*, 857 F.3d at 793. Summary judgment must be denied.

### c. The person who attacked Plaintiff could not have been Duran Bailey

With regard to the identity of Blaise's attacker, Defendants wrote in the Officer's Report that Blaise said her attacker was "an older, smelly black male." PSOF ¶ 113b. The Officer's Report omits Blaise's statement that her attacker was a "giant" compared to her. Again, a reasonable jury could easily conclude the omission of this statement was an intentional misrepresentation.

In addition, Defendants later wrote in the Officer's Report that, when shown a picture of Bailey, Blaise said she put Bailey out of her mind. This is both false and misleading. Blaise said she *did not recognize* Bailey; and, separately, that she had put her attacker out of mind. *Id.* ¶ 80a, 105. Defendants misrepresented that Blaise said she put Bailey out of her mind despite the fact that she did not recognize him or make any statement indicating she had ever encountered him.

40

### d.    A single knife swipe is nowhere near the extensive damage suffered by Duran Bailey

Finally, Defendants made false statements, misrepresentations, and material omissions regarding what occurred when Blaise was attacked to falsely represent that her attack resembled the murder of Bailey. Bailey was brutally beaten, suffering a fracture to his head and a rib, abrasions and stab wounds to the face and neck, fractured and missing teeth, stab wounds to the abdomen, and a *postmortem* stab wound to the anus and *postmortem* amputated penis. *Id.* ¶ 29. The attack Blaise described was nothing like this brutal event, and no reasonable person would think they were in any way the same. *Id.* ¶¶ 79-91.

Defendants attempted to make it seem as if these events were one and the same, even when they knew they were not. For example, Defendants falsely wrote in the Officer's Report that Plaintiff told them she grabbed her attacker's penis and testicles and "cut it off." *Id.* ¶ 103. They similarly wrote in the Arrest Report that Blaise believed she severed her attacker's penis. *Id.* ¶ 108b. But Blaise never said this—she said that the only thing she did was cut her attacker once (she did not say she cut off a penis) before escaping and leaving in her car. *Id.* ¶¶ 11-12, 80b.

Perhaps more significantly, to account for the contradiction between a single knife swipe and a brutal beating, stabbing, and *postmortem* mutilation and sexual assault, Defendants falsely wrote that Blaise said she "completely lost it" during the attack and "'snapped' and [could not] remember what else happened," after she cut her attacker. *Id.* ¶ 111. Blaise never said either of these things or anything else to indicate that she lost control and savagely killed someone, mutilated him, wrapped him in plastic and covered him in trash. *Id.* She told Defendants that the single thing she did was cut her attacker once and then left in her car, at which point she saw her attacker alive and crying. *Id.* ¶¶ 11-12, 15, 80b, 109b, 111, 113f. A reasonable jury could conclude that Defendants' claims that Blaise admitted she lost control or "snapped" (to the point where she could not recall what happened) was intended to paper over the key differences

41

between the events so that Defendants could characterize Blaise's statements as a confession to the Bailey murder.

Defendants also falsely wrote in the Arrest Report that Plaintiff "hid" her car at her ex-boyfriend's house and that when she left, Plaintiff last saw her attacker lying on the ground. *Id.* ¶¶ 108c, 108d, 112a. However, Defendants knew that Plaintiff never said any of these things when explaining the attempted rape she suffered Memorial Day weekend, and they intended their statements to falsely portray moving the car as some form of "consciousness of guilt" for murdering someone when she was actually the victim of an attempted sexual assault. Indeed, and by the time they wrote the Officer's Report, Defendants knew that Plaintiff leaving her car at Davis's house had taken place over a month before, as they themselves wrote. *Id.* ¶ 112a. Neither the Officer's Report nor the Arrest Report note Plaintiff's important statement that her attacker was alive when she left, nor do they note that, in response to specific and leading questions from the Defendants, she responded that she did not ever hit, move, or cover up her attacker—all things that had been done to Bailey. *Id.* ¶¶ 80b, 81b, 113d, 113f. These statements made clear that Plaintiff was not discussing the Bailey murder, and a reasonable jury could find that Defendants fabricated these aspects of the reports, too. *Caldwell*, 889 F.3d at 1115; *see also Jones*, 873 F.3d at 1127 n.1.

Defendants further fabricated Plaintiff's interrogation statements themselves by suggesting facts to Plaintiff and even using their questions to wrongly attribute to her statements that she did not make, including that the attack occurred a couple weeks before she was arrested, and that she "completely lost it" when she cut her attacker. PSOF ¶¶ 85-86, 111. Defendants knew that Blaise was vulnerable to their suggestive interrogation techniques—they had started the interrogation by referring to her abuse as a child and emotionally manipulating her. *Id.* ¶¶ 59, 61, 87-88. In addition, Defendants went through Blaise's entire explanation of her attack before turning on the recording device to try to control the statement and obtain, on the recording, just the information they wanted. *Id.* ¶¶ 67, 70. Defendants refused to ask what they knew were necessary follow-up questions when Blaise reported things that were inconsistent with the Bailey

murder, and they further refused to ask Blaise questions to elicit key information about her attack. *Id.* ¶ 84. Defendants knew that this misconduct would result in a contaminated and unreliable statement from Blaise, but nonetheless fabricated a statement they could falsely label a "confession." *Id.* ¶¶ 82, 84.

In short, Defendants fabricated evidence by making numerous misrepresentations and intentional omissions in their reports regarding the key facts of the Bailey murder and Blaise's attack, creating a false narrative that Blaise confessed to a crime that, in reality, is starkly different from the incident she described to Defendants in which she was the victim of an attempted rape. *Spencer*, 857 F.3d at 799-800 ("[A]n interviewer who deliberately mischaracterizes witness statements in her investigative reports … commits a constitutional violation." (quoting *Costanich*, 627 F.3d at 1111)).

### 2.    A Reasonable Jury Could Easily Find Sufficient Evidence of Fabrication by Looking at the Direct and Circumstantial Evidence

In addition to direct evidence of fabrication, there is ample evidence from which a jury (evaluating all the evidence, including the evidence just discussed) could easily find for Plaintiff under one of the "circumstantial evidence" theories of fabrication.

To begin, there is substantial evidence Defendants knew Plaintiff was innocent of the Bailey murder but continued their investigation and efforts to frame her despite this knowledge. *See Devereaux*, 263 F.3d at 1076. There is significant evidence that Defendants knew Blaise had not been involved in the July 8 Bailey murder on the west side of Las Vegas at the Nevada State Bank during her interrogation, but rather a wholly independent attempted rape over Memorial Day weekend on the opposite side of town at the Budget Suites, as discussed above. PSOF ¶¶ 80-81. The "who," "what," "when," "where, and "why" of each incident did not match. *Id.* The events were apples and oranges. In other words, the evidence described above is sufficient to permit a reasonable jury to conclude Defendants knew Plaintiff was innocent, but arrested and prosecuted her anyway.

But there is more. In a stark departure from established policing procedures, Defendants refused to conduct an honest investigation—for example, by taking steps to confirm that Plaintiff was describing to them an event that had nothing to do with Bailey, and that she had told people about before Bailey was even murdered—and instead wrote their reports falsely implicating Plaintiff in a crime she did not commit.[8] A reasonable jury could conclude that Defendants knew or should have known they were arresting and prosecuting the wrong person but did so anyway from the direct evidence above and additional circumstantial evidence including:

- During the interrogation, Plaintiff was describing a separate attack, but Defendants refused to ask obvious and necessary follow-up questions, even in the face of glaring inconsistencies like Plaintiff's statement that the attack occurred over a month before her interrogation. *Id.* ¶¶ 84, 112, 114. Instead of asking these obvious questions, a departure from established policing standards, Defendants suggested facts of the Bailey homicide to Blaise and caused her to doubt her own recollection of the event, something they knew would contaminate her statement and result in a misleading and inaccurate record. *Id.* ¶¶ 82, 84-85, 87. Defendants also knew that there was no physical evidence tying Plaintiff to the murder of Bailey despite the extremely violent nature of his death. *Id.* ¶¶ 93-94. Physical evidence at the scene—including bloody footprints and fresh tire marks— confirmed that Blaise was not responsible for the murder. Defendants purposely

---

[8] It is well established that departures from established policing practices can serve "as circumstantial evidence" of the officer's "state of mind and to show that [the officer's] failure[s] "deviated far from the norm of what would be expected of a reasonable police officer in the Detectives' position." *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (citing, among other authorities, *Jimenez v. Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013)). Indeed, police practices testimony is helpful because it "can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez*, 732 F.3d at 721-22. Under these authorities, and others (*e.g.*, *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017), and *Smith v. Hemet*, 394 F.3d 689, 703 (9th Cir. 2005), Defendants attempt to render Plaintiff's police-practices expert evidence irrelevant is erroneous. The failure of Defendants to adhere to these accepted policing practices—to conduct honest, meaningful follow-up instead of rushing to arrest Plaintiff—is powerful circumstantial evidence of their *mens rea* and that precludes summary judgment as well. *Mellen*, 900 F.3d at 1104-05.

44

ignored the physical evidence and refused to request testing of key pieces of evidence, like the sexual assault kit, the cigarette butts found on Bailey's body and under the plastic wrapped around his body, and the trash wrapped around his abdomen—evidence which they knew was likely to further cement her innocence. *Id.* ¶¶ 35, 93-95.

- Defendants were also aware that multiple witnesses stated that Blaise told them about the attack she suffered in Las Vegas *before* July 8, the date of Bailey's murder, and that Blaise was in Panaca the week of July 2. *Id.* ¶¶ 94, 96, 118a. Despite this and the clear evidence that Blaise was discussing an attempted rape at the Budget Suites on Memorial Day weekend, the Defendants took no steps to investigate whether a man was stabbed at the Budget Suites in late May or early June, whether Blaise was actually in Panaca at the time of Bailey's murder, and whether other known possible suspects might have committed the Bailey murder. *Id.* ¶¶ 94, 98-99.

- Defendants refused to ask Blaise and numerous key third parties about Blaise's whereabouts on the date of the murder or otherwise take any steps to determine that piece of information. *Id.* ¶¶ 84a, 94c, 96.

In sum, a reasonable jury could conclude that Defendants actively avoided obtaining evidence that likely would have shown Plaintiff had absolutely no involvement in the Bailey murder, instead relying on their misleading and fabricated reports of a cursory, vague, and suggestive interrogation to cause Plaintiff to be prosecuted for a crime they knew she did not commit.

### B. Defendants' Fabrication Caused Plaintiff's Deprivation of Liberty

To establish causation, Plaintiff need only demonstrate that the evidence fabricated by Defendants contributed to Plaintiff's deprivation of liberty in some way. *See Whitlock v. Brueggemann*, 682 F.3d 567, 580-83 (7th Cir. 2012). Proximate cause exists where "the injury is of a type that a reasonable person would see as a likely result of the conduct in question."

*Spencer*, 857 F.3d at 798 (citing *Whitlock*, 682 F.3d at 582-83). The Supreme Court long ago held § 1983 must be read "against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 189 (1961); *see Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) (finding causation with regard to statements submitted in a criminal prosecution because police officers "are generally responsible for the 'natural' or 'reasonably foreseeable' consequence of their actions").

Under these rules, "a § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Caldwell*, 889 F.3d at 1115 (citing *Devereaux*, 263 F.3d at 1074-75, and Ninth Cir. Jury Instr. § 9.33). As a result, police conduct that becomes part of the "evidentiary record" in the authorization of the charges against the plaintiff is sufficient to permit a jury to find causation. *Id.* at 1117*; see also Gregory v. City of Louisville,* 444 F.3d 725, 741 (6th Cir. 2006) (holding that officer's investigatory notes "were the result of pretrial fabrication efforts by [the officers]," and "comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents. … Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution."). Thus, officers who submit false reports "to the prosecutor may be held liable for damages incurred as a proximate result of those reports." *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

The question of causation is intensely factual and generally a question for the jury. *See Pac. Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142, 1168 (9th Cir. 2013) (explaining that causation "is an intensely factual question that should typically be resolved by a jury.") (citing *White v. Roper*, 901 F.2d 1501, 1505-06 (9th Cir. 1990)).

Here, there is no dispute that Defendants' fabricated evidence was provided to the prosecutors and, as a result, a reasonable jury could conclude that Defendants' fabrication contributed to and caused Plaintiff's injury. Defendants used the fabricated Arrest Report as the basis for arresting Plaintiff and submitted that Arrest Report to a magistrate in an effort to seek a

preliminary hearing regarding whether there was probable cause to charge Plaintiff with the murder of Duran Bailey. PSOF ¶¶ 115, 118. That effort was successful, a preliminary hearing was held on the basis of the fabricated report, and Plaintiff was ultimately charged with that crime. *Id.* Defendants also submitted their fabricated Arrest Report and Officer's Report to the prosecutors with the rest of their homicide binder. *Id.* ¶ 116. The prosecutors received and reviewed that information as part of their decision to prosecute Blaise, and a jury could conclude this information infected the prosecutor's evaluation of the evidence and the case. *Id.* In fact, Defendants concede that the prosecutors relied on the Officer's Report and used it as a basis for bringing charges. Dkt. 67 at 73. Moreover, fabricated statements were discussed at trial. *See* PSOF ¶¶ 116, 121. As a result, there is sufficient evidence from which a jury could conclude that Defendants' fabrications caused Plaintiff's prosecution and deprivation of liberty. *Caldwell*, 889 F.3d at 1117; *Blankenhorn*, 485 F.3d at 482.[9]

Defendants argue that the presumption of prosecutorial independence breaks the chain of causation between Defendants' fabrications and Plaintiff's injury. Dkt. 67 at 72. There are several problems with this argument.

First, the presumption of prosecutorial independence does not apply to a fabrication of evidence claim, only one under the Fourth Amendment (traditionally called malicious prosecution). *See, e.g.*, *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). In that

---

[9] Defendants may argue that the prosecutors also received the transcript of Plaintiff's statement, and therefore knew that Defendants included misrepresentations and material omissions in their reports. But Defendants' reports included fabricated statements that Defendants falsely represented as being made during unrecorded portions of their interrogation of Blaise. PSOF ¶¶ 107, 111, 114. And, as discussed above, Defendants fabricated portions of the recorded statement itself by suggesting facts regarding the Bailey murder to Blaise and wrongly attributing, through their questions, inaccurate statements to her. For example, Defendants stated during the interrogation that she was "explaining to [them] what happened a couple weeks ago." *Id.* ¶ 114. But Blaise never said this and did not correct the statement because she did not know they were interrogating her about a murder that occurred on July 8 and so did not understand this needed to be corrected. *Id.* But Defendants were aware of this discrepancy because Blaise told them the attack occurred over a month before the interrogation. *Id.* ¶¶ 80c, 114. Finally, the prosecutors likely relied on Defendants' misrepresentation that Blaise was confused about where the attack occurred and did not remember what happened during the attack given that they spoke with Blaise both before and after the recording and spent hours with her in person at her house in Panaca, on the drive to Las Vegas, and at the jail. *See id.* ¶¶ 116-17.

47

context, discussed below, the question is whether the post-arrest detention is authorized by something other than the original probable cause after there has been some judicial process. However, the introduction of fabricated evidence—at any proceeding and at any moment along the way in the criminal prosecution—taints the entire process, regardless of its form and regardless of whether the prosecutors knew about it. *Cf. Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (fabricated evidence violates "the fundamental conceptions of justice which lie at the base of our civil and political institutions.") (citing *Hebert v. Louisiana*, 272 U.S. 312, 316 (1926)); *Napue v. Illinois*, 360 U.S. 264 (1959) ("The principle that a State may not knowingly use false evidence … to obtain a tainted conviction" is "implicit in any concept of ordered liberty[.]"); *Miller v. Pate,* 386 U.S. 1, 7 (1967) (explaining that the "Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence" and "[t]here has been no deviation from that established principle."). As a result, the existence or not of probable cause is irrelevant to whether evidence has been fabricated, and so is the question of whether any prosecutorial judgment alters the probable cause analysis. *See Spencer*, 857 F.3d at 801 (concluding that "a lack of probable cause to prosecute a defendant is not an element of a deliberate-fabrication claim" and rejecting the contention that a plaintiff must "prove that, setting aside the fabricated evidence, probable cause was lacking").

Second, given the principles above—and from *Monroe v. Pape* itself—the entire point of fabricating these reports was to convince (and, in essence, trick) the prosecutors into prosecuting Plaintiff. The "natural consequences" of fabricating these reports is their use by prosecutors; they were not intended or expected to be left sitting in a drawer, unused. Knowing that, Defendants cannot insulate themselves from liability for the natural consequences of their fabrications, when that was the point in the first place.

Third, at any rate, and assuming *arguendo* prosecutorial discretion mattered at all, Defendants' argument is belied by the record, which Defendants and the Court must take in the light most favorable to Plaintiff at this stage. Under this doctrine, there is sometimes a presumption that the prosecutor filing the complaint exercised independent judgment in

determining *probable cause* (again, confirming this is a Fourth Amendment concept, not a concept for Due Process), thus potentially breaking the chain of causation between the officers' fabrication in initiating pretrial seizure and the plaintiff's injury; but this presumption is overcome if the officers "knowingly provide misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy*, 368 F.3d at 1067; *accord Caldwell*, 889 F.3d at 1116-17 ("[I]f a plaintiff establishes that officers either presented false evidence to or withheld crucial information from the prosecutor, the plaintiff overcomes the presumption of prosecutorial independence and the analysis reverts back to a normal causation question"). The presumption is easily overcome here.

For one, the fabricated reports discussed in detail above were provided to the prosecutors in this case and were part of their assessment regarding whether to prosecute the case. PSOF ¶¶ 116-17. Second, Defendants provided the fabricated Arrest Report to a magistrate as part of the initial step to determine whether there was probable cause to charge Plaintiff with the Bailey murder of Duran Bailey. *Id.* ¶¶ 114, 118. A preliminary hearing was granted and held based on the magistrate's review of the fabricated information in the arrest report. *Id.*

The August 7, 2001 preliminary hearing itself involved fabricated statements and material omissions from Defendant Thowsen, upon which the Court relied to determine there was probable cause to bring charges against Plaintiff. *Id.* Most notably, Thowsen testified, when asked, that Plaintiff did not know when her attack occurred. *Id.* ¶ 118f. This is a clear falsehood in light of the fact that Blaise told him the attack occurred well over a month before her interrogation—something Thowsen knew undermined any belief that Blaise was confessing to the Bailey murder. *Id.* ¶¶ 84a, 109e, 113e. And by August 7, 2001, Thowsen knew that multiple other witnesses corroborated Blaise's statement to them that her attack occurred over a month prior to her interrogation. *Id.* ¶ 96. For example, Blaise had told two friends in Panaca about her attack before July 8, and Pyszkowski confirmed that Blaise left her car at Davis's house in late

May or early June, meaning her attack occurred in late May or early June. *Id.* ¶¶ 81d, 118. But Thowsen withheld this important information. *Id.* ¶ 118i.

Thowsen also testified that Blaise said the attack occurred in a park lot near Sam's Town by Flamingo and Boulder Highway. *Id.* ¶ 118d. But Blaise never mentioned Flamingo (the street on which Bailey's attack occurred) and Thowsen withheld Blaise's detailed description of where the attack occurred, creating an impression that Plaintiff did not know where the attack actually occurred. *Id.* Thowsen also stated that Blaise told him the cell she was held in after her arrest looked like the location where she was attacked and that when she cut her attacker she "snapped" and could not remember anything else that happened. Blaise made neither of these statements, which Thowsen included to make it appear that Blaise was describing Bailey's murder in the dumpster enclosure, and that she lost control and engaged in a vicious attack that she did not recall, rather than defending herself by cutting her attacker once in an open parking lot and then driving away while her attacker was still alive. *Id.* ¶ 118g. And when the prosecutor asked Thowsen for Blaise's description of her attacker and asked pointed questions about whether this description matched Bailey, Thowsen made an omission—he failed to mention that Blaise said her attacker was a giant compared to her, something that clearly pointed away from Bailey. *Id.* ¶ 118b. Given these and other misrepresentations and omissions affirmatively made by Thowsen at the probable cause hearing, there can be no presumption of prosecutorial independence in this case. *See Caldwell*, 889 F.3d at 1116 ("Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independent. … [I]f a plaintiff establishes that officers either presented false evidence to or withheld crucial information from the prosecutor, the plaintiff overcomes the presumption of prosecutorial independence and the analysis reverts back to a normal causation question.").

Defendants additionally argue that Plaintiff's claim fails because one of the district attorneys who was involved in the criminal trials was unaware of any evidence of Defendants fabricating or withholding evidence, and because the district attorney believed and still believes there was probable cause to prosecute Plaintiff for the murder of Duran Bailey. Dkt. 67 at 73.

This actually proves the point: the Defendants did not disclose their fabrications, which is why there is no "independent" honest judgment in the first place. *Caldwell*, 889 F.3d at 1117-18 (concluding that the fabricated evidence may have infected the prosecutor's review of the evidence and therefore rebutted any presumption that the decision to charge was independent).

The reliance on the trial prosecutor is also a red herring. Plaintiff contends there was no probable cause to arrest and prosecute her but, even if there was, that would not impact Plaintiff's fabrication claim. *See Spencer*, 857 F.3d at 801. Plaintiff has a constitutional right not to be charged and prosecuted based on fabricated evidence regardless of whether probable cause exists absent the fabricated evidence. *Id*.; *Halsey v. Pfeiffer*, 750 F.3d 273, 292-93 (3d Cir. 2014) (even where probable cause exists, "we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").

Because a reasonable jury can find Defendants fabricated evidence that caused her harm, Plaintiff's claim must go to a jury to decide these factual disputes.[10]

### C. Defendants Are Not Entitled to Qualified Immunity

Defendants contend that they are entitled to qualified immunity regarding Plaintiff's due process claim because there is no clearly established law that officers can be held liable for "failing to believe a witness's story." Dkt. 67 at 74. This argument is premised on a fundamental

---

[10] Defendants also argue that Plaintiff's expert Sue Peters testified that *all* exculpatory evidence was contained in the Arrest Report. Dkt. 67 at 71 (citing Dkt. 67-57 at 80-81). But Defendants misrepresent Peters' deposition testimony. Peters stated simply that specific exculpatory evidence—that specific individuals in Panaca learned about Plaintiff's attack before July 8 and the murder of Duran Bailey—was contained either in the Officer's Report or in their recorded statements. Dkt. 67-57 at 80-81. Peters does not suggest that all exculpatory information known to Defendants was included in the Officer's Report. *Id.* Defendants also state that Peters was unaware of any evidence that was fabricated or withheld. Dkt. 67 at 72. But again, Peters testified that Defendants spun or misrepresented the evidence and failed to accurately document what was said during their interrogation. Dkt. 67-57 at 72-74. Regardless, the scope of Peters' opinions do not limit what Plaintiff can prove based on the evidence in this case. Similarly, Defendants misrepresent Plaintiff's testimony when they write that she failed to identify any evidence that was knowingly fabricated or withheld, and that she "admits that she has never been told of such evidence." Dkt. 67 at 72. Plaintiff testified that Defendants fabricated her statement by making it "something that it wasn't" and that Thowsen did not follow up regarding whether other penis injuries had occurred in the Las Vegas area in May or June. Dkt. 67-27 at 196. Regardless, and again, Plaintiff's personal knowledge of Defendants' misconduct does not limit what can be proved by the evidence in this case.

disagreement with Plaintiff's facts and arguments, and seriously misconstrues (against Plaintiff) the record in this case. The evidence taken in the light most favorable to Plaintiff shows that Defendants knew that Plaintiff had absolutely no involvement in the Bailey murder. PSOF ¶¶ 35-114. With this knowledge, Defendants carefully misrepresented Blaise's statement about an attempted rape she suffered Memorial Day weekend as a confession to the Bailey murder, including in their official reports. *Id.* ¶¶ 104-114. Given Defendants' knowledge and the nature of the misrepresentations, a jury could conclude these misrepresentations were not trivial or careless.

Defendants do not and cannot dispute that the law was clearly established in 2001 that Plaintiff had a constitutional right not to be subjected to criminal charges based on fabricated evidence. Dkt. 67 at 74; *see Devereaux*, 263 F.3d at 1074-75; *Cunningham v. City of Wenatchee*, 345 F.3d 802, 811 (9th Cir. 2003) (finding the right clearly established in 1994). Defendants are not entitled to qualified immunity.

## II.    Plaintiff Is Entitled To A Trial On Her Fourth Amendment Detention Absent Probable Cause Claim

The Fourth Amendment protects individuals from pretrial detention absent probable cause. This right is implicated both before and after the onset of criminal proceedings. *Manuel v. City of Joliet*, 137 S. Ct. 911, 918-19 (2017). In order to proceed on this claim, Plaintiff need only demonstrate that: (1) her detention was made in the absence of probable cause, and (2) Defendants proximately caused the unlawful detention. *See id.* Here, Plaintiff has provided ample evidence to support this claim.[11]

### A.    Plaintiff Was Detained without Probable Cause

As discussed above, there was no probable cause to arrest and detain Plaintiff for the Bailey murder. *See supra*, PSOF ¶¶ 56, 89. Defendants knew that, during her interrogation, Plaintiff was describing an attempted rape that occurred on Memorial Day weekend on the east

---

[11] Defendants do not raise any argument that Plaintiff's right to be free from detention absent probable cause was not clearly established in 2001. The argument has been waived and Plaintiff does not address qualified immunity for this claim.

side of Las Vegas where she defended herself, escaped, and drove away in her car while her attacker was still alive. *Id.* ¶¶ 80-81. Defendants knew her description of the event completely contradicted the brutal July 8 murder of Bailey on the west side of Las Vegas. *Id.* The glaring inconsistencies between Blaise's statement about her attack and the facts of the Bailey murder belie any reasonable belief that Blaise had any involvement in that crime. *See Hart v. Parks*, 450 F.3d 1059, 1065 (9th Cir. 2006) ("Probable cause exists when 'the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'") (quoting *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001)). The evidence obtained between Plaintiff's interrogation and the probable cause determination at the preliminary hearing only further cemented that Plaintiff was not involved in the Bailey homicide and in fact was three hours away in Panaca at the time. *See* PSOF ¶¶ 88-103. Moreover, Defendants' actions during and after the interrogation of Blaise—refusing to ask obvious and necessary follow-up questions, misrepresenting and omitting material evidence in their reports, and refusing to take standard and obvious investigatory steps—only confirms that they knew Plaintiff was not involved in the murder, but chose to rely on a misrepresentation of her statement and not seek evidence that they knew would show her innocence. *Id.* ¶¶ 61-114. In short, Defendants arrested Plaintiff without probable cause, and then caused her pretrial detention by making false statements and material omissions to the prosecutors, the magistrate, and the court at the preliminary hearing.

### 1.    Collateral Estoppel Has No Application Here

Defendants assert that Plaintiff is collaterally estopped from pursuing her Fourth Amendment detention-without-probable-cause claim because there was a finding of probable cause at her preliminary hearing. Dkt. 67 at 75-76. But this misunderstands the law.

At the threshold, federal law and not state law governs the application of collateral estoppel where there is no extant state-court judgment. That is because, in federal-question cases,

federal courts are required only "to give preclusive effect to state court *judgments.*" *Allen v. McCurry*, 449 U.S. 90, 96-98 (1980) (emphasis added); *accord Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81-81 (1984). In this case, however, Blaise's murder conviction was vacated and is no judgment at all. In the absence of a state-court judgment, federal law controls, and under federal law, a vacated criminal judgment "cannot serve as the basis for a disposition on the grounds of res judicata or collateral estoppel." *Mills v. Covina*, 921 F.3d 1161, 1170 n.2 (9th Cir. 2019); *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 762 (9th Cir. 1991); *Ornellas v. Oakley*, 618 F.2d 1351, 1356 (9th Cir. 1980); *see also* Wright & Miller, Fed. Prac. & Proc. § 4427 ("Judicial actions must achieve basic minimum quality to become eligible for res judicata effects. First, there must be a judgment."); *id.* §4432 ("Once … the judgment is vacated, preclusion is of course defeated[.]"); *id.* § 4433 ("A second judgment based upon the preclusive effects of the first judgment should not stand if the first judgment is reversed.").

Federal courts across the country have rejected Defendants' precise argument—that a judicial determination in an original proceeding is a barrier to one in a subsequent civil suit where there is no extant judgment. *See, e.g., Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006) (calling this argument "absurd"); *Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019); *O'Connell v. Alejo*, 2020 WL 1244852, at *4 (D. Colo. Mar. 16, 2020); *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 393 (N.D.N.Y. 2018).

Moreover, even if Nevada law were somehow applicable, the result is the same. Like federal law, Nevada recognizes there can be no subsequent estoppel where there is no extant judgment. *Horvath v. Gladstone*, 637 P.2d 531, 533 (Nev. 1981) (essential to application of preclusion is "a final judgment on the merits."); *see also Holt v. Regional Trustee Servs. Corp.*, 1266 P.3d 602, 605 (Nev. 2011) (affirming basic principle that only a final *judgment* can have preclusive effect)*; In re Sandoval,* 232 P.3d 422, 424 (Nev. 2010) (same); *Bower v. Harrah's Laughlin, Inc.,* 215 P.3d 709, 718 (Nev. 2009) (same); *Alcantara ex rel. Alcantara v. Wal-mart Stores, Inc.,* 321 P.3d 912, 918 (Nev. 2014) (same).

Further still, the Nevada Supreme Court has ruled that the "doctrine of collateral estoppel is not concerned with interlocutory rulings," *Woods v. City of Reno*, 2018 WL 493015, at *10 (D. Nev. Jan. 18, 2018) (citing *Bull v. McCuskey*, 615 P.2d 957, 960 (Nev. 1980)*, overruled on other grounds by Ace Truck v. Kahn*, 746 P.2d 132 (1987)). As a result, under Nevada law, a finding of probable cause in a preliminary hearing does *not* preclude a plaintiff from litigating the issue in a subsequent tort suit. *See Scafidi v. LVMPD*, 966 F.3d 960, 963 (9th Cir. 2020) ("[T]he Nevada Supreme Court recognized that a probable cause determination in a preliminary hearing does not preclude a plaintiff from litigating that issue in a subsequent suit.") (citing *Jordan v. State ex rel. Dep't of Motor Vehicles and Pub. Safety*, 110 P.3d 30, 48-49 (Nev. 2005)).

Finally, estoppel is an equitable doctrine. Given the significant information now known, it would be inequitable to apply the initial probable cause determination (based upon fabricated evidence) against Plaintiff—who was, herself, merely trying to put together the pieces of her life after being sexually assaulted as a teenager and having the bravery and wherewithal to survive. *Scafidi*, 966 F.3d at 963-64.

### 2. Probable Cause Cannot Be Based upon Fabricated Evidence

Because the preliminary hearing was based upon fabricated evidence and material omissions, *supra*, PSOF ¶¶ 115, 118, it has no bearing on whether there was probable cause for Plaintiff's pretrial detention. *See Manuel,* 137 S. Ct. at 920 n.8 ("[I]f the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights."); *Scafidi*, 966 F.3d at 963-64 (the *prima facie* evidence of probable cause that emerges from a preliminary hearing probable cause determination is overcome by a showing that an officer lied in his report or at the probable cause hearing). Defendants' argument fails.

Accordingly, Defendants' argument that the Court can conclude, based on the assertions made by Defendants themselves in the Arrest Report, that there was probable cause for Plaintiff's detention is meritless. Dkt. 76 at 85. And, as discussed in detail above, this report contains numerous falsehoods. Dkt. 67-40 at 25-27; PSOF ¶¶ 106-109. To determine whether

probable cause existed, the Court must look to what the Defendants knew at the time, which, as discussed above, is that Plaintiff did *not* confess to the Bailey murder, but instead explained that she was the victim of a sexual assault that occurred over a month earlier on the opposite side of town; Defendants also knew that there was no evidence connecting her to the Bailey murder. PSOF ¶¶ 80-103.

Moreover, the factual assertions identified by Defendants in their summary judgment motion would not allow a prudent person to believe Blaise had killed Bailey; instead, they boil down to the single fact that Plaintiff said she once swiped and cut at a living man's penis, which they want to equate to the fact that, Bailey's penis had been completely severed *postmortem*, after suffering an extensive, violent and extreme attack that fractured his skull and other bones. Dkt. 67 at 76. This is absurd. Defendants' assertion of probable cause boils down to one thing: two penises were cut in some way. But, to say these events were apples and oranges puts them in too close of a comparison and no reasonable person would think that describing a single cut in defense is anything like the torture and dismemberment Bailey tragically suffered.

### 3. Plaintiff's Police Practices Expert Cannot Decide, or Opine on, an Issue of Law (and Defendants Misconstrue Her Testimony)

Defendants also argue that the testimony of Plaintiff's police practices expert entitles them to summary judgment. They are mistaken. First, it is well established that experts cannot provide testimony that amounts to "legal conclusions as to the ultimate issues in the case," which are "impermissible subjects for expert testimony"; it would be reversible error to allow an expert to supplant, via opinion testimony, the issue of whether or not, as a matter of law, a reasonable jury could find there was no probable cause to arrest Plaintiff. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1214 n.11 (9th Cir. 2008); *see also Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law."). Indeed, in *Torres*, the Ninth Circuit specifically held it was reversible error for an expert to offer a legal conclusion as to the existence of probable cause. 548 F.3d at 1214 n.11; *see also Tubar v. Clift*, 2009 WL 1325952, at *3 (W.D. Wash. May 12, 2009) (excluding legal conclusion about probable cause).

Second, Defendants' claim that Plaintiff's expert testified during her deposition that Defendants had probable cause to arrest Blaise based on her statements during her July 20 interrogation is untrue. Dkt. 67 at 76. Peters repeatedly testified to the exact opposite. *See, e.g.*, Dkt. 67-57 at 54 (opining that, based on her experience and training, the information obtained during the interrogation was insufficient to find probable cause), 111-12 (similar), 77 (refusing to agree that Defendants had probable cause to arrest Plaintiff and correcting that "Defendants were able to *craft* a probable cause statement to what they believe was her involvement in the murder of Duran Bailey"). Defendants' claims misrepresent the evidence and construe testimony *against* plaintiff rather than in her favor, which is impermissible at the summary judgment stage. *See Jones*, 873 F.3d at 1127 n.1. Peters testified that the Defendants were able to "*articulate* that they had probable cause"; not that they *actually had it*. Dkt. 67-57 at 34. That is perfectly consistent with Plaintiff's entire theory of the case; in short, that Defendants were able to misrepresent the evidence in their reports and testimony to portray Plaintiff's statements as a confession to the murder when they were not. *Id.* at 34. Peters' testimony was far more critical of Defendants than they maintain; she criticizes their *articulation* of probable cause as being misleading and a departure from established policing standards. *Id.* at 52 (explaining that "each officer or detective, in my opinion, can creatively write what they believe their probable cause is," but the statement from Blaise clearly showed that "there's two different events being talked about" and additional information would have been necessary to address that contradiction), at 50-51 (discussing what is appropriately considered as probable cause, including that one must consider the pros and the cons for probable cause, but not discussing whether probable cause was established in this case).

**III.    A Jury Must Decide Plaintiff's Conspiracy Claim[12]**

"To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999)). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some "facts probative of a conspiracy." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983); *see also Mendocino Envtl. Ctr.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999). An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants" meaning, "[f]or example, a showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy." *Mendocino*, 192 F.3d at 1301-02 (quoting *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir. 1991)). In addition, while each participant must "share the common objective[,] … each participant in the conspiracy need not know the exact details of the plan." *Franklin v. Fox*, 312 F.3d 423, 441 (9th. Cir. 2002); *see United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir.1989) (*en banc*). The existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding to achieve the conspiracy's objectives.'" *Mendocino*, 192 F.3d at 1301-02 (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979)). Likewise, where there is a question about a defendant's intention or state of

---

[12] Defendants do not develop any separate argument regarding Plaintiff's Nevada civil conspiracy claim beyond citing the state law conspiracy standard. Dkt. 67 at 79. For the following reasons, Plaintiff's state law conspiracy claim must be decided by a jury because there is ample evidence in the record that Defendants shared an agreed objective to fabricate evidence against Plaintiff and cause her wrongful prosecution for the murder. Additionally, to the extent that Defendants argue that the intracorporate conspiracy doctrine applies under Nevada law, they have provided no authority to suggest that Nevada law recognizes that doctrine. Research by Plaintiff's counsel similarly revealed none.

mind, this is also a factual issue "inappropriate for resolution by summary judgment." *Id.* at 1302 (quoting *Braxton-Secret v. Robins Co*., 769 F.2d 528, 531 (9th Cir. 1985)).

Here, there is ample evidence in the record for a jury to conclude that Defendants engaged in a conspiracy to violate Plaintiff's due process and Fourth Amendment rights. Defendants were the two Detectives assigned to investigate the Duran Bailey murder and they worked together as partners. PSOF ¶ 33. Before July 20, 2001, Defendants refused to meaningfully investigate any suspects in the Bailey murder. *Id.* ¶ 49. On July 20, they learned that Plaintiff had been the victim of an attempted rape in Las Vegas, and that she defended herself from that rape. *Id.* ¶ 50. Defendants then interrogated Plaintiff, who told them about the attempted rape that she suffered at a Budget Suites on the east side of Las Vegas over Memorial Day weekend. *Id.* ¶¶ 57-58. Plaintiff told them that she cut the attacker once, the attack occurred in the open parking lot of the Budget Suites off Boulder Highway and Nellis, and the attack occurred over a month before the interrogation. *Id.* ¶¶ 80-81. Plaintiff told Defendants that her attacker was a "giant," and when she drove away in her car her attacker was crying. *Id.* ¶¶ 80a, 109b, 111, 113f. Defendants knew this was not a confession to the murder of Bailey that occurred on July 8 on the west side of Las Vegas in a trash enclosure near the Nevada State Bank, during which Bailey was severely beaten, stabbed, and mutilated *postmortem. Id.* ¶¶ 29, 80-81.

Despite the significant inconsistencies between the two incidents, Defendants refused to ask obvious and important follow up questions that they knew they needed to ask in order to reach the truth of the matter. *Id.* ¶ 84. Nor did Defendants take necessary investigative steps, including interviewing important witnesses and testing significant evidence, to obtain information that would have shed light on Plaintiff's innocence or the possible culpability of other likely suspects. *Id.* ¶¶ 92-99. They refused to do this even when information emerged from witnesses that Blaise had told them about her attack before the Bailey murder and that she was in Panaca at the time of the attack. *Id.* ¶ 81d. Moreover, Defendants took careful steps to manipulate the facts in order to create the record they wanted: they threw away all of the detailed

1 and meticulous notes they took during each interview and throughout the investigation, and they

2 talked through each witness's statements with them before turning on the recorder and asking

3 careful questions designed to get the answers they wanted. *Id.* ¶¶ 100-103. A jury could easily

4 conclude that Defendants worked together with a shared goal to cause Plaintiff's criminal

5 prosecution and criminal conviction based on fabricated evidence and absent probable cause. *See*

6 *Mendocino*, 192 F.3d at 1301-02.

7          Defendants argue that Plaintiff's conspiracy claim must fail because she has not provided

8 evidence supporting an underlying constitutional violation. Dkt. 67 at 79. But for the reasons

9 discussed above with regard to Plaintiff's Due Process and Fourth Amendment claims, this

10 argument fails.

11          Second, Defendants argue that the record lacks any evidence to show a conspiracy. This

12 argument is without merit. Defendants ignore the ample misconduct discussed above and

13 misrepresent the record. For example, they assert that Plaintiff's expert opined that *all*

14 exculpatory evidence was included in the Detective's Officer Report and the witness's voluntary

15 statements. Dkt. 67 at 79. But the deposition testimony cited does not support this incorrect

16 contention. *See supra*, n.11. Defendants also argue that, at bottom, Plaintiff's claim is that

17 Defendants "misunderstood or misinterpreted her confession." Dkt. 67 at 79. But Defendants

18 misunderstand or misrepresent Plaintiff's argument. Plaintiff contends that Defendants knew

19 Plaintiff was not confessing to the murder and that there was no evidence linking her to that

20 crime; despite this, they manipulated her confession, fabricated, and omitted material

21 information in their reports, and conducted their investigation so as to avoid additional evidence

22 of the truth: that Plaintiff had no involvement in the Bailey murder. Indeed, whether Defendants

23 misunderstood Blaise's statement as a confession to the Bailey murder or knew that it was not a

24 confession to that crime is a quintessential jury question that must be resolved in Plaintiff's favor

25 at this stage. *See Mendocino*, 192 F.3d at 1302. Defendants' disagreement with Plaintiff's

26 version of the facts cannot support summary judgment, and given that all evidence and

27 inferences must be taken in the light most favorable to Plaintiff, this claim must go to a jury.

Finally, Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine and therefore fails as a matter of law. For good reason, the Ninth Circuit has never applied that doctrine to § 1983 conspiracy claims and has repeatedly allowed § 1983 claims alleging conspiracies against individuals from the same corporate entity to go forward. *See*, *e.g.*, *Dirks v. Martinez,* 414 F. App'x 961, 963 (9th Cir. 2011) (denying qualified immunity on conspiracy claim against three Los Angeles County sheriff deputies); *Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013) (reversing grant of summary judgment with regard to claim that officers from the same law enforcement agency conspired to abuse their power as law enforcement officers and violate her constitutional rights); *Baldwin v. Placer Cty.*, 418 F.3d 966, 970-71 (9th Cir. 2005) (upholding denial of summary judgment with regard to conspiracy claim against officers of the same entity); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999) (upholding jury verdict finding unlawful conspiracy to violate constitutional rights against a group of officers and employees of the City); *cf. Harris v. Roderick*, 126 F.3d 1189, 1195-96 (9th Cir. 1997) (upholding denial of motion to dismiss and qualified immunity on *Bivens* conspiracy claim against federal law enforcement agents).

The intracorporate conspiracy doctrine originated in the antitrust context and derived from the unique nature of conspiracies in that context. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1868 (2017); *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1325-28 (N.D. Cal. 1988) (noting that the doctrine "derived from the special nature of antitrust law," that antitrust conspiracies "are a unique breed", and explaining in detail why the rationale behind the doctrine does not fit with civil rights cases and should not be extended to conspiracy claims in the civil rights context). The doctrine provides that "an agreement between or among agents of the same legal entity, when the agents act in their *official capacities*, is not an unlawful conspiracy" because "[w]hen two agents of the same legal entity make an agreement in the course of their *official duties*, … as a practical and legal matter their acts are *attributed to their principal*." *Ziglar*, 137 S. Ct. at 1867 (emphasis added). This means there are not the required two or more separate persons to form a conspiracy. *Id.*

The nature of § 1983 claims precludes an application of the doctrine to those claims. As the Supreme Court noted in *Ziglar*, the logical foundation of the intracorporate conspiracy doctrine is that agents of a corporate entity act on behalf of their principal, and their individual actions will be imputed to the corporate entity. That premise does not apply in the context of § 1983 claims, where *Monell* and subsequent jurisprudence conclusively hold that actions of municipal employees *cannot* be imputed to the municipality. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). In other words, the fundamental premise of the intracorporate conspiracy doctrine—that the actions of the agent are imputed to the principal—cannot apply to §1983 actions. To conclude otherwise—that the intracorporate conspiracy doctrine shields the individual Defendants from liability—would be to hold, in effect, that LVMPD is vicariously responsible for their conduct. This result is impossible to square with *Monell* and logically forecloses applying the doctrine here.[13]

Defendants argue, at the very least, they "enjoy qualified immunity on the issue because the law is not clearly established as to whether such a claim exists." Dkt. 67 at 80. Defendants cite *Fazaga v. FBI*, 965 F.3d 1015 (9th Cir. 2020), but that case does not support their position. *Fazaga* and the case on which it relies, *Ziglar*, examine whether federal officials from the same federal entity would have known that they were engaging in an unlawful conspiracy under 1985(3) when they entered discussions and agreements among themselves or made policy decisions for that entity. *Fazaga*, 965 F.3d at 1060; *Ziglar*, 137 S. C.t at 1867-68. First, § 1985(3) and § 1983 are different statutes with different purposes and different elements. *See United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S.

---

[13] Defendants cite several district court cases from the District of Arizona and the Northern District of Ohio, but such decisions do not settle constitutional standards or bind courts even in the same district, *Camreta v. Greene*, 131 S. Ct. 2020, 2033 n. 7 (2011), and they cannot illustrate what clearly established law is for present purposes where, as here, the Ninth Circuit has already shown the law to be clearly established. *See Dirks,* 414 F. App'x at 963; *Cameron*, 713 F.3d at 1023; *Baldwin v. Placer Cty.*, 418 F.3d 966, 970-71 (9th Cir. 2005); *Gilbrook*, 177 F.3d at 857.

825, 840-41 (1983) ("Unlike § 1983, § 1985(3) does not provide a cause of action for the deprivation of independent rights 'secured by the Constitution and laws.' Instead, it prohibits private conspiracies intended to prevent persons or classes of persons from the equal exercise of any of their civil rights. No violation of an independent legal right is required; nor does § 1985(3) require state action or the involvement of the State in any other way.").

Indeed, whether Defendants knew they were engaging in an unlawful conspiracy under color of law by agreeing to fabricate evidence against Plaintiff is a separate and distinct question from whether federal officials from the same agency would have known they were engaging in a private conspiracy by setting and carrying out policy decisions for their entity. Defendants have provided no explanation for why *Fazaga*'s holding regarding the state of the clearly established law concerning private conspiracies under § 1985(3) upsets the clearly established law that public officials acting under color of law may not conspire to violate the constitutional rights of individuals. Defendants' argument also runs contrary to the established principle that qualified immunity turns on what was clearly established at *the time of their conduct*. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (qualified immunity looks at the status of the law "at the time of the challenged conduct"); *Sampson v. Cty. of Los Angeles*, 974 F.3d 1012, 1018-19 (9th Cir. 2020) (same). The law in 2001 provided beyond ample notice that their agreement to violate Plaintiff's constitutional rights would subject them to liability and *Fazaga* cannot retroactively make the status of the law *at that time* "unsettled."

And second, the holding in both *Fazaga* and *Ziglar* is limited to agreements reached by federal officials in their official capacities. *Fazaga*, 965 F.3d at 1060; *Ziglar*, 137 S. Ct. at 1867-68. As *Ziglar* noted, "there are other sound reasons to conclude that conversations and agreements between and among federal officials in the same Department should not be the subject of a private cause of action for damages under § 1985(3)," namely that such claims "implicate[] the substance of their official discussions" and "open discussion among federal officers is to be encouraged, so that they can reach consensus on the policies a department of the Federal Government should pursue." *Ziglar*, 137 S. Ct. at 1868. This concern does not exist here,

where the Defendants are law enforcement officers working together to frame an innocent individual, not federal officials developing national policy. Indeed, local law enforcement officers have long known they can be held liable for engaging in a conspiracy with one another to violate an individual's constitutional rights under § 1983. *See Dirks,* 414 F. App'x at 963; *Cameron*, 713 F.3d at 1023; *Baldwin*, 418 F.3d at 970-71; *Gilbrook*, 177 F.3d at 857.

## IV.    A Jury Must Decide Plaintiff's Failure To Intervene Claim

It is well-established that police officers cannot sit idly by and permit a blatant violation of someone's constitutional rights. Instead, "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994)). Accordingly, it is well-established that officers can be held liable for failing to intervene where they had opportunity to do so. *Id.*

Here, Defendants knew that Blaise, a teenage girl, had absolutely no involvement in the Bailey murder, but rather had suffered a horrific attack where she was the victim of an attempted sexual assault on the east side of Las Vegas over Memorial Day weekend. PSOF ¶¶ 80-81. Defendants each knew that the other was fabricating and misrepresenting evidence to create a false impression that Plaintiff had confessed to the Bailey murder when she had not. *Id.* ¶¶ 33, 100-113. Defendants each had an opportunity to intercede in the fabrication of the Officer's Report and Arrest Report, and to stop their submission to the magistrate and prosecutors involved in Plaintiff's criminal proceedings. SOF ¶¶ 33, 104-18. Despite knowledge of Plaintiff's innocence, the impending and ongoing violation of her constitutional rights, and the likelihood that she would be wrongfully incarcerated as a result, Defendants took no steps to intercede. As a result, a jury must decide whether Defendants are liable for failing to intercede in the violation of Plaintiff's constitutional rights.

Defendants first contend that because Plaintiff has not shown an underlying violation of her constitutional rights, her failure to intervene claim must fail. Dkt. 67 at 78. For the reasons

discussed above, this argument is without merit. Defendants next contend that the duty to intervene is limited to the excessive force context, and, even if it is not, the law was not clearly established that the duty to intervene extended to the violations of Plaintiff's due process and Fourth Amendment rights alleged here. *Id*. This argument misunderstands the law in this Circuit.

In *Cunningham*, the Ninth Circuit confirmed the scope of a failure to intervene claim. 229 F.3d at 1289-90. The Court explained that police officers have a duty to intercede whenever "their fellow officers *violate the constitutional rights* of a suspect or a citizen" and they had a "'realistic opportunity to intercede.'" *Id.* at 90 (emphasis added); *see also Koon*, 34 F.3d at 1447 n.25 ("There is another route to police officer liability under the civil rights statutes for injuries perpetrated by third persons. Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."). The Court in no way suggested that this duty was limited to the excessive force context, which it could easily have done by stating the standard as a duty to intercede in a fellow officer's use of excessive force.

The Ninth Circuit has recently confirmed that *Cunningham* and the duty to intercede are not limited to the excessive force contest and applies to other forms of failures and specifically in the context of wrongful convictions and interrogations. In *Tobias v. Arteaga*, 996 F.3d 571, 583-84 (9th Cir. 2021), the Ninth Circuit made clear officers can be liable for failing to intervene in a coercive confession that violates a suspect's Fifth Amendment rights. Indeed, the duty to intervene applies wherever the officer has the opportunity to intercede in the violation of a constitutional right in question. *Id. Tobias* did not suggest that it was expanding the duty set out in *Cunningham* in any way. In fact, *Tobias* relied on *Cunningham* to conclude that, when the plaintiff was interrogated in 2013, the defendants' duty to intercede in the violation of his Fifth Amendment right was clearly established. In short, *Tobias* confirmed that the broad language of *Cunningham* did indeed recognize an established duty of a law enforcement officer to intervene,

whenever they have a reasonable opportunity, in the violation of an individual's constitutional rights. *Id.* This rule controls.[14]

The fact that the Ninth Circuit has not specifically state that there is a duty to intervene when fellow officers fabricate evidence is without consequence. The core issue when deciding whether a right was clearly established is notice: the "salient question … is whether the state of the law [at the time of the incident] gave [defendants] fair warning that their alleged [conduct] was unconstitutional.'" *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). "A clearly established right is one that has a 'sufficiently clear foundation in then-existing precedent.'" *Nunes v. Arata, Swingle, Van Egmond & Goodwin (PLC)*, 983 F.3d 1108, 1112 (9th Cir. 2020) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). A right is clearly established when "any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

Although analysis of whether a right was "clearly established" cannot occur in the abstract or at too high a level of generality, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the Supreme Court has consistently rejected the notion that qualified immunity is confined to determining whether there is a case exactly on point; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see Ziglar,* 137 S. Ct. at 1866-67 ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.' That is, an officer might lose qualified immunity even if there is no reported case 'directly on point.'")

---

[14] Other circuits confirm this rule. *See, e.g.*, *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) ("[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing on the constitutional rights of a citizen is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) *that any constitutional violation has been committed by a law enforcement official*; and the officer had a realistic opportunity to intervene." (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)) (emphasis added)); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (same); *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002) (holding that, where they have a reasonable opportunity, officers have an obligation to intervene in an unlawful detention by other officers); *Reid v. Wren*, 57 F.3d 1081, 1995 WL 339401, at *2 (10th Cir. 1995) (unpublished) (holding that officers have a constitutional obligation to intervene in an illegal seizure of property).

(quoting, respectively, *Anderson*, 483 U.S. at 640, and *al-Kidd*, 563 U.S. at 741). Were it otherwise, "officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle v. Rutherford*, 272 F.3d 1272, 1275 (9th Cir. 2001).

Accordingly, qualified immunity is unavailable in the "obvious case," *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam), and where the application of pre-existing law is "apparent" even where there is no case "directly on point." *Ziglar*, 137 S. Ct. at 1866-67. In fact, it is the most obvious violations of the law that are likely to have no cases on point because one would not think a case would be needed to clearly establish the illegality of the act. *See, e.g.*, *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082-83 (10th Cir. 2015) ("[S]ome things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing."); *Burgess v. Lowery*, 201 F.3d 942, 944-45 (7th Cir. 2000) (explaining possibility that "the existence of the right was so clear . . . that no one thought it worthwhile to litigate the issue."); *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (*en banc*) ("If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the constitution).

Here, Defendants could have no doubt at the time of their misconduct that the fabrication of evidence against Plaintiff was unconstitutional—that principle was "virtually self-evident." *Devereaux*, 263 F.3d at 1075-76. It should be obvious that a police officer cannot fabricate evidence, nor fail to stop their partner from doing so to secure someone's wrongful conviction. And, given the decisional law—like *Koon* in 1994 and *Cunningham* in 2000, each Defendant was aware that he had an obligation not to sit idly by while the other fabricated evidence against Plaintiff, which was then used in her criminal proceedings to prosecute and convict her for a crime she did not commit. *Cunningham*, 229 F.3d at 1289-90; *see also Tobias*, 996 F.3d at 583-84. The duty was obvious in light of the wrongfulness of the conduct, the opportunity to intervene, and the firm language from this Circuit. *See Brousseau*, 543 U.S. at 199.

Tellingly, Defendants provide no explanation of why they would have been uncertain regarding whether they were permitted do nothing while their partner caused fabricated evidence to be used against a criminal defendant. Indeed, suppressing that information itself constitutes a separate due process violation for suppressing the misconduct of which the officers are aware. *See, e.g.*, *United States v. Bundy*, 968 F.3d 1019, 1037 (9th Cir. 2020) (failure to disclose flagrant misconduct violates due process); *Fields v. Wharrie*, 740 F.3d 1107, 1117 (7th Cir. 2014) (prosecution's failure "to disclose [a] false statement's corrupt origins at trial violates his due-process right to a fair trial").[15]

For these reasons, the law was clearly established that Defendants had an obligation to intervene in the violation of Plaintiff's due process and Fourth Amendment rights, and Plaintiff's failure to intervene claim must go to a jury.

---

[15] Defendants' reference to district court decisions is inapposite because such decisions do not settle constitutional standards or bind courts even in the same district, *Camreta v. Greene*, 131 S. Ct. 2020, 2033 n. 7 (2011), and they cannot illustrate what clearly established law is for present purposes where, as here, the Ninth Circuit has already established the operative, binding rule. However, it is worth pointing out that one of those cases dealt with the state of the law over 10 years before the investigation into Duran Bailey's death. *See Milke v. City of Phoenix*, 2016 WL 5339693, at *1-2 (D. Ariz. Jan. 8, 2016). And another did not address the question of whether an officer has a duty to intervene outside the excessive force context. *See Briscoe v. Madrid*, 2018 WL 4586251 (E.D. Cal. Sept. 21, 2018) (dismissing plaintiff's failure to intervene claim because it alleges a failure to intervene in the use of excessive force by a *private citizen*, and such claims are limited to the failure to intervene when a *fellow officer* is the one utilizing excessive force; whether the obligation to intercede exists outside the use of force context was not considered). And, regardless, numerous district courts have found that an obligation to intervene exists outside the excessive force context. *See, e.g.*, *Ricks v. City of Pomona*, 2019 WL 296199, at *4-5 (C.D. Cal. July 25, 2019) (finding a constitutional obligation to intervene in an unreasonable search); *Lu Hang v. County of Alameda*, 2011 WL 5024641 (N.D. Cal. Oct. 20, 2011) (finding that officers could be constitutionally liable for witnessing but failing to stop an unconstitutional interrogation and detention); *Stewart v. Jacobs*, 2010 WL 11519288, at *11-12 (D. Ariz. Apr. 16, 2010) (denying summary judgment to defendants regarding a claim that they failed to intervene in an unconstitutional search); *Hurt v. Vantlin*, 2017 WL 1021396 (S.D. Ind. Mar. 16, 2017), *aff'd in relevant part*, 880 F.3d 831 (7th Cir. 2018) (denying summary judgment to defendants with regard to a claim that they failed to intervene in a coerced confession and the fabrication of evidence); *Hill v. City of Chicago*, 2009 WL 174994, at *10 (N.D. Ill. Jan. 26, 2009) (denying summary judgment to defendants regarding the claim that they failed to intervene in plaintiff's coerced confession); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 345-46 (S.D.N.Y. 2009) (denying summary judgment to defendants regarding a claim that they failed to intervene in an unconstitutional search).

**V.    A Jury Must Decide Plaintiff's State Law Claims**

    **A.    A Reasonable Jury Could Find that Defendants Maliciously Prosecuted Plaintiff**

An individual is liable for malicious prosecution if he "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff" without probable cause and with malice. *LaMantia v. Redisi*, 38 P.3d 877, 879-80 (Nev. 2002). "[M]alice may be inferred from proof of want of probable cause." *Bonamy v. Zenoff*, 362 P.2d 445, 446 (Nev. 1961). Under Nevada law, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated against a person without probable cause. *See Catrone v. 105 Casino Corp.*, 414 P.2d 106, 108 (Nev. 1966); *Frank v. City of Henderson*, 2015 WL 5562582, at *4 (D. Nev. Sept. 21, 2015); *Aziz v. Eldorado Resorts, LLC*, 72 F. Supp. 3d 1143, 1152 (D. Nev. 2014).[16]

And for the reasons discussed in detail above, there was no probable cause to arrest, detain, or prosecute Plaintiff for the murder of Duran Bailey. Defendants knew Plaintiff had no involvement in the Bailey murder, yet they misrepresented her statement about a wholly separate event in which she was the victim of an attempted sexual assault as a confession to that murder. PSOF ¶¶ 80-114. Defendants' actions caused Plaintiff's arrest and wrongful prosecution. *Id.* ¶¶ 96, 114-18. Plaintiff's conviction was eventually overturned based on expert testimony that Duran Bailey was killed during a period where multiple witnesses placed Plaintiff three hours away in Panaca, Nevada. *Id.* ¶¶ 2, 25. Plaintiff has provided sufficient evidence for a jury to decide this claim.

Defendants contend there is no evidence of malice. This argument, like their argument that probable cause existed to arrest and prosecute Plaintiff simply because two penises were cut, is without merit. As noted, malice can be inferred from a lack of probable cause. *Bonamy v.*

---

[16] Defendants appear to suggest that the federal presumption of prosecutorial independence applies to a state law malicious prosecution claim. Dkt. 67 at 81-81. This presumption applies in the Fourth Amendment context, not to a Nevada state law claim for malicious prosecution, and Defendants provide no authority or argument to the contrary. *See Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008). Plaintiff's research revealed no such presumption under Nevada state law.

*Zenoff*, 362 P.2d 445, 446 (Nev. 1961). And here there is ample evidence that Defendants prepared reports with intentionally (or at the very least, recklessly) false statements and material omissions. PSOF ¶¶ 104-114. This is more than sufficient evidence of malice. *See Rowland v. Lepire,* 313 P.2d 1332, 1335 (Nev. 1983).

Defendants further argue that Plaintiff's claim must fail because she "believes the Detectives were 'fair' with her." Dkt. 67 at 82 (citing Plaintiff's deposition testimony). But Plaintiff said no such thing during her deposition. Rather, Plaintiff responded to defense counsel's questions by saying that Defendants were never verbally abusive or mean to her, and that, *at the time of her interrogation and arrest*, she believed they had been fair to her. Dkt. 67-27 at 162. But at that point, Plaintiff still believed they were questioning her about the attempted rape she suffered in May and she had no idea that the Defendants would later fabricate reports with false and misleading statements and omissions and otherwise wrongly portray her honest description of her attempted rape as a confession to the Bailey murder. *See* PSOF ¶ 114. Nor did she know that they would refuse to follow up on the information in their possession pointing squarely at her innocence of Bailey's murder. *Id.* ¶¶ 92-96. In short, Plaintiff's testimony in no way undermines the ample evidence of Defendants' misconduct and efforts to pin a terrible crime on a teenager they knew was innocent. Defendants' contention that Plaintiff "is only upset with the manner the Detectives interpreted her voluntary statement" grossly misrepresents the record, especially given the standard at summary judgment, and only highlights that the parties' factual disputes must be resolved by a jury.

**B.    A Reasonable Jury Could Find that Defendants Abused the Legal Process**

Under Nevada law, an abuse of process claim requires "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." *LaMantia*, 38 P.3d at 879. Abuse of process claims may be brought against law enforcement officers who act improperly and with improper motives during a criminal investigation. *Posadas v. City of Reno*, 851 P.2d 438, 457

70

(Nev. 1993) (denying summary judgment on an abuse of process claim against, among others, the law enforcement officers responsible for the criminal investigation of the plaintiff); *LaMantia*, 38 P.3d at 888 (recognizing that a person may be liable for abuse of process if he "actively pressured or directed" another to improperly use the legal process); *Woods*, 2018 WL 493015, at *17-18 (similar).

Here, Plaintiff has adequately shown that a reasonable jury can conclude Defendants are liable for abuse of process. Defendants knew that Blaise was a survivor of an attempted sexual assault in May 2001. PSOF ¶¶ 80-81. Rather than treat her as a victim and act to hold her attacker accountable, Defendants framed her for a crime they knew she did not commit. *Id.* ¶¶ 82-118. They did this by fabricating investigative reports with false statement and material omissions and wrongly portraying her statements about her attack as a confession to the murder of Duran Bailey. *Id.* Their failure to conduct any follow up questioning or other investigation when clear evidence emerged that Blaise was telling them about a different incident and that she was in fact 3 hours away at the time of Bailey's murder only confirms that Defendants were not using the legal process to seek justice and hold a killer accountable, but rather to frame an innocent teenager. *Id.* ¶¶ 92-96. This claim must go to a jury, and Defendants' arguments to the contrary are based on a fundamental dispute with Plaintiff's version of the facts. Given the summary judgment standard, their motion must be denied.

### C.    A Reasonable Jury Could Find that Defendants Intentionally Inflicted Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove (1) extreme and outrageous conduct; (2) intent or reckless disregard for" the causing of emotional distress; (3) severe or extreme emotional distress; and (4) causation." *Rivera v. Corr. Corp of Am.*, 999 F.3d 647, 655 (9th Cir. 2021) (citing *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000)). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community" and "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent

authority over the other, or power to affect his interests." *Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1142 (D. Nev. 2014) (internal citations omitted).

As discussed in detail above, Defendants knew that Plaintiff was the victim of a traumatic attempted sexual assault, yet fabricated evidence that she committed a crime they knew she had absolutely nothing to do with. PSOF ¶¶ 80-118. There can be little doubt that this amounts to extreme and outrageous conduct. *Woods*, 2020 WL 4194844, at *1-2, 16 (denying summary judgment on IIED claim where there was at least a material factual dispute about whether defendants fabricated evidence against the plaintiff). Defendants presented their reports containing known false statements and misleading omissions to both the magistrate and the prosecutors, and Plaintiff was eventually prosecuted and convicted due to Defendants' efforts to misrepresent Blaise's statements as a confession to the Bailey murder. PSOF ¶¶ 106-18. Defendants argue that Plaintiff herself described Defendants' conduct as "fair." Dkt. 67 at 84. For the reasons discussed above, this argument misrepresents the record and has no bearing on whether the Defendants' conduct was extreme and outrageous.

Defendants, yet again, misrepresent the testimony of Plaintiff's expert, Sue Peters. Defendants assert that Peters concluded that Defendants, at most, were "negligent and not thorough." Dkt. 67 at 84. The deposition testimony cited does not support this. Rather, Peters testified clearly that Defendants intentionally failed to follow up on information that they knew strongly indicated Blaise's innocence, and that Defendants would have known based on Plaintiff's statements that she was not describing the Duran Bailey murder, but an entirely separate event. Dkt. 67-57 at 66; *see also* Ex. 5 at 9. The Court should reject Defendants' arguments on this claim and allow a jury to resolve the parties' factual disputes.

### D.   LVMPD Is Liable under *Respondeat Superior* and Must Indemnify

LVMPD does not make any argument that it should not be held liable under *respondeat superior* for the state law torts committed by Defendants Thowsen and LaRochelle. *See* Dkt. 67. Any such argument has therefore been waived. *See Eberle*, 901 F.2d at 818 (quoting *Northwest*

72

*Acceptance Corp.*, 841 F.2d at 924); *Meggs*, 2016 WL 1259390, at *4; *McEnroe*, 2016 WL 7369238, at *5. Defendants similarly do not dispute that Nevada law requires indemnification for misconduct by law enforcement officers like Defendants, and they provide no argument about why indemnification would not apply in this case. Dkt. 67 at 84-85. Instead, Defendants simply assert that indemnification is not a claim for relief. *Id.* They rely on an out-of-circuit case discussing Ohio indemnification law that has no bearing on whether Plaintiff has properly sought indemnification under Nevada law in this case. Plaintiff's claim for indemnification is proper and should proceed. *See Woods*, 2020 WL 4194844, at *17 (denying City of Reno's motion for summary judgment with regard to the plaintiff's indemnification claim).

## CONCLUSION

For the reasons discussed above, the Court should deny Defendants' motion.

Respectfully submitted,
KIRSTIN BLAISE LOBATO

By:  /s/ Megan Pierce
One of Plaintiff's Attorneys

Elizabeth Wang*
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

Megan Pierce*
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
megan@loevy.com
*Admitted *pro hac vice*

Luke Busby
NV Bar # 10319
316 California Ave., #82
Reno, NV 89509
O: 775.453.0112
luke@lukeandrewbusbyltd.com

David B. Owens*
LOEVY & LOEVY
100 S. King St., # 100 -748
Seattle, WA 98104
O: 312-243-5900
david@loevy.com

*Counsel for Plaintiff Kirstin Blaise Lobato*

## <u>CERTIFICATE OF SERVICE</u>

I, Megan Pierce, an attorney, hereby certify that on August 31, 2021, I filed the foregoing Plaintiff's Response to Defendants' Motion for Summary Judgment via CM/ECF, which was electronically delivered to all counsel of record.

<u>/s/ Megan Pierce</u>
One of Plaintiff's Attorneys