UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KIRSTIN BLAISE LOBATO,

        Plaintiff,

        v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, *et al.*,

        Defendant.

Case No. 2:19-cv-01273-RFB-EJY

**ORDER**

## I.     INTRODUCTION

Before the Court is Defendants' Motion for Summary Judgment, ECF No. 67. For the reasons stated herein, the motion is GRANTED in part and DENIED in part.

## II.     PROCEDURAL HISTORY

On July 23, 2019, Plaintiff filed a Complaint. ECF No. 1. Defendants filed a Motion for Partial Dismissal on September 13, 2019. ECF No. 24. Plaintiff responded on October 18, 2019. ECF No. 34.

The Court denied Defendants' Motion for Partial Dismissal on the record on November 4, 2020. ECF No. 58. On March 29, 2021, Defendants filed an Answer. ECF No. 59. Discovery

closed on March 28, 2021. ECF No. 54. On June 28, 2021, Defendants filed the instant Motion for Summary Judgment. ECF No. 67. Plaintiff responded on August 31, 2021. ECF No. 75. Defendants replied on September 24, 2021. ECF No. 79. On January 21, 2022, the Court granted *nunc pro tunc* Defendants' Motion for Leave to File Excess Pages. ECF No. 80.

On March 7, 2022, the Court held a hearing on Defendants' Motion for Summary Judgment. The Court took the parties' arguments under submission. This order follows.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

The Court finds the following facts to be undisputed based on the record.

On the evening of July 8, 2001, an individual searching through a dumpster found a dead body, partially wrapped with plastic, in an enclosure near a trash dumpster in the area of 4240 West Flamingo Road, Las Vegas, Nevada. The body was covered with garbage bags and loose trash, and there were cigarette butts found in the plastic wrapped around the body. Police later identified the body as that of Duran Bailey, a homeless man who resided in the area. Bailey had suffered stab wounds, a fractured skull, missing teeth, as well as a severed penis and lacerations to his anus and scrotum. The cause of death was determined to be blunt force trauma to the head and stab wound to the neck. The examiner also concluded that the injuries to Bailey's genitalia were inflicted postmortem. The death was labeled a homicide, and it was determined that Bailey was killed on July 8, 2001.

Detectives Thowsen and LaRochelle were assigned to investigate the case. On July 20, Thowsen and LaRochelle received a call from Laura Johnson, a Juvenile Probation Officer in Lincoln County, Nevada. Johnson told the detectives that a friend of hers, Dixie Tienken, a teacher in Lincoln County, had reported to her that one of her former students had cut the penis of a man who tried to rape her. That student was allegedly Plaintiff Lobato. Defendants went to Johnson's house and interviewed her—part of the interview was recorded, and part of it was not recorded. LaRochelle took contemporaneous notes of what was said during the unrecorded portion of the

interview but later discarded the notes. Defendants subsequently searched Lobato's name in their criminal history database and learned she was the victim of sexual assault at the age of six.

The same day, Thowsen and LaRochelle went to interview Lobato at her parent's house in Panaca, Nevada, about three hours north of Las Vegas. Lobato was eighteen years old at the time of the interview. Lobato's parents were not home when the detectives arrived. Lobato agreed to speak with the officers and signed a <u>Miranda</u>[1] card. Lobato spoke to the detectives for about fifteen to twenty minutes before the detectives turned on the tape recorder. LaRochelle took contemporaneous notes of what was said during the unrecorded portion of the interview but later discarded the notes.

During her interview with the detectives, Lobato stated the following. "Over a month" prior, she was at a Budget Suites motel on the east side of town. She had been on a three-day drug binge on methamphetamines at the time. The motel was located near "Boulder Highway and Nellis," "close to Sam's Town." Lobato had parked her car, a red Pontiac, in the parking lot of the Budget Suites. While Lobato was in the parking lot, a large, older black male who "smelled" approached her, threw her down, and attempted to rape her. Lobato grabbed a knife from her rear pocket and cut the man's penis. Lobato then fled the scene. When she left, the man was still on the ground, crying. Lobato did not move him anywhere or cover him up. Lobato then left her car at her ex-boyfriend's house for about a week. Lobato also admitted to possessing a baseball bat in the backseat of her car. After obtaining Lobato's statement, Defendants arrested her for the murder of Duran Bailey with a deadly weapon.

On August 7, 2001, a preliminary hearing was held, and the presiding judge found there was probable cause to support the charges against Lobato. Lobato was detained pending trial. Lobato's first criminal trial occurred in May 2002. At trial, Lobato's defense was that at the time of Bailey's murder on July 8, she was not in Las Vegas, but was in Panaca, Nevada, with family and friends. On May 18, 2002, the jury found Lobato guilty of first-degree murder with use of a deadly weapon and sexual penetration of a dead human body. The conviction was subsequently

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

reversed on direct appeal. The Nevada Supreme Court determined the trial court erred in not allowing Lobato to impeach a jailhouse informant, who had testified for the State that Lobato had confessed to her that she killed Bailey and cut off his penis.

In 2006, Lobato was retried and convicted again. She was sentenced to thirteen to thirty-five years' imprisonment. In 2011, Lobato filed a new appeal arguing that (1) the trial court failed to consider new evidence of actual innocence; (2) the State withheld exculpatory evidence; (3) Lobato's defense counsel was ineffective for failing to consult forensic experts regarding the precise time of Bailey's death; and (4) the trial court failed to hold a Brady[2] or ineffective assistance of counsel hearing. In 2016, the Nevada Supreme Court remanded the case for further proceedings. The court rejected Lobato's Brady claims but agreed with Plaintiff on her ineffective assistance of counsel claim.

In October 2017, an evidentiary hearing on post-conviction relief was held, to address the alleged ineffective assistance of Lobato's trial counsel. On December 19, 2017, the court issued its ruling, finding that defense counsel was ineffective for failing to meaningfully consult a forensic pathologist and forensic entomologist regarding Bailey's precise time of death, because time of death was a crucial aspect of establishing Lobato's alibi defense. The court found that Lobato's primary alibi defense was that on July 8, 2001, she was in Panaca from 11:30 a.m. until the end of the night, and that she returned to Las Vegas only the next afternoon. Various defense witnesses testified that they saw Lobato in Panaca throughout the day on July 8. The State argued that Lobato killed Bailey in the early morning hours of July 8, 2001, before she left for Panaca. Because the expert testimony revealed that Bailey likely was killed after sunset on July 8, Lobato could not have killed Bailey, because her uncontested alibi evidence placed her in Panaca at the time of death. The court observed that "given Defendant's strong alibi defense, [her] counsel needed to narrow the time of Decedent's death as much as possible," and trial counsel was deficient for failing to introduce any evidence regarding Bailey's precise time of death. The court granted Lobato's petition for post-conviction relief and ordered a new trial.

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

1

2

3
On December 29, 2017, the State of Nevada dismissed the charges against Lobato, stating that it did not seek to retry the case for a third time in light of the fact that Lobato would become immediately eligible for parole if convicted again.

4

5
B.  Disputed Facts

6
The parties dispute whether Defendants Thowsen and LaRochelle coerced Lobato or overbore her will during her pre-arrest interview; whether Defendants intentionally fabricated, omitted, or mischaracterized any information from Plaintiff's statement to them in their arrest and officer reports; whether Defendants destroyed any notes from witness interviews with the intention of fabricating or omitting evidence; and whether, after being transported to the Clark County Detention Center ("CCDC"), Plaintiff told officers that her jail cell resembled the area in which she had been attacked.

7

8

9

10

11

12

13

14
IV.    LEGAL STANDARD

15
Summary judgment is appropriate "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

16

17

18

19
The moving party bears the burden of showing the absence of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to show specific facts demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

20

21

22

23

24

25
However, the nonmoving party may not merely rest on the allegations of her pleadings. She must produce specific facts by affidavit or other evidence showing a genuine issue of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(1986). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

## V.    DISCUSSION

Defendants seek summary judgment as to all claims. For the reasons stated below, the Court grants summary judgment with respect to Plaintiff's first, fourth, and tenth claims and denies summary judgment with respect to all other claims.

### A.   Count 1: § 1983 Fifth and Fourteenth Amendment – Involuntary Confession

Defendants first move for summary judgment on Plaintiff's claim, brought under 42 U.S.C. § 1983, for violations of her Fifth and Fourteenth Amendment rights arising from her allegedly coerced confession. Defendants argue that the evidence in the record does not support Plaintiff's claim that Thowsen and LaRochelle "forced Plaintiff to incriminate herself falsely." Defendants note that at the time of her interrogation, Plaintiff was a legal adult and high school graduate, was interviewed for under an hour, read and understood her Miranda rights, and was never threatened in any way. As such, the totality of the circumstances indicate that the detectives' tactics did not undermine Plaintiff's "ability to exercise her free will," such that the interrogation was impermissibly coercive under the Fifth Amendment. Cunningham v. City of Wentachee, 345 F.3d 802, 810 (9th Cir. 2003).

Plaintiff no longer pursues this claim. The Court accordingly grants Defendants' Motion for Summary Judgment as to this count and dismisses Plaintiff's § 1983 claim for involuntary confession.

### B.   Count 2: § 1983 Fourteenth Amendment – Fabrication of Evidence

Defendants next move for summary judgment on Plaintiff's § 1983 claim for substantive due process violations arising from the alleged fabrication of evidence. Plaintiff argues her Fourteenth Amendment rights were violated when Detectives Thowsen and LaRochelle fabricated or mischaracterized evidence to misdirect the prosecution to conflate Plaintiff's account of her attack with the facts of Bailey's death. Specifically, Plaintiff contends that Defendants fabricated, omitted, or mischaracterized statements she made during her initial interview with them on July 20, 2001, so that they could make it appear as if she was confessing to the Bailey murder. According to Plaintiff, Thowsen and LaRochelle knew that she was speaking to a different incident entirely—one that occurred on a different date, at a different location, and with a different assailant—but inaccurately reported her account in their Arrest and Officer's Reports in order to pin the Bailey murder on her.

Plaintiff first argues that the detectives mischaracterized the timing of the events that Plaintiff told them. Plaintiff argues that her attack occurred during Memorial Day weekend, and that she told Thowsen and LaRochelle that her attack occurred "over a month" prior to the interview. Based on this, she argues, the detectives should have known that Plaintiff was not describing the Bailey murder, which occurred just a week and a half prior to the July 20 interview. Plaintiff argues that Defendants made it appear that Plaintiff was referring to the July 8 Bailey murder by omitting this crucial detail from their reports. Further, Plaintiff argues the detectives added information to obscure the fact that Plaintiff had told them her attack occurred a month prior to the interview. For instance, they wrote in the Arrest Report that "on Friday, July 13th, Lobato returned to Panaca sometime after the incident," and in the Officer's Report that "Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident." Plaintiff contends that the implication of these details, when read in the absence of the important fact that her attack occurred weeks <u>before</u> July 13th, was that Plaintiff was in Las Vegas at the time of the July 8 Bailey murder and went to Panaca shortly after the murder. Further, Plaintiff argues these statements suggested that Plaintiff returned to Panaca because she was depressed after killing Bailey. Plaintiff also argues Defendants mischaracterized

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

statements made by witnesses who confirmed that Plaintiff was attacked before July 8, the day of Bailey's murder. For instance, a witness named Heather McBride told Defendants that Plaintiff told her she was attacked. When asked when Plaintiff told McBride this, McBride told Defendants: "I know [the conversation] was before the weekend and . . . after the Fourth of July, I think, so it was either [July 5 or 6]." Plaintiff contends the detectives deliberately mischaracterized McBride's statement by writing in their Officer's Report that Plaintiff told McBride about the attack "on what [McBride] thought was the 5th or 6th." Plaintiff argues this paraphrasing of McBride's statement was purposely misleading, because it made it sound like McBride was unsure of when Plaintiff told her about the attack, when she was in fact certain that she was told about the attack before July 8, when Bailey was killed. Plaintiff contends this mischaracterization, combined with the material omissions regarding when Plaintiff said she had been attacked, created the impression that Plaintiff could have been responsible for the July 8 Bailey murder.

Plaintiff next argues Defendants mischaracterized or omitted crucial information regarding the location of Plaintiff's attack. Plaintiff argues she was very clear with the detectives that she was attacked "at the Budget Suites on Boulder Highway and Nellis, close to Sam's Town," near a shopping center across the street and a fountain around the corner. This detailed description, Plaintiff argues, unequivocally placed her attack on the east side Las Vegas. Bailey's body was found much farther west, near the Strip. While the Arrest Report noted that Plaintiff thought the incident occurred on the east side of town, it did not include Plaintiff's specific description of where she was attacked, and it included an observation that Plaintiff "appeared unsure because of her using methamphetamine at the time and her unfamiliarity with the city." Plaintiff argues the material omission of her specific description of the location of her attack, combined with the observation that Plaintiff "appeared unsure" due to drug use, created the false impression that she could have been attacked at the site of the Bailey murder, on the west side of town. Plaintiff also argues the Defendants' reports fabricated information about how Plaintiff described the parking lot where she was attacked. Plaintiff states she was clear with Defendants that she was attacked in a parking lot, near her car, and not in an enclosure near a trash dumpster. To attempt to rectify this

contradiction, Plaintiff argues, Defendants wrote in their reports that after Plaintiff was arrested and brought to the jail, she told officers that her cell at the jail reminded her of the location where she was attacked and that the location of the attack did not have a covering. Plaintiff argues she never made this statement.

Third, Plaintiff argues Defendants mischaracterized or omitted information from their reports which would have made it clear that Plaintiff's attacker was not Bailey. Plaintiff argues she told Defendants that her attacker was "really large," and a "giant" compared to her, when Bailey was only 133 pounds at the time of his death. Plaintiff notes that Defendants omitted this description from their reports, which a reasonable jury could conclude was an intentional misrepresentation. Moreover, Defendants wrote in the Officer's Report that Plaintiff said she "put Bailey out of her mind" when Defendants showed her a photo of him. Plaintiff contends this is both false and misleading, as Plaintiff told the officers she did not recognize Bailey, and separately, that she had put her attacker out of her mind. Defendants misrepresented that Plaintiff said she put Bailey out of her mind, despite the fact that she stated she did not recognize him, and made no statement indicating she had ever encountered him.

Finally, Plaintiff argues Defendants materially misrepresented her description of what she did in response to her attack. Plaintiff argues it was clear that Bailey was brutally beaten to death and had his body wrapped in plastic, and that the mutilation of his genitalia was done postmortem. By contrast, Plaintiff argues, the defensive actions she took to ward off her attacker did not at all resemble what was done to Bailey. Plaintiff argues the detectives falsely wrote in their reports that Plaintiff told them she severed her attacker's penis, when she said no such thing. Instead, she told detectives that she cut her attacker once before escaping and leaving in her car. To account for the contradiction between a single knife swipe and a brutal beating, stabbing, and postmortem mutilation, Plaintiff argues Defendants falsely wrote that Plaintiff said she "completely lost it" during the attack and "'snapped' and [could not] remember what else happened" after she cut her attacker. Plaintiff alleges she never said either of these things or anything else to indicate that she lost control and savagely killed someone, mutilated him post-mortem, wrapped him in plastic, and

covered him in trash. Plaintiff told Defendants that the single thing she did was cut her attacker once and then left in her car, at which point she saw her attacker alive and crying. Plaintiff argues a reasonable jury could conclude that Defendants' misstated claims that Plaintiff admitted she lost control or "snapped" (to the point where she could not recall what happened) was intended to paper over the key differences between the events so that Defendants could characterize Plaintiff's statement as a confession to the Bailey murder. Further, Plaintiff argues a reasonable jury could conclude that the detectives omitted Plaintiff's statement that her attacker was alive when she left, and omitted the fact that Plaintiff stated she never hit, moved, or covered up her attacker, to make it seem she could have killed Bailey. Plaintiff argues that under the totality of the circumstances, there can be no dispute that Defendants mischaracterized and fabricated evidence. Plaintiff notes that this evidence was provided to the prosecutors and, as a result, a reasonable jury could conclude that Defendants' fabrication contributed to and caused Plaintiff's injury.

Defendants argue the evidence in the record does not support a fabrication of evidence claim, and that summary judgment is appropriate. Defendants argue that the detectives' reports truthfully recounted what Plaintiff told the detectives about the timing of her attack, the location of her attack, the description of her assailant, and the actions Plaintiff took.

With respect to timing, Defendants argue substantial evidence supported the detectives' belief that Plaintiff was discussing the July 8th murder, and not an attack that occurred weeks before July 8. First, Defendants note Plaintiff never told the detectives that her attack occurred over Memorial Day weekend, and even her statement that her attack occurred "over a month ago" does not place the attack close to Memorial Day weekend. Second, Defendants argue that other witnesses provided information to support a July 8th date. For instance, Dixie Tienken indicated that Plaintiff had told her about an attack that occurred "just a day or two" before her July 10th or 11th visit with Plaintiff. They further argue that Plaintiff's medical records supported the representation that she became depressed after July 8th and returned home on July 13th to get help. Finally, with respect to McBride's statement, Defendants argue their reports did not falsely label McBride as being "unsure" of when Plaintiff reported the attack to her; instead, the reports

10

accurately stated that McBride "thought [the date] was the 5th or 6th."

Next, with respect to the location of the crime, Defendants argue their reports truthfully reported what Plaintiff told them about where she had been attacked. The Officer's Report indicated that Plaintiff said she was attacked "at a Budget Suites near Flamingo and Boulder Highway." And while the Arrest Report stated that Plaintiff "appeared unsure" of where she was attacked due to her drug use, it nevertheless reported that Plaintiff "thought that the incident had occurred on the east side of Las Vegas." Even if the reports did not state, word-for-word, what Plaintiff told the detectives, Defendants argue the reports were not deliberately misleading, as they were based on the detectives' *subjective interpretations* of Plaintiff's statements. Defendants also argue they did not fabricate Plaintiff's remarks about how the jail cell resembled the location where she was attacked, as Plaintiff testified at her 2002 criminal trial to the same.

Defendants also argue their reports did not omit, mischaracterize, or fabricate any material statements regarding her alleged attacker. They contend a jury could not conclude the omission that her attacker was a "giant" was intentional or material, as the term "giant" is subjective, and Plaintiff admitted to being "out of [her] mind" on drugs during the attack. Further, both criminal juries heard this evidence as Plaintiff testified to her attacker's size at her 2002 criminal trial.

Finally, Defendants argue the detectives did not misrepresent Plaintiff's description of the nature of her attack or the actions she took. Defendants argue Plaintiff told the detectives: "I cut his penis, I remember that" and "I think I was trying to cut it off but I don't know if I actually did." Thus, the Officer's Report and the Arrest Report, which recounted that Plaintiff "cut it off" and that she "cut it," respectively, were not material or intentional mischaracterizations of Plaintiff's statements. To the extent that the Officer's Report misrepresented Plaintiff's statement, that misrepresentation was fixed by the Arrest Report. Further, Defendants contend the Officer's Report was consistent with what Plaintiff allegedly told other witnesses about her actions.

Defendants also argue that the detectives' reports were informed by the totality of their investigation, including witness interviews they conducted, and that the fact that Plaintiff merely disagrees with their interpretation of the evidence does not support a fabrication of evidence claim.

Defendants further contend that all inculpatory and exculpatory evidence was provided to the district attorney, and that at most, Plaintiff provided evidence of potential recording errors in their reports. Defendants also argue Plaintiff cannot establish that any omissions or recording errors in their reports actually caused a constitutional deprivation, namely because they are immunized by the District Attorney's and Magistrate Judge's independent conclusions that probable cause existed to proceed against Plaintiff. Defendants also argue they are entitled to qualified immunity, as there is no clearly established law prohibiting recording errors or misstatements in police reports.

It is well established that criminal suspects have a "due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux v. Abbey, 263 F.3d 1070, 1075-76 (9th Cir. 2001). A plaintiff prevails on a due process fabrication of evidence claim if she establishes that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. Spencer v. Peters, 857 F.3d 789, 798 (9th Cir. 2017)). Deliberate fabrication can be shown by either "direct evidence of fabrication" or "circumstantial evidence related to a defendant's motive." Caldwell v. City and County of San Francisco, 889 F.3d 1105, 1112 (9th Cir. 2018). Direct evidence of fabrication may be shown by the inclusion of statements that were "never made" in an officer's report, or "when an interviewer deliberately mischaracterizes witness statements in her investigative report." Spencer, 857 F.3d at 793.

The Court finds that there are genuine disputes of material fact regarding whether Defendants Thowsen and LaRochelle deliberately fabricated evidence against Plaintiff. Construing the evidence in the record in the light most favorable to Plaintiff, a reasonable jury could find based upon several different pieces of circumstantial evidence in the record that Defendants deliberately mischaracterized Plaintiff's statements and omitted certain important information in their investigative reports, thereby constructing a theory of the case that painted Plaintiff as having clearly admitted to the crime, when she only admitted to cutting someone in an earlier unrelated incident.

First, the Court finds that Plaintiff has identified evidence in the record that would create a

genuine dispute as to whether Defendants mischaracterized Plaintiff's statements regarding the date of her attack. Plaintiff told Thowsen and LaRochelle that she was attacked "over a month ago." This information would have placed Plaintiff's attack sometime before June 20, several weeks before the Bailey murder, which occurred on July 8. Both the detectives' Arrest Report and their Officer's Report omitted this crucial statement. The only two references to date or time in the Arrest Report were (1) that a "on 07/20/01 . . . Det. Towsen [sic] received information . . . that Kirstin Blaise Lobato had told [someone] . . . that she was involved in a <u>recent incident in Las Vegas</u> where she severed the penis of a man who had attacked her"; and (2) that "on Friday, July 13th, [Lobato] returned to Panaca sometime after the incident." While the Officer's Report contained a lengthy description of what Plaintiff allegedly told the detectives she did to her attacker and the steps she took afterwards (such as throwing away her clothes and the knife she used), it omitted mention of the fact that she said her attack occurred "over a month ago." Instead, the summary of Plaintiff's alleged acts ended with the following statement: "Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident." This alleged misstatement is both contrary to Plaintiff's allegations and it further clearly suggests that Plaintiff essentially admitted to the attack on Bailey. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the material omission of Plaintiff's statement about when she was attacked, combined with the detective's shading of her attack as having been "recent" and inclusion of the detail that she returned to Panaca on July 13th "sometime after the incident," constituted deliberate mischaracterization by the detectives of Plaintiff's statement.

Second, the Court finds that a genuine dispute exists as to whether Defendants mischaracterized Plaintiff's statements regarding the location of her attack. Plaintiff told the detectives that she was attacked "at the Budget Suites on Boulder Highway." When asked for more details, she stated that the cross-street was "Nellis," that the location was close to "Sam's Town," and that there was a nearby fountain and shopping center across the street. It is undisputed that this would have placed the attack on the far east side of Las Vegas. It is also undisputed that Bailey's

body was found in a dumpster enclosure outside of the Nevada State Bank, further west, where there was no shopping center across the street or nearby fountain. Plaintiff's specific description of where she was attacked was omitted from the Arrest Report. Instead, Defendants wrote that Plaintiff thought the incident occurred on the east side of Las Vegas, but "appeared unsure because of her using methamphetamine at the time and her unfamiliarity with the city." Plaintiff never expressed any doubt as to the location of her attack. To the contrary, Defendants asked Plaintiff about the location of her attack twice—once at the beginning of the interview and again at a later point in the interview—and on both occasions, Plaintiff stated that she was attacked at the Budget Suites on Boulder Highway, across the street from a shopping center and close to a fountain. While the Officer's Report contained more details of Plaintiff's specific statement about her attack, it again did not provide a precise recounting of Plaintiff's statement. The Officer's Report stated that Plaintiff "believed [she] was at a Budget Suites near Flamingo and Boulder Highway." Plaintiff's statement never included mention of "Flamingo"—Bailey was, however, found on West Flamingo Road. Viewing the facts in the light most favorable to Plaintiff, the Court finds that this evidence creates a genuine issue of disputed fact as to whether the detectives intentionally omitted Plaintiff's specific descriptions of where she was attacked, added an unreported location fact ("Flamingo"), and mischaracterized her statements, because Plaintiff's precise account would have placed her at a location far from where the Bailey murder occurred.

　Third, the Court concludes that a reasonable jury could find that Defendants intentionally omitted crucial information regarding Plaintiff's description of the identity of her assailant. Plaintiff told the detective that her attacker was a "giant" and "really big" compared to her. She stated that she was five foot six inches tall and 120 pounds, but closer to 100 pounds at the time of the attack. Id. These statements are missing from the officers' reports. A reasonable jury could conclude that these details were omitted because they call into question whether Plaintiff's attacker was Bailey, given that Bailey was five foot ten inches tall and 133 pounds at the time of death.

Further, the Court finds genuine issues of disputed fact as to whether the detectives mischaracterized other key aspects pertaining to the identity of Plaintiff's attacker. Specifically,

14

when Plaintiff was shown a mug shot of Bailey by detectives and asked by them if this was her

attacker, she said that she did not recognize him. She never told them that it might have been him

or that she was unable to identify her attacker. Indeed, she gave a physical description of him. The

Officer's Report, however, recounted the exchange as follows:

> Det. Thowsen showed Lobato a photograph of Duran Bailey without
> saying anything about the picture. Lobato looked at the photograph,
> and her eyes began to tear. Lobato said that she could not recognize
> him [referring to the photograph], and that she had put him [Duran
> Bailey] out of my mind.

The Court agrees with Plaintiff that by adding "[Duran Bailey]" to Plaintiff's statement that she

had put her attacker out of her mind, and by omitting Plaintiff's description of her attacker's size

(relative to hers), it could be reasonably inferred that Defendants intentionally misrepresented or

omitted key identifying features which would have distinguished the two incidents.

Finally, the Court finds a genuine dispute exists as to whether Defendants purposefully

mischaracterized Plaintiff's statements regarding the actions she took to ward off her assailant. It

is undisputed that Bailey was brutally beaten and suffered several severe injuries to his head, neck,

and body, and that his genital mutilation was inflicted post-mortem. It is further undisputed that

Bailey's body was found in a dumpster enclosure, covered in trash, and wrapped with plastic wrap.

However, Plaintiff stated that after she cut her attacker's penis, she left him still alive, on the

ground and "crying," and that she did not hit him or cover his body in any way. The transcript of

Plaintiff's interview also reveals that the officers did not follow up with any questions about these

discrepancies between the state of Bailey's body and the state that Plaintiff left her attacker in.

Further, while Plaintiff told the detectives that she "cut his penis" and "was trying to cut it off but

didn't know if [she] actually did," the detectives' Arrest Report, contrary to Plaintiff's statement,

indicated that she affirmatively "thought that she severed the penis from the male's body," and the

Officer's Report stated that Plaintiff "grabbed his penis and testicles with her left hand and 'cut it

off' with her right hand." This latter description of severing Bailey's penis is, according to Plaintiff,

a clear mischaracterization of her statement. Viewing the facts in the light most favorable to

Plaintiff, a reasonable jury could find that the detectives embellished Plaintiff's account of what she did to her attacker—turning a "cut" into an amputation—in an effort to eliminate any doubt that Plaintiff severed Bailey's penis. Further, these mischaracterizations were exacerbated by the fact that the Officer's Report stated that "[a]ccording to Lobato, at that point she 'snapped' and cannot remember what else happened." A reasonable jury could find that a statement that Plaintiff "snapped"—which Plaintiff disputes she said—is qualitatively different than a statement that Plaintiff forgot what occurred or blacked out, and that the detectives exaggerated or mischaracterized Plaintiff's statements to make it seem that Plaintiff lost control and brutally killed Bailey. The totality of the many alleged fabrications, mischaracterizations and discrepancies between Plaintiff's account and the officers' reports provides substantial circumstantial evidence from which a reasonable jury could conclude that Defendants fabricated evidence.

The Court also disagrees with Defendants that Plaintiffs cannot prove causation on a fabrication of evidence claim because the independent actions of the prosecutors and magistrates break the causal chain. If a defendant knowingly provided fabricated evidence to the prosecutors or concealed exculpatory evidence, the prosecutor's actions cannot be considered independent, and do not break the causal chain. See Awabdy v. City of Adelanto, 368 F.3d 1062, 1067-1068 (9th Cir. 2004) ("[T]he presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." (emphasis added)). To establish causation, Plaintiff need only demonstrate that the evidence fabricated by Defendants contributed to Plaintiff's deprivation of liberty in some way. Whitlock v. Brueggemann, 682 F.3d 567, 580-83 (7th Cir. 2012). Proximate cause exists where "the injury is of a type that a reasonable person would see as a likely result of the conduct in question." Spencer, 857 F.3d at 798.

Plaintiffs have presented evidence establishing a triable issue of fact with respect to the causal link between detectives Thowsen and LaRochelle's alleged fabrications and her subsequent

loss of liberty. It is undisputed that the Arrest Report and Officer's Report were provided to the prosecutors. It is also undisputed that the Arrest Report was the basis for arresting Plaintiff, and that it was presented to a magistrate to establish probable to charge Plaintiff with the murder of Duran Bailey. A reasonable jury could infer that the prosecutors reviewed the information contained within both reports as part of their decision to prosecute Plaintiff, and that the information contained within those reports had an substantial or controlling impact on their evaluation of the evidence and their theory of the case.

The Court further finds that Defendants are not entitled to qualified immunity. State officials are entitled to qualified immunity from § 1983 claims unless they violated a right protected under the U.S. Constitution that was clearly established at the time of the violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). To be clearly established, the constitutional question confronted by the official must be "beyond debate." Plumhoff v. Rickard, 572 U.S. 765, 779 (2014) (citation omitted). A case directly on point is not required in order for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011). Further, the right must be defined at "the appropriate level of generality . . . [the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000). Finally, "[w]here the [defendants'] entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) (denying qualified immunity where there was a genuine issue of material fact as to whether officers' mistaken belief that victim officer was a civilian was reasonable under the circumstances).

Defendants argue the issue is whether a plaintiff has a constitutional right to be free from mere recording errors and misstatements in police reports. The Court disagrees. The appropriate level of generality at which to evaluate qualified immunity in this case is whether it was clearly established by 2001 that Plaintiff had a right not to be subjected to criminal charges based on

material omissions or mischaracterizations in a suspect's statement or confession. The Court finds that such a right was clearly established by the time the officers submitted their reports to the prosecutor. See Liston v. City of Riverside, 120 F.3d 965, 973 (9th Cir. 1997) (stating that fabrication may occur by "material false statements or material omissions"); see also United States v. Stanert, 762 F.2d 775, 781 (stating in the warrant context that "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw," causing the "magistrate to be misled in such a manner [as to] denude the probable cause requirement of all real meaning"). Based on the above evidence, construed in the light most favorable to Plaintiff, a reasonable jury could find that Defendants knew or should have known that Plaintiff was not involved in the Bailey murder, given the disparities between the circumstances of Bailey's murder and Plaintiff's description of her attack. A reasonable jury could further find that with this knowledge, Defendants strategically misrepresented or omitted details about the attack Plaintiff suffered before June 20, to make it seem that she had confessed to the July 8 Bailey murder. In light of this evidence and the precedent articulated in Liston and Stanert, the Court finds that the right to be free from criminal prosecution based on material omissions or mischaracterizations in a witness statement was clearly established in 2001, such that a reasonable officer would have known that Thowsen and LaRochelle's alleged conduct was unlawful. As such, Defendants are not entitled to qualified immunity on Plaintiff's fabrication of evidence claim.

The Court further denies qualified immunity on the grounds that there are genuine issues of disputed fact as to Plaintiff's statements to the detectives. Plaintiff has presented disputed evidence of material fabrications, mischaracterizations, and omissions by the Defendants. Accepting the Plaintiff's version of disputed facts, these facts would establish an intentional pattern of material omissions and fabrications which violated Plaintiff's constitutional rights. Consequently, the Court finds that qualified immunity should be denied as there are genuine issues of disputed fact at the heart of the alleged constitutional violation here. Wilkins, 350 F.3d at 956.

C. Count 3: § 1983 Fourth Amendment – Detention Absent Probable Cause

18

The Court turns next to Plaintiff's § 1983 claim for detention absent probable cause. To establish a Fourth Amendment violation of detention absent probable cause, Plaintiff need only demonstrate that: (1) her detention was made in the absence of probable cause, and (2) Defendants proximately caused the unlawful detention. Manuel v. City of Joliet, 137 S. Ct. 911, 918-19 (2017).

Plaintiff argues the detectives knew there was no probable cause to arrest and detain Plaintiff for the Bailey murder, and thus her Fourth Amendment rights were violated. Plaintiff argues it was obvious from her interview with Thowsen and LaRochelle that she was describing an attempted rape that occurred over a month earlier on the east side of Las Vegas, where she defended herself, escaped, and drove away in her car while her attacker was still alive—an account that did not align with crucial and immutable facts of the brutal July 8 murder of Bailey in a different part of the city. Plaintiff argues that Defendants cleverly concealed the glaring inconsistencies between her statement about her attack and the facts of the Bailey murder by fabricating evidence, and that such fabricated evidence cannot be the basis for a probable cause determination. As such, Plaintiff argues, she is entitled to a trial on a Fourth Amendment detention absent probable cause claim.

Defendants argue Plaintiff is collaterally estopped from pursuing this claim due to the probable cause finding at Lobato's preliminary hearing. Defendants argue that because the presiding judge found probable cause to support the charges against Plaintiff, the detectives are essentially immunized from this claim. Further, on the merits, Defendants argue the undisputed evidence establishes that probable cause existed to support Lobato's arrest. Defendants note that throughout the long lifespan of Plaintiff's criminal case, no judge or jury has ever found that probable cause was lacking. Defendants argue that Thowsen and LaRochelle rightly determined probable cause existed based on the following facts: 1) Bailey was violently murdered; 2) Bailey's penis was severed from his body with additional injuries to his body; 3) no knife or weapon was found at the scene; 4) Johnson reported second-hand information to Thowsen that Lobato told someone she was involved in a Las Vegas incident where she severed a man's penis; 5) Lobato told the officers she was attacked by an older black male in a parking lot, that she was "unsure" of

the exact location, that she used a knife to cut and possibly sever the man's penis, and that she left the man on the ground, got rid of the knife and clothes, and that she "didn't think anyone would miss him"; and 6) after the interview, Lobato told detectives that the incident occurred in an enclosed area similar to the CCDC jail cell, which confirmed to the detectives that Lobato had killed Bailey in the enclosed dumpster area where his body was found.

First, the Court finds that claim is not collaterally estopped. While federal courts must give preclusive effect to state court judgments, such is the case only when the state court judgment constituted a final judgment on the merits. Allen v. McCurry, 449 U.S. 90, 94-96 (1980) (stating that a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in the prior action). A preliminary hearing probable cause determination is not a final judgment on the merits. Scafidi v. LVMPD, 966 F.3d 960, 963-64 (9th Cir. 2020).

The Court further finds there to be genuine issues of material fact regarding whether Plaintiff's detention occurred in the absence of probable cause. As stated in the above analysis regarding Plaintiff's fabrication of evidence claim, there are multiple categories of disputed facts in the record as to whether the detectives intentionally included material misrepresentations and omissions in their reports. Under Plaintiff's version of events, there would have been no probable cause to arrest her, because, at a minimum, she admitted to a different attack at a different time in a different location with a different attacker. It is undisputed that detectives' allegedly fabricated reports were submitted to the magistrate for Plaintiff's probable cause hearing and served as the basis for her detention and later prosecution. Thus, triable issues of fact exist that preclude this Court from granting summary judgment on this claim.

D.  Count 4: § 1983 Fourteenth Amendment – Failure to Intervene

Defendants next seek summary judgment on Plaintiff's § 1983 claim for failure to intervene. "Police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." Cunningham v. Gates, 229 F.3d 1271, 1289 (9th

Cir. 2000). Officers can be held liable for failing to intercede if they had an opportunity to intercede but failed to do so. <u>Ramirez v. Butte-Silver Bow Cnty.</u>, 298 F.3d 1022, 1029-30 (9th Cir. 2002) (stating there is no violation of duty to intercede where there was no evidence that the defendant was aware of the constitutional violation as it occurred).

Plaintiff argues that detectives Thowsen and LaRochelle each had an opportunity and duty to intercede in the fabrication of the Officer's Report and Arrest Report, and to stop the submission of those reports to the magistrate and prosecutors involved in Plaintiff's criminal proceedings. Plaintiff argues that a jury must decide whether Defendants are liable for failing to intercede in the violation of Plaintiff's constitutional rights.

Defendants argue that this claim fails on the merits because Plaintiff cannot prove a substantive constitutional violation. They also argue they are entitled to qualified immunity because it is not clearly established that the duty to intercede exists where it is alleged that officers failed to prevent each other from fabricating evidence in police reports. Defendants argue the Ninth Circuit has only recognized a claim for failure to intervene in the excessive force context, and that police officers do not have a general duty to intervene in all alleged wrongdoings by another officer.

The Court dismisses this claim on the grounds that it is duplicative of Plaintiff's due process claim and conspiracy claims in Counts Two and Five. Plaintiff's theory of liability on this count is substantively indistinguishable from her theory of liability under due process claim. Plaintiff has consistently alleged that the detectives collectively and jointly fabricated and misstated evidence in this case. She does not point to any disputed or undisputed fact which would suggest that either Thowsen or LaRochelle understood or believed that statements made in the reports in this case were fabricated but said nothing about such alleged fabrication. Consequently, the Court finds that it need not address the issue of whether a duty to intercede would exist in this case as Plaintiff's theory of liability does not support such a claim in this case. This Count is therefore dismissed without prejudice as duplicative.

E.  Counts 5 and 9: § 1983 and State Law Conspiracy

The Court next turns to Plaintiff's conspiracy claims. Plaintiff alleges a claim for conspiracy under § 1983, as well as under state law.

"To establish liability for a conspiracy in a § 1983 case, a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." Crowe v. County of San Diego, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"—a plaintiff need only point to some "facts probative of a conspiracy." Ward v. EEOC, 719 F.2d 311, 314 (9th Cir. 1983). An agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants," meaning, "[f]or example, a showing that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy." Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999). In Nevada, a conspiracy claim "consists of a combination of two or more persons who, by some concert of action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the acts." Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc., 971 P.2d 1251, 1256 (Nev. 1988).

Plaintiff argues there is ample evidence in the record from which a jury could conclude that Defendants agreed to violate Plaintiff's due process and Fourth Amendment rights, in violation of state and federal conspiracy law. Plaintiff directs the Court to the above-noted inconsistencies between Plaintiff's account of her attack and the circumstances surrounding Bailey's death, and argues that a reasonable jury could infer a conspiracy from the fact that Defendants did not ask important and obvious follow up questions or take necessary investigative steps (such as testing the trash/cigarette butts taken from around and on Bailey's body) that would have shed light on Plaintiff's innocence. Plaintiff also argues Defendants took steps to create the record they wanted, including by throwing away the notes they took during the non-recorded portions of witness interviews. Plaintiff argues a jury could reasonably conclude that Defendants worked together with the shared goal of causing Plaintiff's criminal prosecution absent probable

cause.

Defendants first argue the conspiracy claims must be dismissed because there is no underlying constitutional violation or tort. Second, they argue there is no evidence the detectives conspired with one another, but that even if a conspiracy existed, Plaintiff's claims are barred by the intra-corporate conspiracy doctrine. Under this doctrine, a conspiracy requires an agreement between two or more persons or distinct business entities—an entity cannot conspire with its own employees or agents. Defendants argue that although the Ninth Circuit has not expressly addressed whether the doctrine applies to government entities for civil rights claims, district courts have extended the doctrine to this context. See, e.g., Stuart v. City of Scottsdale, 2021 WL 977166, at *6 (D. Az. March 16, 2021) (civil rights allegations "fall squarely within the intra-corporate conspiracy doctrine" and "where the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand"). Defendants argue that at a minimum, defendants enjoy qualified immunity because it is not clearly established whether such a claim exists.

The Court finds that a reasonable jury could infer from the circumstantial evidence in the record that certain actions were taken by the detectives that could not have happened without an agreement to fabricate evidence. First, the Court notes that there is disputed evidence in the record that suggests that Thowsen and LaRochelle allegedly took similar steps to dispose of certain pieces of evidence that could have been exculpatory. For instance, Defendants conducted a preliminary unrecorded interview of Johnson, during which time LaRochelle took contemporaneous notes. It is undisputed that LaRochelle later disposed of these notes. The same alleged misconduct occurred with the preliminary unrecorded interview of Plaintiff—LaRochelle took notes, and Defendants subsequently discarded them. The Court also reiterates its above analysis regarding the apparent discrepancies between Plaintiff's account of her attack and the story that was memorialized in the Arrest Report and Officer's Reports. It is undisputed that Thowsen and LaRochelle were the two detectives assigned to investigate the Bailey murder, that they worked together as partners, and that they were the only officers responsible for interviewing Plaintiff and for putting together the reports after the fact. It is also undisputed the detectives were aware of the allegedly fabricated and

mischaracterized facts and statements in the police reports that served as a basis for Plaintiff's prosecution and subsequent conviction. The Court finds that a reasonable jury could conclude from the disputed facts that Thowsen and LaRochelle committed acts that "are unlikely to have been undertaken without an agreement"—specifically, their failure to ask reasonable follow-up questions to resolve the apparent discrepancies between Bailey's murder and Plaintiff's account of her attack; their omissions, misstatements, and mischaracterizations of Plaintiff's account, as set forth in their Arrest and Officer's Reports; and their discarding of notes of unrecorded interviews, which Plaintiff alleges contained a more complete account of her attack. Mendocino, 192 F.3d at 1301.

The Court further finds that Defendants are not entitled to the protections of qualified immunity or the intra-corporate doctrine. The Ninth Circuit has never held that this doctrine applies where officers within the same police force conspire to violate a suspect's constitutional rights. To the contrary, the Ninth Circuit has permitted conspiracy claims to go forward where "a jury could infer, based on circumstantial evidence," that officers agreed to violate a suspect's constitutional rights. Dirks v. Martinez, 414 Fed. Appx. 961, 963 (9th Cir. 2011) (underlying claims of malicious prosecution and conspiracy where officers allegedly arrested plaintiff without probable cause, created false police reports, and made false allegations against plaintiff).

The Court further finds this doctrine inapplicable as there is an established jurisprudence as to liability for individuals and entities under Section 1983. First, it is well established under Section 1983 precedent that there is no vicarious liability for an entity and that individual liability of a state official only exists upon a showing of individual "personal participation" in the alleged violation. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Moreover, liability for a public entity (Monell[3] liability) may only be established through a particular set of inquiries and standards. Gordon v. Cty. of Orange, 6 F.4th 961, 973 (9th Cir. 2021) (explaining inquiry for establishing municipality liability under Monell). The Court thus finds that a conspiracy claim may proceed under federal and state law so long as it properly asserts that each co-conspirator has had

---

[3] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

some personal participation in the alleged conspiracy. The Plaintiff has established that there are genuine issues of disputed fact as to a conspiracy between the detectives to violate Plaintiff's rights.

The Court accordingly denies summary judgment with respect to Plaintiff's state and federal conspiracy claims.

### F.  Count 6: Malicious Prosecution

The Court also denies summary judgment with respect to Plaintiff's state law malicious prosecution claim. An individual is liable for malicious prosecution if he "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff" without probable cause and with malice. LaMantia v. Redisi, 38 P.3d 877, 879-80 (Nev. 2002). Under Nevada law, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated against a person without probable cause. Catrone v. 105 Casino Corp., 414 P.2d 106, 108 (Nev. 1966); see also Bonamy v. Zenoff, 362 P.2d 445, 446 (Nev. 1961) ("[M]alice may be inferred from proof of want of probable cause."). Malice may also be implied if defendants acted in willful disregard of the plaintiff's rights. Ewish v. State, 871 P.2d 306, 312 (Nev. 1994).

Defendant argues Lobato's state law malicious prosecution claim fails as a matter of law because the detectives had probable cause to arrest her. They also argue there is no evidence of malice. Plaintiff responds that a reasonable jury could find that defendants maliciously prosecuted Plaintiff based on the fact that they knew she was not confessing to the Bailey murder, and thus lacked probable cause to arrest her.

Based upon the Court's prior findings and rulings in this order, the Court finds there to be genuine issues of fact as to whether the detectives knew there was no probable cause to arrest, detain, or seek the prosecution of Plaintiff for the Bailey murder. The Court also finds that there are genuine issues of disputed fact based upon the evidence as to whether the detectives intentionally fabricated and mischaracterized evidence to bring about Plaintiff's prosecution and

conviction. The factual determinations that underlie Plaintiff's fabrication of evidence claim will bear on the resolution of Plaintiff's malicious prosecution claim. The Court accordingly denies summary judgment with respect to this claim.

### G.   Count 7: Abuse of Process

The Court also denies summary judgment on Plaintiff's state law abuse of process claim. Under Nevada law, an abuse of process claim requires "(1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding." LaMantia, 38 P.3d at 879. Abuse of process claims may be brought against law enforcement officers who act improperly and with improper motives during a criminal investigation. Posadas v. City of Reno, 851 P.2d 438, 457 (Nev. 1993). To survive summary judgment, a plaintiff must present "specific facts that [defendants] had an ulterior purpose in the underlying lawsuit, other than resolving [the] legal dispute . . . and improperly used the legal process to accomplish that purpose." LaMantia, 38 P.3d at 8.

Defendants argue summary judgment is appropriate on this claim because there is no evidence that the detectives had an ulterior motive in arresting Plaintiff. Defendants argue Lobato has identified no ulterior purpose beyond an ordinary criminal arrest. They further contend that after Plaintiff was arrested, all decisions regarding her prosecution were made by the District Attorney's office, thus immunizing them from an abuse of process claim arising from acts taken after the initial investigation. Plaintiff counters that a reasonable jury can conclude Defendants are liable for abuse of process. Plaintiff argues the detectives knew that they were fabricating and mischaracterizing evidence regarding an individual who, based upon the evidence was innocent of the murder of Bailey. Specifically, as previously noted, Plaintiff alleges the detectives fabricated investigative reports with false statement and material omissions and wrongly portraying her statements about her attack as a confession to the murder of Duran Bailey.

The Court finds that the parties' arguments are based on a fundamental dispute regarding the underlying facts of the investigation and subsequent prosecution. Construing the evidence in

the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that defendants committed abuse of process by fabricating or mischaracterizing Plaintiff's statements and failing to conduct a thorough investigation, for the ulterior purpose of securing the prosecution of someone they knew to be innocent. While the mere filing of a complaint is insufficient to establish abuse of process, the Court finds that Plaintiffs' allegations (and the evidence in the record to support those allegations) go beyond the "mere filing of a complaint"—they go to the underlying investigation and prosecution of an allegedly innocent person. See Laxalt v. McClatchy, 622 F. Supp. 737, 752 (D. Nev. Nov. 18, 1985). As such, the Court denies summary judgment with respect to this claim.

H.  Count 8: Intentional Infliction of Emotional Distress

Defendants also ask this Court to grant summary judgment on Plaintiff's state law claim for intentional infliction of emotional distress ("IIED"). To prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove (1) extreme and outrageous conduct; (2) intent or reckless disregard for" the causing of emotional distress; (3) severe or extreme emotional distress; and (4) causation." Rivera v. Corr. Corp of Am., 999 F.3d 647, 655 (9th Cir. 2021) (citing Olivero v. Lowe, 995 P.2d 1023, 1025 (Nev. 2000)). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community" and "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998); Refai v. Lazaro, 614 F. Supp. 2d 1103, 1122 (D. Nev. Apr. 13, 2009) (quoting Restatement (Second) of Torts § 46 cmt. e (stating police officers have been held liable for "extreme abuse of their position")).

Defendants argue there is no evidence of extreme or outrageous conduct by the Detectives. Defendants contend that Plaintiff herself testified that the detectives were fair with her, and at most, that detectives were negligent or not thorough with their investigation. Defendants argue this is not enough to meet the exacting standard for an IIED claim. Plaintiff argues that, construing the

27

evidence in the light most favorable to her, Defendants knew that she was the victim of a traumatic attempted sexual assault, yet fabricated evidence that she committed a crime they knew she had absolutely nothing to do with. They argue there can be little doubt that this amounts to extreme and outrageous conduct.

As with several of Plaintiff's other claims, the Court finds that disposition of this cause of action will turn on the resolution of factual disputes regarding the scope and extent of Defendants' actions. If a jury concludes that the detectives intentionally fabricated evidence despite their knowledge that Plaintiff was not responsible for the Bailey murder, this could constitute extreme and outrageous conduct taken in reckless disregard of causing Plaintiff emotional distress. See, e.g., Woods v. City of Reno, No. 3:16-cv-00494-MMD-DJA, 2020 U.S. Dist. LEXIS 128798, *38-40 (D. Nev. July 21, 2020) (denying summary judgment on an IIED claim where triable issues of fact existed as to whether defendants fabricated evidence against plaintiff).

The Court denies summary judgment with respect to this claim.

I.   Count 10: Indemnification

Finally, the Court grants summary judgment with respect to Plaintiff's claim for indemnification.

Plaintiff appears to raise respondeat superior claims against LVMPD, predicated upon her state law tort claims. Her Complaint alleges that "LVMPD is liable for all state law torts committed by [Thowsen and LaRochelle] while they were employed by the LVMPD pursuant to the doctrine of respondeat superior." At the same time, Plaintiff raises a separate claim for "indemnification" under Nevada state law. Indemnification in the state of Nevada is governed by NRS 41.0349, which provides that

> In a civil action brought against any present or former officer . . . of the State or a political subdivision . . . in which a judgment is entered against the person based on any act or omission relating to the person's public duty or employment, the State or political subdivision shall indemnify the person unless (1) the person failed to submit a timely request for defense; (2) the person failed to cooperate in good faith in the defense of the action; (3) the act or omission . . . was not within the scope of the person's public duty or employment; or (4) the act or omission of the person

was wanton or malicious.

NRS 41.0349.

The Court finds that Plaintiff's "indemnification" claim does not seek any independent relief. It merely asserts that LVMPD must pay for any tort judgment for compensatory damages arising from Thowsen and LaRochelle's wrongdoing, committed within the scope of their employment. The Court finds that this claim is already captured by Plaintiff's other causes of action. Plaintiff's request for indemnification is not an affirmative claim for relief, but a premature argument regarding remedies. As such, the Court grants summary judgment with respect to Plaintiff's standalone claim for indemnification.

## VI.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 67) is **GRANTED** in part and **DENIED** in part. The motion is granted with respect to Plaintiff's first and tenth claims for involuntary confession and indemnification. The motion is granted without prejudice as to Plaintiff's fourth claim for failure to intervene. The motion is denied with respect to all other claims.

**IT IS FURTHER ORDERED** that the Motion for Leave to File Supplement, ECF No. 84, and the Motion to Strike Motion for Leave to File Document, ECF No. 85, are DENIED as moot.

**IT IS FURTHER ORDERED** that the parties shall submit a proposed joint pretrial order by September 20, 2022.

**DATED: September 1, 2022**

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

29